# EXHIBIT A



# Forensic & Valuation Services Practice Aid

# Calculating Intellectual Property Infringement Damages

Copyright © 2013 by
American Institute of Certified Public Accountants, Inc.
New York, NY 10036-8775

All rights reserved. For information about the procedure for requesting permission to make copies of any part of this work, please e-mail copyright@aicpa.org with your request. Otherwise, requests should be written and mailed to the Permissions Department, AICPA, 220 Leigh Farm Road, Durham, NC 27707-8110.

## *Notice to Readers*

This publication is designed to provide illustrative information with respect to the subject matter covered. It does not establish standards or preferred practices. The material was prepared by AICPA staff and volunteers and has not been considered or acted upon by AICPA senior technical committees or the AICPA board of directors and does not represent an official opinion or position of the AICPA. It is provided with the understanding that the AICPA staff and the publisher are not engaged in rendering any legal, accounting, or other professional service. If legal advice or other expert assistance is required, the services of a competent professional person should be sought. The AICPA staff and this publisher make no representations, warranties, or guarantees about, and assume no responsibility for, the content or application of the material contained herein and expressly disclaim all liability for any damages arising out of the use of, reference to, or reliance on such material.

This practice aid supersedes AICPA Forensic and Valuation Services (FVS) Section Practice Aid 06-1, *Calculating Intellectual Property Infringement Damages*.

## Acknowledgments

The principal authors of this practice aid are Daniel L. Jackson, CPA/CFF, CFE, and Kathleen M. Kedrowski, CPA/CFF, CLP.

In addition, a special note of gratitude is extended to Brent K. Bersin, William Choi, Scott Dalrymple, Kyle Elam, Katherine Farrell, Myles McCormack, Maria Munoz, Jill M. Rusk, and Gabrielle Scheibe who assisted Ms. Kedrowski and Mr. Jackson with the authoring and editing of this practice aid.

### 2011–2012 Damages Task Force

> Greg Regan, *Chair*
> Scott Bouchner
> Dave Duffus
> Michael Fahlman
> Jarit Loughmiller
> Andrew Richmond
> Christian Tregillis

In addition, members of the 2011–2012 AICPA Forensic and Litigation Services Committee and FVS Executive Committee provided information and advice to the authors and AICPA staff for this practice aid.

### AICPA Staff

> Jeannette Koger
> *Director*
> *Member Specialization & Credentialing*

Page 3

Elaine Leggett
*Technical Manager*
*FVS Section*

Barbara Andrews
*Project Manager*
*FVS Section*

# Chapter 1

## *Introduction*

### Intent of the Practice Aid

The objective of this practice aid is to provide guidance to forensic accounting practitioners with business or litigation experience concerning intellectual property rights and calculating infringement damages. This practice aid focuses on the theoretical, legal, economic, and accounting foundations of intellectual property and methodologies commonly employed in the calculation of intellectual property damages.

The first section of this practice aid provides an overview of the patent, trademark, and copyright law in the United States. The second section of this practice aid addresses the calculation of damages arising from the infringement of intellectual property. There are also several appendixes to this practice aid. Appendix A is titled "Intellectual Property Print and Electronic Resources," and appendix B is titled "Intellectual Property Professional Associations." Appendix C, "Summary of Intellectual Property Cases," provides a listing of relevant case law. These example cases provide insight about the methods and procedures accepted by U.S. courts in the calculation of damages. However, the practitioner is cautioned that these court cases provide only general guidance; the facts and circumstances of each engagement are controlling and may dictate the choice of appropriate methodology.

Many intellectual property case decisions have been issued by the courts since the development of the first edition of AICPA Forensic and Valuation Services Section Practice Aid 06-1, *Calculating Intellectual Property Infringement Damages*, in 2006. In these decisions, the issue of intellectual property infringement damages has been discussed at length. The list of cases in appendix C is by no means all inclusive; the list contains a sample of noteworthy cases taken from the Supreme Court, Federal Circuit, and district courts to provide guidance to CPAs regarding the methods and procedures considered or accepted by U.S. courts in the calculation of damages. The precedential value of intellectual property case law changes as appellate and other courts publish new decisions. New decisions may potentially affect the application of law and the methodologies described herein. Therefore, the current precedent should be carefully reviewed with counsel before a practitioner relies on any cases cited in appendix C. As noted in this practice aid, the U.S. courts continue to award damages in intellectual property cases under a variety of theories and analyses, giving the damages expert freedom to explore the economic consequences of the infringing activity.

### Overview of Economic Significance of Intellectual Property

The ability to manage, value, and exploit intellectual capital [fn 1] has become a significant corporate objective. Investors and shareholders alike are investing more in intellectual capital today than in the past, because it tends to yield a higher return on investment than other corporate assets. [fn 2] Currently, the innovation process—seeking new ways of meeting market demand—appears to yield the highest return on investment. [fn 3] As a result, many companies are making huge investments into intellectual capital, in part as a means of spurring innovation.

The World Intellectual Property Organization has addressed this trend as follows:

> IP assets are gaining ground as a measure of corporate viability and future performance. In 1982, some 62 percent of corporate assets in the United States of America were physical as-sets, but by 2000, that figure had shrunk to a mere 30 percent . . . A recent study shows that, on average, 40 percent of the value of a company is not shown in any way on its balance sheet. For this reason, IP is sometimes referred to as a "hidden value". Whether hidden or expressly valued, it is now clear that patents, copyrights, trademarks, geographical indications and trade secrets are significant contributors to enterprise value. [fn 4]

The following examples of high-profile patent infringement cases demonstrate how intellectual property disputes can involve millions or even billions of dollars:

- In *Medtronic, Inc. v. Michelson*, more than $1 billion changed hands when Medtronic was required to pay Michelson $400 million in punitive damages for patent infringement and another $159 million in unpaid royalties and other sums. [fn 5]

- In *Honeywell, Inc. v. Minolta Camera Co.*, a $96 million judgment was entered against Minolta for its infringement of Honeywell's patented autofocus camera technology. Based on that judgment, Honeywell was able to license out its tech-

---

[fn 1]  Intellectual capital must be distinguished from intellectual property. *Intellectual capital* consists of human capital (people) and structural capital (for example, internal processes and structures, databases, customer relationships, patents, trademarks, trade secrets, and copyrights).

[fn 2]  "Intangible Assets and Value Creation—Interviews from the book," accessed May 7, 2012, www.juergendaum.com/mybook_i.htm.

[fn 3]  *Id.*

[fn 4]  World Intellectual Property Organization, "Chapter 3," in *Intellectual Property—A Powerful Tool for Economic Growth*, www.wipo.int/tools/en/gsearch.html?cx=00039556715131772129 8%3Aaqrs59qtjb0&q=Intellectual+Property%E2 %80%94A+Powerful+Tool+for+Economic+Growth.

[fn 5]  Kirkland and Ellis LLP, "Deals & Suits: Michelson v. Medtronic," Jan. 1, 2005, www.kirkland.com/sitecontent.cfm?contentID=230&itemid=7222.

nology to other major camera manufacturers, netting it $400 million in additional income. [fn 6]

Given the magnitude of the dollars at stake, the development and protection of intellectual property has become a high priority among analysts and business leaders. This trend was addressed by Federal Reserve Chairman Alan Greenspan at the 2003 Financial Markets Conference of the Federal Reserve Bank of Atlanta, in Sea Island, Georgia, as follows:

> Before World War I, markets in this country were essentially uninhibited by government regulations, but they were supported by rights to property, which in those years largely meant physical property. Intellectual property—patents, copyrights, and trademarks—represented a far less important component of the economy, which was mainly agricultural.
>
> . . . Only in recent decades, as the economic product of the United States has become so pre-dominantly conceptual, have issues related to the protection of intellectual property rights come to be seen as significant sources of legal and business uncertainty. [fn 7]

In light of the important role played by intellectual property in the current global economy, identifying, managing, and protecting these assets are essential functions for many businesses. A CPA with specialized training in forensic accounting and valuation can provide his or her clients with professional assistance in this area, helping them manage their intellectual property assets, supporting them in license negotiations, calculating damages, and performing other important functions.

## Overview of Traditional Forms of Intellectual Property

A central premise of U.S. intellectual property law is to foster innovation by affording innovators certain rights in connection with their innovations. Article I, Section 8, Clause 8 of the U.S. Constitution specifically authorized the U.S. Congress to enact patent and copyright laws. The federal trademark laws were authorized more generally in the Constitution, pursuant to article I, section 8, clause 3, which states, "Congress shall have

---

[fn 6]  Christopher J. Steffen, Honeywell's CFO during this period, believes that "[a]s our economy becomes less manufacturing oriented, intellectual property becomes a much more important asset and represents a great deal of what shareholders have given a company to invest." Randy Myers, "Fighting Words: Growing rank of litigants are putting price tags on ideas," *CFO Magazine* (March 1998), www.cfo.com/article.cfm/2989975/c_3046551?f=insidecfo.

[fn 7]  Alan Greenspan, "Intellectual Property Rights," (lecture, Financial Markets Conference of the Federal Reserve Bank of Atlanta, Sea Island, Georgia, February 27, 2004), www.federalreserve.gov/boarddocs/speeches/2004/200402272/default.htm.

power . . . to regulate commerce with foreign Nations, and among the several States, and with Indian Tribes." [fn 8]

The following sections of this practice aid present an overview of the patent, trademark, and copyright systems in the United States. Each section addresses the nature of the rights protected, property considerations, the formal registration processes, and enforcement considerations. A summary of trade secret law is also included.

Given the broad and ever-expanding nature of intellectual property law and practice, this practice aid is not intended to be exhaustive in nature. It is intended for information purposes, and it is presented in the context of litigation services engagements performed by forensic accountants.

## Patent Overview

Article I, Section 8, Clause 8 of the Constitution specifically authorized Congress to enact patent laws. [fn 9] Patents provide an economic incentive for inventors to publish their inventions and discoveries. In order to qualify for patent protection, inventions and discoveries should represent a "new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." [fn 10] In addition to patents for utilitarian inventions (utility patents), patents are available for certain ornamental designs (design patents) and certain plants (plant patents). Utility patents may be granted to anyone who invents or discovers any new and useful process, machine, article of manufacture, or composition of matter or any new and useful improvement thereof. Design patents may be granted to anyone who invents a new, original, and ornamental design for an article of manufacture. Plant patents may be granted to anyone who invents or discovers and asexually reproduces any distinct and new variety of plant.

Damages for patent infringement are governed by *Patents, U.S. Code* (USC) 35, Section 284, which states that "[u]pon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court." [fn 11] This section provides for two distinct measures of damages in a patent infringement case, namely, (1) lost profits, but (2) in no event less than a reasonable royalty.

The focus of damage analysis in a patent infringement dispute typically starts with the lost profits suffered by the patent holder. The goal of lost profits, when appropriate, is to

---

[fn 8]  U.S. Const. art. I, sec. 8, cl. 3.

[fn 9]  U.S. Const. art. I, sec. 8, cl. 3 also authorized the U.S. Congress to enact copyright laws.

[fn 10]  *Patents, U.S. Code* (USC) 35, Section 101.

[fn 11]  35 USC 284.

award the patent holder damages adequate to compensate for the infringement, but in no event less than a reasonable royalty. If, in all reasonable probability, the patent holder would have made the sales that the infringer made, the patent holder is entitled to recover the profits it would have earned from the sales denied it as a result of the infringement. [fn 12]

A variety of special damage issues arise if the patent-in-suit is a design patent. As with utility patents, lost profits or a reasonable royalty are available in litigation concerning the infringement of a design patent. The United States Patent Act, however, also permits design patent owners to seek damages in an amount equal to the infringer's profit [fn 13] as an alternative remedy. A design patent owner may not recover both the infringer's profit and a reasonable royalty; it must elect one or the other. Additionally, a patent owner may not recover a reasonable royalty for infringement of a utility patent as well as profits for infringement of a design patent on the sale of a single product.

The goal of assessing reasonable royalties in patent infringement cases is to place the infringed party in the same position that it would have been had it hypothetically negotiated a license for the patent. "When actual damages cannot be proved, [the] patent owner is entitled to 'reasonable royalty,' which is an amount which a person desiring to manufacture and sell a patented article, as a business proposition, would be willing to pay as a royalty and yet be able to make and sell the patented article in the market at a reasonable profit." [fn 14]

### *The Patent Application Process*

In support of a utility patent application, an inventor will attempt to demonstrate to the United States Patent and Trademark Office (USPTO) that his or her invention has each of the following attributes:

1. It is useful.

2. It is new.

3. It is not obvious.

The applicant is required to file with the USPTO a set of formal papers, including a written patent application describing the invention, and pay a fee. The patent application description must include the specifications, the claims, and any necessary drawings.

---

[fn 12]  *Livesay Window Co. v. Livesay Indus., Inc.*, 251 F.2d 469 (5th Cir. 1958).

[fn 13]  Under this alternative, the design patent owner is not only entitled to the profits of the infringer, but it may also be entitled to the profits of other sellers in the chain of distribution.

[fn 14]  *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152 (6th Cir. 1978).

Section 112 of the United States Patent Act states that "the specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." [fn 15] The claims of a patent are the numbered paragraphs found at the end of a patent application, usually preceded by the phrase "I (we) claim" or "What is claimed is." These claims define the boundaries of the patent right, just as a deed defines the boundaries of real estate. [fn 16]

Upon receiving a patent application, the USPTO assigns it to a patent examiner for review. [fn 17] The examiner, who generally has expertise or training in the relevant technical field, reviews the patent application to determine whether the inventor has met the requirements for issuance of a patent. In addition to reviewing the application for indications of utility and form, the examiner ordinarily conducts a search for patents or other published literature (referred to as "prior art") that preceded the patent application. The objective of this search is to determine whether the claimed invention is new and nonobvious in view of the prior art.

In most cases, a patent application is pending with the USPTO between one and three years. This extended review period is the result of the large volume of patent applications filed and the labor-intensive examination process. This process often involves extended communications among the USPTO, applicants, and their attorneys or agents.

Under U.S. patent law, a patent application can be based either on (1) an existing invention or (2) an existing idea of an inventor, even if the inventor has not physically built or tested the idea to see whether it works. A patent is granted for a term beginning on the date on which the patent is issued and ending 20 years from the date on which the patent application was filed in the United States or, if the application contains a specific reference to an earlier filed application or applications under 35 USC 120, 121, or 365(c), from the date on which the earliest such application was filed. [fn 18]

### *"Infringement" During the Patent Application Process*

35 USC 271 defines infringement of a patent as follows:

> [e]xcept as otherwise provided in this title, whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefore, infringes the patent.

---

[fn 15] 35 USC 112.

[fn 16] *Corning Glass Works v. Sumitomo Elec. USA, Inc.*, 868 F.2d 1251, 1257 (Fed. Cir. 1989).

[fn 17] The U.S. Patent and Trademark Office (USPTO) maintains the confidentiality of pending patent applications under 35 USC 122.

[fn 18] 35 USC 154.

> [w]hoever actively induces infringement of a patent shall be liable as an infringer.

> [w]hoever offers to sell or sells within the United States, or imports into the United States a component of a patented machine, manufacture, combination, or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an

> infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer. [fn 19]

Patent applicants have limited recourse against those guilty of "infringing" conduct committed while the patent is pending but prior to its issuance. This is the case even if the "infringer" is on actual notice of the pending patent claim. "If the would-be infringer stops all activities once the patent issues, then the infringer would seem to be free from any liability, at least from patent theories. If the would-be infringer intends to continue his acts after the patent issues, then the knowing infringer may temper his pre-issuance actions in an effort to avoid potentially enhanced damages from post-issuance infringement." [fn 20]

Addressing this issue in *Gustafson, Inc. v. Intersystems Industrial Products, Inc*., Chief Judge Markey considered it

> obvious that a party cannot be held liable for "infringement", and thus not for "willful" infringement, of a *nonexistent* patent, i.e., no damages are payable on products manufactured and sold before the patent issued. Whether an act is "willful" is by definition a question of the actor's *intent*, the answer to which must be inferred from all the circumstances. Hence a party cannot be found to have "willfully" infringed a patent of which the party had no knowledge. Nor is there a universal rule that to avoid willfulness one must cease manufacture of a product immediately upon learning of a patent, or upon receipt of a patentee's charge of infringement, or upon the filing of suit. [fn 21]

### *Nature of Patent Rights*

The essence of patent rights resides in the ability of the owner to exclude others from making, using, selling, offering to sell, or importing the patented invention into the United States. This right to exclude others is separate and distinct from the right of a patent

---

[fn 19]  35 USC 271 (Effective December 8, 2003).

[fn 20]  Michael A. Shimokaji, "Inducement and Contributory Infringement Theories to Regulate Pre-Patent Issuance Activity," 1997, www.lawtechjournal.com/archives/blt/i2-mas.html.

[fn 21]  *Gustafson, Inc. v. Intersystems Indus. Prods., Inc*., 897 F.2d 508 (5th Cir. 1990).

owner to make, use, sell, and offer to sell or import the patented invention. A patent is considered personal property, and its rights can be sold pursuant to a written license agreement.

### First to File Versus First to Invent

In September 2011, the Leahy-Smith America Invents Act was signed into law. This law included some of the most significant changes to patent law in the United States in the previous 50 years. Perhaps the most prominent of these was a shift of the ownership of a patent to the "first to file" rather than the "first to invent." This change aligned the U.S. process with that of many other countries. Provisions exist within the law to address disputes that arise regarding the determination of the true inventor, as well as other important features.

### Patents as Property

The United States Patent Act treats patents as personal property. As such, patent rights can be sold pursuant to a written agreement or licensed in a like manner. Licensing is a process by which a holder of patent rights (the licensor) grants permission to another party (the licensee) to commercially exploit the patented invention, usually in return for some form of payment or royalty.

Licenses can be exclusive or nonexclusive. Under an exclusive license, the licensor grants exploitation rights to the licensee to the exclusion of others (including the licensor or patent holder). In contrast, a nonexclusive license permits multiple licensees and may allow the licensor or patent holder to act as a competing manufacturer.

## Trademarks Overview

Trademark law governs the use of a word, phrase, symbol, product shape, logo, or device by a manufacturer or merchant to identify the source of the goods or services and to distinguish them from those made or sold by another.

Trademarks for goods (or service marks for services) act to (1) identify and distinguish the goods (or services) of one company from the goods (or services) of another and (2) indicate the source of the goods (or services), even if that source is unknown. Any of a number of symbols or designations can serve as a trademark or service mark, such as words, logos, product configurations, and sounds. A color or smell may also be entitled to trademark protection. A designation of *TM* (for trademarks), *SM* (for service marks), or ® (for registered marks) evidences a claim of protection by the owner of the mark.

In contrast to patents and copyrights, trademarks may be afforded protection both under federal law (whether federally registered or not) and state law. The federal statutes governing U.S. trademark law are found in the Lanham Act (*Commerce and Trade*, USC 15, Section 1051). State statutes and common law also provide trademark protection. Among other purposes, state trademark laws are intended to prevent the deceptive and misleading use of marks in commerce and to protect persons engaged in such commerce against unfair competition. Additionally, certain state trademark laws can be used to exclude others

from lessening the capacity of a famous mark to identify and distinguish goods or services, regardless of whether there is an absence of competition or a likelihood of confusion.

## Registration Process

To obtain a federal trademark registration, the trademark owner must file a formal registration application, together with specimens showing how the mark is used, and pay the required fee. The USPTO examines trademark registration applications through a process similar to that used for patent applications. After filing, the trademark application is assigned to a USPTO trademark attorney, who evaluates whether the requirements for registering a mark have been met. The USPTO attorney examines the registration for specifically enumerated categories of marks that cannot be registered (that is, immoral, deceptive, scandalous, or merely descriptive marks). In addition, the USPTO attorney conducts a search of registered marks to determine whether prior registered marks exist that are likely to (1) cause confusion, (2) cause mistake, or (3) deceive with respect to the applicant's trademark.

After this examination, the USPTO attorney either accepts or rejects the trademark application. If the application is accepted, the public is notified in a government publication called the *Official Gazette*, which puts the public on constructive notice of the acceptance. This notice is given so that members of the public have an opportunity to object to the grant of a registration within an opposition proceeding. Assuming the mark is not successfully opposed in such a proceeding, a registration ordinarily will issue. Conversely, if the USPTO attorney rejects the application, the applicant is afforded an opportunity to challenge that decision.

The USPTO registration process permits a person to pursue a trademark registration based simply on a "bona fide intent to use" a mark in commerce. This process affords an applicant certain priority rights when it does not currently use a mark but wants to preserve it for future use.

Among other purposes, a federal trademark registration can be used in a lawsuit as *prima facie* evidence of the registered mark and of the registrant's exclusive right to use that mark in commerce. However, trademark rights and entitlement to relief for infringement are available whether or not a trademark registration is in place. In the absence of a federal registration, the trademark owner must prove that the mark is inherently distinctive to be entitled to relief. [fn 22]

Provided certain conditions are met, a mark's registration can become incontestable after a prescribed time period. An *incontestable* registration generally serves as conclusive ev-

---

[fn 22] A mark that is inherently distinctive is commonly referred to as having acquired secondary meaning. *Secondary meaning* generally refers to a mark that is descriptive of the goods or services and which consumers recognize as synonymous with a function, such as IBM for computers and other business machines.

idence of the validity and registration of the mark, as well as the registrant's ownership of the mark and exclusive right to use it.

### Nature of Trademark Rights

Trademark rights arise by virtue of use. In general, the first party to use a symbol as a mark in commerce to distinguish goods or services is entitled to exclude others from making a confusingly similar use of the mark in the same area of commerce. However, the failure to continue to use a mark appropriately can result in an abandonment of the mark, that is, a forfeiture of the trademark rights.

### Trademarks as Property

The Lanham Act treats trademarks as personal property. As a result, trademark rights can be sold along with the goodwill of the business associated with the mark. Trademark rights can also be licensed, provided that certain requirements are imposed under the licensee to help preserve the "source indicating" nature of the mark. [fn 23]

### Service Marks, Certification Marks, and Collective Marks

Trademark law also governs service marks, certification marks, and collective marks, which are used on services or businesses rather than products. An example of a service mark is McDonald's® for restaurant services. A certification mark refers to any word, name, symbol, device, or any combination thereof, used, or intended to be used, in commerce with the owner's permission by someone other than its owner, to certify regional or other geographic origin, material, mode of manufacture, quality, accuracy, or other characteristics of someone's goods or services, including work or labor performed on the goods or services by members of a union or other organization. [fn 24]

Collective marks are a trademark or service mark used or intended to be used in commerce, by the members of a cooperative, an association, or other collective group or organization, including a mark that indicates membership in a union, an association, or other organization. [fn 25]

### Trade Dress

Trade dress under the Lanham Act refers to the "design and appearance of the product together with all the elements making up the overall image that serves to identify the prod-

---

[fn 23] *See, generally, Stanfield v. Osborne Indus., Inc.*, 52 F.3d 867, 871–72 (10th Cir. 1995).

[fn 24] USPTO, "Frequently Asked Questions about Trademarks," accessed May 7, 2012, www.uspto.gov/web/offices/tac/tmfaq.htm#DefineCertMark.

[fn 25] *Id.*

uct presented to the consumer." [fn 26] The elements in question should serve no purpose other than identification of the source. In addition, the court will determine whether the purchasing public is likely to confuse the "dress" adopted and used by the alleged infringer.

In *Two Pesos, Inc. v. Taco Cabana, Inc.*, the operator of a chain of Mexican restaurants sued an operator of a similar chain for trade dress infringement under the Lanham Act. The U.S. Supreme Court held that ". . . trade dress which is inherently distinctive is protectable under [the] Lanham Act without showing that it has acquired secondary meaning." [fn 27] Generally, a "likelihood of confusion" must be proven in order to establish a trade dress infringement claim; it is not sufficient for confusion to be merely possible.

### Enforcement of Trademark Rights

Whether a trademark owner sues for infringement under a trademark registration, state statute, or common law, the test for infringement will ordinarily turn on the likelihood of confusion. That is, does the use of the mark by the alleged infringer result in a likelihood of confusion about origin, sponsorship, or approval of the subject goods or services?

A mark is infringed under U.S. trademark law when another person uses the mark in a manner that causes confusion about the source or sponsorship of the goods or services involved. The confusion can arise from the similarity in the nature of the products or services or other factors that cause the infringer's product or service to be associated, affiliated, connected, approved, authorized, or sponsored by the mark owner.

If a mark is protected only under common law (that is, no trademark registration), different parties can permissibly use the same mark if there is no geographic overlap in their use of such mark. Federally registered marks have a nationwide geographic scope and cannot be used by multiple parties without a valid license.

With respect to damages, Section 1117 of the Lanham Act [fn 28] states that a plaintiff shall be able

> to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. The court shall assess such profits and damages or cause the same to be assessed under its direction. In assessing profits, the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. In assessing damages, the court may enter judgment, according to the circumstances of the case, for any sum above the

---

[fn 26] *Best Cellars, Inc. v. Wine Made Simple, Inc., LJG Wines, Inc.*, 320 F. Supp. 2d 60 (S.D.N.Y. 2003).

[fn 27] *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763 (1992).

[fn 28] Trademark damages were reclassified from *Copyrights*, USC 17, to *Commerce and Trade*, USC 15, in 2003.

amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty. The court in exceptional cases may award reasonable attorney fees to the prevailing party. [29]

Although the Lanham Act gives trademark owners the right to recover the defendant's profits as well as the owner's actual damages, the owner's recovery is "subject to the principles of equity." [30]  In essence, this means that actual damage and disgorgement awards in a single case may not be duplicative. Further, if a new claimant seeks an award of damages against an infringing defendant based on the same act or course of conduct that gave rise to an earlier damage award against the same defendant, the court will address equitable considerations.

Trademarks may be subject to reverse confusion. [31]  This type of confusion occurs when consumers are likely to mistakenly believe, usually as a result of widespread advertising or promotion by the infringer, that the trademarked products are actually those of the infringer. [32]

A suit for trademark dilution may be available under federal or state law. Dilution lawsuits often are between two parties that do not compete with each other. Nevertheless, the accused party is alleged to have (1) disparaged the mark or (2) diminished the value of the mark. Remedies for state trademark dilution are similar to remedies under the Lanham Act for registered trademark infringement (15 USC 1114) and unfair competition (15 USC 1125[a]). The incidence of dilution suits has increased with the advent of disputes concerning Internet domain names.

## Copyright Overview

---

[29]  15 USC 1117.

[30]  *Id.*

[31]  15 USC 1125 states the following:

Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which— (a) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or (b) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

[32]  Bryan A. Garner, ed., *Black's Law Dictionary, Eighth Edition* (St. Paul, MN: West Publishing Co., 2004), 320.

The United States Copyright Act protects original works of authorship fixed in any tangible medium of expression (subject to certain restrictions related to works for hire), including the following works:

1. Literary works

2. Musical works, including any accompanying words

3. Dramatic works, including any accompanying music

4. Pantomimes and choreographic works

5. Pictorial, graphic, and sculptural works

6. Motion pictures and other audio/visual works

7. Software programs and applications

8. Sound recordings

9. Architectural works

Notice of copyright is shown as (1) either the symbol © or the word "Copyright" or "Copr.," (2) the year of first publication, and (3) the name of the owner. Appending the notice of copyright is no longer legally required in order to establish copyright protection in a work. However, if a notice of copyright is present, it may afford certain benefits to the copyright owner, independent of the obvious deterrent effect on potential infringement.

### The Registration Process

The law of copyright is exclusively federal. The United States Copyright Office handles the registration of copyrights in this country. However, a copyright may exist automatically at the time of its creation.

An applicant for copyright registration must complete an application, submit one or more copies of the work, and pay a fee. The U.S. Copyright Office examines the application to determine whether (1) the subject matter can be copyrighted and (2) all legal and formal requirements for a copyright have been met.

Demonstration of originality is essential for copyright registration. For example, in *Feist Publications, Inc. v. Rural Telephone Service Co.*, *Inc.*, the U.S. Supreme Court ruled that an alphabetical listing of names and addresses in a white pages telephone directory did not evidence the requisite degree of creativity required for originality and was not copyrightable. The Court held that (1) the names, towns, and telephone numbers of the utili-

ty's subscribers were not copyrightable facts, and (2) these bits of information had not been selected, coordinated, or arranged in an original way sufficient to meet the constitutional or statutory requirements for copyright protection.[fn 33]

Assuming all registration requirements are met, the U.S. Copyright Office will ordinarily issue a formal certificate of copyright registration. The certificate is effective as of the date that the U.S. Copyright Office received all items required for registration. The certificate of registration, if issued within five years of the first publication of the work, constitutes *prima facie* evidence of the copyright's validity and of the facts stated in the certificate.

In the event that the U.S. Copyright Office denies an application for registration, it affords the applicant an opportunity to respond.

### *Nature of Rights From Copyrights*

Subject to certain limitations, Section 106 of the Copyright Act enumerates the following six categories of exclusive rights conferred upon copyright owners:

1. To reproduce the copyrighted work in copies or photo records.

2. To prepare derivative works based upon the copyrighted work.

3. To distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending.

4. In the case of literary, musical, dramatic and choreographic works; pantomimes; and motion pictures and other audiovisual works, to perform the copyrighted work publicly.

5. In the case of literary, musical, dramatic and choreographic works; pantomimes; and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly.

6. In the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission.

The bundle of rights granted a copyright owner does not include the right to exclude any and all kinds of copying. For instance, copying is legally permissible to the extent that the subject matter copied is not "fixed in a tangible medium of expression" or if the portion copied does not satisfy the originality requirement.[fn 34] In addition, the Copyright Act

---

[fn 33] *Feist Publications, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340 (1991).

[fn 34] 17 USC 102.

does not protect "any idea, procedure, process, and system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work." [fn 35]

Among the limitations on the copyright owner's exclusive rights is the doctrine of "fair use" codified in *Copyrights*, USC 17, Section 107. Under the fair use doctrine, copying for "purposes such as criticism, comment, news reporting, teaching . . . scholarship, or research" [fn 36] may not constitute infringement, based upon an analysis of the following factors:

1. The purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes

2. The nature of the copyrighted work

3. The amount and substantiality of the portion used in relation to the copyrighted work as a whole

4. The effect of the use upon the potential market for or value of the copyrighted work

### Ownership and Works for Hire

As patent rights vest in the inventor, the ownership of a copyright typically vests in the author of a work. Under the "work made for hire" doctrine, the author may be someone other than the person who actually performed the physical act of creating the work. The Copyright Act provides that this doctrine can apply in (1) employer–employee relationships (for example, if an employee creates a work within the scope of employment, the employer is the author) and (2) if works are commissioned. If the parties agree in writing that the work is a "work for hire," the employer or commissioning party owns the copyright. [fn 37]

The Copyright Act treats copyrighted works as personal property. As a result, copyrights are transferable, in whole or in part, by written agreement. Rights under a copyright can be transferred under exclusive and nonexclusive licenses.

### Enforcement of Copyrights

The violation of any of the exclusive rights of a copyright owner under the Copyright Act can result in an action for copyright infringement. Proving infringement requires a

---

[fn 35] *Id.*

[fn 36] 17 USC 107.

[fn 37] Bryan A. Garner, ed., *Black's Law Dictionary, Eighth Edition* (St. Paul, MN: West Publishing Co., 2004), 1637.

demonstration that the infringer copied original elements of the copyrighted work, and copying can be proved by either direct or circumstantial evidence. Under the latter approach, the copyright owner must prove that (1) the defendant had access to the copyrighted work (such as if the accused infringer had an opportunity to review the copyrighted work), and (2) the alleged infringing work is substantially similar to the copyrighted work.

17 USC 504 is the primary copyright damage provision in the Copyright Act. 17 USC 504(a) provides that "an infringer of copyright is liable for either (1) the copyright owner's actual damages and any additional profits of the infringer, as provided by subsection (b); or (2) statutory damages, as provided by subsection (c)."[fn 38] 17 USC 504(b) states that the copyright owner, when disgorging the infringer's profits, must present proof of the infringer's gross revenue; the infringer, however, is required to prove deductible expenses and elements of profit attributable to factors other than the copyrighted work.

17 USC 504(c) states that the statutory amount of damages must be

> in a sum of not less than $750 or more than $30,000 as the court considers just . . . . In a case where the copyright owner sustains the burden of proving, and the court finds, that infringement was committed willfully, the court in its discretion may increase the award of statutory damages to a sum of not more than $150,000. In a case where the infringer sustains the burden of proving, and the court finds, that such infringer was not aware and had no reason to believe that his or her acts constituted an infringement of copyright, the court in its discretion may reduce the award of statutory damages to a sum of not less than $200.[fn 39]

Note, however, that the infringer's recovery cannot be duplicative. For example, the copyright owner may not recover both the profits the infringer made and the profits that the copyright owner would have made on the same sales.

Summing up, 17 USC 504 authorizes courts to grant copyright owners actual damages suffered as a result of the infringement. In addition, any profits of the infringer attributable to the infringement are granted to the copyright owner in order to remedy the damage caused by the infringement, as long as these damages are not duplicative. Should the copyright owner be unable to prove actual damages or the defendant's profits, 17 USC 504 alternatively grants the copyright owner the right to elect (at any time before final judgment is rendered) to recover an award of statutory damages instead of actual damages and profits.

As under patent law, various remedies beyond money damages are available to a copyright owner who prevails in an infringement action. These remedies include injunctive re-

---

[fn 38]  17 USC 504.

[fn 39]  17 USC 504.

Page 20

lief under 17 USC 502 and impoundment and destruction of the subject infringing matter under 17 USC 502. As discussed previously, statutory damages may also be available under 17 USC 504.

## Trade Secrets Overview

In most states, a trade secret consists of a formula, pattern, physical device, idea, process, or compilation of information that (1) provides the owner of the information with a competitive advantage in the marketplace and (2) is treated in a way that can reasonably be expected to prevent the public or competitors from learning about it, absent improper acquisition or theft. [fn 40] Trade secret law can protect valuable technical information, such as the formula for Coca-Cola, which would otherwise be in the public domain.

In 1979, the National Conference of Commissioners on Uniform State Laws promulgated the highly influential Uniform Trade Secrets Act (UTSA), which was amended in 1985. This act was intended to codify the basic principles of common law trade secret protection. Although the definition of a trade secret varies from jurisdiction to jurisdiction, the majority have adopted a hybrid of the following definition in the UTSA:

> "Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process, that: (i) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. [fn 41]

The UTSA has been enacted into law in a majority of states. In the states that have not adopted the UTSA, such as New York and Texas, the Restatement of Torts, Restatement of Unfair Competition, or both remain influential. In general, the legal principles articulated in the restatements are mirrored by the UTSA.

Sections 2 and 3 of the UTSA address damages. Section 2(a) states "[u]pon application to the court, an injunction shall be terminated when the trade secret has ceased to exist, but the injunction may be continued for an additional reasonable period of time in order to eliminate commercial advantage that otherwise would be derived from the misappropriation." [fn 42] Section 3(a), governing the award of damages for misappropriation of a trade secret, states that

---

[fn 40]  Uniform Trade Secrets Act (UTSA) with 1985 Amendments, 9.

[fn 41]  Section 1(4) of the UTSA.

[fn 42]  UTSA with 1985 Amendments, 8.

[e]xcept to the extent that a material and prejudicial change of position prior to acquiring knowledge or reason to know of misappropriation renders a monetary recovery inequitable, a complainant is entitled to recover damages for misappropriation. Damages can include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss. In lieu of damages measured by any other methods, the damages caused by misappropriation may be measured by imposition of liability for a reasonable royalty for a misappropriator's unauthorized disclosure or use of a trade secret.[fn 43]

In most states, the essential elements of a claim alleging trade secret misappropriation are the following:

1. A trade secret

2. Acquisition of the trade secret in confidence

3. The unauthorized use of the trade secret

In 1995, the Seventh Circuit Court of Appeals, in *PepsiCo, Inc. v. Redmond*, reinvigorated the "inevitable disclosure" doctrine applicable to trade secrets. Under this doctrine, the owner of the trade secret can prove trade secret misappropriation by demonstrating that the employee's new employment will inevitably lead him or her to divulge the secret, whether consciously or not, because of the type of work in which the employee will be involved with the new employer.[fn 44] One of the complexities of the inevitable disclosure doctrine lies in differentiating between a protected trade secret, on the one hand, and the ex-employee's knowledge and skills retained in his or her memory, on the other.

"[I]n the case of a trade secret[,] appropriation is to be determined by reference to the analogous line of cases involving patent infringement, just as patent infringement cases are used by analogy to determine the damages for copyright infringement. Damages are allowed in trade secret cases, not upon the theory of the taking of property, but rather upon the theory of a breach of a confidential relationship."[fn 45] "However, it often happens that defendants have utilized protected technology to their advantage with no obvious ef-

---

[fn 43] UTSA with 1985 Amendments, 11.

[fn 44] *PepsiCo, Inc. v. Redmond*, 1996 WL 3965 (N.D. Ill. 1996).

[fn 45] *Int'l Indus., Inc. v. Warren Petroleum Corp.*, 248 F.2d 696, 699 (3d Cir. 1957).

fect on the plaintiff, except for the relative differences in their competitive position." [fn 46] Therefore, "[c]omputing damages in a trade secrets case is not cut and dry." [fn 47]

For a trade secret misappropriation claim to prevail, the trade secret needs to contain elements that are unique and potentially unknown. Without this showing, the claim will be dismissed. For example, in *In re Midgard Corp.*, the Tenth Circuit Court of Appeals was

> hard-pressed to understand what this secret information is. Midgard claims only generally that the secret is "the compilation of information as to [its] customers, suppliers, pricing and practices." As the bankruptcy court found, Midgard made no effort to keep any of this information confidential or to limit Todd's use of the information. Midgard admitted it told hundreds of people about its exclusivity agreement with its primary or sole customer, Medite. There is no indication that the names of Midgard's scrap suppliers were not easily ascertainable by observation or by reference to directories. Midgard complains that Todd bought the same piece of wood-grinding equipment that it was planning to buy, but this was an off-the-shelf machine advertised in trade publications . . . We see no error in the bankruptcy court's finding that Midgard did not prove the existence of a trade secret. [fn 48]

Case law has expanded the protection of trade secrets under the Computer Fraud and Abuse Act (CFAA). In *Shurgard Storage Centers, Inc. v. Safeguard Self Storage, Inc.*, an employer alleged that former employees had the employer's trade secrets stored on their computers and had given them to a competitor. The court held that (1) for purposes of stating a claim under the CFAA, the former employees had lost access to their computers when they allegedly became agents of the competitor; (2) the CFAA was not limited to situations in which the national economy was affected; (3) the fraud provision of the CFAA did not require showing of common law fraud elements; (4) the provision penalizing infliction of damage on protected computers was not limited to conduct of outsiders; and (5) the damage claim was stated, even though appropriation did not affect integrity of secrets within employers' computers. [fn 49]

Trade secrets also include customer lists. For example, in *Ed Nowogroski Insurance, Inc. v. Rucker*, the Washington State Superior Court ruled that employees had misappropriated employer's trade secrets by retaining and using client lists and other documents. The court awarded damages, except it withheld relief for one employee's solicitation of cli-

---

[fn 46] D. Warden, W. Bratic, and C. Eggleston, "Trade Secrets and Patents: Comparison and Contrasts in Royalty Determination," *les Nouvelles* (September 2000), 143.

[fn 47] *Am. Sales Corp. v. Adventure Travel, Inc.*, 862 F. Supp. 1476 (E.D. Va. 1994).

[fn 48] *In re Midgard Corp.*, 107 F.3d 880 (10th Cir. 1997) (unpublished opinion).

[fn 49] *Shurgard Storage Ctrs., Inc. v. Safeguard Self Storage, Inc.*, 119 F. Supp. 2d 1121 (W.D. Wash. 2000).

ents based on the misappropriation of memorized information. [fn 50] On appeal, the Supreme Court of Washington, addressing the issue of first impression, "held that trade secret protection does not depend on whether a customer list is taken in written form or memorized." [fn 51]

As can be seen from this discussion, the protection of trade secrets arises under a complex body of case law that makes the calculation of damages for their theft a challenge. As a result, an expert will benefit from being both flexible and analytic in developing an approach for measuring damages in trade secret cases.

## Jurisdiction Summary

The following table summarizes the jurisdictions in which civil actions for intellectual property disputes can be brought in the U.S. court system. Note that a federal court's diversity jurisdiction may provide for a federal forum even for disputes that are based exclusively on state law.

| | *Patent* | | | | | |
| | *Utility Patent* | *Plant Patent* | *Design Patent* | *Trademark* | *Copyright* | *Trade Secret* |
|---|---|---|---|---|---|---|
| State Court | | | | X | | X |
| Federal Court (Appeal via Local Circuits to U.S. Supreme Court) | | | | X | X | X |
| Federal Court (Appeal via Federal Circuit to United States Supreme Court) | X | X | X | | | |

---

[fn 50] *Ed Nowogroski Ins., Inc. v. Rucker*, 137 Wash. 2d 427, 971 P. 2d 936 (Wash. 1999).

[fn 51] *Id.*

# Chapter 2

## *Calculating Infringement Damages*

### Introduction

Many intellectual property disputes arise from allegations that one party infringed another party's intellectual property rights. As such, the forensic accountant is often confronted with the issue of assessing lost profits or economic damages resulting from the alleged infringement. Significant differences exist between valuing intellectual property for transaction purposes, on the one hand, and estimating damages resulting from intellectual property infringement or misappropriation, on the other.

For example, the forensic accounting expert often assesses the value of the intellectual property for its potential *future* benefits and gains or for purchase price allocation purposes. In this context, the expert may focus his or her analysis on (1) consumer demand for the product, (2) the likelihood that an alternative substitute product will emerge, or both. In contrast, the orientation of the damages expert in a litigation context is more retrospective than prospective in nature. Forensic accounting experts often find themselves analyzing historical data for purposes of ascertaining what would have transpired "but for" the alleged infringement, with an assumption that the future sales of an infringing product will be enjoined at trial. There are exceptions to this assumption, however, such as when future sales or pricing will be adversely affected even after the issuance of an injunction against continued infringement.

Taxes, ordinarily a component of a transactional valuation analysis, are not ordinarily addressed in calculating damages arising from infringement or misappropriation. In the litigation context, damages are normally computed on a pretax basis, as damage awards from intellectual property disputes are taxable as ordinary income under U.S. law. Exceptions to this rule may arise, however, if profits would have been earned in one time period or tax jurisdiction, but are shifted to another as a result of the litigation. In such a case, an adjustment to the damage analysis may be necessary to make the injured party whole. The expert should consult with counsel to determine the appropriate tax treatment in the relevant jurisdiction.

Intellectual property case law is often categorized by the nature of the property in dispute. For example, there is a distinct body of case law individually addressing patents, copyrights, trademarks, and trade secrets. However, these cases often address principles or concepts applicable to all forms of intellectual property. If unique differences exist in the intellectual property laws and case history, this practice aid will (1) distinguish those differences and (2) provide corresponding case law references.

### Overview of Calculating Damages

The following chart summarizes the nature of damages available for infringement of each type of intellectual property.

| | Patent [fn 1] | | | | | |
| | Utility Patent | Plant Patent | Design Patent | Trademark | Copyright | Trade Secret [fn 2] |
|---|---|---|---|---|---|---|
| Lost Profits | X | X | X | X | X | X |
| Price Erosion | X | X | X | X | X | X |
| Corrective Advertising | | | | X | | |
| Unjust Enrichment | | | X | X | X | X |
| Reasonable Royalty | X | X | X | X | X | X |
| Decrease in Value | | | | X | X | X |
| Statutory [fn 3] | | | | X | X | |

## Compensatory Damages

The fundamental purpose of a civil damages remedy is to make the plaintiff whole for its legally recognized injuries or losses. [fn 4] Compensatory actual damages for intellectual property infringement or misappropriation, accordingly, are intended to compensate the plaintiff for economic loss caused by the infringement. Examples of compensatory damages include lost profits (that is, profits lost on sales that would have been made but for the infringement) and reasonable royalty (that is, royalty income that the plaintiff would have earned had it entered into an agreement to license the intellectual property in suit to the defendant), among other measures.

### Market Value Measure

The market value measure is what courts most often refer to when they use the term *general damages*. [fn 5] The market value measure determines the market value of the intellectual property "as is" and the market value "as if it were not injured." The difference be-

---

[fn 1] **Statutory damages may be available for patent mismarking.**

[fn 2] **Specifics depend on individual state law.**

[fn 3] Statutory damages for trademarks are only available in regard to trademark infringement involving counterfeiting.

[fn 4] Dan Dobbs, *Dobbs Law of Remedies: Damages—Equity Restitution*, 2d ed. (1993), 281.

[fn 5] *Id.*, 288.

tween these two values is the damage that the defendant's wrongful act inflicted on the intellectual property owner.

### Lost Opportunity Measure

The lost opportunity measure quantifies the decrease in market value or the impact on market value that the intellectual property owner is deprived of by reason of the infringement. This lost opportunity measure is often referred to by the courts as *special* or *consequential damages*.[fn 6]

Although the market value measure and the lost opportunity measure may appear similar in nature, they are, in fact, distinct damage measures. The market value measure compensates a plaintiff for the diminished value of the intellectual property attributable to a civil wrong. The lost opportunity measure, on the other hand, compensates a plaintiff for the loss of income that would have been generated from the intellectual property's use or ownership. A plaintiff is normally permitted to seek one or the other of these two alternative measures of damages, but not both.[fn 7]

## Unjust Enrichment and Prejudgment Interest

Unjust enrichment is an alternative damages measure to compensatory damages. Although compensatory damages seek to restore the plaintiff to its financial position absent the defendant's wrongful act, an unjust enrichment award seeks to deprive the defendant of whatever gain or benefit was obtained from the wrongful act. In other words, unjust enrichment seeks to take from the defendant the fruits of its wrongful act and award them to the plaintiff.

In his book *Dobbs Law of Remedies: Damages—Equity Restitution*, Dan Dobbs identifies the following methods for measuring the gain obtained by a defendant for purposes of an unjust enrichment award:

1. The increased assets in the hands of the defendant from the receipt of the property

2. The market value of services or intangibles provided to the defendant, without regard to whether the defendant's assets were actually increased; that is, the amount which it would cost to obtain similar services, whether those services prove to be useful or not

3. The use value of any benefits received, as measured by (*i*) market indicators such as rental value or interest or (*ii*) actual gains to the defendant from using the benefits, such as the gains identified in item (5)

---

[fn 6] *Id.*, 302.

[fn 7] *Id.*, 312–13.

4.  The gains realized by the defendant upon sale or transfer of the asset received from the plaintiff

5.  Collateral or secondary profits earned by the defendant by use of an asset received from the plaintiff, or, similarly or comparably, the savings effected by the use of the asset [fn 8]

Unjust enrichment is a damage measure that is frequently employed in intellectual property litigation. For example, the United States Copyright Act expressly provides for the recovery by the copyright owner of "any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages." [fn 9] Provided that an award does not include a double recovery, a copyright owner may recover both (1) actual damages and (2) an infringer's profits. Accordingly, a copyright owner can receive both compensatory and unjust enrichment damages as a monetary award.

With respect to trademarks, the Lanham Act explicitly authorizes a trademark owner to recover both the infringer's profits and its own damages sustained "subject to the principles of equity and upon such terms as the court deems reasonable . . . " [fn 10] Similarly, the Uniform Trade Secrets Act (UTSA) expressly provides that, in addition to recovering its actual loss, a trade secret owner may recover the "unjust enrichment" caused by the misappropriation to the extent the enrichment is not taken into account in calculating the owner's actual loss. [fn 11]

Notably, the Copyright Act, the Lanham Act, and the UTSA each provide that the intellectual property owner shall recover only the net profits of the infringer that are *traceable to the infringement*. This constraint requires an expert attempting to quantify an appropriate unjust enrichment award to determine (1) the infringer's revenues and costs associated with the infringement and (2) what portion of the net profits are attributable to the infringement (commonly referred to as the *apportionment problem*). These issues often present significant analytical challenges to the expert. [fn 12]

Prejudgment interest may be awarded in addition to other damages. In *Allen Archery, Inc. v.Browning Manufacturing Co.*, [fn 13] the Federal Circuit explained that an award of pre-

---

[fn 8] *Id.*, 571–86.

[fn 9] *Copyrights, U.S. Code* (USC) 17, Section 504(2)(b).

[fn 10] *Commerce and Trade*, USC 15, Section 1125(c)(1).

[fn 11] Section 3(a) of the Uniform Trade Secrets Act (USTA) with 1985 Amendments.

[fn 12] The fact that the burden is on the infringer to prove the expenses that should be deductible from gross revenues to derive net profits somewhat eases the expert's apportionment challenge. See the section titled "Apportionment" in this chapter.

[fn 13] *Allen Archery, Inc. v. Browning Mfg. Co.*, 898 F.2d 787 (Fed. Cir. 1990).

judgment interest is necessary to place the patent owner in the same position it would have been in but for the infringement. If the court awards prejudgment interest, that interest ordinarily accrues from the date that damages began. However, that is not the case for trademarks; the Lanham Act provides that "[t]he court in its discretion may award prejudgment interest on relief recovered under this paragraph, at an annual interest rate established under Section 6621(a)(2) of Title 26, commencing on the date of service of the claimant's pleading setting forth the claim under this paragraph and ending on the date such recovery is granted, or for such shorter time as the court deems appropriate." [fn 14]

### The Infringement Damage Calculation

In general, if "the record permits the determination of actual damages, namely, the profits the patentee lost from the infringement, that determination accurately measures the patentee's loss. If actual damages cannot be ascertained, then a reasonable royalty must be determined." [fn 15] The expert will ordinarily make certain preliminary findings before determining the most appropriate measure of infringement damages. One such finding is the dollar amount of sales. The units sold and incremental profits will also need to be determined, because incremental profits are central to the damage calculation. These determinations are discussed in subsequent sections.

It appears that a number of courts demand somewhat less precision in the calculation of damages in the nonpatent context. For example, once a copyright owner establishes a causal link between the alleged infringement and some loss of anticipated revenue, a court may allow estimation regarding the amount lost within a reasonable range of certainty. Uncertainty about the precise amount of damages does not preclude recovery of damages if the causal relationship and the fact of damages are established. As neither the Copyright Act nor its legislative history specifically defines actual damages, the judicial system enjoys a large degree of latitude in determining actual damages. Similarly, in trademark litigation, courts typically have "wide discretion in assessing damages, which may be awarded even where they are not susceptible to precise calculations." [fn 16]

## Lost Profits

Although articulated in various ways, one consistent theme in calculating infringement damages is the entitlement of the owner to recover lost profits due to the infringer's conduct. The discussion in this section will address lost profits in the context of patents. However, lost profits can be calculated for infringement of copyrights, trademarks, and other forms of intellectual property as well.

---

[fn 14]  15 USC 1116(d)(11).

[fn 15]  *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075 (Fed. Cir. 1983).

[fn 16]  T.G. Slater, Jr., "Damages in Trademark Cases: Finding Them and Proving Them" (presentation, American Intellectual Property Law Association 2002 Spring Meeting, New York, NY, April 19, 2002).

Lost profits are calculated based on the profits that the intellectual property owner would have made from the sale of the units but for the infringement. This statement is true even if some of the components of the units were not covered by the intellectual property in suit. The measure of lost profit damages can be based on a combination of components, such as the following:

- Lost unit sales

- Lower unit sales prices

- Higher costs, such as increased production or marketing costs

- Lost sales on ancillary (convoyed [17]) products that are typically sold with the infringed product

- Extra expenses, such as trademark advertising expense

**Availability of Lost Profits**

To be entitled to lost profits, a plaintiff " . . . must demonstrate that there was reasonable probability that, but for the infringement, it would have made infringer's sales." [18] The patent owner must offer proof demonstrating, to a reasonable probability, entitlement to lost profits but for the infringement. [19] In *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, the Federal Circuit stated that once the intellectual property owner establishes the reasonableness of this inference, the burden shifts to the infringer to show that the inference is unreasonable for some or all of the lost profits. [20]

The *Panduit* [21] and two-supplier market test [22] are two recognized methods of showing but for causation. As discussed subsequently, market definition is a critical factor under both tests.

***Patent Disputes: The Panduit Test***

---

[17] See the section titled "Cost of Goods Sold or Manufacturing Costs" in this chapter for a discussion of convoyed sales.

[18] *State Indus., Inc. v. Mor-Flo Indus., Inc.*, 883 F.2d 1573, 1577 (Fed. Cir. 1989),*cert. denied*, 493 U.S. 1022 (1990).

[19] *King Instruments Corp. v. Perego*, 65 F.3d 941, 952 (Fed. Cir. 1995),*reh'g denied*, 1165 S. Ct. 1675 (1996).

[20] *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152 (6th Cir. 1978).

[21] *Id.*

[22] *Lam, Inc. v. Johns-Manville Corp.*, 718 F.2d 1056, 1065 (Fed. Cir. 1983).

The Federal Circuit has made clear that there is no single method by which the patent owner must carry its burden of proving lost profits. The *Panduit* case is a leading authority on the measurement of lost profits in the patent arena, and it articulated a four-factor test that has been accepted by most courts as a useful, but nonexclusive, method for a patent holder to prove entitlement to lost profits. [fn 23]

Under *Panduit*, the patent owner must prove each of the following facts to be entitled to lost profits:

1.  Demand existed for the infringed product during the period of infringement.

2.  Acceptable noninfringing substitute products were not available to satisfy demand during the period of infringement.

3.  The patent owner possessed the manufacturing and marketing capability to have supplied the patented product to the customers who bought the infringing product.

4.  The amount of the profit the patent holder would have made. [fn 24]

Historically, if any of the four prongs of the *Panduit* test was not proven, the patent holder was unable to recover lost profits. Subsequent cases have refined, and in some respects, relaxed these requirements. For instance, case law has refined the first *Panduit* factor to require demand for the patented features rather than just the product. With respect to the second *Panduit* factor, a patent holder need not negate each and every possibility that the purchaser would not have purchased a product other than its own, absent the infringement. Rather, the patent holder need only show that there was a "reasonable probability" that the sales would have been made by it but for the infringement. If the patent holder establishes the reasonableness of this inference by satisfying all four prongs of the *Panduit* test, the burden of proving entitlement to lost profits due to the infringing sales has been sustained. [fn 25] Each of the four *Panduit* factors is discussed in the following sections.

**Demand existed for the infringed product.** If both the patent holder and the infringer have made sales of the product to informed customers on a regular basis, then demonstrating demand may be straightforward. [fn 26] To show that demand exists for the patented product or feature of the product, the patent holder should attempt to establish a link between the patented feature and the commercial success of the product.

---

[fn 23] *State Indus.*, 883 F.2d at 1573, 1577.

[fn 24] *Panduit*, 575 F.2d at 1152.

[fn 25] *Kaufman Co. v. Lantech, Inc.*, 926 F.2d 1136 (Fed. Cir. 1991).

[fn 26] *Gyromat Corp. v. Champion Spark Plug Co.*, 735 F.2d 549, 552 (Fed. Cir. 1984).

For example, in *Gyromat Corp. v. Champion Spark Plug Co.*,[fn 27] the court observed that "the patented control features were advertised by Champion and while Champion has shown that painting systems could be made and sold without the patented features, the patented control system was obviously important enough to keep for 15 years on all of its short stroke reciprocating painting systems. If there was no demand for the patented system, Champion would not have run the risk of infringement."[fn 28] The court also found that "[t]he substantial number of sales of infringing products containing patented features was compelling evidence of the demand for the product"[fn 29] for the purpose of determining lost profits.

Analyses that may assist in establishing the commercial success of the patented feature include the following factors:

1. Showing the levels and growth of sales of the patented product for both the patent holder and the infringer

2. Mapping the variations between the sales of the patented product and its predecessor product

3. Reviewing the infringer's business plans and product literature that may speak to the importance of the patented feature

4. Demonstrating the infringer's sales prior and subsequent to infringement

5. Showing the length of time the infringer has been infringing the patent

In response to a patent holder's proof of demand for the patented product or feature, an infringer may claim that its entry into the market expanded that market beyond what it would have been absent the infringer's entry. Alternatively, if the infringer is able to show that (1) there is no demand for the patented feature or (2) consumers who purchased the infringing product were either unaware of the patented feature or that the patented feature was not a material part of their buying decision,[fn 30] then the patent holder will have a challenge meeting the first prong of the *Panduit* test.

Subsequent cases have indicated that the term *patented product* could be interpreted to mean that the patentee must prove customer demand for the patented feature. In *DePuy*

---

[fn 27] *Id.*

[fn 28] *Id.*

[fn 29] *Id.*

[fn 30] *See, e.g.*, *Slimfold Mfg. Co. v. Kinkead Indus., Inc.*, 932 F.2d 1453 (Fed. Cir. 1991) (denying lost profits because the patentee failed to establish that the customer purchased the bifold doors because of a desire for the patented advantage); *GNB Battery Tech., Inc. v. Exide Corp.*, 886 F. Supp. 420 (D. Del. 1995).

*Spine, Inc. v. Medtronic Sofamor Danek, Inc.*,[fn 31] the Federal Circuit concluded that there only needs to be a showing of demand for the infringing product, as opposed to the more stringent hurdle of showing demand for the patented feature. In this case, the defendant argued that the plaintiff was not entitled to lost profits because it had not shown that demand for the patented product "was driven by 'the screws' top-loading' feature."[fn 32] The Federal Circuit disagreed with the defendant and found that the first *Panduit* factor

> does not require any allocation of consumer demand among the various limitations recited in a patent claim. Instead, the first *Panduit* factor simply asks whether demand existed for the "patented product," i.e., a product that is "covered by the patent in suit" or that "directly competes with the infringing device."[fn 33]

> . . . . Accordingly, Medtronic asks us to hold that the requisite demand under the first *Panduit* factor is demand for the specific feature (i.e., claim limitation) that distinguishes the patented product from a noninfringing substitute, not simply demand for the patented product. We decline Medtronic's request. Medtronic's argument unnecessarily conflates the first and second *Panduit* factors.[fn 34]

The court, citing *Rite-Hite Corp. v. Kelley Co., Inc.*,[fn 35] concluded that "the focus on particular features corresponding to individual claim limitations is unnecessary when considering whether demand exists for a patented product under the first *Panduit* factor. Rather the elimination or substitution of particular features corresponding to one or more of the claim limitations goes to the availability of acceptable noninfringing substitutes under the second *Panduit* factor..."[fn 36]

**Acceptable noninfringing substitutes.** A heavily litigated issue involves whether acceptable, noninfringing substitutes for the patented invention existed during the infringement period (that is, the second *Panduit* factor). "The underlying rationale for imposing this requirement is that if acceptable noninfringing substitutes existed, consumers may

---

[fn 31] *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314 (Fed. Cir. 2009). The patent-at-issue relates to pedicle screws used in spinal surgery. A jury awarded $226.3 million in lost profit damages, of which $149.1 million related to the patented pedicle screws and $77.2 million related to unpatented "pull-through" products. On appeal, the court affirmed lost profit damages on the pedicle screws but reversed lost profit damages on the unpatented pull through products.

[fn 32] *Id.*

[fn 33] *Id.*

[fn 34] *Id.*

[fn 35] *Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538 (Fed. Cir. 1995).

[fn 36] *DePuy Spine*, 567 F.3d at 1314.

have purchased the substitutes, rather than the patent owner's product, even if the infringer had not been in the marketplace." [fn 37]

Addressing this factor in *Grain Processing Corp. v. American Maize-Products Co.*, the court ruled that "[i]n reconstructing the market to determine what patentee would have made if infringement had not occurred, for purpose of claim of lost profits, patentee must project economic results that did not occur, and, to prevent the hypothetical from lapsing into pure speculation, there must be sound economic proof of the nature of the market and likely outcomes with infringement factored out of the economic picture." [fn 38]

The patent holder—attempting to prove that there are no or few acceptable noninfringing substitutes under the second *Panduit* factor—tends to have a narrow interpretation of what a consumer finds to be an acceptable alternative. In particular, the patent holder may attempt to show that any alternatives in the marketplace are truly inferior and do not have the distinct features and benefits of the product with the patented feature. Conversely, the alleged infringer tends to have a more expansive view of the market. For example, the alleged infringer may attempt to prove that there are many acceptable alternatives in the market, making it impossible to demonstrate with any reasonable degree of certainty that the patent holder would have sold additional units if the infringer was absent from such market.

In *Cryovac, Inc. v. Pechiney Plastic Packaging, Inc.*, [fn 39] the district court affirmed that lost profits may be awarded based on the patentee's market share prior to the infringement, even in light of potential noninfringing alternative products. Pechiney moved for partial summary judgment, arguing that Cryovac is not entitled to lost profits because noninfringing alternatives were available from a third party, Curwood, Inc. In turn, Cryovac argued that, first, Curwood's products do not represent a noninfringing alternative to its patented products, and, second, even if Curwood's products were deemed noninfringing alternatives, Cryovac is nonetheless eligible for lost profits damages under *State Industries, Inc. v. Mor-Flo Industries, Inc.* [fn 40] The district court denied Pechiney's motion for partial summary judgment, finding, "there are genuine issues of material fact as to whether Curwood offered a non-infringing alternative" and concluded, "even if Curwood did produce a product that was a non-infringing alternative, it is possible for Cryovac to

---

[fn 37] *Scripto-Tokai Corp. v. Gillette Co.*, 788 F. Supp. 439, 455 (C.D. Cal. 1992).

[fn 38] *Grain Processing Corp. v. American Maize-Prods. Co.*, 185 F.3d 1341 (Fed. Cir. 1999).

[fn 39] *Cryovac Inc. v. Pechiney Plastic Packaging, Inc.*, 430 F. Supp. 2d 346 (D. Del. 2006). The patent-at-issue relates to meat packaging materials. The defendant filed a summary judgment motion prior to a jury trial that the plaintiff is not entitled to lost profits due to the existence of noninfringing alternatives.

[fn 40] *State Indus., Inc. v. Mor-Flo Indus., Inc.*, 883 F.2d 1573 (Fed. Cir. 1989).

be awarded lost profits damages based on the market share it held prior to Pechiney's entrance into the market." [fn 41]

**Market share approach.** The second prong of the *Panduit* test requires proof that acceptable noninfringing substitute products were not available to satisfy demand during the period of infringement. Early interpretations of this prong required the patent holder to prove that there was a two-supplier market—itself and the infringer—and that a customer would either have purchased the patent holder's product or the infringing product. If this burden was carried by the patent holder, customers would, by definition, have purchased the patent holder's product absent the infringement.

More recently, the courts have ruled that if multiple competitors exist in the marketplace, they may apply a percentage of market share approach in the context of the second *Panduit* factor. For example, in *State Industries*, the Federal Circuit allowed the patent owner to estimate sales that would have been made in the but for world by nonparty competitors on the basis of their proportionate market share of infringing sales. Under this approach, awarding lost profits based on market share is appropriate, even if acceptable noninfringing alternatives exist, if the patent owner is able to (1) demonstrate an established market share and (2) meet its burden under the other three *Panduit* factors. In this regard, the Federal Circuit stated the following:

> In the two-supplier market, it is reasonable to assume, provided the patent owner has the manufacturing and marketing capabilities, that it would have made the infringer's sales. In these instances, the Panduit test is usually straightforward and dispositive. ("[w]here a patent owner maintains that it lost sales equal in quantity to the infringing sales, our precedent has approved generally the [Panduit test] . . .")

In this case, there are multiple competitors, and the patent owner contends that all the competitors infringed or sold a far less preferable alternative—fiberglass. The district court made the absence of acceptable substitutes, the second *Panduit* factor, neutral by crediting all the other competitors with their market shares as State Industries requested. If the court is correct in its finding that the other competitors were likely infringers of one or the other of State Industries's patents, State Industries would have been entitled to their shares of the market on top of its own and a correspondingly greater share of Mor-Flo's sales. If it is wrong in whole or in part, State Industries would have been entitled to its current share or to a lesser increase in share. [fn 42]

The patent holder in *State Industries*, was allowed to recover lost profits to the extent of its 40 percent national market share. [fn 43] Additionally, the Federal Circuit determined

---

[fn 41] *Cryovac*, 430 F. Supp. 2d at 346.

[fn 42] *State Indus.*, 883 F.2d at 1573, *cert. denied*, 493 U.S. 1022 (1990).

[fn 43] *Id.* at 1579.

that the lower court did not err in its determination of a reasonable royalty, which applied to the remaining 60 percent of infringing sales. [fn 44]

In performing a market share analysis, the expert may consider recasting the market without the infringing product's sales, as depicted in the following figure.



With the market defined as including the defendant's infringing sales, the plaintiff's market share is 50 percent (left pie chart). With the infringing sales excluded from the market, the plaintiff's market share is 67 percent (right pie chart).

The plaintiff's ability to satisfy the second *Panduit* factor often hinges on (1) the interpretation of the relevant market and (2) what the consumer was looking for when purchasing the infringing item. Although the relevant market might be argued as encompassing nearly all competing substitute products, the Federal Circuit has narrowed the scope of the patent holder's burden by ruling that substitute products which incorporate some, but not all, of the elements of the patented invention do not necessarily constitute an acceptable substitute. Specifically, in *Standard Havens Products, Inc. v. Gencor Industries, Inc.*, the Federal Circuit ruled that

> . . . the mere existence of a competing device does not necessarily make that device an acceptable substitute. A product on the market which lacks the advantages of the patented product can hardly be termed a substitute acceptable to the customer who wants those advantages. Accordingly, if purchasers are motivated to purchase because of particular features available only from the patented product, products without such features—even if otherwise competing in the market place—would not be acceptable noninfringing substitutes. [fn 45]

---

[fn 44] *Id.* 1575.

[fn 45] *Standard Havens Prods., Inc. v. Gencor Indus., Inc.*, 953 F.2d 1360, 1373 (Fed. Cir. 1991).

The relevant market does include other devices or substitutes similar in physical and functional characteristics to the patented invention. [fn 46] It excludes, however, alternatives "with disparately different prices or significantly different characteristics." [fn 47] Once the market is defined, it generally becomes an easier task to determine how many suppliers operate in the defined relevant market. Market supplier inquiry focuses on the number of companies involved in the supply market, not the number of alternatives in the relevant market.

Market share was further addressed in *BIC Leisure Products, Inc. v. Windsurfing International, Inc.* On appeal, the Federal Circuit rejected the trial court's award of lost profits because it found that "[a]ssuming BIC [Leisure] had not been in the market, Windsurfing did not show that BIC [Leisure]'s customers would have purchased sailboards from Windsurfing and other manufacturers in proportion to their market shares." [fn 48] The Federal Circuit found that the types and prices of boards sold by the plaintiff and defendant were different and would be purchased by distinct customers. In other words, absent infringement, purchasers of the infringing product would *not* purchase products from the patent holder, even in proportion to the patent holder's market share.

In *American Seating Co. v. USSC Group, Inc.*, [fn 49] an award of lost profits on the defendant's sales of products that were noninfringing but substituted for infringing product sales was upheld. In this case, the plaintiff sought lost profits on sales made by the defendant based upon offers to sell in contract bids describing an infringing product. Upon award of the contracts, the defendant delivered noninfringing replacement products in lieu of the infringing products described in the offer to sell contract bids. The Federal Circuit found that but for the defendant's initial offer to sell the infringing products, the patentee would have otherwise made sales of its product covered by the patented technology. The court found that the jury's conclusion that the replacement product was not an acceptable substitute was reasonable.

In *Golden Blount, Inc. v. Robert H. Peterson Co.*, [fn 50] the Federal Circuit found there was a two-supplier market controlled by the patentee and defendant, and that but for the in-

---

[fn 46] *Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*, 246 F.3d 1336 (Fed. Cir. 2001).

[fn 47] *Crystal Semiconductor*, 246 F.3d at 1336, 1356.

[fn 48] *BIC Leisure Prods., Inc. v. Windsurfing Int'l, Inc.*, 850 F. Supp. 224 (S.D.N.Y. 1994).

[fn 49] *Am. Seating Co. v. USSC Group, Inc.*, 514 F.3d 1262 (Fed. Cir. 2008). The patent-at-issue relates to wheelchair tie-down restraint systems for use in mass transit vehicles. At trial, the jury awarded $1,366,612 in lost profits on sales of infringing product and $959,517 in lost profits on sales of replacement products. These awards included lost profits on collateral sales of passenger seats.

[fn 50] *Golden Blount, Inc. v. Robert H. Peterson Co.*, 438 F.3d 1354 (Fed. Cir. 2006). The patent-at-issue relates to gas-fired fireplace burners and associated equipment. At trial, the district court awarded damages that were vacated by the appellate court and remanded to resolve the limited issue of the returned goods. The district court found damages of $429,256 in lost profits, which were trebled. Attorney's fees were awarded in the amount of $622,015. The defendant appealed.

fringement, the patentee would have made the infringing sales. At the bench trial, the plaintiff's damages expert provided testimony that there was sufficient demand, that there were no noninfringing alternatives, and that the plaintiff had sufficient marketing and manufacturing capacity. The plaintiff's damages expert testified that the plaintiff, along with the defendant, controlled 95 percent of the market, and, therefore, a two-supplier market existed. The court accepted the plaintiff's calculation of damages based upon lost sales of an entire burner assembly as well as a full set of logs. The defendant appealed arguing that the plaintiff had failed to prove the parties were competing for sales of two-burner installations, the calculation of the plaintiff's margin was inaccurate, and certain sales should be excluded because they were returns from distributors. The district court's damages theory was reviewed for abuse of discretion and factual findings were reviewed for clear error. The Federal Circuit found that the patentee provided sufficient evidence regarding the probability that the sales would have been made but for the infringement. "By coming forward with no quantitative evidence to rebut this testimony, Peterson left itself open to the inference reasonably drawn by the district court." [fn 51]  On the issue of the returns from distributors, the court found that no lost sale existed upon which to base a damages award because no act of infringement occurred and vacated the award on this limited basis. The case was remanded to reexamine and recompute damages, if necessary, to exclude the returned units from the calculation of damages.

**Available and substitute.** An accused infringer's ability to produce an acceptable noninfringing substitute during the damages period may also defeat the patent holder's recovery of lost profits. The infringer may attempt to show that it would have consummated some or all of the infringing product sales by selling another *available, noninfringing substitute* in the relevant market. In other words, customers would have selected the infringer's available, noninfringing alternative instead of the patented invention in the absence of infringement.

In *Grain Processing*, the Federal Circuit held that if a patent holder offers proof of sales it would have made but for the infringement, "an accurate reconstruction of the hypothetical 'but for' market takes into account any alternatives available to the infringer." [fn 52] The Federal Circuit explained that a product or process may qualify as an acceptable noninfringing substitute for purposes of defeating a lost profits claim, even if it was not "on the market" or "for sale" during the period of the infringement. [fn 53]  In that case, the accused infringer has the burden of showing that the alleged alternative would have been available during the damage period.

---

[fn 51] *Golden Blount*, 438 F.3d at 1354. The court also rejected "Peterson's arguments regarding the profit margins on each lost sale. The district court based its findings on both documentary and testimonial evidence, and Peterson has failed to convince us that these findings were clearly erroneous."

[fn 52] *Grain Processing*, 185 F.3d at 1341, 1351.

[fn 53] *Id.* at 1343.

Page 38

The defendant in the *Grain Processing* case supported its claim that its noninfringing process would have been available during the infringement period. The defendant presented specific proof that it had "the necessary equipment, know-how, and experience" [fn 54] during such period to implement the noninfringing process. The alleged infringer was also able to demonstrate that its noninfringing process created a product acceptable to customers, based in part on market data obtained after converting to the noninfringing process, but prior to the damages portion of the trial. [fn 55] Notably, neither party to this dispute had contended that the alternative process the infringed the patent or that the alternative was not acceptable to customers. In light of *Grain Processing*, defendants may attempt to make arguments concerning "available alternatives" that may be less "available" than the option in that case.

In *Micro Chemical, Inc. v. Lextron, Inc*., the Federal Circuit overruled the lower court's grant of summary judgment with regard to lost profits. In overruling the lower court, the Federal Circuit stated that "[t]he record shows that Lextron did not have the necessary equipment, know-how, and experience to make the Type 5 machine at the time of the infringement . . . [and] [t]he effects of the changes also were not well known or readily available." [fn 56]

Acceptable noninfringing substitutes may also use the *design-around* concept. The design-around concept refers to "mak[ing] something that performs the same function or has the same physical properties as [a patented product or process] but in a way different enough from the original that it does not infringe the patent." [fn 57] The design-around alternative should provide the same or comparable utility without infringing the patent.

In *Mitutoyo Corp. v. Central Purchasing, LLC*, [fn 58] the appellate court affirmed the district court's decision that "Mitutoyo was not entitled to a lost profit award, either for infringement or breach of contract, because it failed to establish any market overlap between its goods and Central's." This ruling was grounded in the evidence that Mitutoyo's products were priced substantially higher and included more advanced features than Central's, coupled with the court's conclusion that Mitutoyo failed "to introduce any direct evidence of market overlap." The court cited *BIC Leisure Products* in noting that in order to be entitled to lost profits, "a patent owner must prove a causal relation between the infringement and its loss of profits. The patent owner must show that 'but for' the infringement, it would have made the infringer's sales." [fn 59] The existence of a causal relationship

---

[fn 54] *Id.* at 1354.

[fn 55] *Id.* at 1355.

[fn 56] *Micro Chemical, Inc. v. Lextron, Inc.*, 318 F.3d 1119 (Fed. Cir. 2003).

[fn 57] Bryan A. Garner, ed., *Black's Law Dictionary, Eighth Edition* (St. Paul, MN: West Publishing Co, 2004), 478.

[fn 58] *Mitutoyo Corp. v. Cent. Purchasing, LLC*, 499 F.3d 1284 (Fed. Cir. 2007).

[fn 59] *Id.* (citing *BIC Leisure Prods. v. Windsurfing Int'l, Inc.*, 1 F.3d 1214, 1218 (Fed. Cir. 1993).

failed due to the price differential (and additional features) between Mitutoyo's and Central's products.

The appellate court affirmed the royalty rate of 29.2 percent, which was based solely on Mitutoyo's profit margin, noting that "[w]hile the trial court could have looked to other figures ... its use of these figures was not clearly erroneous." However, the court took issue with the district court's determination that a third party's sales should be included in the royalty base, noting that although Central and the third party had "a strong business relationship, they are independent corporate entities," and there was insufficient evidence to conclude that Central would have agreed to pay royalties on third party sales. [fn 60]

In *DSU Medical Corp. v. JMS Co., Ltd.*, the Federal Circuit upheld the trial court's exclusion of testimony proffered by DSU's expert witness, whose testimony related to the "hypothetical existence or hypothetical terms of a contract" between the accused infringer and a third party. [fn 61]  DSU's expert computed lost profit damages based on JMS's sale of the accused Platypus guard as well as subsequent sales of the noninfringing WingEater guard, based on an "accelerated market entry notion that [DSU] would have captured the market in advance of the introduction of the WingEater, but for the infringing sales of the Platypus." [fn 62]  The appellate court affirmed the trial court's exclusion of the DSU expert witness's testimony with regard to lost profit damages, in part, because he "relied too heavily on hypothesized contracts in hypothesized markets that lacked sound economic grounding." [fn 63]  In addition, "[t]he trial court disallowed the [expert witness'] testimony on this subject because 'sales of acceptable noninfringing substitute products [could not] be the basis of legally compensable patent damages,' and the WingEater was an acceptable noninfringing substitute for the patented products." [fn 64]

According to the court, "[w]hile it may be possible for an infringement to have a foreseeable, and therefore compensable, effect on future contracts, the trial court was correct to perceive that it could not occur when the future contract was itself for a non-infringing substitute." [fn 65]  However, with respect to DSU's ability to secure sales of accused products through multiyear contracts, the court sustained the jury's lost profit award.

**Manufacturing and marketing capability to exploit demand.** Manufacturing and marketing capacity and capability (that is, the third *Panduit* factor) requires the patent holder

---

[fn 60]  *Mitutoyo*, 499 F.3d at 1284.

[fn 61]  *DSU Med. Corp. v. JMS Co., Ltd.*, 471 F.3d 1293 (Fed. Cir. 2006).

[fn 62]  *Id.* (citing *In Limine* Order, 296 F. Supp. 2d at 1151).

[fn 63]  *Id.*

[fn 64]  *Id.* (citing *DSU Med.*, 296 F. Supp. 2d at 1140, 1159 (N.D. Cal. 2003) (*In Limine* Order)).

[fn 65]  *Id.*

to prove that the infringed sales could have been made by the patent holder within the relevant time period. This factor may be proven in a variety of ways. For example, the patent holder may demonstrate manufacturing capacity by showing that its facilities were capable (or could have been made capable of) producing the number of patented inventions demanded [fn 66] or that the manufacturing could have been subcontracted to another manufacturing facility. [fn 67] The patent owner typically will attempt to demonstrate the financial capacity and management strength necessary to produce the additional units.

The Federal Circuit has stated that "[t]he demand which a patentee must have the capacity to meet is measured by the total sales, by the patentee and the infringer, of the patented product." [fn 68] The following factors may assist in determining capacity to meet such demand:

1. The relative number of lost units compared to the historic sales of the patent holder. The larger the volume of lost sales claimed by the patent holder compared to the historic sales volume, the more difficult it may be to demonstrate capacity.

2. The size and effectiveness of the sales and distribution network that the patent holder has in place compared with what it would need in order to make the lost sales volume.

3. Channels of distribution for the actual historic sales may differ from those channels through which the infringer made the infringing sales. The patent holder may need to demonstrate that it had the ability to make sales through these alternate channels of distribution in order to prove marketing capacity.

4. It may have been necessary for the patent holder to increase production capacity. The patent holder would need to demonstrate the ability (financial and technical) to increase production within the required time period. In addition, it may be necessary to adjust the calculation of the incremental profit margin to reflect the additional investment by the patent holder in increased capacity.

5. In certain industry sectors, such as pharmaceuticals, increasing production capacity requires certification and approval from government agencies such as the Food and Drug Administration. These approvals may increase the cost or time required before the patent holder can increase production.

---

[fn 66] *Bio-Rad Lab., Inc. v. Nicolet Instrument Corp.*, 739 F.2d 604, 616 (Fed. Cir. 1984).

[fn 67] *Gyromat Corp. v. Champion Spark Plug Co.*, 735 F.2d 549, 554 (Fed. Cir. 1984).

[fn 68] *Datascope Corp. v. SMEC, Inc.*, 879 F.2d 820, 825 (Fed. Cir. 1989).

6. Analysis of the cost and availability of certain key raw materials may be necessary in order to demonstrate that the patent holder had the ability to manufacture the lost sales that are being claimed in the lost-profit calculation. [fn 69]

The patent holder may be able to prove manufacturing capacity by demonstrating that sufficient capacity existed, could have been contracted for, or both to manufacture the additional units that were infringed. The latter analysis would require the expert to quantify the costs of contract manufacturing of the patented product. Alternatively, the patent holder can demonstrate manufacturing capacity by showing that it was feasible to expand its existing production facilities to meet the growing demand. However, this approach will often be found unfeasible when expansion would require closing down the production of a more profitable product. [fn 70] With respect to marketing capacity, the patent holder should attempt to demonstrate its ability to reach the marketplace in question, from a geographic or support perspective.

**Quantifying lost profits.** Lost profits do not have to be calculated with absolute precision, but rather with *reasonable probability*. [fn 71] In other words, lost profits are neither unfounded speculation, nor complete precision, but rather an estimate. Because " . . . determination of a damage award is not an exact science[,] [t]he trial court must best approximate the amount to which the patent owner is entitled." [fn 72] "When the amount of damages is not ascertainable with precision, reasonable doubt is appropriately resolved against the infringer." [fn 73]

Typically, a patent holder may recover lost incremental profits, equal to the difference between (1) gross revenues resulting from regaining the sales lost due to infringement and (2) the incremental cost of making those sales. This measure of profit loss is appropriate when the patentee's fixed costs do not rise, or only slightly increase, relative to the increases in production. The Federal Circuit addressed this damage measure in *Paper Converting Machinery Co. v. Magna-Graphics Corp.*, acknowledging that

> [t]he incremental income approach to the computation of lost profits is well established in the law relating to patent damages. The approach recognizes that it does not cost as much to produce unit N+1 if the first N (or fewer) units produced already have paid the fixed costs. Thus fixed costs—those costs which do not vary

---

[fn 69] R. L. Parr, *Intellectual Property Infringement Damages: a Litigation Support Handbook,* 2d ed. (New York: John Wiley & Sons, 1999), 64–65.

[fn 70] *Polaroid Corp. v. Eastman Kodak Co.*, 16 U.S.P.Q.2d 1481, 1511 (D. Mass. 1990), typographical errors to opinion amended by 17 U.S.P.Q.2d 1711 (D. Mass. 1991).

[fn 71] *Bio-Rad Lab.*, 739 F.2d at 604, 616.

[fn 72] *King Instrument Corp. v. Otari Corp.,* 767 F.2d 853, 863 (Fed. Cir. 1985).

[fn 73] *Del Mar Avionics, Inc. v. Quinton Instrument Co.*, 836 F.2d 1320 (Fed. Cir. 1987).

with increases in production, such as management salaries, property taxes, and in-surance—are excluded when determining profits. [fn 74]

"Incremental costs are distinct from marginal costs in that marginal costs include only those costs that vary when producing one more unit, whereas incremental costs include any costs that increase as production expands over a relevant range . . ." [fn 75] *The incremental profit margin* is typically defined as the profit left after the deduction of those costs necessary to make and sell the additional units within a relevant incremental range. For example, 5,000 products may be produced at a certain level of incremental cost, but if a quantity greater than 5,000 is produced, the incremental costs may be reduced. The cost reduction may arise, for example, from the producer's ability to obtain volume discounts for purchasing additional materials. The incremental profit margin may be expressed as a percentage of the unit price of the product.

Conceptually, lost profits can be separated into two parts, namely (1) the but for lost sales or revenues and (2) the incremental profit margin on those but for sales. The courts have often followed the recommendations of accounting or economic experts in this area. For example, in *Lam, Inc. v. Johns-Manville Corp.*, the Federal Circuit awarded the patent holder incremental profits based on the following calculation:

1. Start with revenue derived from sales of the patented product and subtract the direct costs of material, labor, commissions, and freight for these sales.

2. Divide this difference by the number of units sold by the patent holder, yielding the incremental profits per unit.

3. Multiply this incremental profit figure by the number of infringing units sold.

4. Solve for the aggregate lost profits by the patent holder. [fn 76]

In *Kalman v. Berlyn Corp.*, the Federal Circuit held that labor costs were fixed costs because no additional labor expense would have been required to produce the infringing devices. [fn 77] In other circumstances, certain expenses included in "overhead" may be incremental and properly deductible in arriving at incremental profits. For example, fringe benefits may be a type of overhead cost to be deducted in calculating incremental profits. The facts of each case will dictate the nature of the costs associated with producing the infringing product.

---

[fn 74] *Paper Converting Mach. Co. v. Magna-Graphics Corp.*, 745 F.2d 11, 14 (Fed. Cir. 1984).

[fn 75] *Micro Motion, Inc. v. Exac Corp.*, 761 F. Supp. 1420, 1429 (N.D. Cal. 1991).

[fn 76] *Lam, Inc. v. Johns-Manville Corp.*, 718 F.2d 1056 (10th Cir. 1983).

[fn 77] *Kalman v. Berlyn Corp.*, 914 F.2d 1473 (Fed. Cir. 1990).

### *Lost Profits in Copyright, Trademark, Trade Secret, and Trade Dress Cases*

In copyright, trademark, trade secret, and trade dress cases, lost profits represent those profits that the intellectual property owner failed to earn as a result of the infringement. The lost sales measure attempts to equate the intellectual property owner's damages with the profits that would have been earned from each lost sale due to the infringer's misconduct. The lost profit test typically applies only if the intellectual property owner and the infringer were actual or potential competitors; otherwise, the infringement is unlikely to have caused the intellectual property owner to lose sales.

The application of the concept of lost profits is similar in copyright, trademark, trade secret, and trade dress cases. The following discussion of lost profits applies to all types of intellectual property infringement unless otherwise noted.

## Measuring Revenues

The beginning point in the estimation of lost profits is the measurement of revenues. The primary question to be answered is: What additional revenues would have been generated by the plaintiff but for the actions of the defendants? That is, if the infringing sales had not occurred, what would the purchasers have purchased from the plaintiff and at what price?

The following issues are relevant to measuring the revenue on lost sales:

1. What is the appropriate period of damages?

2. Are lost profits recoverable for the entire apparatus in which the infringing sale is included or only for the feature covered by the intellectual property in suit?

3. How is the number of units of the infringing product to be determined?

4. Can lost profits be recovered for products and services not covered by the intellectual property in suit?

5. Did the infringer cause an effect on the price that the intellectual property holder could have charged but for the infringer's actions?

These issues are discussed in the following sections.

### *Damage Period*

The damage period may begin at the onset of infringement of existing intellectual property. In the case of patent disputes in which the patent owner's products are marked as patented, the damage period begins when the infringing product is made, sold, imported, or

offered for sale. [fn 78]  Conversely, if the patent owner's products are not marked as patented, the damage period begins only when the infringer receives actual notice of infringement and has made, sold, imported, or offered for sale an infringing product.

The damage period typically ends on the date of trial. However, subsequent to trial a patent owner may seek compensation for an infringer's impact on the patent owner's prospective sales if that impact emanates from the market effect of the infringer's past infringement. (This issue is particularly relevant to a price erosion claim, which is discussed in the section titled "Measuring Incremental Costs" in this chapter.) In addition, certain types of infringement may inherently continue beyond the trial date. For example, if the term of a contract to supply a particular service on patented goods extends beyond the trial date, damages may be awarded for sales made after that date. The pendency of an injunction may influence whether such damages are awarded. Damages cannot be awarded for infringement that occurred more than six years prior to the filing of the complaint for patent disputes. [fn 79]

An issue that may affect damages is whether a defendant's infringement resulted in a market entry advantage that would not have existed but for the infringement. If the defendant, after issuance of an injunction, can enter the market again with a competing product sooner than would have been possible without the infringement, the plaintiff may suffer additional future lost sales and profits. This is most likely to occur if the patent is at or near expiration.

### Sales Price

Damages are often calculated based on the intellectual property owner's pre-infringement (actual) sales prices. The courts require documentation from the intellectual property owner to justify the method or basis for estimating these prices. If multiple models of the same product are involved, courts may use the average price of the number and type of model sold.

Several aspects of the infringed product's past pricing history may be scrutinized. The product's pricing history may be examined to determine the historical rate of price increases or decreases. Additionally, it may be appropriate to compare the historical rate of price increases to the historical inflation rate so that the impact of inflation is removed. The plaintiff's pricing models for quantity and early pay discounts may also be relevant.

### Price Erosion

---

[fn 78]  *Patents*, USC 35, Section 287.

[fn 79]  35 USC 286.

A claim for price erosion may exist if (1) the patent holder [fn 80] is not able to increase prices as much as he or she would have absent the infringement or (2) the patent holder is forced to decrease price in the face of the competition due to the infringer's conduct. The earliest known case involving the issue of price erosion was *Yale Lock Manufacturing Co. v. Sargent* in 1886. [fn 81]

Price erosion was addressed by the Federal Circuit in *Lam*, which affirmed a damage award for products sold by the patent holder at a depressed price. [fn 82] The patent holder projected sales through the infringement period based on the rate of preinfringement growth for the patented product. The patent holder then calculated the damages by subtracting the actual sales from projected sales during the infringement period. [fn 83] The projected sales excluded price reductions implemented to compete with the infringer's product. [fn 84]

Courts have held that a claim for price erosion can be sustained if an infringer's actions prevented an intellectual property holder from raising prices or maintaining historical price increases. For example, in *Ziggity Systems, Inc. v. Val Watering Systems*, the court held that but for the infringement, the patent holder would have raised the price for products covered by the patent. [fn 85] The court applied this theory to both the sales made by the patent holder and those made by the infringer, which collectively represented 95 percent of the total market. However, the court did not consider the doctrine of price elasticity to be applicable to its analysis. [fn 86] Price elasticity, which measures the responsiveness of quantity demanded to a change in price, [fn 87] is discussed in the section titled "Price Elasticity" in this chapter.

A careful analysis of the industry in which the infringed and infringing products operate is often central to assessing a potential price erosion claim. For example, in *Crystal Semiconductor Corp. v. TriTech Microelectronics International, Inc.*, Crystal Semiconductor's expert witness attempted to measure price erosion by comparing the price performance of (1) the plaintiff's product covered by the patent-in-suit and (2) a similar product manu-

---

[fn 80] Price erosion claims are not limited to patent suits, although they are less common in other types of intellectual property disputes.

[fn 81] *Yale Lock Mfg. Co. v. Sargent,* 117 U.S. 536 (1886).

[fn 82] *Lam, Inc. v. Johns-Manville Corp.,* 718 F.2d 1056, 1067 (Fed. Cir. 1983).

[fn 83] *Id.* at 1068.

[fn 84] *Id.* at 1067.

[fn 85] *Ziggity Sys., Inc. v. Val Watering Sys.*, 769 F. Supp. 752, 824 (E.D. Pa. 1990).

[fn 86] *Id.* at 824.

[fn 87] M.L. Katz and H.S. Rosen, *Microeconomics,* 3d ed. (Boston: McGraw-Hill, 1998), 73.

factured by the plaintiff that served a different market.[fn 88] The expert's approach compared the market for Crystal Semiconductor's computer audio chips in the Apple Computer market to the market for Crystal Semiconductor's computer audio chips in the IBM and IBM compatible personal computer (PC) market. This *benchmark approach* was designed to link the price performance of a noninfringed product to the price performance of the infringed product as a reasonable proxy. The Federal Circuit, however, found this benchmark approach unreliable because the "Apple CODEC market had characteristics of an oligopoly while the PC CODEC [IBM compatible] market was competitive."[fn 89]

In *Crystal Semiconductor*, the Federal Circuit also addressed the necessity of examining the law of demand in the context of potential price erosion. In this regard, the court found that Crystal had failed "to show the reaction of the market if, 'but for' [the] infringement, Crystal would have tried to charge at least 89¢ more per CODEC. All markets must respect the law of demand."[fn 90] In other words, if the patent holder claims it could have charged higher prices but for the infringement, the patent holder must show the impact of such higher prices on the units demanded in the marketplace.

Another case illustrating the importance of industry analysis in price erosion litigation is *Ericsson, Inc. v. Harris Corp.*[fn 91] Ericsson (the patent owner) contended that it was entitled to "lost profits due to lost sales" and "lost profits due to price erosion." To prove lost profits due to lost sales, Ericsson divided the market between the broader "Harris market" and the narrower "Ericsson market." The Harris market included customers that designed the infringing Harris product into their products. But these Harris customers may not have designed the Ericsson patented product into their products, meaning that Harris had actually expanded the market. The narrower Ericsson market was limited to customers that had designed the Ericsson patented product into their products. The court upheld this market segmentation, finding that "Ericsson's market definitions and allocations were supported by substantial and economically sound evidence."[fn 92]

To prove lost profits due to price erosion, Ericsson sought to identify factors that precluded competition, including costs to redesign the competing devices as well as the contested patent itself. Ericsson also contended that the uniqueness of the market would have enabled it to increase volumes at a higher price. The court acknowledged that Ericsson had "presented evidence of the high switching costs associated with redesigning a line

---

[fn 88] *Crystal Semiconductor Corp. vs. TriTech Microelectronics Int'l, Inc.,* 246 F. 3d 1336, 1357 (Fed. Cir. 2001).

[fn 89] *Id.* at 1358.

[fn 90] *Id.* at 1359.

[fn 91] *Ericsson, Inc. v. Harris Corp.,* 352 F. 3d 1369 (Fed. Cir. 2003).

[fn 92] *Id.* at 1369.

card, the relatively low costs of SLICs,...[and] substantial evidence of the similarities between the two products and their markets." [fn 93]

The *Crystal Semiconductor* and *Ericsson* decisions demonstrate two important principles that should be addressed in analyzing price erosion claims, namely (1) the possibility that the infringer has expanded the market over what it would have been but for the infringement and (2) the care that should be used in attempting to identify benchmarks.

In a recent district court decision, *Rolls-Royce PLC v. United Technology Corp.*, the plaintiff argued that absent competition from the defendant, it would have been able to charge a higher price for its patented engine and would have received more in aftermarket repair services and spare parts for those engines. [fn 94] The plaintiff's expert relied on the assumption that the market for jet engines was price inelastic. The defendant challenged this assumption as flawed. The court criticized the plaintiff's expert report for not "cit[ing] any evidence that a jet engine is a necessity in the same way as milk." The court also criticized the plaintiff's expert report for stating that consumers would not be concerned about paying a small amount more for airline tickets. However, the court stated that the focus be on how the actual purchaser, the airlines, would react in determining the appropriate figures. Ultimately, the court concluded that the "unsupported assumption of price inelasticity [undermined] the validity of [Plaintiff's] price erosion damages claim." [fn 95]

In another recent decision, *SynQor, Inc. v. Artesyn Technologies, Inc.*, Magistrate Judge Everingham of the Eastern District of Texas addressed a *Daubert* issue partially concerning the plaintiff's expert's use of benchmark prices for bus converters for computer systems in the lost profits analysis. [fn 96] The plaintiff's expert used a per unit benchmark price of $70 for the but for price that was based exclusively on the last three orders the plaintiff received from a single large customer. The plaintiff's expert used this benchmark to establish but for prices ranging between $60 and $107 per unit for the plaintiff's bus converters based on the type of bus converter sold by the defendants. These but for prices were higher than the actual selling price for the specific bus converter and assumed that the but for price would hold throughout the damages period.

The defendants challenged the benchmark but for price as a "low volume, high price" benchmark that resulted in but for prices that were 1.5 to 3 times the actual prices ob-

---

[fn 93] *Id.*

[fn 94] *Rolls-Royce PLC v. United Tech. Corp.*, Case No. 1:10CV457 (E.D. Va., May 4, 2011), available at http://patent-damages.com/wp-content/uploads/2011/07/1-10-cv-00457-limine.pdf.

[fn 95] *Id.* at 10

[fn 96] *SynQor, Inc. v. Artesyn Techs., Inc.*, Case No. 2:07-CV-497-TJW-CE (E.D. Tex. Dec. 13, 2010).

tained by the plaintiff or defendants. The defendants argued that the plaintiff's expert cherry-picked a high number and applied this high number across the board.

The defendants also argued that the plaintiff's expert ignored the elasticity of demand. The plaintiff responded that elasticity of demand was not considered because certain units were excluded from the plaintiff expert's damages base.

Judge Everingham held that *Daubert* did not compel exclusion of the plaintiff's expert's lost profits testimony. Regarding the elasticity of demand, Judge Everingham was not prepared at the time to make a ruling but recognized that it is a "rare circumstance" when a "patentee is entitled to a higher price divorced from the effect of that higher price on demand for the product." Judge Everingham cautioned that the presiding judge should evaluate the evidence at trial and determine whether the plaintiff's expert's damages theory should be submitted to the jury.

### *Considerations in the Calculation of Price Erosion*

In order to recover price erosion damages, the patent holder must show that but for the infringement, it would have sold its products at higher prices. [fn 97] However, an analysis would have to account for the impact higher prices would have on the but for quantities. [fn 98]

In a price erosion calculation, several factors should be examined for their potential effect on the noninfringed price. These factors include the price elasticity of the intellectual property owner's product that competes with the infringing product and other factors that may influence the prices of the two competing products, including the market structure, profit margin data, price quotes, and internal communications from sales people describing how they were compelled to lower prices.

### *Price Elasticity*

The price elasticity of supply and demand is often central to the calculation of damages based on alleged price erosion. The price elasticity of demand measures the sensitivity of the quantity demanded to price changes of the product. [fn 99] Under basic economic principles of supply and demand, an increase in the price of a product usually results in a decrease in the amount of the product demanded. [fn 100] Conversely, a decrease in price usu-

---

[fn 97] *Ericsson, Inc. v. Harris Corp.*, 352 F.2d at 1378 (citing *BIC Leisure Prods., Inc. v. Windsurfing Int'l, Inc.*, 1 F.3d 1214, 1220 (Fed. Cir. 1993)).

[fn 98] *See id.* at 1378 (citing *Crystal Semiconductor Corp. vs. TriTech Microelectronics Int'l, Inc.*, 246 F.3d1357 (Fed. Cir. 2001)).

[fn 99] R. Pindyck and D. Rubinfeld, *Microeconomics,* 5th ed. (Upper Saddle River, NJ: Prentice Hall, 1998), 30.

[fn 100] *Id.* at 30.

ally results in an increase in the quantity demanded. A product's price elasticity of demand is the percentage change in quantity demanded divided by the percentage change in price. [fn 101] In other words, elasticity reveals how much the quantity demanded for a product varies with a change in price.

The interrelationship between price elasticity and price erosion is apparent in *3M Co. v. Johnson& Johnson*. In that case, the special master ruled that the "vigorous price competition" between 3M and Johnson & Johnson had caused a reduction in the price of the infringed product during the infringement period, and that absent the competition, 3M would have been able to raise the price of the product. However, the court found that 3M would have contracted the size of the market as a result of the price increases. [fn 102]

In its *Crystal Semiconductor* decision, the court addressed the law of demand and price elasticity, quoting the following excerpt from Paul Samuelson's text, *Economics*: [fn 103]

> According to the law of demand, consumers will almost always purchase fewer units of a product at a higher price than at a lower price, possibly substituting other products. For example, if substitution of a product was impossible and the product was a necessity, elasticity of demand would be zero—meaning consumers would purchase the product at identical rates even when the price increases. This very rare type of market is called inelastic. On the other side of the spectrum, if any price increase would eradicate demand, elasticity of demand would be infinite—meaning consumers would decline to purchase another single product if the price increases by any amount. This very rare type of market is called perfectly elastic. [fn 104]

The expert can use a variety of tools from both statistics and economics to determine the price elasticity of demand for a product.

### Market Analysis of Infringing Product

An examination of the market that the plaintiff's product serves is required to assess the merits of a price erosion claim. The number of competitors in a given market influences the prices established in that market, with price erosion easier to measure in two-supplier markets than in multisupplier markets. However, an intellectual property owner cannot

---

[fn 101] *Id.* at 30.

[fn 102] *3M Co. v. Johnson and Johnson,* 976 F.2d 1559, 1579 (Fed. Cir. 1992).

[fn 103] Paul Samuelson, *Economics,* 11th ed. (1980), 53–55.

[fn 104] *Crystal Semiconductor Corp. vs. TriTech Microelectronics Int'l, Inc.,* 246 F. 3d 1336, 1359 (Fed. Cir. 2001). In *Crystal Semiconductor,* the Federal Circuit indicated that the "patentee's price erosion theory must account for the nature, or definition, of the market . . . and the effect of the hypothetical increased price on the likely number of sales at that price in the market."

merely assume that it would capture the entire market absent the infringement simply because it operates in a two-supplier market. Further, market size can be affected by a number of issues. For example, the defendant may contend that it had expanded the market by entering it with a lower-priced infringing product, negating any price erosion claim. [fn 105]

The intellectual property owner also cannot assume that the infringer would be absent from the market absent the infringement, especially if the infringer sells multiple products, only one of which infringes. In such a case, the infringer may affect the size of the market through (1) discounting similar model products, (2) adding features to existing products to entice customers, or (3) designing around the patent and offering a new product.

In a market in which the intellectual property holder and infringer are two competitors among many, price erosion may be much more difficult to prove or measure. In a market with a large number of competing products, price is much less influenced by the actions of a single competitor; rather, the entire market acts to set the price. As more and more firms compete in a market, each may find it harder to raise prices and avoid losing sales to other firms. [fn 106]

Price erosion may also be claimed on products that are serving two different markets. Identifying differences in the markets served by the infringing product and the intellectual property owner's product can reveal the factors that influence price in each of those markets.

### Substitutes and New Product Entrants

Potential substitutes for the infringed product from its own segment and competing industries should be examined with regard to price erosion. Substitutes that limit the potential returns of an industry by placing a ceiling on the prices that firms in that industry can profitably charge [fn 107] can diminish or invalidate a price erosion claim.

The threat of new entrants into the infringed product's industry should also be examined. "New entrants to an industry bring new capacity, the desire to gain market share and often substantial resources. Prices can be bid down or incumbents' costs inflated as a result, reducing profitability." [fn 108] The likelihood of new entrants into an industry may have an effect on the price for an infringed product. This factor should be considered in assessing

---

[fn 105] R. Weil, M. Wagner, and P. Frank, eds., *Litigation Services Handbook*, 3d ed. (New York: John Wiley and Sons, Inc., 2001), 30.

[fn 106] R. Pindyck and D. Rubinfeld, *Microeconomics*, 5th ed. (Upper Saddle River, NJ: Prentice Hall, 1998), 345.

[fn 107] M. Porter, *Competitive Strategy* (New York: Macmillan Publishing, 1980), 23.

[fn 108] *Id.*, 7.

potential price erosion. Conversely, barriers to entry into an industry or a market may simplify an argument for price erosion.

### Power of Suppliers and Buyers

Suppliers and buyers may influence the price of an infringed product. With respect to buyers, factors that may influence price include (1) the percentage of total sales an individual buyer represents to a seller and (2) the ability of buyers to easily switch to another product. [fn 109] If buyers of the product which suffered price erosion have significant market power, their impact on the market and price of the infringed product should be considered; the lower price may have come from buyer power, not additional competition. Similarly, the power of suppliers in the creation of the infringed product should be examined. [fn 110]

The switching costs of the buyer should also be considered. If the buyer's costs of switching from the patented technology to a different technology are significant, the intellectual property holder may have a captive market. In such a case, prices could be substantially increased without affecting demand.

### Entire Market Value Rule—Lost Profits

Lost revenues in intellectual property disputes may be calculated based on the selling price of the component of a system that is covered by the intellectual property in suit, or, alternatively, the lost revenue may be the amount lost on the sale of the entire unit, product, or system of which the component piece was a part. This latter approach is referred to as the *entire market value rule*, which allows for the recovery of damages based on the value of an entire apparatus containing several features, even though only one feature is covered by the intellectual property-in-suit. [fn 111] The entire market value rule ordinarily applies when the nonpatented and patented components are physically part of the same machine, as in the *Rite-Hite* case. [fn 112] However, some courts have extended the rule's application to physically separate nonpatented components, so long as they are considered part of one complete machine or constitute a functional unit. [fn 113]

---

[fn 109] *Id.*, 25.

[fn 110] *Id.*, 28.

[fn 111] *Leesona Corp. v. United States*, 599 F.2d 958, 974 (Ct. Cl. 1981).

[fn 112] *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1549 (Fed. Cir. 1995).

[fn 113] *Id.*; *see also, Kalman v. Berlyn Corp.*, 914 F.2d 1473, 1485 (Fed. Cir. 1990). (affirming an award of damages for filter screens used with a patented filtering device); *TWM Mfg. Co., Inc. v. Dura Corp.*, 789 F.2d 895, 901 (Fed. Cir. 1986) (affirming award of damages for nonpatented wheels and axles sold with patented vehicle suspension); *Kori Corp. v. Wilco Marsh Buggies & Draglines, Inc.*, 761 F.2d 649, 656 (Fed. Cir. 1985) (affirming an award of damages for nonpatented uppers of an improved amphibious vehicle having a patented pontoon structure).

The entire market value rule has been applied to both lost profits and a reasonable royalty, as well as to patent and other types of intellectual property disputes. The rule recognizes that, in some cases, the economic value of intellectual property may be greater than the value of the sales of the covered part alone. [fn 114]  Essentially, the entire market value rule applies if the patent holder would have sold the complete device (rather than just the patented component) if there had been no infringement.

For example, in *King Instruments Corp. v. Perego*, the Federal Circuit awarded the patent holder lost profits on sales made by the infringer of nonpatented parts for a video tape splicing machine that used the patented invention. [fn 115]  Similarly, in *State Industries*, the Federal Circuit awarded damages based on the patent holder's profit margin on the sales of an entire water-heating unit. This case concerned the infringement of a patented method for adding foam insulation to the water heaters during the manufacturing process. [fn 116]

In contrast, in *Hughes Aircraft Co. v. United States*, the Federal Circuit declined to award damages based upon the entire market value rule. Hughes argued that the government had infringed its patent controlling the altitude of a spacecraft and that the damage award should include the value of the patented device plus the value of the payload. The payload was the noninfringing satellite that was attached to the spacecraft with the patented device. The court, however, found that Hughes could not reasonably have anticipated the sale of the satellite if it had been granted the contract to build the infringing spacecraft. As the satellite and the spacecraft did not constitute a functional unit, application of the entire market value rule was unwarranted. [fn 117]

Further, in *Juicy Whip, Inc. v. Orange Bang, Inc.*, the patent related to a device that dispensed beverages. The device contained a transparent bowl that provided a large capacity for beverage sales and was also resistant to bacterial growth. The district court did not allow the patentee to present evidence that the defendant's conduct caused enhanced damages because it affected the patentee's sales of related, nonpatented juice syrup. The Federal Circuit held that the "district court abused its discretion by disallowing Juicy Whip's

---

[fn 114] *Brunswick v. United States*, 36 Fed. Cl. 204 (Fed. Cir. 1996), *aff'd*, 182 F.3d 946 (Fed. Cir. 1998); *see also*, *Gargoyles, Inc. v. United States*, 37 Fed. Cl. 95 (Fed. Cir. 1997) (using the entire market value rule to calculate the royalty base), *aff'd*, 113 F.3d 1572 (Fed. Cir. 1997); *Fonar Corp. v. General Elec. Co.*, 107 F.3d 1543 (Fed. Cir. 1997),*cert. denied*, 522 U.S. 908 (1997). *But see, In re Dahlgren Int'l, Inc.*, 811 F. Supp. 1180 (N.D. Texas 1992) (calculating a royalty base without including nonpatented goods or services, even though lost profit calculations account for such items).

[fn 115] *King Instruments Corp. v. Perego*, 65 F.3d 941 (Fed. Cir. 1995) (Nies, J., *dissenting*), *reh'g denied, petition for rehearing en banc declined*, 72 F.3d 855 (Fed. Cir. 1995) (Nies, J., *dissenting*).

[fn 116] *State Indus., Inc. v. Mor-Flo Indus., Inc.*, 883 F.2d 1573 (Fed. Cir. 1989).

[fn 117] *Hughes Aircraft Co. v. United States*, 31 Fed. Cl. 464 (Fed. Cir. 1994).

presentation of factual support for the theory of lost profits" on nonpatented juice syrup sales. [fn 118]

The Federal Circuit concluded that the district court "was clearly erroneous in determining that there was no functional relationship between Juicy Whip's dispenser and the syrup; on the contrary, it is clear that there is such a relationship and Juicy Whip should be entitled to prove damages with respect to lost profits from lost syrup sales." The Federal Circuit's opinion was that the district court incorrectly applied the entire market value rule because in fact the dispenser and syrup were analogous to parts of a single assembly or a complete machine. The Federal Circuit cites *Rite-Hite* in noting, that the entire market value rule "has been extended to allow inclusion of physically separate unpatented components normally sold with the patented components" with the stipulation that both are "considered to be components of a single assembly or parts of a complete machine, or they together constituted a functional unit." [fn 119]

The entire market value rule may also apply to the determination of a reasonable royalty. See the section titled "Entire Market Value Rule—Reasonable Royalty" in this chapter.

### *Convoyed or Collateral Sales*

Lost profits can be awarded for the lost sales of ancillary or accessory products (that is, convoyed or collateral sales). Convoyed sales generally include sales of products not covered by the intellectual property in suit but that are caused by the sale or use of that intellectual property.

When determining whether a patent holder may recover damages for convoyed sales, the expert should be careful to distinguish that issue from the application of the entire market value rule. The entire market value rule allows for the recovery of damages based on the value of an entire apparatus containing several features, even though only one feature is patented. [fn 120] In contrast, convoyed sales are of items that are not typically a physical part of the original device but which are sold as a result of the sale of the patented item.

The Federal Circuit has stated that "[t]he expression 'convoyed sales' should preferably be limited to sales made simultaneously with a basic item; the spare parts here should best be called 'derivative sales.'" [fn 121] "[I]t is not the physical joinder or separation of the contested items that determine their inclusion in or exclusion from the compensation base

---

[fn 118] *Juicy Whip, Inc. v. Orange Bang, Inc.*, 382 F.3d 1367 (Fed. Cir. 2004).

[fn 119] *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1543 (Fed. Cir. 1995).

[fn 120] *Paper Converting Mach. Co. v. Magna-Graphics Corp.*, 745 F.2d 11, 22 (Fed. Cir. 1984).

[fn 121] *Carborundum Co. v. Molten Metal Equip. Innovations, Inc.*, 72 F.3d 872, 881n8 (Fed. Cir. 1995).

for computing a royalty ... so much as their financial and marketing dependence on the patented item under standard marketing procedures for the goods in question."[fn 122]

Regardless of the terminology used, the test for damages remains the same. That is, the intellectual property holder may recover damages for convoyed sales if the intellectual property owner can prove that it would have made those sales but for the infringement.

Under the entire market value rule and convoyed sales doctrine, an intellectual property owner is not permitted to recover losses for products that are sold with the patented item merely for a business or marketing advantage. In *Rite-Hite*, the Federal Circuit stated that it would not extend liability "to include items that have essentially no functional relationship to the patented invention and that may have been sold with an infringing device only as a matter of convenience or business advantage."[fn 123] Further, there should be a reasonable probability that the sale of the patented item would have caused the sale of the nonpatented accessory. But all facts and circumstances should be carefully analyzed. For example, in *King Instrument Corp. v. Otari Corp.*, the court stated that the "infringer had acquired implied license to sell unpatented repair parts through payment of damages as to past infringing machine sales and could not be enjoined from selling any spare parts."[fn 124]

An intellectual property holder may recover damages for lost sales of services related to the patented invention. In *Ristvedt-Johnson, Inc. v. Brandt, Inc.*, the court awarded the patent holder lost profits on machine sales, repair services, preventive maintenance inspection agreements, and supplies. The plaintiff was able to demonstrate that the one-year maintenance agreements were normally purchased when a customer bought the patented coin sorter. However, the court restricted the award for the contracts to the period during which the infringement occurred.[fn 125]

In *DePuy Spine*, the Federal Circuit reversed the award of $77.2 million in lost profits on unpatented pull-through products. The Federal Circuit concluded that the patent holder was "not legally entitled to recover lost profits on ... unpatented products" because "it is undisputed that DePuy's unpatented pull-through products neither compete nor function with its patented SummitTM and MountaineerTM devices and were sold (i.e., 'pulled-through') only by virtue of DePuy's business relationship with surgeons."[fn 126]

---

[fn 122] *Leesona*, 599 F.2d 958, 974, *cert. denied*, 444 U.S. 991 (1979).

[fn 123] *Rite-Hite*, 56 F.3d at 1538, 1550.

[fn 124] *King Instrument Corp. v. Otari Corp.*, 814 F.2d 1560 (Fed. Cir. 1995).

[fn 125] *Ristvedt-Johnson, Inc. v. Brandt, Inc.*, 805 F. Supp. 557, 565 (N.D. Ill. 1992).

[fn 126] *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314 (Fed. Cir. 2009).

The court noted that "[i]n contrast to such functionally-integrated components that are properly subject to lost profits, 'there is no basis for extending that recovery to include damages for [unpatented] items that are neither competitive with nor function with the patented invention.'" The Federal Circuit stated that "lost profits cannot be recovered on unpatented items 'that have essentially no functional relationship to the patented invention and that may have been sold with an infringing device only as a matter of convenience or business advantage.'" [fn 127]

In *American Seating*, the patent was directed to a wheelchair restraint system that complied with the Americans with Disabilities Act for use in mass transit vehicles. The patent-at-issue did not cover either flip-up or fixed passenger seats. The trial court granted USSC's motion "to set aside the verdict for convoyed sales because the record evidence, viewed in the light most favorable to American Seating, was insufficient as a matter of law for the jury to find that the patented tie-down system and unpatented passenger seats were part of a single functional unit." The Federal Circuit agreed with the trial court's conclusions that the patent owner failed as a matter of law to meet its burden of establishing a functional relationship between passenger seats and the patented restraint system. The court confirmed that the jury properly awarded damages for lost profits on the alleged infringer's deliveries of the VPRo II product predicated upon offers to sell the infringing VPRo I product. [fn 128]

The Federal Circuit noted that a

> functional relationship does not exist when independently operating patented and unpatented products are purchased as a package solely because of customer demand. The fact that customers prefer that passenger seats and tie-down wheelchair restraint systems come from a single supplier for ease of purchase, repair, and uniform design and appearance, does not compel the conclusion that the seats and tie-down system are "analogous to components of a single assembly or ... parts of a complete machine." [fn 129]

The court cited as evidence that "[t]ie-downs and passenger seats were usually but not always purchased by bus manufacturers from the same company; package sales were for reasons of convenience and 'one-stop shopping,' not because of an absolute requirement that the two items function together." Additional evidence cited by the court was the showing "that passenger seats command a market value and serve a useful purpose independent of the patented product." "Because it is clear that no interrelated or functional relationship inheres between the seats and the tie-down restraint system on a passenger bus, the district court was correct that the jury had no basis to conclude that lost profits on col-

---

[fn 127] *Id.* (citing *Rite-Hite*, 56 F.3d at 1551).

[fn 128] *Am. Seating*, 514 F.3d at 1262.

[fn 129] *Id.*

lateral sales of passenger seats were due American Seating." Accordingly, the court con-
cluded that "[d]amages on these items would exceed that which suitably compensates for
the infringement."[fn 130]

### Lost Revenues in Copyright Cases

To perform a lost profits calculation in a copyright case, the copyright owner can (1) ana-
lyze sales for a period before the infringement and compare that to the sales subsequent
to the infringement or (2) use the infringer's sales as a base. These techniques are merely
a means to an end, namely a determination of the magnitude of sales the copyright holder
would have made absent the infringement.

If the infringing work and the copyrighted work compete at the same price in the same
market, the infringer's sales may be used as a measure of sales lost by the copyright own-
er. Under this measure, the court will ordinarily multiply the copyright owner's profit on
one sale by the number of sales made by the defendant to arrive at the copyright owner's
actual damages. However, it is rare that the copyrighted work price and infringer's price
are the same. Differences may exist between the copyright owner and the infringer on
matters such as pricing, packaging, advertising, efficiency, cost, production techniques,
and goodwill. Such differences may preclude use of the infringer's sales as a measure of
the copyright owner's lost sales.[fn 131] In essence, to justify a one-to-one substitution of
the infringer's sales for the copyright owner's lost sales, the copyright owner should at-
tempt to show that all of the infringer's customers would have bought the copyrighted
work but for the availability of the infringing product.[fn 132]

Even if the copyright owner is not able to use the infringer's sales as a measure of its own
lost profits, the owner still may be able to recover the infringer's profits. For example, in
*Stevens Linen Associates, Inc. v. Mastercraft Corp.*, the court allowed the copyright own-
er the choice between (1) lost profits based on all of the defendant's sales made to cus-
tomers which had purchased from the copyright owner in the past or (2) lost profits de-
termined by the percentage difference in sales of the infringed product compared with the
percentage difference in sales of all other noninfringed products of the copyright owner.[fn 133]

Courts will ordinarily reject projections made by copyright owners that cannot be sup-
ported by reasonably probable evidence.[fn 134] However, courts may accept probable es-

---

[fn 130] *Id.*

[fn 131] *Mary Ellen Enterprises, Inc. v. Camex, Inc.*, 68 F.3d 1065, 1070 (8th Cir. 1995).

[fn 132] M.A. Glick, L.A. Reymann, and R. Hoffman, *Intellectual Property Damages: Guidelines and Analysis* (Hobo-
ken, N.J.: John Wiley & Sons, Inc., 2003), 318.

[fn 133] *Stevens Linen Assocs., Inc. v. Mastercraft Corp.*, 656 F.2d 11 (2d Cir. 1981).

[fn 134] *Id.* at 15.

timates in the form of opinion testimony. If the copyrighted product is sold at a price significantly higher than the defendant's infringing product, the courts are likely to assume that less than all of the defendant's sales were sales lost by the copyright owner, as the lower price likely caused at least some of the defendant's sales.

Although many courts have limited the copyright owner to the profits of the infringer as compensation for lost profits, other courts have found this remedy to be insufficient. In *F.W. Woolworth Co. v. Contemporary Arts, Inc.*, the United States Supreme Court determined that "a rule of liability which merely takes away the profits from an infringement would offer little discouragement to infringers. It would fall short of an effective sanction for enforcement of the copyright policy."[fn 135]

In determining the copyright owner's lost profits, it is necessary to deduct the incremental overhead expenses that the copyright owner would have incurred if, in fact, those extra sales had been made.[fn 136] If overhead expenses would not increase as a result of additional sales, there is no need to include overhead costs as a component of the damage measure.

Many copyright damages cases have been tried in the courts over the years with the majority of the cases providing little guidance for the damages expert on determining damages. However, a few, described subsequently, are worth discussing, particularly because the decisions are from the Federal Circuit. As with any matter, forensic accountant should consider requesting of counsel or perform a search of relevant case law in the federal district, state, or other court to locate any specific precedents that may be relevant to the facts and circumstances at hand.

As noted in the section titled "Apportionment" in this chapter, the Copyright Act, the Lanham Act, and the UTSA each provide that in an unjust enrichment claim, the intellectual property owner shall recover only the net profits of the infringer *attributable to the infringement*. By comparison, in a lost profits claim, all of the profits derived from infringing sales are awardable as damages. As a result, in an unjust enrichment claim, only the portion of profits from infringing sales that can be ascribed to the intellectual property in question are to be awarded. The issue of the apportionment of revenues and costs came to the forefront again in a 2010 copyright case.

The district court, upon remand from the Federal Circuit for damages, in *William A. Graham Co. v. Haughey*[fn 137] determined that it was not necessary to second guess the jury

---

[fn 135] *F.W. Woolworth Co. v. Contemporary Arts, Inc.*, 344 U.S. 228, 234 (1952).

[fn 136] *Taylor v. Meirick*, 712 F.2d 1112, 1121 (7th Cir. 1983).

[fn 137] *William A. Graham Co. v. Haughey*, 94 U.S.P.Q.2d 1147 (E.D. Pa. 2010). The copyrights-at-issue relate to certain insurance documents called "Standard Survey and Analysis" and "Standard Proposal." A jury awarded damages of $16,561,230 against one defendant and $2,297,397 against the other. A new trial was ordered and the jury in the second trial awarded damages of $1.4 million against one defendant and $268,000 against the other. The second verdict was appealed and remanded by the Federal Circuit.

when looking at the allocation of profits between those attributable to the infringing use and those attributable to factors other than the infringing use. The defendant argued that the plaintiff's expert had miscalculated the amount of gross revenues attributable to the infringement and that the role of the infringement in the client's purchase decision was "modest" as compared to the role of producer and client used in determining allocations to defendants. Further, a question was raised regarding whether the jury could infer additional documents contained infringements (due to the defendants' destruction of documents). "This step of the damage calculation requiring the allocation of profits between those attributable to infringement and those attributable to factors other than infringement is a 'highly fact specific' inquiry. *Andreas*, 336 F.3d at 797 (citing *Estate of Vane v. The Fair, Inc.*, 849 F.2d 186, 190 [5th Cir. 1988]). It is not our function to second-guess the jury." Unless the jury's award was such that it "shocks the judicial conscience" or results in a "miscarriage of justice" then the allocation of revenues and costs, and ultimate damages related to that allocation, will stand. Further, the jury was "free to infer" that the infringing material was used in more documents than produced. [fn 138]

## Measuring Incremental Costs

As discussed previously, when calculating lost profits, the appropriate benefit stream to measure is the incremental profit margin. Determining incremental costs is challenging and often a significant source of contention. It is not unusual for the infringer to claim that the intellectual property owner would need to increase its costs proportionately with the production of additional units or additional revenues. These costs may include increased general and administrative costs or other nondirect product related costs. Increasing these types of costs would lower the profits on the infringing units, as well as the related damages. In response, the intellectual property owner often argues that (1) the gross margin more closely reflects incremental profitability, and (2) it would not have been necessary to add equipment, overhead, or infrastructure to produce and sell the infringed units. This position, of course, tends to increase profitability from the lost sales, as well as related damages. The truth could fall anywhere within the range of these two polar positions, depending on the specific facts and circumstances of the case. [fn 139]

A careful examination of costs is essential to determining the profitability of the lost sales. An examination of each specific cost line item may be necessary. This effort often involves reviewing the costs reflected within detailed financial statements, standard accounting records, and other financial documents. In lieu of a determination by line item, a statistical analysis of the relationship between cost and volume may provide the required

---

[fn 138] *Id.*

[fn 139] M.A. Glick, L.A. Reymann, and R. Hoffman, *Intellectual Property Damages: Guidelines and Analysis* (Hoboken, N.J.: John Wiley & Sons, Inc., 2003), 147.

cost estimates. Such analysis can identify, on average, how much costs have in fact increased for each unit increase in sales volume. [fn 140]

One of the initial determinations for each cost item is whether the cost is variable or fixed over the range of actual and anticipated incremental production. A comparison of the intellectual property owner's output to the claimed incremental sales can help determine the amount of incremental costs that would need to be incurred to make the incremental sales. For example, a doubling in sales may call for an investment in additional manufacturing facilities and management personnel, while an increase of only 5 percent of a plaintiff's sales may not require such an investment.

### Fixed Costs

*Fixed costs* remain constant in total dollar amount as the level of sales activity changes. [fn 141] These costs typically do not respond to changes in the volume of sales activity within (1) a set period of time or (2) a set production level. Examples of fixed-cost items may include factory and manufacturing equipment and buildings, property taxes and certain insurance, charitable contributions, research and development, and depreciation.

Capacity is often an important issue when evaluating fixed costs. If a company has excess capacity, it may well have been able to produce and sell the infringed units with little, if any, additional fixed costs. Conversely, if the company is operating at or close to full capacity, then additional units of production may require additional investments in equipment or other typically fixed costs.

### Variable Costs

*Variable costs* are those that change in direct proportion to changes in volume of activity. A variable cost is one in which the per-unit cost remains relatively constant as volume changes. [fn 142] In other words, total variable costs vary as the level of unit sales changes. Although, in theory, variable costs are relatively constant as volume changes, this is not always true in economic reality. The expert should closely examine variable costs that may increase or decrease as volume changes.

Direct materials and direct labor costs are usually variable costs, because the total of these expenses varies directly with the number of units produced. In addition, sales commissions may vary with total sales and, therefore, are typically variable. Other variable costs may include factory overhead items such as utilities, production supplies, and lubricants.

---

[fn 140] J. Kinrich, R. Mangum, and A. Meister, "Cost Analysis," in *Intellectual Property Damages, Guidelines and Analysis*, 2004 supplement, M. Glick, L. Reymann, and R. Hoffman, eds. (New York: Wiley, 2004).

[fn 141] P.E. Fess and C.S. Warren, *Accounting Principles*, 16th ed. (Cincinnati, OH: South-Western Publishing Co., 1990), 810.

[fn 142] J. Gray and D. Ricketts, *Cost and Managerial Accounting* (New York: McGraw-Hill Book Co., 1983), 28.

Total variable costs change in direct proportion to changes in production volume, which equates to zero dollars when the activity level is zero.

### Semi-Variable Costs or Mixed Costs

A number of costs have both fixed and variable characteristics. [fn 143] *Semi-variable* or *mixed* costs are expenses that can be separated into fixed and variable components. The variable component increases or decreases with sales or production volume, while the fixed component does not vary. For example, sales personnel may be paid both a base salary and a commission based on sales. Although the base salary component represents a fixed cost, sales commissions fluctuate with the amount of sales and represent a variable cost.

Some costs are considered step variable costs. *Step variable costs* increase or decrease only in response to fairly wide changes in activity level. For example, the cost of an additional maintenance worker may represent a step-variable cost.

### Cost of Goods Sold or Manufacturing Costs

*Cost of goods sold* refers to the costs of the manufactured products sold. Typically, these costs reflect the raw materials and manufacturing costs used to convert the raw materials into finished goods and can include such expenses as storage costs, import taxes, and shipping expenses.

### Gross Profits

*Gross profits* refer to the excess of net sales revenue over the cost of goods sold. These profits are referred to as "gross" because the operating expenses have not been deducted. The gross profit margin is computed by dividing gross profits by net revenues.

### Operating Expenses

*Operating expenses* include those expenses incurred in the buying, selling, and administrative functions of the business. These activities may be divided so that the selling expenses and the general and administrative expenses appear separately.

### Selling and Marketing Expenses

*Selling and marketing expenses* are costs incurred to promote the sales of the product and generate revenues. These costs should be directly related to the sale of merchandise. Selling and marketing expenses include salaries for sales and marketing personnel, sales office expenses, travel funds, promotions, advertising, and other costs associated with the

---

[fn 143] P.E. Fess and C.S. Warren, *Accounting Principles*, 16th ed. (Cincinnati, OH: South-Western Publishing Co., 1990), 810.

direct efforts aimed at getting products or services from the company to the consumer. These expenses may include marketing development costs associated with new products as well as existing products.

Expenses are often characterized as cost of goods sold, selling and marketing, and general and administrative. However, the character of the expenses depends on the nature of the industry. Fixed expenses in one industry or one business can be variable in another.

### General and Administrative Expenses

*General and administrative expenses* include expenses associated with general expenditures on the administrative side of the business. These expenses can include accounting services, payroll and human resources, management information services, and cash management (accounts payable and accounts receivable), as well as other support activities. The costs of these services typically do not vary with the company's production output. However, the facts and circumstances in each case vary and need to be analyzed.

### Incremental Profit Margin

The calculation of the incremental profit margin requires a determination of which costs are fixed and which costs are variable over a known increase to various levels of sales volume. In general, companies with historically high variable and low fixed costs (such as consulting firms) will have lower incremental profits relative to firms with historically low variable costs and high fixed costs (such as software companies).

After assessing the historical movement of the cost relative to volume and considering the type of cost, the cost is classified as either fixed or variable. A review and analysis of the income statement may be necessary to obtain the incremental profit margin on additional units sold. Generally, an income statement categorizes costs into cost of goods sold, operating expenses, and general and administrative expenses. Income statement items that are often ignored in a damage calculation include gains or losses from discontinued operations, extraordinary income, or extraordinary expenses. [fn 144] Generally, lost profits are calculated on a pretax basis.

To measure the incremental costs associated with the increased units sold, the courts have typically adopted two approaches, namely (1) account analysis and (2) regression analysis. Account analysis "involves examining accounts at the general ledger level and determining whether that cost is fixed or variable." [fn 145] Regression analysis "is a statistical technique for determining the relationship between two variables" [fn 146] and is applied to

---

[fn 144] M.A. Glick, L.A. Reymann, and R. Hoffman, *Intellectual Property Damages: Guidelines and Analysis* (Hoboken, N.J.: John Wiley & Sons, Inc., 2003), 77–78.

[fn 145] *Polaroid Corp. v. Eastman Kodak Co.*, 16 U.S.P.Q.2d 1481, 1526 (N.D. Mass. 1990).

[fn 146] *Id.*

cost and volume data. Before relying upon a regression analysis, the expert should have a thorough understanding of regression modeling.

Although regression analysis can generate an unbiased estimate of, for example, the average cost incurred in manufacturing each unit, the quality or value of that estimate depends on the precision of the estimate. Regression analysis generates not only estimates of model parameters, but also estimates of the precision of the analysis, often referred to as the standard error. Standard tools of statistics allow a determination of whether a level of precision is acceptable, a condition referred to as statistical significance. The expert should evaluate whether the results of a regression analysis are "statistically significant."

Courts have considered the relative reliability of account and regression analyses. For example, in *Micro Motion, Inc. v. Exac Corp.*, the court weighed the reliability of an account analysis against a regression and historical analysis in an effort to determine the costs that the patent holder would have incurred had it produced the units that were sold by the infringer. [147] The court determined that the regression analysis was of little probative value and declined to follow it. The court found that the regression analysis was more applicable to cases involving well-established firms with regular sales, not one that had substantial nonrecurring costs. Instead, the court adopted the account analysis that classified each cost as a variable, semi-variable, or fixed cost. [148]

In contrast, the court in *Polaroid Corp. v. Eastman Kodak Co.* rejected an account analysis in favor of a regression analysis. [149] The court found that the account analysis relied too heavily on the subjective assessments of the parties and was subject to undue bias. [150] The court also rejected the account analysis because it lacked supporting documentation, including an absence of working papers, notes, or the names of personnel contacted. [151] Additionally, the court found problematic that the account analysis was performed for only one year, although the infringement had occurred over multiple years.

In addition to the analyses discussed previously, the expert should also consider the following factors:

- When looking at costs of sales and individual line items over time as compared with unit production, care should be taken in analyzing the basis for inventory

---

[147] *Micro Motion*, 761 F. Supp. at 1420, 1429.

[148] *Id.* at 1429. The account analysis was based on an individual review by the testifying expert of almost 6,000 accounts.

[149] *Polaroid*, 16 U.S.P.Q.2d at 1481.

[150] *Id.* at 1526.

[151] *Id.* at 1527.

costing. That is, first-in, first-out; last-in, first-out; or average inventory costing may yield dramatically different results.

- Cost studies which provide information about what costs are specifically associated with the production or sale of units should be considered.

- Contracts can clarify what the commissions are on incremental unit sales or what the costs of materials are at various material purchase levels (for example, considering quantity discounts).

Invoices showing purchases of inventories or materials, including those reflecting price increases, may help the expert ascertain what portion of cost increases were driven by changes in unit production or sales, as compared to other causes.

### Future Lost Profits

In *Shockley v. Arcan, Inc.,* [fn 152] the Federal Circuit overturned a jury award for future lost profits. The court acknowledged "that a patentee may be able to produce sufficient evidence to recover projected future losses" in cases "where the patentee has presented reliable economic evidence of 'but for' causation." According to the court, however, "[a]lthough future lost profit calculations necessarily contain some speculative elements, a patentee may supply adequate evidence to enable the fact-finder to responsibly estimate future losses based on sound economic models and evidence, not pure guesswork." [fn 153]

In this case, Excalibur, the co-plaintiff, had an expert testified that he had based his estimate of future lost sales volumes on what Excalibur told him to assume. The court determined this to be "a benchmark without any basis in economic reality." As a result, the court decided "[b]ecause the jury's $3,000,000 future lost profit award was based on evidence derived from speculative assumptions, it runs counter to the great weight of record evidence and cannot stand." [fn 154]

## Reasonable Royalty

Once infringement has been proven in patent cases, the patent holder is entitled to "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty." [fn 155]

---

[fn 152] *Shockley v. Arcan, Inc.*, 248 F.3d 1349 (Fed. Cir. 2001).

[fn 153] *Id.* (citing *Oiness v. Walgreen Co.*, 88 F.3d 1031 [Fed. Cir. 1996]).

[fn 154] *Id.*

[fn 155] 35 USC 284.

In the event lost profit damages cannot be proven for all of the alleged infringing sales, then the patent owner is entitled to reasonable royalties from use of the patented technology for the remaining units sold by the infringer. In other words, the patent holder is entitled to some form of damages on all the infringing sales.

In nonpatent intellectual property disputes, reasonable royalty is neither the base case nor the minimum award. However, it remains an alternative measure of damage and is available under appropriate circumstances. For example, the UTSA (as amended in 1985) states that "[i]n lieu of damages measured by any other methods, the damages caused by misappropriation may be measured by imposition of liability for a reasonable royalty for a misappropriator's unauthorized disclosure or use of a trade secret." [156]

The case law on reasonable royalty for nonpatent intellectual property suits borrows from the more developed body of case law from patent disputes. As a result, the subsequent discussion relating to the parameters and guidelines provided for reasonable royalties in the context of patent disputes is generally applicable to other types of intellectual property infringement, unless otherwise noted. Of course, in all intellectual property disputes, the reasonable royalty to be paid to the plaintiff by the defendant is governed by the particular facts of the case.

A starting point in determining a reasonable royalty is an established royalty—that amount paid by the parties for the intellectual property in suit—as it is based upon the voluntary agreement of a licensor and a licensee. When an established royalty does not exist or cannot be proven in sufficient detail, the expert may need to calculate a royalty that would result from a hypothetical negotiation between the parties. These alternatives are discussed in the following sections.

## Established Royalty

To recover an award of damages based on an established royalty rate, the patent owner needs to show that a licensing agreement covering the patent was entered into with another party, typically prior to a lawsuit or threat of a lawsuit. [157] The patent holder may have to demonstrate that multiple parties have found the royalty rate to be reasonable. [158] Some courts have held that a single licensing agreement may be insufficient and unreliable to prove an established royalty rate. [159] In addition, there is ambiguity regarding the acceptability of settlement agreements, which is addressed in greater detail the section titled "Date of Hypothetical Negotiation" in this chapter. In general, the expert should

---

[156] UTSA with 1985 Amendments, 11.

[157] *Studiengesellschaft Kohle, m.b.h. v. Dart Indus.*, 862 F. 2d 1564, 1572 (Fed. Cir. 1988).

[158] *Trell v. Marlee Elecs. Corp.*, 912 F. 2d 1443, 1446 (Fed. Cir. 1990).

[159] *Hanson v. Alpine Valley Ski Area*, 718 F. 2d 1075, 1078 (Fed. Cir. 1983); *Wang Labs., Inc. v. MitsubishiElec. Am., Inc.*, 860 F. Supp. 1448, 1452 (C.D. Cal. 1993).

consider whether the royalty rate was accepted by enough members in the industry to be considered reasonable. Additionally, the expert should consider whether or not existing licenses are truly comparable to the patent in dispute.

In evaluating established or otherwise existing royalty rates for the purposes of determining the reasonable royalty that an infringer should pay the patent holder, it is often appropriate to suggest royalty adjustments to account for inherent differences between the existing agreement and the hypothetical negotiation (for example, the certainty regarding infringement and validity or the perceived threat of litigation). Although such differences may be real and suggest the need for an adjustment, the expert should not fail to consider all the inherent differences between actual negotiations and hypothetical negotiations. For example, actual negotiations usually include the transfer of knowledge and know-how, as well as documentation and continued support. These items, often of substantial value, are normally not transferred to infringers. The expert should use caution when deciding how to properly quantify the overall royalty adjustment.

## Hypothetical Negotiation

A reasonable royalty analysis attempts to determine a royalty the patent owner would have obtained in an arm's-length hypothetical negotiation between the patent owner (as a willing licensor) and the infringer (as a willing licensee) just prior to the onset of infringement. This hypothetical negotiation analysis is inherently different from a real-world negotiation in that it assumes that both parties agree the patent is valid and that the infringer's use of the technology is infringing. In light of the artificial nature of the hypothetical negotiation, a patent owner is not required to prove the reasonable royalty and its resulting damages with exact certainty but rather "as a matter of just and reasonable inference." [fn 160] (In this regard, refer to the section titled "Entire Market Value Rule—Reasonable Royalty" in this chapter.)

The hypothetical negotiation assumes that both parties would have been willing and able to negotiate a license agreement and that the negotiation took place at the time of first infringement. Although the hypothetical negotiation is assumed to occur at the time of first infringement, it would be wrong to conclude that this timing should generally result in a last-minute premium to be applied to the reasonable royalty.

It may appear that, like in a valuation, only information available as of the date of the supposed hypothetical negotiation could be used to determine the value of the royalty. However, despite the fact that the hypothetical negotiation should be as of the date of first infringement, the courts have considered information subsequent to the hypothetical negotiation date in determining the damage award. [fn 161] This information is typically referred to as the "Book of Wisdom."

---

[fn 160] *SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*, 926 F.2d 1161 (Fed. Cir. 1991).

[fn 161] *Fromson v. Western Litho Plate & Supply Co.*, 853 F.2d 1568 (Fed. Cir. 1988).

In deciding the reasonable royalty issues, the *Panduit* court addressed the following issues concerning the hypothetical negotiation:

> The setting of a reasonable royalty after infringement cannot be treated, as it was here, as the equivalent of ordinary royalty negotiations among truly "willing" patent owners and licensees. That view would constitute a pretense that the infringement never happened. It would also make an election to infringe a handy means for competitors to impose a "compulsory license" policy upon every patent owner. Except for the limited risk that the patent owner, over years of litigation, might meet the heavy burden of proving the four elements required for recovery of lost profits, the infringer would have nothing to lose, and everything to gain if he could count on paying only the normal, routine royalty noninfringers might have paid. As said by this court in another context, the infringer would be in a "heads-I-win, tails-you-lose" position. [fn 162]

The expert understands that in an actual negotiation between a willing buyer and a willing seller, neither party is required to undertake the transaction. However, in a hypothetical negotiation, both parties are required to consummate the transaction. Therefore, the hypothetical negotiation needs to consider the specific circumstances surrounding both parties, such as financial position, competitive strategies, and market position.

A seminal case for determining a reasonable royalty rate is *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, which identified 15 factors that need to be considered in a reasonable royalty rate calculation. These factors are discussed in the following sections.

When measuring reasonable royalty rates, the courts have looked to the date when infringement first began. As noted the court has found that the date of the hypothetical negotiation is the first step in a reasonably royalty calculation and is "essential for properly assessing damages." [fn 163]

In *Harris Corp. v. Ericsson, Inc.*, the Federal Circuit affirmed that royalty rates determined using the hypothetical negotiation framework may vary over the damages period. In this case, the reasonable royalty rate was determined to decrease over the damages period from 1.75 percent for the first 5 years and a renewal rate of 0.5 percent thereafter. In this case, the notice date of August 17, 1998, is the date on which this lawsuit was filed. Ericsson relied on the undisputed fact that the statutory damages period did not begin until this date when it received notice of the patent. Ericsson argued that royalty rates prior to the beginning of the statutory damages period are immaterial. "Where we part company with the district court is over the understanding that it is permissible to use a blended royalty rate when all of the infringement for which damages are available took place after the lower rate would have come into effect." Because the damages period began at a

---

[fn 162] *Panduit Corp. v. Stahlin Bros. Fibre Works*, 575 F.2d 1152, 1158 (6th Cir. 1978).

[fn 163] *Integra Lifesciences I, Ltd. v. Merck KGaA*, 331 F.3d 860 (Fed. Cir. 2003).

much later date than the hypothetical negotiation (on the date Ericsson received notice of the patent-at-issue), the Federal Circuit ruled that the lower rate of 0.5 percent was the appropriate rate on which to base damages. In particular, the Federal Circuit ruled again the mandating consideration of a hypothetical negotiation on the date of first infringement (but not automatically excluding evidence of subsequent events); the appropriate reasonable royalty is that which is in effect during the damages period. [164]

### Georgia-Pacific Factors

Georgia-Pacific [165] provided a list of 15 factors that the court considered important in determining a reasonable royalty rate. These factors have been widely adopted by the courts for use in calculating a reasonable royalty rate in a patent case. Not all of the factors will be considered in each case, nor will they all have the same level of importance in each case. In discussing the 15 factors, the court indicated that ". . . there is no formula by which these factors can be rated precisely in the order of their relative importance or by which their economic significance can be automatically transduced into their pecuniary equivalent." [166]

The 15 Georgia-Pacific factors are as follows:

1. The royalties received by the patent holder for the licensing of the patent in suit, proving or tending to prove an established royalty

2. The rates paid by the licensee for the use of other patents comparable to the patent in suit

3. The nature and scope of the license, as exclusive or nonexclusive, or as restricted or nonrestricted in terms of territory or with respect to whom the manufactured product may be sold

4. The licensor's established policy and marketing program to maintain its patent monopoly by not licensing others to use the invention or by granting licenses under special circumstances designed to preserve that monopoly

---

[164] *Harris Corp. v. Ericsson, Inc.*, 417 F.3d 1241 (Fed. Cir. 2005). The patent-at-issue relates to a particular way of processing wireless signals in such devices as cellular phones and base stations. The jury awarded $61.3 million in reasonable royalty damages, based upon the plaintiff's expert's royalty rate of 1.75 percent. The trial court found that the evidence did not support the damages award and gave Harris the choice between a remitted the amount to $43,270,150 (using a blended royalty rate) and a new trial, recognizing that a reasonable royalty rate could be modified over time by subsequent events.

[165] *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970), modified, 446 F.2d 295 (2d Cir. 1970), cert. denied, 404 U.S. 870 (1971).

[166] *Id.*

5.  The commercial relationship between the licensor and licensee, such as whether
    they are competitors in the same territory in the same line of business or whether
    they are inventor and promoter

6.  The effect of selling the patented specialty in promoting sales of other products of
    the licensee; the existing value of the invention to the licensor as a generator of
    sales of its nonpatented item; and the extent of such derivative or convoyed sales

7.  The duration of the patent and the term of the license

8.  The established profitability of the product made under the patent, its commercial
    success, and its current popularity

9.  The utility and advantages of the patent property over the old modes or devices, if
    any, which had been used for working out similar results

10. The nature of the patented invention, the character of the commercial embodiment
    of it as owned and produced by the licensor, and the benefits to those who have
    used the invention

11. The extent to which the infringer has made use of the invention and any evidence
    probative of the value of that use

12. The portion of the profit or of the selling price that may be customary in the par-
    ticular business or in a comparable business to allow for the use of the invention
    or analogous inventions

13. The portion of the realizable profit that should be credited to the invention as dis-
    tinguished from nonpatented elements, the manufacturing process, business risks,
    or significant features or improvements added by the infringer

14. The opinion testimony of qualified experts

15. The amount that a licensor (such as the patent holder) and a licensee (such as the
    infringer) would have agreed upon if both had reasonably and voluntarily tried to
    reach an agreement; that is, the amount that a prudent licensee—which desired, as
    a business proposition, to obtain a license to manufacture and sell a particular ar-
    ticle embodying the patented invention—would have been willing to pay as a roy-
    alty and yet be able to make a reasonable profit and the amount that would have
    been acceptable by a prudent patent holder that was willing to grant a license [fn 167]

### *Analyses to Support an Opinion on a Hypothetical Negotiation*

---

[fn 167] *Id.*

To maximize the effectiveness of an analysis of a hypothetical negotiation, the expert may want to perform the following types of analysis, depending on the facts of the case, consistent with the *Georgia-Pacific* and hypothetical negotiation parameters.

| *Georgia-Pacific Factor(s)* | *Analysis* | *Where to Find* |
|---|---|---|
| 1, 2, 3 | Review of existing license agreements pertaining to the intellectual property in suit or similar intellectual property. These agreements may be between the plaintiff and the defendant, between either of the parties and others not involved in the suit, or between parties not involved in the suit. In general, the closer the technology and the parties, the more relevant the agreements. | Commercial royalty databases, public filings, licenses involving the parties to the case (often produced in discovery), and financial records of the parties |
| 8, 12, 13 | Profitability of products covered by the intellectual property in suit compared to that of other products | Company financial records, public filings, sales reports, and invoices |
| 8, 9, 10 | Review of marketing materials to determine the importance of the covered feature to the sales and profitability of covered and infringing products | Company financial statements, internal company correspondence, marketing plans, correspondence with customers, sales training materials, and customer opinion surveys |
| 5 | Documents pertaining to the competitive relationship between the companies | Internal correspondence, licensing history and correspondence, and each party's customer list |
| 4 | Documents pertaining to the amount of protection and effort the plaintiff places on its intellectual property | Correspondence and testimony of company management |
| 9 | Cost savings and other benefits of the intellectual property in suit | Internal correspondence, financial records, and correspondence |
| 15 | Financial position of companies and need for intellectual property and product sales | Financial statements and records over time, particularly as of date of first infringement |
| 6 | Collateral sales and related product sales | Sales invoices showing how often the products are sold together and marketing literature |

### *Classification of the Georgia-Pacific Factors*

A treatise on the subject of intellectual property law and damages classifies the 15 *Georgia-Pacific* factors into two broad groupings of (1) licensing activity (including prior and existing licenses, licensing policies, and industry customs) and (2) the value of the patent (including anticipated profits, benefits of the invention, value of the invention, available

noninfringing alternatives, and the duration of the patent). [fn 168] Alternative classifications of the *Georgia-Pacific* factors exist, including similar categories set forth in *Promega Corp. v. Lifecodes Corp.* [fn 169]

In *Promega*, the court stated that the *Georgia-Pacific* factors fall into two categories. The first category is specific and general market conditions in the pertinent industry, which include prior and existing licenses under the patent, industry custom and licenses on comparable patents, and the patent owner's licensing policy and the relation between the parties. The second category is the anticipated profitability of the product or process made, used, or sold by the alleged infringer and covered by the patent and includes the infringer's anticipated profits; comparative utility and noninfringing alternatives; collateral benefits and convoyed sales; improvements, small parts, and apportionment; state of development and commercial success; and duration of the patent. The grouping of the *Georgia-Pacific* factors demonstrates the interplay of the issues presented in the *Georgia-Pacific* case and the hypothetical negotiation.

*Licensing Activity*

Prior licensing agreements entered into by the patent owner or the industry can play "an important role in determining a reasonable royalty award." [fn 170] A patent owner may recover under an established royalty when the patent owner has consistently licensed to others at a uniform royalty and comparable in manner to that of the defendant. In order for past agreements to constitute an established royalty, the following five criteria generally must be met: [fn 171]

1. Paid or secured before the infringement began

2. Paid by a sufficient number of persons to indicate the reasonableness of the rate

3. Must be uniform in amount

4. Must not have been paid under threat of suit or in settlement of litigation

5. Must be for comparable rights or activity under the patent

The standard for establishing the existence of an established royalty is high. As a result, in many instances, patent owners are unable to satisfy the five criteria. In the absence of

---

[fn 168] J.T. Thomas, D.A. Segal, and H.M. Lyon, *Intellectual Property Law Damages and Remedies: Updated through Release 18*, Terence P. Ross, ed. (New York: Law Journal Press), 3-58.

[fn 169] *Promega Corp. v. Lifecodes Corp.*, 53 U.S.P.Q.2d 1463, 1999 WL 1427829 (D. Utah, 1999).

[fn 170] Thomas, Segal, and Lyon, 3-58.

[fn 171] *ResQNet.com, Inc. v. Lansa*, 594 F.3d 860 (Fed. Cir. 2010).

an established royalty, prior or existing rates "are carefully weighed by the courts in de-
termining a reasonable royalty." [fn 172] Actual agreements that have been reached between
a willing seller and a willing buyer may provide insight into the hypothetical negotiation
between patent owner and the defendant at the time of infringement. [fn 173]

In *Lucent Technologies, Inc. v. Gateway, Inc*., the Federal Circuit was unable to deter-
mine how the agreements presented by Lucent were similar to a hypothetical negotiation
for the patent-at-issue. The court found that "Lucent had the burden to prove that the li-
censes were sufficiently comparable to support the lump-sum damages award" and did
not present evidence other than a "recitation of royalty numbers, one of which is arguably
in the ballpark of the jury's award." The Federal Circuit found that the royalty agree-
ments in evidence "differ substantially from the hypothetical negotiation scenario involv-
ing the [patent-in-suit]." [fn 174] In particular, many of the agreements were for different pa-
tented technology, more than one patent, cross licenses, and not explained about whether
the patented technology was essential to the licensed product versus a small component
or feature or contained complex royalty structures that would not have existed at the hy-
pothetical negotiation. Further, for the four running royalty license agreements presented
by Lucent, the Federal Circuit found that although "fundamental differences exist be-
tween lump-sum agreements and running royalty agreements," running royalty and lump
sum license agreements may be relevant to one another. "For a jury to use a running-
royalty agreement as a basis to award lump-sum damages, however, some basis for com-
parison must exist in the evidence presented to the jury. In the present case, the [court
found that the] jury had almost no testimony with which to recalculate in a meaningful
way the value of any of the running royalty agreements to arrive at the lump-sum damag-
es award." [fn 175]

In *Integra Lifesciences v. MerckKGaA*, the Federal Circuit suggested that licenses used to
provide insight into a reasonable royalty should have "scientific or economic circum-

---

[fn 172] Thomas, Segal, and Lyon, 3-58.

[fn 173] *See, e.g.*, the cases in the following two circuits:

- First Circuit: *Bose Corp. v. JBL, Inc.*, 112 F. Supp. 2d 138, 165 (N.D. Mass. 2000) ("Lacking an estab-
lished royalty rate, the Court must retroactively construct a hypothetical 'arms-length' negotiation between
a willing licensor and willing licensee to determine the royalty rate upon which the parties would have
agreed.").

- Seventh Circuit: *Northlake Marketing & Supply, Inc. v. Glaverbel*, 72 F. Supp. 2d 893, 902 (N.D. Ill. 1999)
("Such a reasonable royalty is determined based upon a hypothetical negotiation between the patent owner
and the infringer, at the time the infringement began, with both parties to the negotiation assuming that the
patent is valid and would be in-fringed but for the license.").

[fn 174] *Lucent Techs., Inc. v. Gateway, Inc*., 580 F.3d 1301 (Fed. Cir. 2009).

[fn 175] *Lucent Techs*., 580 F.3d at 1301.

stances that permit comparison to [the hypothetical license]." [fn 176] The court also addressed royalty stacking, which occurs when the licensee is required to pay multiple royalties on a product when more than one patent is embodied or otherwise used to commercialize that product; accordingly, the licensee may find itself in an unprofitable position by paying royalties under multiple licenses. In *Integra Lifesciences*, the Federal Circuit found that "the number of patent licenses needed to develop a drug may also affect the value placed on any single technology used in the development process. The cumulative effect of such stacking royalties can be substantial." [fn 177] The court concluded that the effect of stacking royalties would be a consideration in the negotiation of a hypothetical license.

As noted at length previously, in *Lucent Technologies*, [fn 178] the Federal Circuit found that comparable licenses should include a license to a technology that was similar in nature to that contemplated under the hypothetical negotiation, among other considerations. Similarly, in *ResQNet.com, Inc. v. Lansa, Inc.*, [fn 179] the Federal Circuit overturned a district court award of a running royalty of 12.5 percent applied to sales of infringing "New-Look" software. The Federal Circuit, in vacating the lower court's decision, found that the "district court's award relied on speculative and unreliable evidence divorced from proof of economic harm linked to the claimed invention and is inconsistent with sound damages jurisprudence." In particular, the court rejected the expert's use of "licenses with no relationship to the claimed invention to drive the royalty rate up to unjustified double-digit levels." The court found that none of the 5 rebundling licenses that had "extremely high rates," which the expert relied upon, mentioned the patents-at-issue or could be linked to the claimed technology. The court found that the expert did not provide a convincing reason to consider them. The court stressed that comparable licenses need to take into account "the technological and economic differences" between the licenses. The fact that the defendant chose not to proffer an expert to rebut the plaintiff's expert should not result in the court affirming an inappropriate royalty rate because the evidentiary burden is on the plaintiff "to persuade the court with legally sufficient evidence regarding an appropriate reasonable royalty." [fn 180]

---

[fn 176] *Integra Lifesciences I, Ltd. v. Merck KGaA*, 331 F.3d 860 (Fed. Cir. 2003) The 5 patents-at-issue relate to patents related to segments of certain proteins that, by interacting with certain receptors on the surfaces of cells, induced better cell adhesion and growth aimed at promoting wound healing. At trial, a jury awarded a reasonable royalty of $15 million for infringement of 4 of the patents-at-issue. Merck appealed the jury's award.

[fn 177] *Id.*

[fn 178] *Lucent Techs.*, 580 F.3d at 1301.

[fn 179] *ResQNet.com, Inc. v. Lansa, Inc., 594 F.3d 860 (Fed. Cir. 2010). The patents-at-issue relate to technology on screen recognition and terminal emulation processes that download a screen of information from a remote mainframe computer onto a local personal computer. The accused product is a software program named "NewLook" that was sold by Lansa in the United States.*

[fn 180] *Id.*

In *LaserDynamics, Inc. v. Quanta Storage America, Inc.*, the district court overturned the jury verdict of $52 million, determining the award to be excessive. [fn 181]  The jury awarded a royalty of 5 percent on standalone drives priced at $28 and a 2 percent royalty on computers incorporating the drives priced at $800. The defendant had been a party to a number of license agreements which carried a lump-sum royalty ranging from $57,750 to $266,000. The plaintiff had not entered into any licenses with royalties near $52 million. Therefore, none of the licenses bore any relationship to the damages amount. The district court, citing *Lucent Technologies*, held that "there was no evidence from which the jury could conclude that the patented features of the invention formed the based for the customer's demand for the entire computer." [fn 182]

Relying on the court's decision in *ResQNet.com*, Federal Circuit Judge Randall Rader, sitting by designation, precluded a damages expert in *IP Innovation, LLC v. Red Hat, Inc.*, from testifying because he found that the expert "arbitrarily picked a royalty rate that is much higher than existing royalty rates for licenses to the patents-in-suit." [fn 183] The starting point for the expert's determined royalty rate was based on industry surveys which "encompass much more than" the patents-at-issue; there was no indication or evidence offered that the industry agreements forming the basis of the survey were "in any way comparable to the patents-in-suit." Judge Rader found that the expert "should have at least inaugurated his analysis with reference to the existing licenses," even if these licenses had been executed during a different time period than the hypothetical negotiation. According to the court, "[a] credible economic approach might have tried to account for the passage of time ... rather than reject them out of hand." The court concluded, citing *ResQNet.com*, that "the trial court should not rely on unrelated licenses to increase the reasonable royalty rate above rates more clearly linked to the economic demand for the claimed technology." [fn 184]

The court's opinions in *Lucent Technologies* and *ResQNet.com* were echoed by the Federal Circuit ruling in *Wordtech Systems v. Integrated Network Solutions, Inc.* [fn 185]  In this matter, the jury awarded a lump-sum royalty amount based on evidence that included 11

---

[fn 181] *LaserDynamics, Inc. v. Quanta Storage Am., Inc.*, 2:06-cv-00348 (E.D. Tex 2010).

[fn 182] *Id.*

[fn 183] *IP Innovation LLC v. Red Hat, Inc., 705 F. Supp. 2d 687 (E.D. Tex. 2009) The patents-at-issue relate to desktop switching technology found in operating systems. The accused product is Linux-based operating systems, Enterprise Linux Desktop and Server products.*

[fn 184] *Id.*

[fn 185] *Wordtech Sys. v. Integrated Network Solutions, Inc.*, 609 F.3d 1308 (Fed. Cir. 2010). The patents-at-issue relate to technology for automated duplication of compact discs. The accused product is a disc duplication device known as the "Robocopiers 600 and 800." A jury trial was held and, upon the finding of infringement, the jury awarded a reasonable royalty of $250,000 that was trebled and included an award of attorney's fees, interest, and costs. Upon appeal, the defendants' request a new trial or remittitur of $52,250. The $250,000 was the equivalent of a 26.3 percent royalty on $950,000 in infringing sales.

running royalty licenses and 2 lump-sum licenses. The court found that the 11 running royalty agreements contained no basis for comparison to the jury's lump-sum award, and that the 2 lump-sum agreements provided no basis for comparison to the sales of the accused product, that is, the volume of sales or projected sales. The court remanded the case for a new trial on damages.

In *Utah Medical Products v. Graphic Controls Corp.*, the Federal Circuit confirmed that the district court did not err in disallowing the license agreements put forth by the defendant's expert. Abuse of discretion is the standard of review for excluding expert testimony. Prior to the jury trial, the district court held a *Daubert* hearing that resulted in the exclusion of the defendant's expert's reasonable royalty theory. The court found that the license agreements used by the expert in support of the royalty opinion "were not relevant to the facts of this case." The district court found that the expert failed to prove that the license agreements were "in any way comparable" to the patent-at-issue. [fn 186]

Courts have often found that settlement license agreements are not instructive with regard to the willing seller or willing buyer negotiation. This is because the circumstances under which the settlement license agreements are negotiated and executed are not comparable to the negotiation that would occur prior to any litigation and without any threat of litigation. [fn 187] As noted in the section titled "Classification of the Georgia-Pacific Factors" in this chapter, a handful of decisions have found that even if the prior licenses were obtained under threat of litigation or in settlement, the royalty rate of the license is still some evidence of a reasonable royalty. Recent decisions further support the potential comparability of settlement license agreements indicating that certain facts of the case may dictate the inclusion of settlement agreements, and, in fact, settlement agreements may be the most comparable license agreements available.

In *ResQNet.com*, the Federal Circuit acknowledged that the "most reliable license in this record arose out of litigation," and in citing *Fromson v. Western Litho Plate & Supply Co.*, it noted that the court should consider the myriad of "events and facts that occurred thereafter and that could not have been known to or predicated by the hypothesized negotiators." [fn 188] Similarly, in *ReedHycalog UK, Ltd. v. Diamond Innovations, Inc.*, the district court allowed the inclusion of five settlement agreements with the other license agreements admitted at trial. The district court indicated that the relevance of the agree-

---

[fn 186] *Utah Med. Prods. v. Graphic Controls Corp.*, 350 F.3d 1376 (Fed. Cir. 2003). The patent-at-issue is a transducer-tipped intrauterine pressure catheter. The accused product is the "Softrans" device. The jury awarded $20 million in damages, approximately 96 percent of the defendant's sales of the accused product.

[fn 187] This chapter does not include a discussion of admissibility of settlement agreements under Federal Rules of Evidence 408 and 403. Under Rule 408, settlement agreements are barred from admission. Under Rule 403, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of "unfair prejudice or confusion."

[fn 188] *Fromson*, 853 F.2d 1568 (Fed. Cir. 1988); *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 870 (Fed. Cir. 2010).

ments, basically the same license structure and financial terms, outweighed any risk of confusion or prejudice that might occur. The district court also remarked that *ResQNet.com* did not allow for the automatic inclusion of settlement agreements, but rather case specifics would determine the inclusion or exclusion of settlement agreements. [fn 189]

It appears settlement agreements are more often admitted when the asserted patents have not been previously licensed or no "more comparable" agreements are available. The settlement agreements then become the best "comparable agreements" and may provide more instruction than the evidence created by the parties to the litigation. Relying on the *ResQNet.com* decision, the court in *Tyco Healthcare Group LP v. E-Z-EM, Inc.*, held that

> [a] prior, related settlement agreement, where it exists, may be central to the fact-finder's determination of damages using a hypothetical negotiations analysis. Given that the "hypothetical reasonable royalty calculation occurs before litigation and that litigation itself can skew the results of the hypothetical negotiation," the parties are entitled to show whether and to what extent the rate from a prior license agreement is the result of a compromise or reflects a desire to avoid litigation. [fn 190]

Further, in *DataTreasury Corp. v. Wells Fargo & Co.*, [fn 191] the district court denied a motion *in limine* from the defendant seeking to exclude a royalty rate that was used in settlement of a case. The court, referencing *ResQNet.com*, stated, "litigation-related licenses should not be excluded," and any "concerns about the reliability of litigation-related licenses are better directed to weight, not admissibility." [fn 192] In doing so, the court held that the defendant can propose a jury instruction that gives guidance on applying the settlement licenses and that the plaintiff should produce documents regarding the negotiations of these settlement licenses.

Although settlement agreements were deemed potentially relevant in the previous decisions, the ultimate decision about the relevance and, therefore, the admissibility of settlement license agreements depends on the totality of the facts in a given case. In *Fenner Investments, Ltd. v. Hewlett-Packard Co.*, the district court clarified that the "*ResQNet* decision has not altered the admissibility of agreements entered into under the threat of

---

[fn 189] *ReedHycalog UK, Ltd. v. Diamond Innovations, Inc.*, 6:08-cv-00325 (E.D. Tex., 2010).

[fn 190] *Tyco Healthcare Group LP v. E-Z-EM, Inc.*, 2010 U.S. Dist. LEXIS 18253 (E.D. Tex.). The court ruled on the plaintiff's motion to compel the defendant to produce documents allegedly covered by the defendant's purported "settlement negotiations" privilege. The license in question was between the defendants and a nonparty third party for technology used in the defendant's products.

[fn 191] *DataTreasury Corp. v. Wells Fargo & Co.*, 2010 U.S. Dist. LEXIS 25291 (E.D. Tex.). The patents-at-issue relate to digital document imaging software such as that used in digital check processing.

[fn 192] *Id.*

litigation. In *ResQNet*, the litigation-related licenses were part of the record and their admissibility was not before the court."[fn 193] The court found "the potential for prejudice and jury confusion substantially outweigh any probative value."[fn 194] The court noted that parties enter into settlements for a number of reasons, which "include not only [the] cost of additional litigation or the relative financial positions of the parties, but also the risk of a sizeable verdict against a defendant or a finding of invalidity or unenforceability against a plaintiff, which would end not only that action but future actions against other alleged infringers."[fn 195] The court determined that allowing settlement agreements would "invite a 'mini-trial' on similarities and differences in the facts" which "would cause unfair prejudice, confuse the issues, and waste time."[fn 196]

Similarly, the district court in *Pioneer Corp. v. Samsung SDI Co.* found that although "negotiations, offers, and agreements reached under the threat of litigation should not be admitted under either *Rules 403* or *408*, such evidence may still be of *some* relevance to a damages expert when considered as one factor among many. Conversely, experts may not exclusively rely on such negotiations, offers, and agreements. Such, however, is not the case here."[fn 197] The court allowed the testimony of the damages expert on negotiations, offers, and agreements reached under the threat of litigation because the expert did not "exclusively rely"[fn 198] upon them.

The court in *Software Tree LLC v. Red Hat, Inc.*,[fn 199] echoed the findings in *Fenner Investments* and further stated that the question before the court in *ResQNet.com* was not one of comparability as in that matter, no question of admissibility or discoverability of litigation-related licenses was before the court.

Rates paid by other industry participants, which may or may not include the infringer, may be used in determining a reasonable royalty under the logic that the parties to the

---

[fn 193] *Fenner Invs., Ltd. v. Hewlett-Packard Co.*, 2010 U.S. Dist. LEXIS 41514 (E.D. Tex.). This decision relates to the plaintiff's motion *in limine* to preclude the defendant's testimony about prior litigation and settlement license agreements. The defendant argued that *ResQNet.com* altered the admissibility of settlement license agreements or those signed under the threat of litigation.

[fn 194] *Id.*

[fn 195] *Fenner Invs.*, 2010 U.S. Dist. LEXIS 41514 (E.D. Tex.).

[fn 196] *Id.* (citing *Insight Tech., Inc. v. SureFire LLC*, 2009 U.S. Dist. LEXIS 97183 [D.N.H. Oct. 8, 2009]).

[fn 197] *Pioneer Corp. v. Samsung SDI Co.*, 2008 U.S. Dist. LEXIS 107079 (E.D. Tex.). The patents-at-issue relate to technology in plasma displays. The plaintiff sought to exclude the testimony of the defendant's damages expert related to his reliance on settlement negotiations, offers, and agreements.

[fn 198] *Id.*

[fn 199] *Software Tree, LLC v. Red Hat, Inc.*, 2010 U.S. Dist. LEXIS 70542 (E.D. Tex.). Before the district court was a motion to compel discover on settlements, negotiations, and offers.

hypothetical negotiation would be guided by the customary practice in the industry. [fn 200] The Federal Circuit, however, has affirmed cases in which an award was substantially higher than those suggested by industry norms. [fn 201] Accordingly, industry custom "is rarely given decisive effect due to the generally unique character of both the patented invention and the market circumstances under which the license would be purchased and utilized." [fn 202] [fn 203]

The courts also have given "weight to any restrictive licensing policies of the patent owner. A formal written policy does not have to exist; rather, the patent owner's licensing policy can be established by taking into account its prior licensing activities." [fn 204] The rationale behind giving any consideration to the patent owner's licensing policies is that if the patent owner generally refuses to grant licenses to its invention, a higher royalty would be justified in order to induce the hypothetical sale. [fn 205] In addition, irrespective of the patent owner's licensing policy, if the patent owner demonstrates that it had the requisite capacity to make the infringer's sales, the patent owner may argue that it would not have licensed the patent to the infringer without commensurate financial incentives. [fn 206]

---

[fn 200] J.T. Thomas, D.A. Segal, and H.M. Lyon, *Intellectual Property Law Damages and Remedies: Updated through Release 18*, Terence P. Ross, ed. (New York: Law Journal Press), 3-58.

[fn 201] *See, e.g.*, *Radio Steel & Mfg. Co. v. MTD Prods., Inc.*, 788 F.2d 1554, 1556 (Fed. Cir. 1986) (affirming an award of 10 percent reasonable royalty despite evidence establishing that the infringer in fact expected a net profit of only 6 percent); *Bio-Rad Lab., Inc. v. Nicolet Instrument Corp.*, 739 F.2d 604, 617 (Fed. Cir. 1984), *cert. denied*, 469 U.S. 1038 (1985) (affirming a 33 percent royalty despite an industry standard of only 3 percent to 10 percent).

[fn 202] Thomas, Segal, and Lyon, 3-58.

[fn 203] *See, e.g.*, the cases in the following two circuits:

- Fourth Circuit: *Tights, Inc. v. Kayser-Roth Corp.*, 442 F. Supp. 159, 163 (M.D.N.C. 1977) ("The Court finds this evidence [of license agreements for the patent-in-suit] more reliable for what the parties would consider the worth of the invention than any evidence of royalties paid on comparable patents.")

- Eighth Circuit: *Austin-Western Road Mach. Co. v. Disc Grader & Plow Co.*, 291 F. 301, 305 (8th Cir. 1923), *cert. denied*, 263 U.S. 717 (1924) ("Royalties paid in more or less similar situations would be considered, although the weight of such evidence in any particular case might be slight.")

[fn 204] Thomas, Segal, and Lyon, 3-58.

[fn 205] *Id.*

[fn 206] *See, e.g.*, the cases in the following four circuits:

- Second Circuit: *Shamrock Techs., Inc. v. Medical Sterilization, Inc.*, 808 F. Supp. 932, 942 (E.D.N.Y 1992), *aff'd*, 28 U.S.P.Q.2d (BNA) 1693 (Fed. Cir. 1993) ("We . . . consider the use [the infringer] made of the [patented] process in competing with [the patentee].")

*Profitability and Value of the Patent*

The second category of *Georgia-Pacific* factors addresses the economic value of the patent generally and to the value to the infringer specifically. "It is axiomatic that the perception of the parties to a negotiation about the value of the patent would be important in determining the outcome of those negotiations."[fn 207] A willing buyer would agree to pay a royalty on the condition that it would expect to earn economic profits from the use of the patent. The courts also have considered the infringer's historical profits earned during the infringement period.[fn 208] In *Interactive Pictures Corp. v. Infinite Pictures, Inc.*, the Federal Circuit considered whether the infringer actually met its anticipated profit projections to be irrelevant.[fn 209]

The courts, however, have noted that the "there is no rule that a royalty be no higher than the infringer's net profit margin."[fn 210] Recent case law has addressed the royalty base used to determine total reasonable royalty damages, affirming, among other things, that a reasonable royalty may exceed benchmarks such as net profit and the cost of acceptable alternatives to infringement. *Golight, Inc. v. Wal-Mart Stores, Inc.*,[fn 211] affirmed that a

---

- Third Circuit: *Total Containment, Inc. v. Environ Prods., Inc.*, 921 F. Supp. 1355, 1401 (E.D. Pa. 1995),*aff'd,* 106 F.3d 427 (Fed. Cir. 1997); *Mobil Oil Corp. v. Amoco Chemicals Corp.*, 915 F. Supp. 1333, 1359 (D. Del. 1994) (parties "were not truly competitors")

- Sixth Circuit: *Minco, Inc. v. Combustion Eng'g, Inc.*, 903 F. Supp. 1204, 1223–24 (E.D. Tenn. 1995),*aff'd* 95 F.3d 1109 (Fed. Cir. 1996) (20 percent royalty was appropriate because the patent owner "had a very high profitability rate" (53 percent) and the infringer "had a strong need to gain the advantages of the patented" product)

- Seventh Circuit: *Am. Med. Sys., Inc. v. Medical Eng'g Corp.*, 794 F. Supp. 1370, 1394 (E.D. Wis. 1992), *aff'd in part, rev'd in part and remanded*, 6 F.3d 1523 (Fed. Cir. 1993) ("[The patentee] had little incentive to license [its] patent. [It] was using the patent, and had the manufacturing capacity to meet demand for pre-filled self-contained prosthesis. By granting [the infringer] a license, [it] would have been assisting the competition in a highly competitive market, and in a sub-market where it clearly was gaining an edge.")

[fn 207] Thomas, Segal, and Lyon, 3-58.

[fn 208] *See, e.g., Trell v. Marlee Elec. Corp.*, 912 F.2d 1443, 1446 (Fed. Cir. 1990). *See also, Bose Corp. v. JBL, Inc.*, 112 F. Supp. 2d 138, 168 (D. Mass. 2000) (examining the infringer's sales over the infringement period).

[fn 209] *Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1384–85 (Fed. Cir. 2002).

[fn 210] *State Indus., Inc. v. Mor-Flo Indus., Inc.*, 883 F.2d 1573, 1580 (Fed. Cir. 1989), *cert. denied*, 493 U.S. 1022 (1990).

[fn 211] *Golight, Inc. v. Wal-Mart Stores, Inc.*, 355 F.3d 1327 (Fed. Cir. 2004). The patent-at-issue is a wireless, remote-controlled portable search light or flash light. Upon a finding of infringement, the court found damages of $464,280 ($31.80 per unit). The defendant appealed indicating that royalty would result in selling the accused product well below cost, because it could not raise the price.

reasonable royalty may be higher than the infringer's net profit, finding that Golight was entitled to a reasonable royalty amount irrespective of what Wal-Mart "might have preferred to pay" relative to its net profit. In its decision, the court cited *State Industries*, which [fn 212] determined that "[t]here is no rule that a royalty be no higher than the infringer's net profit margin." "Wal-Mart's evidence in this case establishes nothing more than what it might have preferred to pay, which is not a test for damages." [fn 213]

This same opinion was held by the district court in *Marine Polymer Technologies, Inc. v. HemCon, Inc.* [fn 214] The district court upheld a 34 percent royalty rate, allegedly higher than the defendant's profit margin, stating, "the law does not require that an infringer be permitted to make a profit." Additionally, in *Mars, Inc. v. Coin Acceptors, Inc.* (Coinco), [fn 215] the defendant argued that "it should not be required to pay more in reasonable royalty damages than it would have paid to avoid infringement in the first place by switching to an available noninfringing alternative." In this case, the district court found that the defendant "probably could have designed" an acceptable alternative, but had not, and, therefore, reduced the royalty rate accordingly; the defendant argued that the reduction was not enough to take into account the cost of its least expensive alternative. The Federal Circuit commented that "even if Coinco had shown that it had an acceptable noninfringing alternative at the time of the hypothetical negotiation, Coinco is wrong as a matter of law to claim that reasonable royalty damages are capped at the cost of implementing the cheapest available, acceptable, non-infringing alternative." [fn 216]

The *Mars* court, in rejecting Coinco's argument, cited *Monsanto Co. v. Ralph* [fn 217] for the conclusion that "a reasonable royalty deduced through a hypothetical negotiation process can never be set so high that no rational self-interested wealth-maximizing infringer acting *ex-ante* would ever have agreed to it." [fn 218] The district court and the Federal Circuit, however, "reject[ed] Coinco's argument that a reasonable royalty can never result in an infringer operating at a loss." [fn 219] The appellate court remarked that, although profit-

---

[fn 212] *State Indus.*, 883 F.2d at 1573, 1580.

[fn 213] *Golight*, 355 F.3d at 1327.

[fn 214] *Marine Polymer Techs., Inc. v. HemCon, Inc.*, 1:06-cv-00100 (D.N.H., 2010).

[fn 215] *Mars, Inc. v. Coin Acceptors, Inc.*, 527 F.3d 1359 (Fed. Cir. 2008). The patents-at-issue relate to coin authentication technology used in vending machines. After a bench trial, the court concluded a blended rate of 7 percent for the 2 patents was reasonable and awarded damages of $14,376,062.

[fn 216] *Id.*

[fn 217] *Monsanto Co. v. Ralph*, 382 F.3d 1374 (Fed. Cir. 2004). The patents-at-issue relate to herbicide-resistant plants.

[fn 218] *Id.*

[fn 219] *Mars*, 527 F.3d at 1359.

ability is among the *Georgia-Pacific* factors, "the law does not require that an infringer be permitted to make a profit."[fn 220]

In *Monsanto Co. v. McFarling*,[fn 221] the Federal Circuit rejected the defendant's opinion that a "technology fee" in its license with the plaintiff was an established royalty for the determination of a reasonable royalty; instead, the court ruled that the bargain for the technology fee was not similar to the hypothetical negotiation context. Using the technology fee

> as the upper limit for the reasonable royalty would create a windfall for infringers like McFarling. Such infringers would have a huge advantage over other farmers who took the standard Monsanto license and were required to comply with the provisions of the license, including the purchase-of-seed and non-replanting provisions. The evidence at trial showed that Monsanto would not agree to an unconditional license in exchange for a payment of the Technology Fee.[fn 222]

The reasonable royalty was not limited to the technology fee, because the fee compensated the patent holder for use of the patent within an agreed upon set of constraints, and because the infringer used the patents-at-issue outside the constraints "for a variety of economic reasons," the royalty would be different.

In *Paymaster Technologies, Inc. v. United States*, the eighth factor of *Georgia-Pacific* was discussed. That factor addresses the established profitability of the product made under the patent, its commercial success, and its current popularity. "We *affirm* the damages judgment as to the royalty rate of 3.5%." The trial court concluded that the eighth factor had a "neutral" impact on the royalty rate. The Federal Circuit found that although the defendant (the United States Postal Service) is a not-for-profit entity, the success of the accused product should be determined by the instances of use—1.5 billion forms used in 10 years—and not simply the infringer's profitability. "We hold that this equates to commercial success. Thus, the courts could have sustainably found that Factor eight was proven by Paymaster. However, that it did not fail to rise to the level of clear error." "That it termed factor eight 'neutral' did not, in any event, prejudice Paymaster and was at most harmless error."[fn 223]

---

[fn 220] *Monsanto Co. v. Ralph*, 382 F.3d 1374 (Fed. Cir. 2004).

[fn 221] *Monsanto Co. v. McFarling*, 488 F.3d 973 (Fed. Cir. 2007). The patents-at-issue relate to herbicide-resistant plants. The jury awarded a reasonable royalty of $40 per bag of seed, less than the plaintiff's proffered royalty of $80.65–$73.20 but well above that proffered by the defendant, $6.50.

[fn 222] *Id.*

[fn 223] *Paymaster Techs., Inc. v. United States*, 180 Fed. Appx. 942 (Fed. Cir. 2006). The patent-at-issue relates to form sets for use with an imprinting apparatus for imprinting money orders. The plaintiff's expert suggested a reasonable royalty rate of 5 percent to 6 percent, and the defendant's expert suggested a reasonable royalty rate of 1.5 percent. The trial court (Court of Federal Claims) determined a reasonable royalty rate of 3.5 percent.

The courts also have recognized that the infringer's expected profits may include collateral benefits, which should be taken into consideration in the hypothetical negotiation. [fn 224] A potential licensee "would consider the profits that it would obtain from convoyed sales of parts, supplies, accessories, and related products, as well as those profits that flow or would be expected to flow from the right to manufacture, use or sell that patented invention." [fn 225] The theory is that "[w]here a hypothetical licensee would have anticipated increased convoyed sales as a result of a patent license, such sales may be considered in fixing a reasonable royalty rate because the licensee would in theory be disposed to pay a higher royalty if it could expect such collateral benefits." [fn 226]

The relative contribution of the patented feature to the overall commercial success is also a factor taken into account. If the contribution of the patented invention is significant, "a large portion of the realizable profit should be attributed to the uniqueness of the invention patented." [fn 227] Conversely, a patent with an insignificant contribution would not be commensurate with a higher royalty. According to *Rite-Hite*, one may look to whether the patent was a "pioneer patent," under the theory that a pioneer patent has manifest commercial success. [fn 228] The relative contribution of a patented invention "varies greatly within each field and for each patent, the weight accorded this factor varies with the circumstances of the individual case." [fn 229]

In *Lucent Technologies*, [fn 230] the court addressed, among other topics, Microsoft's theory that damages for infringement of a method patent should be limited to the "proven number of instances of actual infringing use," which Microsoft defined as use by the ultimate consumer. Microsoft argued that the frequency with which customers used the accused date picker function was irrelevant because this information was not available at the time

---

[fn 224] *A&L Tech. v. Resound Corp.*, 1995 WL 415146 (N.D. Calif. 1995).

[fn 225] J.T. Thomas, D.A. Segal, and H.M. Lyon, *Intellectual Property Law Damages and Remedies: Updated through Release 18*, Terence P. Ross, ed. (New York: Law Journal Press), 3-58.

[fn 226] *A&L Tech.*, 1995 WL at 415146.

[fn 227] *Golight, Inc. v. Wal-Mart Stores, Inc.*, 216 F. Supp. 2d 1175, 1184 (D. Colo. 2002).

[fn 228] *See, e.g.*, *Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1554 (Fed. Cir.) (*en banc*),*cert. denied*, 516 U.S. 867 (1995).

[fn 229] Thomas, Segal, and Lyon, 3-58.

[fn 230] *Lucent Techs., Inc. v. Gateway Inc.*, 580 F.3d 1301 (Fed. Cir. 2009). The patent-at-issue, known as the "Day patent" or "date picker functionality," relates to a method that allows the user to enter data into fields on a computer screen without using a keyboard. This case was first filed by Lucent in 2002 against Gateway and subsequently Microsoft intervened. Three actions were filed in the Eastern District of Virginia, Southern District of California, and Delaware that were subsequently consolidated in the Southern District of California. The court severed the Day patent from four other patents that were consolidated in the action. The jury found that the Microsoft products that feature a date selection pop-up tool, including Money, Outlook, and Mobile, infringed the patent-at-issue.

of the hypothetical negotiation. The Federal Circuit held that "neither precedent nor economic logic requires us to ignore information about how often a patented invention has been used by infringers," and "[c]onsideration of evidence of usage after infringement started can, under appropriate circumstances, be helpful to the jury and the court in assessing whether a royalty is reasonable." However, "[o]n the other hand, [the Court has] (". . . ") never laid down any rigid requirement that damages in all circumstances be limited to specific instances of infringement proven with direct evidence. Such a strict requirement could create a hypothetical negotiation far-removed from what parties regularly do during real-world licensing negotiations." The court concluded that "[t]he damages award ought to be correlated, in some respect, to the extent the infringing method is used by consumers" because that would be considered in the hypothetical negotiation. [fn 231]

Another consideration is the technological development of the patented technology. All else equal, a more mature and established technology will command a higher royalty, as such a technology will involve fewer commercial risks and will require less time and capital to commercialize.

The remaining term of the patent at the time of infringement is another factor to be considered in the hypothetical negotiation. "Generally, it is believed that a buyer would have been more likely to agree to a higher royalty the longer the remaining term of the patent. A defendant, however, may argue that the longer the remaining patent term, the lower the royalty." [fn 232] The rationale for a lower royalty is that an extended period provides greater incentive to look for noninfringing alternatives to the patent. [fn 233]

The courts have taken into consideration "whether the defendant had any non-infringing alternatives that were equal in terms of cost and performance." [fn 234] All else equal, an infringer "would have been in a stronger position to negotiate for a lower royalty rate knowing it had a competitive noninfringing device in the wings." [fn 235] The infringer must establish that (1) the alternative is sufficiently similar to the infringed patent and (2) the noninfringing alternative was available, that is, in existence and covered by a patent owned by a third party, at the time the infringement began. [fn 236] The patent owner may

---

[fn 231] *Lucent Techs.*, 580 F.3d at 1301.

[fn 232] Thomas, Segal, and Lyon, 3-58.

[fn 233] *Id.*

[fn 234] *Id.*

[fn 235] *Zygo Corp. v. Wyko Corp.*, 79 F.3d 1563, 1571–72 (Fed. Cir. 1996).

[fn 236] *See, generally*, D. Chisum, 7 *Chisum on Patents*, § 20.03[3][b][v] (2000).

counter that the fact that the infringer opted for the patented technology reveals the advantages of the patented technology over alternatives. [fn 237]

Several cases address the impact of noninfringing alternatives on the determination of a reasonable royalty. Further, in *Mars*, the Federal Circuit explained that a noninfringing alternative is not necessarily a cap on damages. Coinco argued that "an infringer should not be required to pay more in reasonable royalty damages than it would have paid to avoid infringement in the first place by switching to an available noninfringing alternative." The court found that this rationale failed for two reasons:

> First...the district court found...that the available "design around was not as good as it would like." There was, therefore, no available and acceptable noninfringing alternative to which Coinco could have switched at the time of the hypothetical negotiation; there was merely the possibility that it could have come up with one.
>
> Second, even if Coinco had shown that it had an acceptable noninfringing alternative at the time of the hypothetical negotiation, Coinco is wrong as a matter of law to claim that reasonable royalty rates are capped at the cost of implementing the cheapest available, acceptable, noninfringing alternative...To the contrary, an infringer may be liable for damages, including reasonable royalty damages, that exceed the amount that the infringer could have paid to avoid infringement. [fn 238]

In addition, the court rejected Coinco's position that a reasonable royalty, when applied to an infringer's sales, "can never result in an infringer operating at a loss." [fn 239]

### *Date of Hypothetical Negotiation*

For measuring reasonable royalty rates, the courts have looked to the date when infringement first began. The hypothetical licensor and licensee are assumed to voluntarily meet on that date with information that addresses the first 14 *Georgia-Pacific* factors and agree upon a reasonable royalty. This form of analysis limits the information available for the hypothetical negotiation to that available (1) before the commercial success of the patent could be determined, (2) before actual profitability could be determined, and (3) even before customer acceptance could be determined. It limits the estimation of a reasonable royalty to budget, forecast, plan pricing, and project operating costs, and, therefore, projections of profits.

Notably, it is often many years after infringement starts before the patent holder becomes aware of the infringement, brings suit against the defendant, and litigates the issues. In

---

[fn 237] *See, e.g., GNB Battery Techs., Inc. v. Exide Corp.*, 886 F. Supp. 420, 439 (D. Del. 1995).

[fn 238] *Mars, Inc. v. Coin Acceptors, Inc.*, 527 F.3d 1359 (Fed. Cir. 2008).

[fn 239] *Id.*

addition, trials often are held years after the patent holder notifies the infringer of infringement and the infringement suit is filed. During this extended period, much information becomes available about the patent and its success that might not have been anticipated or available at the hypothetical negotiation date when infringement began. As a result, the analyses and outcomes under the first 14 *Georgia-Pacific* factors will often be different if the court limits itself to information available on or before the date of first infringement.

The courts have addressed the use of information that becomes available only after the date at which the hypothetical negotiation is assumed to have taken place (the date of first infringement). For example, in *Fromson*, the court stated that

> [t]he methodology encompasses fantasy and flexibility; fantasy because it requires a court to imagine what warring parties would have agreed to as willing negotiators; flexibility because it speaks of negotiations as of the time infringement began, yet permits and often requires a court to look to events and facts that occurred thereafter and that could not have been known to or predicted by the hypothesized negotiators. [fn 240]

Some courts have cautioned against treating the negotiation as one with full knowledge of future events. In *Integra Lifesciences*, the Federal Circuit ruled that "[t]he first step in a reasonable royalty calculation is to ascertain the date on which the hypothetical negotiation in advance of infringement would have occurred." [fn 241]  The Federal Circuit went on to reverse and remand the reasonable royalty verdict because "the record does not clearly indicate whether 1994 or 1995 is the proper date for the first infringement." [fn 242]  In its opinion, the court emphasized the importance of determining the first date of infringement because "[t]he value of a hypothetical license negotiated in 1994 could be dramatically different from one undertaken in 1995 . . . [as] a year can make a great difference in economic risks and rewards." [fn 243]

In *Applied Medical Resources Corp. v. U.S. Surgical Corp.*, U.S. Surgical was accused of infringing through sales of two separate products, Versaport I, which began in 1994, and Versaport II, which began in 1997. [fn 244]  In a previous trial between the parties, U.S. Surgical was found to have infringed patents owned by Applied Medical Resources and was

---

[fn 240] *Fromson v. Western Litho Plate & Supply Co.*, 853 F.2d 1568, 1575 (Fed. Cir. 1988).

[fn 241] *Integra Lifesciences*, 331 F.3d at 860, 870.

[fn 242] *Id.*

[fn 243] *Id.*

[fn 244] *Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 435 F.3d 1356 (Fed. Cir. 2006).

enjoined from selling Versaport I. [fn 245] U.S. Surgical had attempted to design around the patents by offering Versaport II, which Applied Medical Resources alleged infringed a distinct set of patented claims.

U.S. Surgical argued that both products would have the same hypothetical negotiation date, which would have contemplated a license for both products. The court disagreed, concluding that "[w]e are required to identify the infringement requiring compensation, and evaluate damages based on a hypothetical negotiation at the time that infringement began, not an earlier one." The court noted the differences in the Versaport products and particulars of the infringement claims, including the date on which infringement commenced. In response to U.S. Surgical's claim that sales of the products overlapped, the court found that infringement that "appear[s] to be continuous in time" is not necessarily a "continuous infringement in law." The court acknowledged that the issues in the case were specific to the parties-in-suit, stating "[w]e recognize that there may be instances, which we do not address here, in which two products, even if not identical, may present the same damages analysis. That is not the case here." [fn 246]

Also, the court confirmed that each lawsuit initiated for infringement of the same patent, by the same infringer but for different products, requires independent hypothetical negotiations because each infringement began on a unique date. "Because the determination of reasonable royalty damages is tied to the infringement being redressed, a separate infringement beginning at a different time requires a separate evaluation of reasonable royalty damages." In the first matter between the parties, *Applied I*, U.S. Surgical was found to have infringed the same patent as well as 2 others, and a jury found that the infringement was willful and awarded damages in the form of a 7 percent reasonable royalty. In *Applied II*, U.S. Surgical sought to establish, as a matter of law under collateral estoppel, that the jury's royalty rate conclusion of 7 percent from *Applied I* was binding. The district court denied this finding and determined that the jury would make "its own '*independent*' determination of the reasonable royalty rate" (citing the district court case *Applied Medical Research Corp. v. U.S. Surgical Corp.*, 353 F. Supp. 2d 1075 [C.D. Cal. 2004] [emphasis in original]). U.S. Surgical appealed the final jury verdict. The Federal Circuit found that the "issue of reasonable royalty damages in *Applied II* is not identical to the issue of reasonable royalty damages in *Applied I* because the infringements requiring compensation began at separate and distinct times." Infringement occurred in *Applied I* in 1994 and occurred in *Applied II* in 1997. Accordingly, the hypothetical negotiation

---

[fn 245] Applied Medical Resources first sued U.S. Surgical in the United States District Court for the Eastern District of Virginia in 1996 ("Applied I") alleging infringement. *Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 967 F. Supp. 861 (E.D. Va. 1997). Affirmed by the United States Court of Appeals for the Federal Circuit on June 30, 1998. *Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 147 F.3d 1373 (Fed. Cir. 1998).

[fn 246] *Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 435 F.3d 1356 (Fed. Cir. 2006). The patent in this matter related to surgical devices called trocars, which are used as access ports into the abdomen during laparoscopic surgery. The trocars must maintain a seal with the instrument during the surgery in order to limit the leakage of gas used in the procedure.

date for the infringing sales in *Applied II* relates to sales beginning in 1997, not the past infringement caused by the 1994 sales in *Applied I*. "The infringement in *Applied II* was caused by sales of Versaport II, which began in 1997, whereas the infringement in *Applied I* was caused by sales of Versaport I, which began in 1994." "We conclude that the damages issues in *Applied I* and *Applied II* are not identical, and therefore the jury's award of reasonable royalty damages for infringing sales of Versaport I in *Applied I* does not preclude another jury's evaluation of reasonable royalty damages for infringing sales of Versaport II at a different time in *Applied II*." [fn 247]

## Updates to Georgia-Pacific

In *Honeywell, Inc. v. Minolta Camera Co.*, the court's jury instructions provided a list of factors to consider when determining a reasonable royalty. [fn 248]  This list—which differs somewhat from the *Georgia-Pacific* list of 15 factors—includes the following factors:

1.  The anticipated amount of profits the prospective licensor reasonably thinks would be lost, as a result of licensing the patent, compared to the anticipated royalty income

2.  The relative bargaining strengths of both the patent owner and the infringer

3.  The anticipated net profits that the prospective infringer reasonably thinks it will earn

4.  The commercial past performance of the product, that is, in terms of profits and public acceptance

5.  The market to be "tapped"

6.  Any other economic factor that would be taken into account by a normally prudent person or entity, under similar circumstances, when negotiating a hypothetical license

Although the *Georgia-Pacific* and *Honeywell* factors provide guidelines when determining a reasonable royalty, they do not represent the only viable approaches to determining a reasonable royalty. "The amount of a reasonable royalty after infringement turns on the facts of each case, as best they may be determined." [fn 249]  For assistance in the establishment of a royalty rate, the expert may want to consult searchable databases such as those identified in appendix A, "Intellectual Property Print and Electronic Resources," of this practice aid.

---

[fn 247] *Id.*

[fn 248] *Honeywell, Inc. v Minolta Camera Co.*, Civil Nos. 87-4847, 88-1624 (N.D. N.J. 1992), jury instructions at 69.

[fn 249] *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152 (6th Cir. 1978).

## Other Methods of Measurement

### *The 25 Percent Rule*

Under this methodology, the royalty rate is set between 25 and 33 percent of operating profit depending on a number of factors and considerations between the patent holder and the infringer. [fn 250] The rationale for leaving between 67 and 75 percent of the profits to the licensee is the assumption of greater financial risk in commercializing the technology.

Until January 2011, although this methodology had received criticism for being overly simplistic, it was deemed useful to the courts as follows:

The 25% rule is a shorthand phrase for a method of dividing expected profit between a licensor and licensee. It divides net pretax profit with normally 25% of that profit being paid to the licensor as a reasonable royalty, while 75% is reserved to the licensee as its profit for the risks attendant to manufacturing and marketing. Normally, the net profit that is divided is . . that of the licensee. Sometimes the licensor's net profit rate may be used, however, where the licensee's profit rate is not known. While a trial court is not limited to selecting one or the other of the specific royalty figures proposed by the opposing parties, *SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*, 926 F.2d at 1168, the court here finds that the 25% rule is an appropriate rationale for determining a base royalty rate. Defendant's licensing expert, Mr. Robert Goldscheider, noted that he first became familiar with the 75%/25% distribution of licensing profits when he began to do licensing work in 1959 and 1960. Since that time, defendant's expert has participated in several hundred licensing negotiations involving intellectual property, and, according to Mr. Goldscheider, he and "at least two other highly respected pioneers in the field of licensing" have written published works concerning the 25% rule. In addition, the 25% rule or a close variant of it has been recognized by a number of other federal courts as a "rule of thumb" or "typical" in the licensing field. [fn 251]

In January 2011, in a case before Chief Judge Randall Rader, the U.S. Court of Appeals for the Federal Circuit significantly limited the applicability of the 25 percent rule as a methodology to determine a reasonable royalty. In *Uniloc USA, Inc. v. Microsoft Corp.*, "[t]his court now holds as a matter of Federal Circuit law that the 25 percent rule of thumb is a fundamentally flawed tool for determining a baseline royalty rate in a hypo-

---

[fn 250] M.A. Glick, *Intellectual Property: The Law and Economics of Patent Infringement Damages*. *See, e.g.*, Robert Goldscheider, *The Licensing Law Handbook* (1993–94). Reference to this rule can be found in *Tektronix, Inc. v. United States*, 552 F.2d 343, 350 (Ct. Cl. 1977); *Paper Converting Mach. Co. v. Magna-Graphics Corp.*, 745 F.2d 11, 22 (Fed. Cir. 1984); *Syntex Inc. v. Paragon Optical Inc.*, 7 U.S.P.Q.2d 1001, 1027 (D. Ariz. 1987); and *Polaroid Corp. v. Eastman Kodak Co.*, 16 U.S.P.Q. 2d 1481, 1535 (D. Mass. 1990). *See also*, R. Goldscheider, J. Jarosz, and C. Mulhern, "Use of the 25 Per Cent Rule in Valuing IP," *les Nouvelles* (December 2002), 123–33.

[fn 251] *Standard Mfg. Co., Inc. & DBP, Ltd. v. United States*, 42 Fed. Cl. 748 (1999).

thetical negotiation. Evidence relying on the 25 percent rule of thumb is thus inadmissible under *Daubert* and the Federal Rules of Evidence, because it fails to tie a reasonable royalty base to the facts of the case at issue."[fn 252]  The U.S. Court of Appeals granted a new trial on damages to Microsoft due to Uniloc's expert's arbitrary use of the 25 percent rule. The U.S. Court of Appeals, citing *ResQNet.com*, *Lucent Technologies*, and *WordTech*,[fn 253] stated that

> [t]he meaning of these cases is clear: there must be a basis in fact to associate the royalty rates used in prior licenses to the particular hypothetical negotiation at issue in the case. The 25 percent rule of thumb as an abstract and largely theoretical construct fails to satisfy this fundamental requirement. The rule does not say anything about a particular hypothetical negotiation of reasonable royalty involving any particular technology, industry, or party. Relying on the 25 percent rule of thumb in a reasonable royalty calculation is far more unreliable and irrelevant than reliance on parties' unrelated licenses . . .[fn 254]

Although this ruling does not preclude the use of the 25 percent rule, its application must "carefully tie proof of damages to the claimed invention's footprint in the market place."[fn 255]  Citing *Kumho Tire Co., Ltd. v. Patrick Carmichael*, *General Electric Co. v. Joiner*, and *ResQNet.com*, the U.S. Court of Appeals stated that "one major determinant of whether an expert should be excluded under *Daubert* is whether he has justified the application of a general theory to the facts of the case. Consistent with this conclusion, this court has held that '[a]ny evidence unrelated to the claimed invention does not support compensation for infringement but punishes beyond the reach of the statute.'" The U.S. Court of Appeals further stated that

> [t]his court's rejection of the 25 percent rule of thumb is not intended to limit that application of any of the Georgia-Pacific factors . . . looking at royalties paid or received in licenses . . . and looking at the portion of profit that may be customarily allowed in the particular business for the use of the invention . . . remain valid and important factors in the determination of a reasonable royalty rate. However, evidence purporting to apply to these, and any other factors, must be tied to the relevant facts and circumstances of the particular case at issue.[fn 256]

***The Analytical Method***

---

[fn 252] *Uniloc USA, Inc. v. Microsoft Corp.*, 10-1035, U.S. Court of Appeals for the Federal Circuit (Washington).

[fn 253] Refer to the section titled "Licensing Activity" in this chapter.

[fn 254] *Uniloc USA*, 10-1035 (Washington).

[fn 255] *Id.*

[fn 256] *Id.*

Another measurement methodology is the *analytical method*. The royalty calculation under this method is based on the infringer's own internal profit projections for the infringing item at the time the infringement began. The analytical method is based on the premise that any rate of return in excess of a normal rate of return can be attributed to the patent. This method takes the profits of the infringer, subtracts the infringer's normal profit, and awards some portion of the remainder to the patent owner.

For example, in *TWM Manufacturing Co., Inc. v. Dura Corp.*,[257] the special master computed "reasonable royalty" damages based on an internal memorandum, written by the infringer's top management before the infringement began. The memo indicated that the infringer projected a substantial gross profit (52.7 percent) from the proposed infringing sales. Using this figure, the special master subtracted overhead expenses to obtain the infringer's projected net operating profit (37 percent to 42 percent) and then divided the projected net operating profit between the infringer and the patent holder. The special master concluded that, at the time infringement began, the infringer would have accepted the standard industry profit on the item. The profit for the infringer was set at the standard industry rate (6.6 percent to 12.5 percent), and the remaining 30 percent became the "reasonable royalty."

On appeal to the Federal Circuit, the infringer contended that it was erroneous for the special master to use this method, asserting that the more traditional "willing licensor–willing licensee" test was legally mandated. The infringer also downplayed the significance of its preinfringement memorandum, highlighting instead that the actual profits realized on the infringing products were much lower than the projected figures. The Federal Circuit, however, rejected the infringer's contentions and affirmed the award. After noting that there is no single way to determine patent damages, the Federal Circuit held that it was of no consequence that a lesser royalty may have resulted from another analysis.[258] "On appeal, an infringer cannot successfully argue that the district court abused its discretion in awarding 'high' royalty by simply substituting its own recomputation to arrive at a lower figure."[259] The only relevant question was whether or not the method used by the lower court was proper, and the appellate court concluded that it was. In particular, the Federal Circuit upheld the special master's use of the analytical method because, unlike the infringer's alternative, it focused on the critical time when infringement began rather than thereafter.

Although making profit projections is typically not straightforward, an advantage of the analytical method to the patent holder is that it attempts to use the information upon which the infringer based its decision to infringe. In some cases, preinfringement projections can become a real impediment to the infringer in the midst of litigation. As dis-

[257] *TWM Mfg. Co., Inc. v. Dura Corp.*, 789 F.2d 895, 899 (Fed. Cir. 1986).

[258] *Id.*

[259] *Id.*

cussed previously, the courts have found preinfringement memorandums and projections to be particularly relevant, because the infringer based its decision to manufacture and market the infringing product on the very information being used to determine the reasonable royalty amount.

An infringer's defense to a reasonable royalty case based on the analytical method is often to attack its own profit projections. Rather than present evidence of a lower actual profit margin or evidence dated after the date infringement first began, the infringer attempts to undercut the reliability of its own proprietary documents dating from the time when infringement began.

### *Discounted Cash Flow Analysis*

Discounted cash flow analysis is a method of valuing an investment based on the estimated future cash flows, taking into consideration the time value of money as follows: [fn 260]

> The discounted cash flow (DCF) method for determining a corporation's enterprise value has three main components: (a) an estimation of net cash flows that the firm will generate and when, over some period; (b) a terminal or residual value equal to the future value, as of the end of the projection period, of the firm's cash flows beyond the projection period; and (c) a cost of capital with which to discount to a present value both the projected net cash flows and the estimated terminal or residual value . . .[with] "terminal value" [being] the value of cash flows expected to be received by the company beyond the "terminal year" (which is the final year for which particularized cash flow projections are made) discounted to the "present value". . . [fn 261]

## Reasonable Royalty in Copyright Disputes

In copyright disputes, if the copyright owner and the infringer compete in the same market, the courts may use a *lost sales* measurement to compensate for the sales that would have been made but for the defendant's infringement. If the owner and infringer serve different markets, the courts may use a *reasonable royalty* or *market value* test to determine the hypothetical reasonable royalty that the copyright owner would have received for the defendant's use. In a dual market context, some courts have held that the value lost by the copyright owner should be approximated from the infringer's acts that prevented the copyright owner from taking advantage of that particular market.

Unlike the patent law, the Copyright Act makes no mention of treating a reasonable royalty as a minimum damage measure. Not unlike the patent law, however, the question

---

[fn 260] P.E. Fess and C.S. Warren, *Accounting Principles*, 16th ed. (Cincinnati, OH: South-Western Publishing Co., 1990), 1104.

[fn 261] *Steiner Corp. v. Benninghoff*, 5 F. Supp. 2d 1117 (D. Nev. 1998).

posed by Section 504(b) of the Copyright Act is "what a willing buyer would have been reasonably required to pay to a willing seller for plaintiffs' work." [fn 262]

The measurement of damages for copyright infringement is not as well established as that for patent infringement, in large part because appeals of copyright cases are taken to the appellate court in the region in which the case was filed, rather than solely to the Federal Circuit. This causes judicial precedent in copyright cases to be regional in nature rather than national in scope. The copyright expert is advised to seek counsel's input and review case law from pertinent jurisdictions.

If the court selects a reasonable royalty measure of damages, it may attempt to determine the amount that the infringer would have paid for the right to use the copyrighted work legally. Just as in patent cases, any preexisting licenses may offer a measure of the appropriate reasonable royalty. [fn 263] For example, in *McRoberts Software, Inc. v. Media 100, Inc.*, the court determined that the jury had ample evidence from which to estimate the value of the competitor's use of the copyrighted source code and arrive at its $1.2 million actual damage award for copyright infringement. Finding that the jury had evidence of the copyright owner's past agreements with the infringing competitor to develop and modify prior versions of the copyrighted material, the court ruled that there was a sufficient basis for the damage award. [fn 264]

The reasonable royalty may take the form of a lump sum representing the reasonable value of the work. Alternatively, the royalty may be a percentage of the licensee's profits. In *On Davis v. The Gap, Inc*., the court determined that a copyright owner's loss of a reasonable royalty or license fee to which a willing buyer and a willing seller would have agreed may serve as its "actual dam-ages" supporting recovery under the Copyright Act. [fn 265]

A defendant may attempt to distinguish preexisting licenses based on (1) the types of uses that they authorized, (2) the amount of the copyrighted work that was used, and (3) the changing value of the copyrighted work over time.

## Unjust Enrichment

*Unjust enrichment* is an alternative damages measure to compensatory damages. Compensatory damages seek to restore the plaintiff to the financial position in which it would have been but for the defendant's wrongful act. In contrast, unjust enrichment seeks to deprive the defendant of whatever gain or benefit it obtained from the wrongful act. In

---

[fn 262] *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505, 512 (9th Cir. 1985).

[fn 263] *Rogers v. Koons*, 960 F.2d 301, 313 (2d Cir. 1992).

[fn 264] *McRoberts Software, Inc. v. Media 100, Inc.*, 329 F.3d 557 (7th Cir. 2003).

[fn 265] *On Davis v. The Gap, Inc.,* 246 F.3d 152 (2d Cir. 2001).

essence, unjust enrichment compels the defendant to disgorge all ill-gotten gains to the owner of the infringed intellectual property.

As discussed previously, Dobbs (in *Dobbs Law of Remedies: Damages—Equity Restitution*) identified five methods for measuring the gain obtained by a defendant for purposes of an unjust enrichment award. [fn 266] The unjust enrichment remedy is frequently employed by the courts in copyright, trademark, and trade secret litigation and is incorporated in the federal statutes governing intellectual property. With respect to copyrights, Section 504(b) of the Copyright Act provides that "[t]he copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages." [fn 267] Therefore, unless it is duplicative, recovery of both actual damages and the defendant's profits is allowed.

With respect to trademarks, the Lanham Act authorizes a trademark owner to recover both the infringer's profits and its own damages sustained "subject to the principles of equity and upon such terms as the court deems reasonable . . ." [fn 268]

The UTSA provides that, in addition to recovering its actual loss, a trade secret owner may recover the "unjust enrichment" caused by the misappropriation to the extent the enrichment is not taken into account in calculating the owner's actual loss. [fn 269] Unjust enrichment is also permitted as a measure of damages in design patent disputes, but it is unavailable for utility patents.

A copyright owner may be entitled to recover indirect profits from copyright infringement. However, before doing so, the copyright owner must first demonstrate that the infringing acts had an effect on the profits earned by the infringer. [fn 270] In *Mackie v. Rieser*, the court determined that the artist was not entitled to indirect profits from the symphony's infringement of his copyrighted sculpture, even though an unauthorized photograph of the sculpture was used in an advertising brochure. The court indicated that because it could not determine how many individuals subscribed because of the artist's work, any claim for indirect profit was speculative and unsupported. [fn 271]

---

[fn 266] See the section titled "Unjust Enrichment and Prejudgment Interest" in this chapter.

[fn 267] 17 USC 504(b).

[fn 268] 15 USC 1125 (c)(1).

[fn 269] UTSA with 1985 Amendments, 11.

[fn 270] *Mackie v. Rieser*, 296 F.3d 909 (9th Cir. 2002).

[fn 271] *Id.*

In *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, the Ninth Circuit Court of Appeals addressed the issue of indirect profits of the infringer.[fn 272] In that case, the court determined that the MGM Grand Hotel had infringed on a music copyright belonging to Frank Music. The music was part of MGM's musical revue entitled "Hallelujah Hollywood" and was heavily promoted to the public as a lead attraction of MGM. After calculating actual damages for infringement, the court determined that the copyright owner was entitled to indirect profits and the court awarded the copyright owner a portion of MGM's total profits. However, before indirect profits may be awarded, the court "must conduct a threshold inquiry into whether there is a legally sufficient causal link between the infringement and the subsequent indirect profits."[fn 273]

Revenues to be included in an unjust enrichment measure of damages may need to reflect application of the entire market value rule. (See the section titled "Entire Market Value Rule—Lost Profits" in this chapter.) If more than simply the copyrighted or trademarked work is included in revenues, an apportionment of the resulting profit to the infringement may be necessary. (See the section titled "Apportionment" in this chapter.)

### Costs in Unjust Enrichment Claims

As indicated previously, profits from unjust enrichment, as well as for lost profits, are calculated as sales from the units in question, less costs associated with producing and selling the additional units. In both lost profits and unjust enrichment claims, the burden to prove the affected revenue stream falls on the plaintiff. The burden to prove costs, however, falls on the *defendant* in unjust enrichment claims, although it remains with the *plaintiff* in claims of lost profits. To prove unjust enrichment, once the fact of damages has been proved, the plaintiff bears only the responsibility to prove the quantum of sales, although the plaintiff may rebut the testimony of the defendant on cost issues.

In *Johnson v. Jones*, the court determined that once the plaintiff in a copyright infringement suit had met the burden of establishing infringer's gross revenue, the burden then shifted to the infringer to prove expenses to deduct from that amount. In the absence of such proof, the plaintiff was entitled to recover the infringer's gross revenue from the infringement. It was not enough that the infringer testified about the average profit margin, as infringement may allow the infringer to recognize net profit at a much larger profit margin percentage of its gross revenue than in the absence of infringement.[fn 274]

In *On Davis*, a copyright case, the Ninth Circuit Court of Appeals narrowed the definition of revenues to be used in the damage claim, stating "we think the term 'gross revenue' under the statute means gross revenue reasonably related to the infringement, not unrelat-

---

[fn 272] *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 886 F.2d 1545, 1551 (9th Cir. 1989).

[fn 273] *Mackie*, 296 F.3d 909.

[fn 274] *Johnson v. Jones*, 149 F.3d 494 (6th Cir. 1998).

ed revenues." [fn 275]  In arriving at its decision, the Ninth Circuit relied in part on the Seventh Circuit's 1983 decision in *Taylor v. Meirick*, which held that the copyright owner was entitled to profits of the infringer related to infringed product sales, but not on everything the infringer sold. Therefore, to establish a *prima facie* case, the copyright owner should show the infringer's gross sales of infringing products. [fn 276]  Notably, the Seventh Circuit in the *Taylor* case explained its logic in interpreting the statute as follows: "If General Motors were to steal your copyright and put it in a sales brochure, you could not just put a copy of General Motors' corporate income tax return in the record and rest your case for an award of infringer's profits." [fn 277]

Consistent with the previous discussion on incremental costs, some courts accept as deductible expenses only those costs directly attributable to the production, distribution, performance, or display of the infringing work. For the infringer to deduct such expenses, it should prove them with a reasonable degree of "specificity." [fn 278]  In some Federal Circuit opinions, the acceptable profit measure is not incremental profit; rather, it is based on a full recognition of the costs related to the infringement, including overhead and fixed costs. Some courts, however, have refused to recognize certain overhead costs. The attorney should provide guidance to the expert in this area.

Under Section 35(a) of the Lanham Act, a trademark owner is only entitled to receive infringers "profits," in other words, the infringer's net revenues. Determining which costs are deductible from gross revenues to arrive at an infringer's profits, however, is not an easy task. There are a number of competing standards for measuring appropriate cost deductions. Under the *differential cost rule*, sometimes referred to as the incremental approach, only specific costs that would not otherwise have been incurred but for the production of the infringing goods are allowed as deductions. Fixed costs, such as rent for manufacturing facilities, would not be deducted. Only variable costs, such as the raw materials and the labor that actually go into manufacturing the infringing product, are allowed as deductions. This is the most favorable rule for trademark owners.

The *direct assistance rule* is a variant of the differential cost rule that is more generous to infringers. Under the direct assistance rule, costs that directly assisted in the production of the infringing goods are allowed as deductions. The benefit to infringers under this rule is that some elements of overhead and general administration are permitted deductions. This is the approach taken under the *Restatement (Third) of Unfair Competition*.

---

[fn 275] *On Davis v. The Gap, Inc.*, 246 F.3d 152, 160 (9th Cir. 2001).

[fn 276] *Taylor v. Meirick*, 712 F.2d 1112, 1122 (7th Cir. 1983).

[fn 277] *Id.*

[fn 278] *Allen-Myland v. Int'l Bus. Machs. Corp.*, 770 F. Supp. 1014, 1024 (3d Cir. 1991).

The *fully allocated cost rule*, sometimes referred to as the full absorption approach, is even more generous to infringers. Under this rule, all expense items properly allocated under generally accepted accounting principles to production of the infringing goods are allowed as deductions. [fn 279] The expert should seek the guidance of counsel on the rules that apply in the relevant jurisdiction.

### *Apportionment*

The Copyright Act, the Lanham Act, and the UTSA each provide that in an unjust enrichment claim, the intellectual property owner shall recover only the net profits of the infringer *attributable to the infringement*. By comparison, in a lost profits claim, all of the profits derived from infringing sales are awardable as damages. As a result, in an unjust enrichment claim, only the portion of profits from infringing sales that can be ascribed to the intellectual property in question are to be awarded.

Similar to the issue of proving deductible costs, in an unjust enrichment claim, it is the defendant's responsibility to prove the deduction from sales to adjust for the apportionment of profits to the various assets that contribute to the sale of an infringing item. The plaintiff may rebut the testimony of the defendant on this issue.

The following are some examples of factors relevant to apportionment:

- Costs of capital

- Intellectual property elements

- Business reputation

- Quality and functionality of product

- Manufacturing ability

- Marketing and advertising

- Hotel guest accommodations

- Restaurants

- Talents of producers, directors, or performers

Many other factors can and should be considered in determining the appropriate apportionment.

---

[fn 279] Terence P. Ross, ed., *Intellectual Property Law Damages and Remedies: Updated through Release 4* (New York: Law Journal Press, 2003), 4-28, 4-29.

Because apportionment is required in a disgorgement claim, but not in a lost profits claim, a plaintiff typically will attempt to prove lost profits when capable of doing so. Apportionment is also not required in statutory damages.[fn 280]

In general, courts recognize the inherent difficulty in analyzing apportionment. As a result, courts tend to require greater certainty in proof of the existence of damages, and they exhibit somewhat greater flexibility in the proving of apportionment.

**Apportionment based on cost.** Apportionment should be performed on the basis of relative value. In economics, it is common to find that the relative cost or price of a component or element is a fair measure of its relative value. That is, something that costs twice as much is often worth twice as much. If that is true for a particular product, it may be reasonable to apportion profits in proportion to the cost of the components.

Other cost-based apportionment methodologies may involve elements other than cost of goods sold. For example, in a copyright case involving advertising, the relative cost (and volume) of infringing advertising to total advertising may be one step in the apportionment process. Because a portion of the value of the good being advertised may come from its inherent quality and desirability and another portion may come from the advertising, the analysis may also include the relative cost of advertising as a whole compared to the cost of goods sold.

Cost-based apportionment is inappropriate if the cost of some elements may not represent their value. This is particularly true if valuable elements are obtained at no cost (for example, because they are already owned by the infringer) or if the cost or value of the elements are not easily measured, such as the value of a brand name. For example, in *Columbia Machine & Stopper Corp. v Adriance Machine Works*,[fn 281] the expert attempted to apportion a machine's profits to the infringing element by using a fraction dividing the cost of the infringing part by the total cost of the machine. The court, however, rejected this approach, finding that part cost was not a fair measure of the relative contribution of the infringing element.

**Alternative noninfringing hypothetical market.** This methodology calls for the creation of a hypothetical supplementary yet noninfringing product with a resulting estimate of the profit created by this product. Under this method, the expert would subtract the hypothetical noninfringing profits from the actual profits made during the sale of infringing products and apportion the difference to the infringing feature.

---

[fn 280] *Nintendo of Am., Inc. v. Dragon Pac. Int'l*, 40 F.3d 1007, 1010 (9th Cir. 1994), *cert. denied*, 515 U.S. 1107 (1995).

[fn 281] *Columbia Mach. & Stopper Corp. v. Adriance Mach. Works*, 79 F.2d 16 (2d Cir. 1935).

Page 97

**Volume basis**. In some cases, the volume of the infringing elements as a portion of the total work is a rational basis for apportionment. For example, in *Frank Music*,[fn 282] the performing act that used the infringing music constituted approximately 12 percent of the show's weekly running time, and the court attributed 12 percent of the show's profits to the infringement.[fn 283] There is, however, no bright line rule.

For example, in *Lottie Joplin Thomas Trust v. Crown Publishers*, the defendant used copyrighted materials in a compilation set.[fn 284] The defendant argued that because the infringing portion comprised 10 percent of the total collection, the plaintiff was entitled to 10 percent of the total profit. The court found this method unacceptable, because the product was marketed as a complete collection and the absence of the infringing material would have had a substantial effect on the overall value of the product. The court ultimately awarded 50 percent of the profits based on the infringed materials, reasoning that the additional products would be purchased to complete the collection.

Similarly, in *Nintendo of America, Inc. v. Dragon Pacific International*, the defendant packaged multiple video games on a single Nintendo cartridge. The expert argued that because 33 percent of the games packaged on a cartridge were Nintendo games, 33 percent of profits was an appropriate apportionment.[fn 285] The court rejected that argument, reasoning that because the entire cartridge was marketed as a Nintendo product, the plaintiff had received the benefit of the Nintendo trademark on all games included on the cartridge.

### Stacked Royalties

The question of the value of intellectual property is complicated if the defendant has expenses (either real or imputed based on its own intellectual property contribution) for other intellectual property used with the product in question. For example, if the product uses other patented technology or earns premium pricing due to a trademark, it may be appropriate to consider the other contributory intellectual property assets in the apportionment analysis.

The court addressed this issue in *Integra Lifesciences*.[fn 286] In that case, the plaintiff's patents related to segments of certain proteins that, by interacting with certain receptors on

---

[fn 282] *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505, 512 (9th Cir. 1985).

[fn 283] The Ninth Circuit made adjustments to the 12 percent finding based on other factors not relevant to this discussion.

[fn 284] *Lottie Joplin Thomas Trust v. Crown Publishers*, 456 F. Supp. 531, 538 (S.D.N.Y. 1977), *aff'd*, 592 F.2d 651 (2d Cir. 1978).

[fn 285] *Nintendo*, 40 F.3d at 1007, 1010.

[fn 286] *Integra Lifesciences I, Ltd. v. Merck KGaA*, 331 F.3d 860 (Fed. Cir. 2003) and *Integra Lifesciences I, Ltd. v. MerckKGaA*, 2004 WL 2284001 (S.D. Cal. 2004).

the surfaces of cells, induced better cell adhesion and growth aimed at promoting wound healing. Integra Lifesciences was awarded $15 million in reasonable royalty damages at trial. On appeal, the Federal Circuit found that the number of patent licenses needed to develop a drug may also affect the value placed on any single technology used in the development process and remanded the case to the district court for further proceedings. On remand, the court reduced the damages to $6.375 million.

Stacked royalties can also apply to the determination of a reasonable royalty if multiple licenses exist with a single product.

**Entire Market Value Rule—Reasonable Royalty**

The entire market value rule, discussed in the section titled "Lost Profits" in this chapter, may also apply to the determination of a reasonable royalty if the patented component is included in a larger device. In that context, the reasonable royalty rate may be applied or apportioned to the sales of the larger device, not just the patented component. However, care should be taken to develop a royalty rate consistent with the underlying facts. If an analysis of comparable licenses suggests a royalty rate of, for example, 5 percent applied to sales of the patented component, it may be improper to conclude that the 5 percent should be applied to sales of the larger device containing the patented element. Rather, it may be appropriate to reduce the royalty rate to compensate for the increased royalty base.

An instance when the patented feature was deemed to be part of a single functioning unit was in *Bose Corp. v. JBL, Inc.*[fn 287] In this case, the patentee brought suit against a seller of loudspeaker systems for infringing its patent relating to ports inside loudspeaker enclosures. Reasonable royalties were calculated based on the entire value of the loudspeaker systems incorporating the accused ports, even though an accused port comprised only a small component of the system.

The Federal Circuit affirmed the district court's award noting that the district court found the patented invention "inextricably worked with other components of loudspeakers as a single functioning unit to provide the desired audible performance."[fn 288] The Federal Circuit also noted that the patented invention "improved the performance of the loudspeakers and contributed substantially to the increased demand for" them, and Bose "provided testimony on its increase in sales in the year following the introduction of its speakers containing the invention." The district court noted that the patented feature "is an integral part of the speaker units sold by Bose, and the port is an integral part of the speaker systems sold by JBL," and it "worked in tandem with other design features and improvements in the Bose products." Bose submitted evidence that the improved performance allowed by the patent was a factor in the defendant's decision to go forward with

---

[fn 287] *Bose Corp. v. JBL, Inc., 274 F.3d 1354 (CAFC 2001).*

[fn 288] *Bose Corp. v. JBL, Inc.*, 274 F.3d 1354 (Fed. Cir. 2001).

manufacturing certain speakers, and that Bose's sales had increased in the year following incorporation of the invention in its own speakers. The district court also noted that, with a minor exception, JBL sold all of its infringing products as "complete systems," and Bose also sold its patented products "as systems, not as separate pieces." The Federal Circuit, however, did not address whether the patented feature was "the" basis for demand or a "predominant" factor. [fn 289]

In *Lucent Technologies*, the Federal Circuit rejected the application of the entire market value rule due to lack of evidence that the patented feature drove demand for the accused product. The patent-at-issue was directed at filling a data entry field with data selected by the user from an on-screen tool. The jury found that the Microsoft products that featured a date picker pop-up tool, including Outlook, infringed the patent-at-issue. At trial, Lucent asked the jury to apply an 8 percent royalty rate to Microsoft's total sales of infringing software products at approximately $8 billion and award $562 million in damages. The jury ultimately awarded a $358 million lump-sum royalty payment. [fn 290]

The Federal Circuit vacated the award and ordered a new trial on damages, finding that the jury's lump-sum award was not supported by substantial evidence. The Federal Circuit also held that, to the extent the jury's lump-sum award was based on an entire market value calculation, the award was both unsupported and against the clear weight of the evidence. The Federal Circuit noted that "the infringing use of the date-picker tool in Outlook is but a very small component of a much larger software program," and that the "vast majority of the features, when used, do not infringe." The Federal Circuit also cited to the date-picker tool's "minor role in the overall program" and "the relative importance of certain other features, e.g., e-mail." "The first flaw with any application of the entire market value rule in the present case is the lack of evidence demonstrating the patented method of the Day patent as the basis—or even a substantial basis—of the consumer demand for Outlook." Even Lucent's own expert testified "that there was no 'evidence that anybody anywhere at any time ever bought Outlook ... because it had a date picker.'" Noting the "unmistakable conclusion" that the patented invention is "not the reason consumers purchase Outlook," the court held that it was improper to apply the entire market value rule. [fn 291]

The Federal Circuit also addressed the methodology employed by Lucent's expert related to adjusting the royalty rate upward to offset a downward adjustment to the base. Lucent's expert initially applied the "entire market value rule to the sale of the 'infringing' computers loaded with the software, opining that Microsoft and Lucent would have agreed to a 1% royalty based on the entire price of the computer containing Outlook. In response, Microsoft filed a motion *in limine* to exclude such testimony, which the district

---

[fn 289] *Bose Corp. v. JBL, Inc.*, 112 F. Supp. 2d 138 (D. Mass. 2000).

[fn 290] *Lucent Techs., Inc. v. Gateway Inc.*, 580 F.3d 1301 (Fed. Cir. 2009).

[fn 291] *Id.*

court granted." At trial, Lucent's expert altered his rate and base "contending that the royalty base should be the price of the software (and not the entire computer) but also that the royalty rate should be increased to 8% (from 1%)" to reach the same damages conclusion. According to the Federal Circuit, this "opinion contrasted starkly to the rates he proposed for the other patents in suit, which were in the 1% range." The Federal Circuit observed that "[t]his cannot be an acceptable way to conduct an analysis of what the parties would have agreed to," especially because "any damages computation based on the value of the entire computer using common royalty rates (e.g., 1-5%) would be excessive." [fn 292]

The Federal Circuit noted that "the base used in a running royalty calculation can always be the value of the entire commercial embodiment, as long as the magnitude of the rate is within an acceptable range (as determined by the evidence)." According to the Federal Circuit, "[t]here is nothing inherently wrong with using the market value of the entire product, especially when there is no established market value for the infringing component or feature, so long as the multiplier accounts for the proportion of the base represented by the infringing component or feature." "Thus, even when the patented invention is a small component of a much larger commercial product, awarding a reasonable royalty based on either sale price or number of units sold can be economically justified." The court, however, found that Lucent had failed to use an appropriately small royalty given the size of the base to which it was applied. [fn 293]

In *Cornell University v. Hewlett-Packard Co.*, [fn 294] Federal Circuit Judge Randall Rader, sitting by designation in the Northern District of New York, reduced the jury's award of $184 million in infringement damages to $54 million finding that Cornell's damages expert incorrectly applied the "entire market value rule." Cornell's patent was directed at technology enabling microprocessors to run faster by simultaneously executing multiple instructions. The claimed invention was a small part of the instruction reorder buffer, which was a part of a processor, which was a part of a CPU module, which was a part of a CPU "brick," which was a part of a larger server. Hewlett-Packard purchased individual microprocessors from Intel and IBM, mounted several microprocessor units into components known as CPU bricks, and sold servers incorporating the CPU bricks. Hewlett-Packard also sold a limited number of individual CPUs.

Despite Judge Rader's admonitions, Cornell's expert then introduced damages evidence based on sales of CPU bricks, which also encompassed more than the microprocessor. Sales of CPU bricks, as calculated by Cornell's expert, were "more than $23 billion in sales Hewlett-Packard would have made if it had sold all of the alleged infringing processors as CPU bricks." Hewlett-Packard was found liable for infringement on that basis,

---

[fn 292] *Id.*

[fn 293] *Id.*

[fn 294] *Cornell Univ. v. Hewlett-Packard Co.*, 609 F. Supp. 2d 279 (N.D.N.Y. 2009).

and the jury awarded $184 million in damages by applying a 0.8 percent royalty rate to the $23 billion royalty base. [fn 295]

Cornell used a royalty base "including not only the revenues Hewlett-Packard would have earned had it sold the infringing processors alone, but on the revenues Hewlett-Packard would have earned had it sold the processors in conjunction with CPU bricks." When Cornell sought the entire market value of all servers and workstations sold by Hewlett-Packard in calculating royalty damages, Judge Rader conducted a *Daubert* hearing and specifically prohibited Cornell's damages expert from using the entire market value rule to include such an expansive royalty base. Judge Rader observed that "neither Cornell nor [Cornell's damages expert] offered credible and sufficient economic proof that the patented invention drove demand for Hewlett-Packard's entire server and workstation market." "Cornell did not offer a single demand curve or attempt in any way to link consumer demand for servers and workstations to the claimed invention." "[Cornell's damages expert] and Cornell have not drawn any connection between the market for servers and workstations and the patented invention." [fn 296]

Hewlett-Packard moved for judgment as a matter of law to reduce the royalty base to earnings attributable to the infringing technology. Judge Rader took issue with Cornell's evidence and expert testimony regarding the $23 billion royalty base, and he found that Cornell had failed to demonstrate entitlement to the entire market value of Hewlett-Packard's CPUs. The application of the entire market value rule, according to Judge Rader, "to the CPU brick was unsupported as a matter of law." "Cornell did not heed this court's warning that any royalty base proffer must account for the fact that the '*115 patent* is a component of a component of Hewlett-Packard's server and workstation products." CPU bricks are "far beyond the scope of the claimed invention and without proof of the necessity of that expansion to adequately compensate for the infringement." "Cornell's hypothetical-CPU-brick-revenues-as-royalty-base argument is simply another iteration of its entire-server-revenues-as-royalty-base argument that this court excluded after a detailed *Daubert* investigation." [fn 297]

As a result, the court granted Hewlett-Packard's motion for judgment as matter of law. According to Judge Rader, the "record contains insufficient evidence to establish the required nexus between the patented aspect of the infringing processors and the entire CPU brick." The court noted that "[a]n over-inclusive royalty base including revenues from the sale of noninfringing components is not permissible simply because the royalty rate is adjustable." It continued, stating

---

[fn 295] *Id.*

[fn 296] *Id.* (citing the court's comments in the *Daubert* hearing 2008 U.S. Dist. LEXIS 41848 [N.D.N.Y. May 27, 2008]).

[fn 297] *Id.*

Cornell attempt[ed] to escape this outcome by arguing that any error in the choice of royalty base is irrelevant because the jury necessarily took the size and composition of the royalty base into account in calculating the final damages award. The court is left to wonder why, if the royalty base mattered so little, Cornell exerted so much energy in pushing for the largest possible base before, during, and even after trial. Moreover, Cornell's assertion is legally incorrect. [fn 298]

Judge Rader noted that Hewlett-Packard's "hypothetical processor revenue calculation represents the only reliable evidence in this record of adequate compensation for infringement of the claimed invention." "Hewlett-Packard sold more than 31,000 infringing processors a la carte during the damages period. Thus, the record supplied some evidence of sales data for processors." Accordingly, Judge Rader reduced the jury's damage award by more than 70 percent. [fn 299]

Judge Rader also set out helpful guidelines for the entire market value rule's application. He observed that "[t]he entire point of [the entire market value rule] is to allow plaintiffs the advantage of collecting royalties on a system that encompasses more than the claimed invention when defendant's real world earnings derive from real world system sales generated by demand for the claimed invention." Judge Rader noted that "with proper proof, a plaintiff may invoke the entire market value rule to include within the royalty base both infringing and non-infringing elements." He then laid out requirements for application of the entire market value rule, stating the following:

> The entire market value rule in the context of royalties requires adequate proof of three conditions: (1) the infringing components must be the basis for customer demand for the entire machine including the parts beyond the claimed invention, *Fonar Corp. v. General Electric Co., 107 F.3d 1543, 1552 (Fed. Cir. 1997); State Indus., Inc. v. Mor-Flo Indus., Inc., 883 F.2d 1573, 1580 (Fed. Cir. 1989)*; (2) the individual infringing and non-infringing components must be sold together so that they constitute a functional unit or are parts of a complete machine or single assembly of parts, *Paper Converting Machine Co. v. Magna-Graphics Corp., 745 F.2d 11, 23 (Fed. Cir. 1984)*; and (3) the individual infringing and non-infringing components must be analogous to a single functioning unit, *Kalman v. Berlyn Corp., 914 F.2d 1473, 1485, 16 USPQ2d 1093, 1102 (Fed. Cir. 1992)*. It is not enough that the infringing and non-infringing parts are sold together for mere business advantage. *See Rite-Hite, 56 F.3d at 1549-50*. Notably, these requirements are additive, not alternative ways to demonstrate eligibility for application of the entire market value rule. *See Id. at 1549-50*. [fn 300]

---

[fn 298] *Id.*

[fn 299] *Id.*

[fn 300] *Id.*

In *Imonex Services v. W. H. Munzprufer Dietmar Trenner*, the Federal Circuit affirmed a district court's order granting a new trial when a first trial resulted in a damages verdict based on insufficient evidence. [fn 301]   The district court excluded Imonex's expert testimony on the entire market value rule. Imonex's expert testified that the entire washing machine was appropriate royalty base for coin acceptors as follows:

> Imonex first argued that a laundromat customer would have perceived that the coin selectors enhanced the performance of the washing machines as a whole. Imonex later argued that the *Georgia-Pacific* factors, specifically factors 8 (commercial success of a product as relevant to royalties) and 13 (distinguishing between patented and non-patented features of an infringing device or process in calculating damages) supported its theory. In addition, Imonex noted that the OEMs could supply profitability data only on the entire machines. [fn 302]

The Federal Circuit found insufficient evidence for the entire market value rule when the patented feature, which differentiated which coins were put into the machine, was not shown to be the basis for the customer demand of the entire laundry machine. The Federal Circuit also affirmed the exclusion of testimony relating to the entire market value rule.

The Federal Circuit also found that "Imonex's proposed expert testimony on the entire market value rule, however, bore no relation to [the entire market value] rule." The Federal Circuit affirmed that "[w]ithout any evident record that the patented features were the basis for customer demand for the laundry machines as a whole, the trial court properly foreclosed further evidence on this unsupported theory." The Federal Circuit added that "[a]ny reliance on the so-called *Georgia-Pacific* factors, actually a *Georgia-Pacific* listing, had little or no relation to Imonex's entire-value calculation in different clothing." [fn 303]

In *Lucent Technologies*, the judge reversed a $1.5 billion verdict against Microsoft because he concluded that the jury misapplied the entire market value rule. The jury based damages on the average sales price of personal computers despite the fact that the patents covered particular features of MP3 technology. Microsoft had built the technology into its Windows Media Player, a software product included in Microsoft's Windows operating system. The judge found a "lack of evidence showing that the patented features set forth in the claims ... were the basis for customer demand." Although Lucent cited evi-

---

[fn 301] *Imonex Servs. v. W.H. Munzprufer Dietmar Trenner Gmbh*, 408 F.3d 1374 (Fed. Cir. 2005), A jury awarded Imonex $10.4 million based on its finding that its '280 and '349 patents (directed to coin selectors used on laundry machines) were valid, enforceable, and willfully infringed. Because the verdict was based on insufficient evidence, a second trial was ordered and resulted in a lower damages award of $1.4 million to Imonex and an attorneys' fees award to Imonex. Imonex appealed the order granting a second trial and Munzprufer appealed the denial of its judgment as a matter of law motion for noninfringement, as well as the enhanced damages award.

[fn 302] *Id.* (citing *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970)).

[fn 303] *Id.*

dence suggesting "that MP3 capabilities overall were a commercially important feature," it cited no evidence that the claimed features "were critical to MP3," "established the basis for the customer demand or value of MP3," or "were critical or provided value to the whole computer." [fn 304]

In *IP Innovation*, Judge Rader affirmed that the patented feature must be the basis for demand in order to invoke the entire market value rule, stating that "[u]nder the entire market value rule, damages are recoverable only 'if the patented apparatus was of such paramount importance that it substantially created the value of the component parts.'" [fn 305]

Judge Rader also opined that the plaintiff's expert relied upon "irrelevant or unreliable evidence" and failed to "account for the economic realities of this claimed component as part of a larger system." "The evidence shows that the workspace switching feature represents only one of over a thousand components included in the accused products." According to Judge Rader, the plaintiff's expert "made no effort to factor out of his proffered royalty base those operating systems in which the user never affirmatively enables the claimed switching feature. In fact, he made no effort to even discern the percentage of users who would never enable or use the claimed feature." Judge Rader concluded that "the record cannot support the unfounded conclusion that the often-unused feature drives demand for a royalty base of 100% of the operating systems as a whole. In sum, this stunning methodological oversight makes it very difficult for this court to give any credibility to [plaintiff's expert's] assertion that the claimed feature is the 'basis for customer demand.' See *Lucent Techs., 580 F.3d at 1336*." [fn 306]

In *i4i Limited Partnership v. Microsoft Corp.*, the United States District Court for the Eastern District of Texas rejected Microsoft's argument that i4i was attempting to "back-door" the entire market value rule through its damages expert's use of the total operating profit earned as a "reasonableness check." [fn 307] The court's rejection centered on the fact that Microsoft did not make an objection to i4i's expert's testimony when it was offered, and i4i never explicitly told the jury that it employed the entire market value rule.

In *Golden Blount*, [fn 308] the owner of a patent relating to fireplace assemblies sued its direct competitor for selling a burner component of a patented assembly. Specifically, the competitor sold ember burner components that provide the flame pattern along with in-

---

[fn 304] *Lucent Techs., Inc. v. Gateway, Inc.*, 2007 U.S. Dist. LEXIS 57135 (S.D.Cal.).

[fn 305] *IP Innovation LLC v. Red Hat, Inc.*, 2010 U.S. Dist. LEXIS 32528 (E.D. Tex.) (citing *Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1549 (Fed. Cir. 1995)).

[fn 306] *Id.*

[fn 307] *i4i Ltd. P'ship. v. Microsoft Corp.*, 670 F. Supp. 2d 568 (E.D. Tex. 2009).

[fn 308] *Golden Blount, Inc. v. Robert H. Peterson Co.*, 438 F.3d 1354 (Fed. Cir. 2006).

structions on how end users could assemble components to produce the patented burner assembly. The ember burner component produced a pleasing flame pattern and was the basis for customer demand of the entire burner assembly (even though the burner assembly is the actual patented invention).

The district court applied the entire market value rule and determined that the patentee was entitled to lost profits on diverted sales of entire burner assemblies, including ember burner components, as well as diverted sales of accompanying grates and artificial logs. The burner assembly, supporting grates and artificial logs constituted a functional unit. The standard of practice in the industry was to sell the entire burner assembly along with accompanying grates and artificial logs together as a unit. The Federal Circuit affirmed the district court, noting favorably its findings that the entire burner assembly, including ember burner components, as well as diverted sales of accompanying grates and artificial logs, operated as a functional unit, and that the practice in the industry was to sell both the patented and unpatented articles together.

In *Fujifilm Corp. v. Benun*,[fn 309] the Federal Circuit explained that the owner's expert provided a reasonable basis for determining the royalty by increasing the royalty rate in an amount proportionate to any reduction in the size of the royalty base, and the jury was entitled to rely on evidence of bundling and convoyed sales in determining the proper scope of the royalty base. Fuji's expert

> testified that in a hypothetical negotiation the royalty rate would have changed inversely to royalty-base changes, resulting in a consistent royalty amount. Specifically, if 50% of LFFPs [lens-fitted film packages] infringed, and the royalty base only included infringing LFFPs (a reduction by one-half in the size of the potential royalty base of all LFFPs), then the royalty rate would double from 40 cents to 80 cents per infringing LFFP. In short, Fuji advocated a consistent royalty amount that would not vary with changes in the royalty-base size.[fn 310]

The Federal Circuit held that "Fuji's expert provided the jury with sufficient information to reach Fuji's proposed royalty amount, whether the royalty base included all LFFPs (a larger royalty base, driving the royalty rate down to reach Fuji's proposed royalty amount), or only infringing LFFPs (a smaller royalty base, driving the royalty rate up to reach Fuji's proposed royalty amount)." The Federal Circuit disagreed with the defendants' position that "the royalty base for the proposed royalty rate can only include infringing LFFPs, thereby making the jury's $2.00 royalty rate excessive."[fn 311]

---

[fn 309] *Fujifilm Corp. v. Benun,* 605 F.3d 1366 (Fed. Cir. 2010).

[fn 310] *Id.*

[fn 311] *Id.*

In a more recent ruling, *Uniloc*, the U.S. Court of Appeals for the Federal Circuit further confirmed, citing *Rite-Hite*, that in order "[f]or the entire market value rule to apply, the patentee *must* prove that the patent-related feature is the basis for customer demand." [fn 312] Uniloc's expert performed "a check to determine whether" his royalty figure was reasonable by comparing it to his calculation of Microsoft's total revenue for Microsoft Office and Windows products. He concluded that his royalty was reasonable as it amounted to only 2.9 percent of the $19.28 billion in total revenue Microsoft received from sales of Microsoft's Office and Windows products which incorporated the patented technology related to product activation, because, in his experience, royalty rates for software are "'generally above—on average, above 10% or 11%.'" [fn 313]

"Microsoft argue[d] that Uniloc's use of the entire market value rule as not proper because it is undisputed that Product Activation did not create the basis for customer demand or substantially create the value of the component parts. Microsoft continue[d] that [Uniloc's experts] testimony tainted the jury's damages deliberations, regardless of its categorization as a 'check.'" The U.S. Court of Appeals agreed. The court held that "this case provides a good example of the danger of admitting consideration of the entire market value of the accused where the patented component does not create the basis for customer demand." "The Supreme Court and this court's precedents do not allow consideration of the entire market value of accused products for minor patent improvements simply by asserting a low enough royalty rate." [fn 314]

As the district court also aptly noted, "'[t]he $19 billion cat was never put back into the bag . . . and in spite of a final instruction that the jury may not award damages based on Microsoft's entire revenue from all the accused products in the case' . . . [t]he disclosure that a company has made $19 billion dollars in revenue from an infringing product cannot help but skew the damages horizon for the jury, regardless of the contribution of the patented component to this revenue." [fn 315]  The U.S. Court of Appeals found that "[e]ven if the jury's damages calculation was not based wholly on the entire market value check, the award was supported in part by the faulty foundation of the entire market value." [fn 316]

**Foreign Sales and Foreign Manufacturing**

---

[fn 312] *Uniloc USA, Inc. v. Microsoft Corp.*, 10-1035, U.S. Court of Appeals for the Federal Circuit (Washington).

[fn 313] *Id.*

[fn 314] *Id.*

[fn 315] *Id.*

[fn 316] *Id.*

*Patents, U.S. Code* (USC) 35, Section 271(f), was enacted following the U.S. Supreme Court's decision in *Deepsouth Packing Co., Inc. v. Laitram Corp.* [fn 317] 35 USC 271(f) states the following:

> Whoever without authority supplies or causes to be supplied in or from the United States all or a substantial portion of the components of a patented invention, where such components are uncombined in whole or in part, in such a manner as to actively induce the combination of such components outside the United States in a manner that would infringe the patent if such combination occurred within the United States shall be liable as an infringer. [fn 318]

In *Deepsouth Packing*, the court acknowledged that liability for infringement could be avoided by manufacturing parts in the United States and then shipping them separately overseas for assembly by customers.

*In Microsoft Corp. v. AT&T Corp.*, the Supreme Court observed that "it is the general rule under United States patent law that no infringement occurs when a patented product is made and sold in another country. There is an exception." 35 USC 271(f) "provides that infringement does occur when one 'supplies... from the United States,' for 'combination' abroad, a patented invention's 'components.'" [fn 319]

*Microsoft* tested the applicability of 35 USC 271(f) to computer software sent from the United States to a foreign manufacturer on a master disc, or by electronic transmission, then copied by the foreign recipient for installation on computers made and sold abroad. Microsoft sent a master version of its Windows operating system to foreign manufacturers, which was then loaded onto the foreign manufacturers' computers and then sold to customers abroad. The stage at which software became a component and implicates 35 USC 271(f) was the distinction over which the parties disagreed.

*AT&T* argued "that reading §271(f) to cover only those copies of software actually dispatched from the United States creates a 'loophole' for software makers." [fn 320] "The Federal Circuit majority found AT&T's plea compelling:

> Were we to hold that Microsoft's supply by exportation of the master versions of the Windows® software—specifically for the purpose of foreign replication—avoids infringement, we would be subverting the remedial nature of §271(f), permitting a technical avoidance of the statute by ignoring the advances in a field of technology—and its associated industry practices—that developed after the en-

---

[fn 317] *Deepsouth Packing Co., Inc. v. Laitram Corp., 406 U.S. 518 (1972).*

[fn 318] 35 USC 271(f).

[fn 319] *Microsoft Corp. v. AT&T Corp.*, 127 S. Ct. 1746 (2007).

[fn 320] *Id.*

actment of §271(f) ... Section 271(f), if it is to remain effective, must therefore be interpreted in a manner that is appropriate to the nature of the technology-at-issue. 414 F.3d at 1371. [fn 321]

The Supreme Court held that because Microsoft does not export the copies that are installed on the computers, Microsoft does not supply the "components" of those computers from the United States under 35 USC 271(f) as the clause is "currently written." In the court's view, "the very components supplied from the United States, and not foreign-made copies thereof, trigger [§271(f)] liability when combined abroad to form the patented invention at issue." [fn 322]  As a result, the copies that were made by third parties outside of the United States are beyond the purview of 35 USC 271(f).

AT&T's patent was deemed to be infringed when a computer is loaded with the Windows operating system that includes software code that digitally encodes and compresses recorded speech in a specific manner. The Supreme Court observed, "[i]t bears emphasis, however, that uninstalled Windows software does not infringe AT&T's patent any more than a computer standing alone does." As a result, the Supreme Court was tasked with determining whether "Microsoft's liability extend[ed] to computers made in another country when loaded with Windows software copied abroad from a master disk or electronic transmission dispatched by Microsoft from the United States." Simply, the court determined, "[o]ur answer is 'No.'" [fn 323]

The Supreme Court recognized that

> [p]lausible arguments can be made for and against extending §271(f) to the conduct charged in this case as infringing AT&T's patent. Recognizing that §271(f) is an exception to the general rule that our patent law does not apply extraterritorially, we resist giving the language in which Congress cast §271(f) an expansive interpretation. Our decision leaves to Congress' informed judgment any adjustment of §271(f) it deems necessary or proper. [fn 324]

The Supreme Court explained that "Section 271(f) applies to the supply abroad of the 'components of a patented invention, where *such components* are uncombined in whole or in part, in such manner as to actively induce the combination of *such components*.' §271(f)(1) (emphasis added)." Further, the Supreme Court concluded that "[a]bstract software code is an idea without physical embodiment, and as such, it does not match §271(f)'s categorization: 'components' amenable to 'combination.'" [fn 325]  In clarifying,

---

[fn 321] *Microsoft*, 127 S. Ct. at 1746 (*citing AT&T Corp. v. Microsoft Corp.*, 414 F. 3d 1366, 1371).

[fn 322] *Id.*

[fn 323] *Id.*

[fn 324] *Id.*

[fn 325] *Id.*

Justice Ruth Bader Ginsburg remarked, "Congress, of course, might have included within §271(f)'s compass, for example, not only combinable 'components' of a patented invention, but also 'information, instructions, or tools from which those components readily may be generated.' It did not. In sum, a copy of Windows, not Windows in the abstract, qualifies as a 'component' under §271(f)." [fn 326]

In *Eolas Technologies Inc. v. Microsoft Corp.*, Judge Rader affirmed the district court's finding that the construction of 35 USC 271(f) implicates software code on golden master discs as components. Microsoft argued that the golden master discs containing Windows source code did not equate to the provision of a component of an infringing product and that the disc was not a physical part of a product. Judge Rader, however, concluded that "the software code on the golden master disk is not only a component, it is probably the key part of this patented invention. Therefore, the language of section 271(f) in the context of Title 35 shows that this part of the claimed computer product is a 'component of a patented invention.'" [fn 327]

Judge Rader interpreted the reference to components of a "patented invention" to be "broad and inclusive" and stated that "every form of invention eligible for patenting falls within the protection of section 271(f)." By extension, Judge Rader concluded that "the statute did not limit section 271(f) to 'machine' components or 'structural or physical' components. Rather every component of every form of invention deserves the protection of section 271(f)." Judge Rader cited to *Rotec Industries, Inc. v. Mitsubishi Corp.*, in explaining that "Section 271(f) closed that obvious loophole in the statutory protections for patented inventions." In addition, Judge Rader cited to the *Congressional Record* (130 Cong. Rec. H10525 [1984]), which also referred to "correcting a loophole." Finally, the appellate court found that the statute "does not impose a requirement of 'tangibility' on any component of a patented invention." As a result of this appellate court decision, the exportation of software code for distribution and use in foreign territories may constitute infringement under U.S. patent law. [fn 328]

In *Voda v. Cordis Corp.*, [fn 329] the Federal Circuit reviewed its jurisdiction over foreign patent claims. The patents in this matter related to cardiology catheters, and the alleged infringement occurred both domestically and internationally. *Voda* held similar patents in each country and sought to consolidate its worldwide infringement action in the United States District Court. The appellate court found that the district court abused its discretion in its exercise of supplemental jurisdiction. The Supreme Court has noted that *Judiciary and Judicial Procedure*, USC 28, Section 1367(c), "reflects the understanding that, when

---

[fn 326] *Id.*

[fn 327] *Eolas Techs. Inc. v. Microsoft Corp.*, 399 F.3d 1325 (Fed. Cir. 2005).

[fn 328] *Id.*

[fn 329] *Voda v. Cordis Corp.*, 476 F.3d 887 (Fed. Cir. 2007).

deciding whether to exercise supplemental jurisdiction, 'a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity.'" [fn 330]  The appellate court observed that "the Supreme Court 'ordinarily construes ambiguous statutes to avoid unreasonable interference with the sovereign authority of other nations.'" and that "'the right conferred by a patent under [United States] law is confined to the United States and its territories.'" [fn 331]

## Permanent Injunction and Post-Infringement Damages

In *eBay, Inc. v. MercExchange, LLC*, [fn 332]  the U.S. Supreme Court held that the issuance of a permanent injunction in a patent infringement lawsuit is governed by the same four-factor test used in other areas of the law. If an injunction is not granted, the issue of post-verdict royalties becomes relevant. As Judge David Folsom wrote in *Paice LLC v. Toyota Motor Corp.*, [fn 333]  when the court decides not to enter a permanent injunction but the adjudged infringer continues to sell infringing product in the market, "what amount of money would reasonably compensate a patentee for giving up his right to exclude yet allow an ongoing willful infringer to make a reasonable profit?" The relatively sparse precedent in this area reveals few answers and many questions. Who determines the post-verdict royalty rate: parties, judge, or jury? What is the role of the *Georgia-Pacific* factors in the ongoing royalty analysis? Can an analytical approach be used to determine post-verdict royalties? What types of evidence should parties submit and when should they submit it? The following cases provide some answers to these questions.

*Amado v. Microsoft Corp.* [fn 334]  addressed the difference between the context of the hypothetical negotiation for pre-verdict and post-verdict reasonable royalty awards, concluding that a "fundamental difference" exists between a reasonable royalty for pre-verdict infringement and damages for post-verdict infringement. "Prior to judgment, liability for infringement, as well as the validity of the patent, is uncertain, and damages are determined in the context of that uncertainty. Once a judgment of validity and infringement has been entered, however, the calculus is markedly different because different economic

---

[fn 330] *Id.* (citing *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156 (1997)).

[fn 331] *Id.* (citing *F. Hoffmann-La Roche, Ltd. v. Empagran S.A.*, 542 U.S. 155 (2004) and *NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282, 1313 (Fed. Cir. 2005)).

[fn 332] *Ebay, Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006).

[fn 333] *Paice LLC v. Toyota Motor Corp.*, 609 F. Supp. 2d 620 (E.D. Texas 2009).

[fn 334] *Amado v. Microsoft Corp.*, 517 F.3d 1353 (Fed. Cir. 2008). The patent-at-issue is directed to a point-and-shoot interface for linking database records to spreadsheets. Upon finding infringement, the jury awarded the plaintiff $0.04 for each infringing sale. An injunction was awarded but stayed, requiring the defendant to deposit into escrow $2.00 for each infringing sale. Upon appeal, the escrow was reduced to $0.12 for each infringing sale (the jury's award of $0.04 trebled). This decision was again appealed. This case was different from *Paice* because it related to compensation for a stay of injunction and not post-verdict damages without an injunction.

factors are involved." "This is not a case like *Paice*, however, where the court's task was to assess an appropriate level of damages for ongoing infringement under circumstances in which an injunction was not warranted. Here, Microsoft *was* enjoined from further activity yet was permitted to continue only by virtue, and with the imprimatur, of the court ordered stay." "When a district court concludes that an injunction is warranted, but is persuaded to stay the injunction pending an appeal, the assessment of damages for infringements taking place after the injunction should take into account the changes in the parties bargaining positions, and the resulting changes in economic circumstances, resulting from the determination of liability..."[fn 335] Accordingly, the courts have concluded that a reasonable royalty determined in a hypothetical negotiation—pre-infringement verdict—likely would be inappropriate as the basis of a post-trial compulsory license, either under an injunction or not.

The issue of post-infringement, or future, damages was brought to the forefront by the Supreme Court's decision in *eBay*. Although the issue of whether a permanent injunction will be entered is a legal question for the court, the quantification of a royalty if an injunction is not awarded has now entered the domain of the damages expert. The following discussion describes the Supreme Court's decision in *eBay* for general knowledge of the CPA, but it also provides information about case decisions relating to the determination of future damages in those situations when an injunction was not entered and the court asked for a damages determination.

*eBay*[fn 336] relates to the availability and appropriateness of permanent injunctions as a remedy for patent infringement. Injunctive relief is an equitable remedy granted when monetary damages are not capable of compensating the plaintiff's violation of rights and preventing injustice. After a finding of infringement, prior precedent suggested the imposition of a permanent injunction was all but a foregone conclusion. *eBay* established that patent holders are subject to the same four-part analysis that is applicable in every other context when permanent injunctive relief is sought as an equitable remedy, and *eBay* and its progeny have established a new burden for parties seeking a permanent injunction.

The Court of Appeals for the Federal Circuit in *eBay* noted that there exists a "general rule that courts will issue permanent injunctions against patent infringement absent exceptional circumstances."[fn 337] However, the Supreme Court in *eBay* rejected this general rule in favor of applying the same framework to the imposition of injunctive relief in patent infringement cases as is applied in all other cases. Established principles of equity require that a party seeking permanent injunctive relief satisfy a four-factor test demonstrating

---

[fn 335] *Id.*

[fn 336] *Ebay*, 547 U.S. at 388.

[fn 337] *MercExchange, LLC v. eBay, Inc.*, 401 F.3d 1323 (Fed. Cir. 2005).

*a.* "that [the plaintiff] has suffered an irreparable injury;"

*b.* "that remedies available at law, such as monetary damages, are inadequate to compensate for that injury;"

*c.* "that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and,"

*d.* "that the public interest would not be disserved by a permanent injunction." [fn 338]

In *eBay, Inc.*, the Supreme Court held that this paradigm applies "with equal force to disputes arising under the Patent Act," thereby eliminating the general rule of issuing permanent injunctions. The Supreme Court held that the "decision whether to grant or deny injunctive relief rests within the equitable discretion of the district courts, and that such discretion must be exercised consistent with traditional principles of equity, in patent disputes no less than in other cases governed by such standards." [fn 339]

In *eBay*, the applicability of a permanent injunction when the patent holder does not practice its patent was addressed. Justice Clarence Thomas wrote in a unanimous decision that neither the district court nor the court of appeals had appropriately applied traditional equitable principles to determine whether *MercExchange* was entitled to a permanent injunction. Justice Thomas rejected the district court's suggestion that injunctions should not be granted when a patent holder is willing to license the patent and is not practicing the patent itself because, in these cases, a patent holder would not suffer irreparable harm without an injunction. For example, according to the Supreme Court, "some patent holders, such as university researchers or self-made inventors," might be able to satisfy the four-factor test even though they "might reasonably prefer to license their patents, rather than undertake efforts to secure the financing necessary to bring their works to market themselves," and they should not be categorically denied the opportunity to seek an injunction. Justice Thomas noted that "traditional equitable principles do not permit such broad classifications." [fn 340] The Supreme Court's list of examples of patent owners who might be able to satisfy the four-factor test without practicing the patented invention (university researchers or self-made inventors) did not explicitly extend to patent holding companies.

The decision takes away what is often the most effective threat of "patent trolls," which threaten litigation to force parties to take licenses to patents the "patent trolls" have acquired but do not themselves practice. [fn 341] Justice Anthony Kennedy's concurring opin-

---

[fn 338] *Ebay*, 547 U.S. at 388.

[fn 339] *Id.*

[fn 340] *Id.*

[fn 341] Jessica Holzer, "Supreme Court Buries Patent Trolls," *Forbes*, May 16, 2006, www.forbes.com/home/businessinthebeltway/2006/05/15/ebay-scotus-patent-rulingcx_jh_0516scotus.html.

ion targets the use of the threat of injunction for "undue leverage" in licensing negotiations, when "an injunction may not serve the public interest." [fn 342]

The progeny of *eBay* establishes that the presumption of irreparable harm for a valid and infringed patent, previously enjoyed by patent holders, likely has not survived. In analyzing the four factors, courts have primarily focused on the first and second factors—irreparable harm and inadequacy of monetary damages. When parties are direct competitors, courts are more likely to find irreparable harm and inadequacy of monetary damages and, thus, will issue an injunction. Conversely, when the parties do not compete, and, in particular, when the patent holder has a history of licensing the patent, courts generally find that monetary damages are sufficient and, thus, will not issue an injunction. Courts that deny injunctive relief do craft alternative remedies. The most common is an ongoing royalty, a royalty based on future infringing sales.

In *Paice*, the Court of Appeals for the Federal Circuit affirmed the denial of permanent injunction because (1) the patent owner "does not actually manufacture any goods, the court concluded that there was no threat that Paice would lose name recognition or market share without an injunction," and (2) "the adequacy of monetary damages was further bolstered, in the court's opinion, by the fact that Paice had offered a license to Toyota during the post-trial period." [fn 343] The Court of Appeals noted "[u]nder some circumstances, awarding an ongoing royalty for patent infringement in lieu of an injunction may be appropriate." [fn 344] "In most cases, where the district court determines that a permanent injunction is not warranted, the district court may wish to allow the parties to negotiate a license amongst themselves regarding future use of a patented invention before imposing an ongoing royalty. Should the parties fail to come to an agreement, the district court could step in to assess a reasonable royalty in light of the ongoing infringement." [fn 345]

Although Toyota was found to infringe, Paice could not demonstrate that it suffered irreparable harm from the infringement. In fact, Paice did not manufacture or sell vehicles and commonly licensed its patents. In denying the request for the injunction, the court ruled that a patent holder had no presumption of irreparable harm even after the patent is found valid and infringed. The court concluded that because the patents only related to a small portion of the vehicle, an injunction would be onerous on Toyota, and that offering to license the technology to Toyota was an indication that monetary damages were sufficient.

---

[fn 342] *Ebay*, 547 U.S. at 388.

[fn 343] *Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1293 (Fed. Cir. 2007).

[fn 344] *Id.* (citing *Shatterproof Glass Corp. v. Libbey-Owens Ford Co.*, 758 F.2d 613, 628 (Fed. Cir. 1985)).

[fn 345] *Id.*

Courts, however, using this framework have issued permanent injunctions when direct competition would cause irreparable harm. In *Novozymes A/S v. Genencor International, Inc.*, a permanent injunction was granted, and the court noted that the parties "were head-to-head competitors" and that Novozymes A/S "ha[d] a right, granted by Congress, not to assist its rival with the use of proprietary technology." [fn 346]

The court, in applying the four-factor analysis, explained that the court in *eBay* "also rejected a categorical rule that a patentee's willingness to license its patent is enough to establish that the patentee would not suffer irreparable harm in the absence of an injunction." [fn 347] However, the United States District Court for the District of Delaware further explains, "[l]egal remedies are not adequate to compensate Novozymes for the infringement of its patent. Because Novozymes markets its technology by licensing it to its subsidiary, the legal remedy of lost profits damages is not available. Even if it were, the statutory right to exclude others represents a benefit that, under these circumstances, cannot be equated by an award of cash." [fn 348] In addition, the court noted, "Novozymes owns two related patents for alpha-amylases. It licenses both patents to its subsidiary, not only in exchange for a 40% royalty, but also with the expectation that the value of its subsidiary will increase with the successful marketing of the licensed technology... even though Novozymes does not market the alpha-amylases itself, it has suffered harm beyond the reasonable royalty that it can recover from Defendants." Concluding, the court stated, "there is no evidence that a permanent injunction would harm the public. While the fuel ethanol industry has growing importance in a time of rising energy prices, Novozymes has a competing product, and Genencor has products that do not infringe the '031 patent." [fn 349]

In contrast, several courts have refused to issue permanent injunctions when the parties did not compete and when the plaintiff had a history of licensing the patent. For example, in *z4 Technologies, Inc. v. Microsoft Corp.*, the district court denied a permanent injunction in part because "[t]here is no logical reason that a potential consumer or licensee of z4's technology would have been dissuaded from purchasing or licensing z4's product activation technology for use in its own software due to Microsoft's infringement." [fn 350] The court explained that "Microsoft only uses the infringing technology as a small component of its own software, and it is not likely that any consumer of Microsoft's Windows or Office software purchases these products for their product activation functionality." Further, it stated that

---

[fn 346] *Novozymes A/S v. Genencor Int'l, Inc.*, 474 F. Supp. 2d 592 (D. Del. 2007).

[fn 347] *Id.* (citing *eBay*, 547 U.S. at 388.

[fn 348] *Novozymes*, 474 F. Supp. 2d at 592.

[fn 349] *Id.*

[fn 350] *z4 Techs., Inc. v. Microsoft Corp.*, 434 F. Supp. 2d 437 (E.D. Texas 2006).

> [h]ere, product activation is a very small component of the Microsoft Windows
> and Office software products that the jury found to infringe z4's patents. The in-
> fringing product activation component of the software is in no way related to the
> core functionality for which the software is purchased by consumers. According-
> ly, Justice Kennedy's comments support the conclusion that monetary damages
> would be sufficient to compensate z4 for any future infringement by Microsoft.

Consequently, the court found no irreparable harm and that z4 could be compensated for
any harm by "calculating a reasonable royalty for Microsoft's continued use of the prod-
uct activation technology." [fn 351]

The United States District Court for the Eastern District of Texas explained that "[i]n the
absence of a permanent injunction against Microsoft, z4 will not suffer lost profits, the
loss of brand name recognition or the loss of market share because of Microsoft's contin-
ued sale of the infringing products. These are the type of injuries that are often incalcula-
ble and irreparable." The court noted that "z4 is not excluded from the use of its intellec-
tual property in a way that cannot be calculated with reasonable certainty in the form of
monetary damages, just as the past damages for infringement were calculated at trial." In
addressing the balance of hardships, the court stated, "[i]mportantly, the potential hard-
ships Microsoft could suffer if the injunction were granted outweigh any limited and rep-
arable hardships that z4 would suffer in the absence of an injunction." The court also
found that the weight of public interest mitigates in favor of Microsoft, stating that

> [u]nder both aspects of z4's proposed permanent injunction, there is a risk that
> certain sectors of the public might suffer some negative effects. However, the
> Court is unaware of any negative effects that might befall the public in the ab-
> sence of an injunction. Although these negative effects are somewhat speculative,
> such potential negative effects on the public weigh, even if only slightly, against
> granting an injunction. Accordingly, the public interest is likely to be disserved if
> a permanent injunction were entered against Microsoft. [fn 352]

Similarly, in *Amado*, the appellate court determined that the district court did not abuse
its discretion in dissolving an injunction "when, after applying the traditional four-factor
test, it determined that an injunction was no longer equitable under the circumstances." [fn 353] The District Court for the Central District of California noted, "Amado's patent only
covers a very small component of the infringing products—claim 21, the only claim that

---

[fn 351] *Id.*

[fn 352] *Id.*

[fn 353] *Amado v. Microsoft Corp.*, 517 F.3d 1353 (Fed. Cir. 2008).

the jury found Microsoft Office and Access infringed, covers a single feature linking Access and Excel." [fn 354]

The Federal Circuit refused to substitute its judgment for that of the district court with regard to the dissolution of the injunction, stating "[d]ue to the equitable nature of injunctive relief, district courts have wide discretion to determine under what circumstances the grant of injunctive relief is appropriate, ... and under what circumstances the modification or dissolution of that injunction is warranted." [fn 355] However, the Federal Circuit vacated the district court's royalty award, finding that the district court failed to adequately explain the basis for its award of $0.12 per infringing unit sold during the stay of the permanent injunction. In addition, it was unclear whether a royalty rate had been set for future infringing sales. The Federal Circuit held that a fundamental difference exists between a reasonable royalty for pre-verdict infringement and damages for post-verdict infringement. It cited *Paice* for the proposition that "'[p]re-suit and post-judgment acts of infringement are distinct, and may warrant different royalty rates given the change in the parties' legal relationship and other factors.'" [fn 356] The court explained that "the assessment of damages for infringements taking place after the injunction should take into account the change in the parties' bargaining positions, and the resulting change in economic circumstances, resulting from the determination of liability..." As a result, the court stated, "[b]ecause we are unable to determine whether the district court's award of $ 0.12 was a reasonable exercise of its discretion ... we vacate the district court's escrow award and remand the matter to the district court for reconsideration." [fn 357] The district court was directed to provide an adequate explanation for its royalty rate.

The Federal Circuit clarified *Amado* from *Paice* in confirming that the royalty rate for the post-verdict infringement could differ from the pre-verdict infringement rate. The court explained, "[t]his is not a case like *Paice*, however, where the court's task was to assess an appropriate level of damages for ongoing infringement under circumstances in which an injunction was not warranted. Here, Microsoft *was* enjoined from further infringing activity yet was permitted to continue only by virtue, and with the imprimatur, of the court-ordered stay." [fn 358]

---

[fn 354] *Amado v. Microsoft Corp.*, 2007 U.S. Dist. LEXIS 96487, 39 (C.D. Cal. 2007).

[fn 355] *Amado v. Microsoft Corp.*, 517 F.3d 1353 (Fed. Cir. 2008) (citing *eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 126 S. Ct. 1837, 164 L. Ed. 2d 641 (2006) and *Sys. Fed'n No. 91 v. Wright*, 364 U.S. 642, 647–48, 81 S. Ct. 368, 5 L. Ed. 2d 349 (1961)).

[fn 356] *Id.* (citing *Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1293, 1317 (Fed. Cir. 2007)).

[fn 357] *Amado v. Microsoft Corp.*, 517 F.3d 1353 (Fed. Cir. 2008).

[fn 358] *Id.*

*i4i Limited Partnership*[fn 359] is a recent case in which the Federal Circuit found that the
imposed injunction was appropriate and affirmed it based on application of the *eBay*
framework. In granting a permanent injunction to i4i, the court noted that "[t]he district
court's conclusion properly recognized that the touchstone of the public interest factor is
whether an injunction, both in scope and effect, strikes a workable balance between pro-
tecting the patentee's rights and protecting the public from the injunction's adverse ef-
fects."[fn 360] The appellate court reviewed the district court's determination of irreparable
injury to i4i noting, the "district court concluded that i4i was irreparably injured by Mi-
crosoft's infringement, based on its factual findings that Microsoft and i4i were direct
competitors in the custom XML market, and that i4i lost market share as a result of Mi-
crosoft's infringing Word products."[fn 361] In addition, the appellate court stated that "it
was proper for the district court to consider evidence of past harm to i4i. Past harm to a
patentee's market share, revenues, and brand recognition is relevant for determining
whether the patentee 'has suffered an irreparable injury.'"[fn 362]

The appellate court also reviewed the district court's finding that monetary damages were
insufficient. The Federal Circuit noted that the "district court found no evidence that i4i
had previously licensed the patent, instead finding evidence that i4i sought to retain ex-
clusive use of its invention" and that "[i]t was not an abuse of discretion for the district
court to conclude that monetary damages would be inadequate." The circuit court also
held that i4i's patented technology was "central" to its business and that its "market share,
revenues, and business strategy are similarly tied to the patented method." In finding the
balance of hardships weighting in favor of i4i, the court explained that the "far greater
importance of the patented method to i4i, combined with the demonstrated past effects of
infringement on i4i, favors issuance of a permanent injunction." Finally, the court ex-
pressed its belief that "the injunction's narrow scope substantially mitigates the negative
effects on the public, practically and economically."[fn 363] The only modification the ap-
pellate court made to the injunction was the effective date, which was extended from 60
days from the date of the injunction order to 5 months from that date. In all other respects
the scope of the permanent injunction was upheld.

In *Nichia Corp. v. Seoul Semiconductor Co.*, the United States District Court for the
Northern District of California denied Nichia's motion for a permanent injunction. The
court, in coming to its decision, applied the *eBay* framework to determine whether in-
junctive relief is warranted. The plaintiff argued that it has and will continue to suffer ir-

---

[fn 359] *i4i L.P. v. Microsoft Corp.*, 598 F.3d 831 (Fed. Cir. 2010).

[fn 360] *Id.* (citing *Broadcom Corp. v. Qualcomm, Inc.*, 543 F.3d 683, 704 (Fed. Cir. 2008)).

[fn 361] *i4i*, 598 F.3d at 831.

[fn 362] *Id.* (citing *eBay Inc. v. MercExchange, L.L.C.,* 547 U.S. 388, 391 (2006)).

[fn 363] *i4i*, 598 F.3d at 831.

reparable harm in the form of "brand recognition erosion, harm to its reputation, price erosion, and loss of market share." [fn 364]

The court noted, however, that it was undisputed that the defendants made only two infringing sales in the United States, one of which resulted from an offer made by Nichia to Seoul Semiconductor. The court stated, "Plaintiff, not surprisingly, fails to offer any evidence that defendants' $165 sale, which occurred almost three years ago, has resulted in brand recognition erosion, harm to plaintiff's reputation, price erosion, loss of market share, or any other irreparable injury." [fn 365]

In addition, Nichia failed to establish that irreparable harm was likely to occur in the future. The district court cites to *United States v. W.T. Grant Co.* for the proposition that the "purpose of an injunction is to prevent future violations" and that a plaintiff has the burden of demonstrating that "there exists some cognizable danger of recurrent violation, something more than mere possibility." [fn 366]

In the case, the court found that

> plaintiff has offered no evidence that defendants as of that time, or at any time after April 2005, made any sales of the accused product in the United States. Further, during pretrial proceedings, defendants stated that the technology embodied in the accused product is "pretty much obsolete" and that it is "at the very, very tail end of [its] sales," (*see* Julian Decl. Ex. I at 6:24-7:3); plaintiff offers no evidence or argument to contradict such assertion. [fn 367]

Although the court explained that "cessation of infringing activity without explanation would not necessarily preclude a finding of future irreparable injury," [fn 368] because the obsolescence of the technology involved is not contested, future irreparable injury cannot be established. The court concluded, "having failed with respect to a showing of irreparable injury, plaintiff necessarily fails to satisfy the second factor, specifically, that 'remedies available at law, such as monetary damages, are inadequate to compensate' plaintiff. *See eBay, 126 S. Ct. at 1839*. Finally, in light of the above findings, the Court further finds the public interest would not be served by the issuance of an injunction." [fn 369]

---

[fn 364] *Nichia Corp. v. Seoul Semiconductor Co.*, 2008 U.S. Dist. LEXIS 12183 (N.D. Cal.).

[fn 365] *Id.*

[fn 366] *Id.* (citing *United States v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953)).

[fn 367] *Nichia*, 2008 U.S. Dist. LEXIS at 12183.

[fn 368] *Id.*

[fn 369] *Id.*

Courts have split on whether to obtain an advisory jury verdict on the appropriate post-verdict royalty. For example, *Cummins-Allison Corp. v. SBM Co.*[fn 370] and *Ariba, Inc. v. Emptoris, Inc.*,[fn 371] submitted the issue to the jury. Other judges have considered the post-verdict royalty after trial as for example, *Presidio Components v. American Technical Ceramics Corp.*;[fn 372] *Creative Internet Advertising Corp. v. Yahoo! Inc.*;[fn 373] *Boston Scientific v. Johnson & Johnson*;[fn 374] *Paice*;[fn 375] and *Joyal Products, Inc. v. Johnson Electric North America, Inc.*[fn 376]

## Royalty Structure

*Lucent Technologies*,[fn 377] also discussed the differences in royalty structures, specifically a running royalty compared to a lump-sum royalty, concluding that "[s]ignificant differences exist between a running royalty license and a lump-sum license." Those differences should be considered as follows in a hypothetical negotiation:

    *a.*  "In a standard running royalty license, the amount of money payable by the licensee to the patentee is tied directly to how often the licensed invention is later used or incorporated into products by the licensee. A running royalty structure shifts many licensing risks to the licensor because he does not receive a guaranteed payment. Royalties are dependent on the level of sales or usage by the licensee, which the licensee can often control."[fn 378]

    *b.*  A lump-sum license, on the other hand, "benefits the patent holder in that it enables the company to raise a substantial amount of cash quickly and benefits the

---

[fn 370] *Cummins-Allison Corp. v. SBM Co.*, 584 F. Supp. 2d 916 (E.D. Tex. 2008).

[fn 371] *Ariba v. Emptoris*, 567 F. Supp. 2d 914 (E.D. Tex. 2008).

[fn 372] *Presidio Components Inc. v. Am. Technical Ceramics Corp.*, 2010 WL 3070370 (S.D. Cal.).

[fn 373] *Creative Internet Advertising Corp. v. Yahoo! Inc.*, 674 F. Supp. 2d 847 (E.D. Tex. 2009).

[fn 374] *Boston Scientific v. Johnson & Johnson*, 2009 WL 975424 (N.D. Cal.).

[fn 375] *Paice LLC v. Toyota Motor Corp., 609 F. Supp. 2d 620 (E.D. Texas 2009).*

[fn 376] *Joyal Prods, Inc. v. Johnson Electric North America, Inc.*, 2009 WL 512156 (D. N.J.).

[fn 377] *Lucent Techs., Inc. v. Gateway Inc.*, 580 F.3d 1301 (Fed. Cir. 2009). The patent-at-issue, known as the "Day patent" or "date picker functionality," relates to a method that allows the user to enter data into fields on a computer screen without using a keyboard. This case was first filed by Lucent in 2002 against Gateway and subsequently Microsoft intervened. Three actions were filed in the Eastern District of Virginia, Southern District of California, and Delaware that were subsequently consolidated in the Southern District of California. The court severed the Day patent from four other patents that were consolidated in the action. The jury found that the Microsoft products that feature a date selection pop-up tool, including Money, Outlook, and Mobile, infringed the patent-at-issue.

[fn 378] *Lucent Techs.*, 580 F.3d at 1301.

target (i.e., the licensee) by capping its liability and giving it the ability, usually for the remainder of the patent term, to actually use the patented technology in its own products without any further expenditure." [fn 379]

*c.*    "The lump-sum license removes or shifts certain risks inherent in most arms-length agreements. A lump-sum license removes any risk that the licensee using the patented invention will underreport, e.g., engage in false reporting, and therefore underpay, as can occur with a running royalty agreement. Additionally, for both contracting parties, the lump-sum license generally avoids ongoing administrative burdens of monitoring usage of the invention." [fn 380]

*d.*    "As generally employed, once a lump-sum license is duly executed, the licensee is obligated to pay the entire, agreed-upon amount for the licensed technology, regardless of whether the technology is commercially successful or even used. A licensee to a lump-sum agreement, under usual licensing terms, cannot later ask for a refund from the licensor based on a subsequent decision not to use the patented technology. There is no provision for buyer's remorse." [fn 381]

*e.*    "The lump-sum structure also creates risk for both parties. The licensed technology may be wildly successful, and the licensee may have acquired the technology for far less than what later proved to be its economic value. The alternative risk, of course, is the licensee may have paid a lump-sum far in excess of what the patented invention is later shown to be worth in the marketplace." [fn 382]

The Court also found that

[p]arties agreeing to a lump-sum royalty agreement may, during the license negotiation, consider the expected or estimated usage . . . of a given invention, assuming proof is presented to support the expectation, because the more frequently most inventions are used, the more valuable they generally are and therefore the larger the lump-sum payment. Conversely, a minimally used feature, with all else being equal, will usually command a lower lump-sum payment. [fn 383]

**Royalty Base**

---

[fn 379] Richard F. Cauley, *Winning the Patent Damages Case: A Litigator's Guide to Economic Models and Other Damage Strategies* (2009), 47.

[fn 380] *Lucent Techs.*, 580 F.3d at 1301.

[fn 381] *Id.*

[fn 382] *Id.*

[fn 383] *Id.*

In *Mitutoyo*,[fn 384] the district court, using a hypothetical negotiation framework, awarded a royalty rate of 29.2 percent on sales of infringing goods sold by the defendant as well as the sales of infringing goods sold by one of the defendants' customers, Harbor Freight Tools USA, Inc. (HFTUSA), without an explanation. The Federal Circuit reversed the district court's award concluding that although a strong business relationship existed between the defendant and HFTUSA, they are independent corporate entities with different owners. Further, no historical dealings or evidence was presented to explain why the defendant would have been willing in the hypothetical negotiation to pay a royalty on HFTUSA's sales. The business relationship "does not provide a sufficient justification for including HFTUSA's sales in the [royalty] base."[fn 385] Rather, the proper infringing sales to include in the royalty base were the defendant's infringing sales to HFTUSA.

In *Fujifilm*,[fn 386] the Federal Circuit found a royalty base that included both infringing and noninfringing product was reasonable considering evidence under the sixth *Georgia-Pacific* factor. Fuji sells single-use cameras, or LFFPs, and holds U.S. patents on certain technology embodied in LFFPs. Once the LFFP is used by the consumer, the film processer processes the film and does not return the empty LFFP to the consumer with his or her pictures. Jack C. Benun and Jazz Products bought the used LFFPs, refurbished them in China, and sold them as new. A jury trial was held, and the jury awarded a running royalty of $2.00 per infringing LFFP, totaling $16,191,406 including interest, and an additional $2.5 million lump-sum royalty. Fuji's expert testified that the parties would have agreed to a royalty of $0.40 per infringing LFFP and that the royalty base upon which the $2.00 running royalty was applied included both infringing and noninfringing LFFPs ("all-product royalty base").

> Fuji's expert testified that the parties would have agreed to a 40 cent royalty rate. Based on defendants' inability to separate the LFFPs, the expert testified at length about Georgia-Pacific Factor 6 (collateral sales) and included both infringing and non-infringing LFFPs in the royalty base... To that end, Fuji's expert provided the jury with sufficient information to reach Fuji's proposed royalty amount, whether the royalty base included all LFFPs (a larger royalty base, driving the royalty rate down to reach Fuji's proposed royalty amount), or only infringing LFFPs (a smaller royalty base, driving the royalty rate up to reach Fuji's proposed royalty amount). By increasing the royalty rate in an amount proportionate to any reduction in the size of the royalty base, [*1373] the jury could have reached a $ 2.21 royalty rate for application to a royalty base including only infringing LFFPs.).

---

[fn 384] *Mitutoyo Corp. v. Cent. Purchasing, LLC*, 499 F.3d 1284 (Fed. Cir. 2007). The patent-at-issue recites a "device for electronically measuring the movement of one object in relation to another, e.g., the movement of a caliper's slide relative to its scale."

[fn 385] *Id.*

[fn 386] *Fujifilm Corp. v. Benun*, 605 F.3d 1366 (Fed. Cir. 2010). The patents-at-issue relate to single-use cameras or lens-fitted film packages (LFFPs).

Fuji's expert presented the "all-product royalty base" as "an accepted technique to avoid repeated disputes over what percentage of LFFPs infringe, a point of contention between Fuji and defendants." [fn 387]  In advocating this technique, the expert testified that the larger the amount of infringing product, the lower the royalty rate and vice-versa; to avoid the varying of the royalty rate, a consistent royalty amount would be negotiated. The Federal Circuit found that the jury could rely on evidence of convoyed sales and bundling and "the fact that bundling and convoyed sales affected [Fuji's] estimate of both the royalty base and royalty rate is thus not sufficient reason to nullify the jury's award." [fn 388]

## Other Damage Calculations

In addition to compensatory damages in the form of lost profits, reasonable royalties, or unjust enrichment, augmented damages in excess of the compensatory measure of recovery may be awarded in appropriate cases. Augmented damages may include enhanced statutory damages and punitive damages. [fn 389]

Certain intellectual property damage statutes permit the award of enhanced damages at the discretion of the court. For example, in a patent case, upon a finding of willful infringement, the court may award up to treble damages plus attorney's fees and costs. In trademark disputes, a court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court finds that the amount of the recovery based on lost profits is either inadequate or excessive, the court may in its discretion enter judgment for such sum as the court finds to be just, according to the circumstances of the case. [fn 390]

In a copyright matter, [fn 391]  the defendant who prevails may be awarded attorney's fees against the plaintiff.

## Market Value

If neither lost sales nor a reasonable royalty have an empirical basis, an infringed copyright owner may employ the *market value test* as an alternative measure of actual damages. The market value test estimates the fair market value that a willing buyer would have paid a willing seller for the use of a work.

---

[fn 387] *Id.*

[fn 388] *Id.* (citing *Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1385 (Fed. Cir. 2001)).

[fn 389] Punitive damages are rarely awarded in intellectual property cases and are not discussed in detail in this practice aid.

[fn 390] 15 USC 1117.

[fn 391] 17 USC 504(d).

Applying the market value test, a number of courts have determined the value to the infringer for the use of the copyrighted work, rather than the value a willing buyer and willing seller would have negotiated. Although this difference may at first blush seem semantic, it can make a substantial difference in the determination of value.

Two instances in which the market value measure of the copyright owner's damages is generally employed are, namely, (1) if the defendant infringer or defendant's infringement has harmed the reputation or the value of the copyrighted work for a particular market or (2) if (*a*) the defendant has made no profits from the infringement, (*b*) the copyright owner has no proven lost sales, and (*c*) the circumstances of the market make the probability of a negotiated license unlikely. [fn 392]

The copyright owner's actual damages may consider the "extent to which the market value of the copyrighted work at the time of infringement has been injured or destroyed by the infringement." [fn 393] This concept was applied in *Montgomery v. Noga*. In that case, actual damages for infringement of a copyrighted computer program were awarded based on the impact of the infringement on the value of an unregistered version of the program that had been derived from the copyrighted program. The court ruled that in determining the magnitude of the injury to the value of the registered copyright at the time of infringement, the value of the protected program would not be determined solely by reference to the market value of the copyrighted program as a standalone product. [fn 394]

## Statutory Damages

### *Statutory Damages for Counterfeit Trademarks*

In cases involving the usage of a counterfeit trademark, the plaintiff may elect, prior to the court rendering final judgment, to recover not less than $500 nor more than $100,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just. [fn 395] Alternatively, if the court finds that the use of the counterfeit mark was willful, the plaintiff may elect, prior to the court rendering final judgment, to recover not more than $1 million per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just. [fn 396] A counterfeit mark is defined as

---

[fn 392] S.A. Edelman and Terence P. Ross, *Intellectual Property Law Damages and Remedies: Updated through Release 4* (New York: Law Journal Press, 2003), 2-25.

[fn 393] D.V. Radack, "Remedies for Copyright Infringement," *JOM*, 50 (5) (1998), 51, www.tms.org/pubs/journals/JOM/matters/matters-9805.html.

[fn 394] *Montgomery v. Noga*, 168 F.3d 1282 (11th Cir. 1999).

[fn 395] 15 USC 1117(c).

[fn 396] 15 USC 1117(c)(2).

(i) a counterfeit of a mark that is registered on the principal register in the United States Patent and Trademark Office for such goods or services sold, offered for sale, or distributed and that is in use, whether or not the person against whom relief is sought knew such mark was so registered; or (ii) a spurious designation that is identical with, or substantially indistinguishable from a designation as to which the remedies . . . are made available . . . [fn 397]

With respect to domain names, the plaintiff may elect, prior to the court's entry of final judgment, to recover in lieu of actual damages or profits, an award of statutory damages in the amount of not less than $1,000 and not more than $100,000 per domain name, as the court considers just. [fn 398]

### Statutory Damages for Copyrights

The Copyright Act allows the plaintiff to obtain statutory damages if the copyright owner is unable to prove its actual damages or the defendant's profits. The statutory amount of damages is to be

in a sum of not less than $750 or more than $30,000 as the court considers just . . . In a case where the copyright owner sustains the burden of proving, and the court finds, that infringement was committed willfully, the court in its discretion may increase the award of statutory damages to a sum of not more than $150,000. In a case where the infringer sustains the burden of proving, and the court finds, that such infringer was not aware and had no reason to believe that his or her acts constituted an infringement of copy-right, the court in its discretion may reduce the award of statutory damages to a sum of not less than $200. [fn 399]

Several of the recent copyright court decisions have revolved around the issue of statutory damages. In *Bryant v. Media Right Productions, Inc.*, [fn 400] the Federal Circuit addressed the definition of a "work" in copyright infringement when calculating statutory damages. In the case, which involved 2 albums containing 10 songs each, the district court ruled each album was a compilation, and, therefore, the plaintiff was only entitled to 1 award of statutory damages per album. Under this decision, including consideration of the defendant's proof of innocence, the court awarded $2,400 in statutory damages. The plaintiffs appealed arguing that each song was a work, because each song has "independent economic value" and the proper calculation of statutory damages was for all 20 songs on the 2 albums. The Federal Circuit affirmed the district court's opinion and

---

[fn 397] 15 USC 1116(d).

[fn 398] 15 USC 1117(d).

[fn 399] 17 USC 504.

[fn 400] *Bryant v. Media Right Prods.*, 603 F.3d 135 (2d Cir. 2010). The copyrights-at-issue are 20 songs contained on 2 albums.

Page 125

found that a copyright owner was only entitled to statutory damages based on 1 infringing use for an album or compilation, regardless of the fact that each of the individual songs may have been registered as an individual copyright. The Federal Circuit has never adopted the independent economic value test (from the First Circuit, *Gamma Audio & Video, Inc.* [fn 401]) and declined to do so in *Bryant*. The court's decision was based on the "intent expressed in the Conference Report" that accompanied the Copyright Act of 1976 which allows for a 1-award restriction on statutory damages for any 1 "work" and defines a compilation as pre-existing materials regardless of individual copyrights (that is, may be considered independent works for other purposes). [fn 402]

The district court in *Sony BMG Music Entertainment v. Tenenbaum* [fn 403] also addressed the issue of statutory damages, albeit from a cumulative perspective. This case is related to the Recording Industry Association of America's suits against 35,000 people in 2003 in an attempt to stop the illegal downloading of music. At trial, a jury awarded statutory damages of $22,500 per song, for a total of $675,000. The court reduced the award to $2,250 per song, for a total of $67,500. In doing so, the judge reduced the damages amount, stating it was "far greater than necessary to serve the government's legitimate interests in compensating copyright owners and deterring infringement," and that the jury's award bore "no meaningful relationship to those objectives." [fn 404] The judge's decision reduced the award by 90 percent and called into play the practical application of the Copyright Act of 1976 in this electronic age, as well as between individuals and corporations.

## Corrective Advertising

In fixing damages, courts may take into consideration the cost of a corrective advertising campaign the trademark owner conducts in order to repair the effect of the defendant's misleading advertising. The purpose of such a campaign is to correct any misimpressions that were formed in the marketplace due to the infringers' actions and thereby return the plaintiff to a preinfringement state.

For example, in *U-Haul International, Inc. v. Jartran, Inc.*, the trial court awarded damages twice the amount of the original false ad campaign. [fn 405] In *Big O Tire Dealers, Inc. v. The Goodyear Tire & Rubber Co.*, the court held that corrective advertising damages were equal to 25 percent of the defendant's advertising expenditures in the relevant market. In reaching its conclusion, the court based its analysis on the Federal Trade Commis-

---

[fn 401] *Gamma Audio & Video, Inc. v. Ean-Chea*, 11 F.3d 1106 (1st Cir. 1993).

[fn 402] *Bryant.*, 603 F.3d at 135.

[fn 403] *Sony BMG Music Entm't v. Tenenbaum*, 2010 U.S. Dist. LEXIS 68642 (D. Mass.). This copyrights-at-issue relate to 30 recordings that were downloaded by the defendant.

[fn 404] *Id.*

[fn 405] *U-Haul International, Inc. v. Jartran, Inc.*, 793 F.2d 1034 (9th Cir. 1986).

sion guideline that often requires businesses engaging in misleading advertising to spend 25 percent of their advertising budget on corrective advertising. [fn 406]

It is often advantageous to seek the opinion of practitioners seasoned in the art of developing advertising campaigns, such as public relations or advertising professionals, to opine on the amount of corrective advertising required to reverse customer confusion or the adverse impact of infringement. Analysis of the advertising levels expended by the parties to the suit may also be probative.

There are at least a few cases of import to the damages expert on determining trademark damages. As with any matter, it is recommended the forensic accountant request of counsel (or perform a search themselves) the relevant case law in the federal district, state, or other court to locate any specific precedents that may be relevant to the facts and circumstances at hand.

In *Aero Products International, Inc. v. Intex Recreation Corp.*, [fn 407] the Federal Circuit overturned the district court's verdict on damages stemming from an action involving both patent and trademark infringement. A jury awarded $6.9 million in damages, comprised of $2.95 million in patent infringement damages that was doubled to $5.9 million and $1 million in trademark infringement damages. The defendant appealed claiming impermissible double recovery. Upon appeal, the Federal Circuit found that the damages awarded did constitute impermissible double recovery and reduced the award by $1 million. The court stated that when patent damages and trademark damages are both based on the same operative facts, for example, same sales of accused products, the plaintiff cannot receive damages for both causes of action. Because the plaintiff brought forth no evidence at trial regarding the defendant's use of the mark "ONE TOUCH" except in connection with the sales of accused product, the same sales also formed the basis for the plaintiff's patent infringement claim. The court found that the plaintiff was fully compensated for the patent infringement when it was awarded a reasonable royalty based on sales of the infringing product. The plaintiff could not also be awarded the defendants' profits for trademark infringement based on the exact same sales.

As noted earlier in this section, courts may take into consideration the cost of a corrective advertising campaign the trademark owner conducts in order to repair the effect of the defendant's misleading advertising. The purpose of such a campaign is to correct any misimpressions that were formed in the marketplace due to the infringers' actions and thereby return the plaintiff to a pre-infringement state. To prevent the double recovery of damages, the district court in *Callaway Golf Co. v. Dunlop Slazenger* [fn 408] granted the

---

[fn 406] *Big O Tire Dealers, Inc. v. The Goodyear Tire & Rubber Co.*, 561 F.2d 1365, 1375 (10th Cir. 1977).

[fn 407] *Aero Prods. Int'l, Inc. v. Intex Rec. Corp.*, 466 F.3d 1000 (Fed. Cir. 2006). The trademark-at-issue is "ONE TOUCH" used on inflatable mattresses.

[fn 408] *Callaway Golf Co. v. Dunlop Slazenger*, 384 F. Supp. 2d 735 (D. Del. 2005). The false advertising related to a claim that a golf ball was "the longest ball on tour" and the trade secrets-at-issue relate to golf ball technology.

defendant's motion for judgment as a matter of law by vacating a $1.1 million award for corrective advertising. After a trial, a jury awarded $1.1 million in unjust enrichment damages and $1.1 million in prospective corrective advertising damages. The defendant sought to overturn the false advertising damages award arguing the award resulted in a windfall for the plaintiff. In this matter, the judge found that corrective advertising damages could be awarded when the plaintiff shows the corrective advertising is a surrogate for actual damages. The court further found that "there is no economic rationale to support an award of 'prospective corrective advertising' damages" as the defendant had long since stopped selling the infringing product. The plaintiff's own expert had testified that corrective advertising and unjust enrichment were alternative damages awards. Therefore, the court found that awarding the plaintiff an additional $1.1 million in corrective advertising on top of the $1.1 million award of unjust enrichment would be an unfair doubling of the damages award.

Corrective advertising was also an issue in *Juicy Couture, Inc. v. L'Oreal USA, Inc.*[fn 409] In this case, the damages expert opined on four distinct damages theories: prospective corrective advertising, hypothetical royalties for the use of the trademarks-at-issue, the defendant's profits, and the plaintiff's lost profits. The defendant challenged all four theories. The court excluded evidence on damages under the prospective corrective advertising theory and hypothetical royalty theory; the defendant abandoned the lost profits theory prior to any challenge; and the court denied the challenge on the defendant's profits.

In excluding the prospective corrective advertising theory, the court discussed that, for the most part, awards of corrective advertising are granted when the plaintiff lacks the financial wherewithal to pay for the necessary prospective advertising. In instances when the inability to pay was not present, the circumstances were such that the trademarks needed to be rehabilitated. In this matter, the parties are not competitors. The court found that Juicy Couture had not lost profits or sales, nor had its reputation suffered. In summary, there is nothing for an award of prospective corrective advertising to correct. In excluding the hypothetical royalties, for much the same reasons that comparability of license agreements have become so important to the calculation of a reasonable royalty in patent infringement matters, the court also disallowed the hypothetical royalty theory proffered by the expert in *Juicy Couture*.[fn 410] The court found that royalties for trademark infringement are usually awarded for an existing trademark licensing agreement. Because Juicy Couture and L'Oreal did not have a previous licensing agreement, the lack of prior licenses caused the expert's opinion to be "speculative" in nature. This finding was coupled with the fact that the only damage left at the time of trial were related to products first sold years after the hypothetical royalty negotiation.

---

[fn 409] *Juicy Couture, Inc. v. L'Oreal USA, Inc.*, 2006 U.S. Dist. LEXIS 30219 (S.D.N.Y.) The trademarks-at-issue relate to the use of "Juicy," "Juicy Couture," and "Choose Juicy" on women's clothing and accessories. The defendant used the name "Juicy" for its long-lasting lipstick.

[fn 410] *Id.*

## Standing to Collect Damages

In *Quanta Computer, Inc. v. LG Electronics, Inc.*, the patent holder sued computer manu-
facturers alleging that the combination of products purchased from the patent holder's li-
censee and nonlicensee memory and buses infringed its computer technology patents.
The United States Court of Appeals for the Federal Circuit affirmed the district court's
conclusion that the doctrine of patent exhaustion did not apply because the patents in-
cluded method claims. The Supreme Court reversed the decision. [fn 411]

The Supreme Court concluded that the "authorized sale of an article that substantially
embodies a patent exhausts the patent holder's rights and prevents the patent holder from
invoking patent law to control post sale use of the article." "Exhaustion is triggered only
by a sale authorized by the patent holder." The circumstances in this case were that LG
Electronics had licensed its patents to Intel, and that Intel's "microprocessors and chipsets
substantially embodied the LGE Patents because they had no reasonable noninfringing
use and included all the inventive aspects of the patented methods." The Supreme Court
held that "[n]othing in the License Agreement limited Intel's ability to sell its products
practicing the LGE Patents." Accordingly, "Intel's authorized sale to Quanta thus took its
products outside the scope of the patent monopoly, and as a result, LGE can no longer as-
sert its patent rights against Quanta." [fn 412]

In *Poly-America, L.P. v. GSE Lining Technology, Inc.*, the Federal Circuit reversed the
district court opinion that awarded lost profits to Poly-America based on sales by a sister
company, Poly-Flex. "We disagree with Poly-America and the district court that Poly-
Flex's lost profits are properly recoverable as if they were Poly-America's own damag-
es." GSE Lining "alleges that Poly-Flex, even though it is a sister corporation to Poly-
America, nonetheless lacks any exclusive rights and is hence not entitled to damages for
infringement." The Federal Circuit noted that "Poly-America and Poly-Flex have a com-
mon parent corporation and are not simply divisions of a single corporation, but are sepa-
rate corporate entities. Their parent has arranged their corporate identities and functions
to suit its own goals and purposes, but it must take the benefits with the burdens." [fn 413]

The Federal Circuit noted that "the recovery of lost profits by a patentee is not limited to
the situation in which the patentee is selling the patented device," but "the patentee needs
to have been selling some item, the profits of which have been lost due to infringing
sales, in order to claim damages consisting of lost profits." Accordingly, the Federal Cir-
cuit rejected Poly-America's position that it "operates together with Poly-Flex as a single

---

[fn 411] *Quanta Computer, Inc. v. LG Elecs., Inc.*, 553 U.S. 617 (2008).

[fn 412] *Id.*

[fn 413] *Poly-America, L.P. v. GSE Lining Tech., Inc.*, 383 F.3d 1303 (Fed. Cir. 2004).

economic unit for the purposes of production, marketing, and sales of the patented liner" and should be treated as "a single economic unit for lost profits." [fn 414]

The Federal Circuit also ruled that provisions in the Poly-America and Poly-Flex contract do not support a standing for lost profits. "The provision of the license agreement between Poly-America and Poly-Flex providing that Poly-America 'desires to have the contractual right to collect all damages accruing to Poly-Flex for certain past infringements of the Patents' does not change this situation." Moreover, "Poly-Flex does not have exclusive rights. It is clearly identified in the license agreement as a non-exclusive licensee, and as such, it received only a 'bare license' and has no entitlement under the patent statutes to itself collect lost profits damages for any losses it incurred due to infringement." "Awarding lost profits to Poly-America on the basis of its private arrangement with Poly-Flex would synthetically create lost profits for Poly-America, when it may not have suffered any, to the detriment of GSE." The Federal Circuit held "that a licensee generally may not sue for damages unless it has exclusive rights under a patent, including the right to sue." [fn 415]

In *Mars*, Mars owned the patents, but its wholly owned subsidiary, MEI, sold the product. Mars entered into a nonexclusive license with MEI, whereby MEI paid Mars a royalty based on total sales value of MEI's products. The Federal Circuit ruled that because Mars did not benefit from the lost profits of MEI while MEI was licensed, that is, it was paid its royalty percentage regardless of whether MEI made a profit, Mars was not entitled to a recovery for lost profits. Accordingly, the Federal Circuit passed on the issue of "whether a parent company can recover on a lost profits theory when profits of a subsidiary actually *do* flow inexorably up to the parent." "In this case, we reduced the amount of the district court's damages award by holding that Mars lacked standing to recover damages on sales from 1996 to 2003." The Federal Circuit concluded that Mars' claim "that it 'inherently' lost profits when the subsidiary lost profits is unsupported." [fn 416]

When Mars licensed MEI, Mars gave not only a nonexclusive license, but Mars also gave MEI the right to sue for infringement. The Federal Circuit found that a patentee cannot give an entity the right to sue without also giving it the right to exclude. On the second issue, the court stated that the subsidiary was not the exclusive licensee to the patents in the United States prior to 1996. It, consequently, lacked constitutional standing. Standing, according to the Federal Circuit, is inexorably bound to the right to exclude others from making, using, or selling. Therefore, MEI lacked standing. The Federal Circuit opinion was consistent with the district court opinion that concluded the following:

---

[fn 414] *Id.*

[fn 415] *Poly-America*, 383 F.3d at 1303.

[fn 416] *Mars, Inc. v. Coin Acceptors, Inc.*, 527 F.3d 1359 (Fed. Cir. 2008).

(1) Mars's arrangement with MEI was a licensing arrangement, rather than an arrangement where profits 'flow[ed] inexorably from MEI to Mars;

(2) Mars's nonexclusive licensing policy signified that it expected only reasonable royalties, rather than lost profits; and,

(3) Mars lacked the capacity to manufacture the patented products itself, without relying on MEI.' [fn 417]

The Federal Circuit also provided guidance on a patent holder's standing to sue for lost profits and whether a licensee has such standing. The appellate court cited *Crown Die & Tool Co. v. Nye Tool & Machine Works*,[fn 418] for the proposition that "[t]he plaintiff in an [infringement] action ... must be the person or persons in whom the legal title to the patent resided at the time of the infringement."[fn 419] The Federal Circuit also cited *Sicom Systems, Ltd. v. Agilent Technologies, Inc.*,[fn 420] for the proposition that "[o]nly a patent owner or an exclusive licensee can have constitutional standing to bring an infringement suit; a non-exclusive licensee does not."[fn 421] "This standing deficiency cannot be cured by adding the patent title owner to the suit."[fn 422] "To be an exclusive licensee for standing purposes, a party must have received, not only the right to practice the invention within a given territory, but also the patentee's express or implied promise that others shall be excluded from practicing the invention within that territory as well."[fn 423]

In *Novozymes*, the district court ruled that Novozymes cannot recover lost profits of NZNA, its wholly owned subsidiary. "Like the corporations in *Poly-America*, Novozymes has structured itself and its subsidiaries for its own goals and purposes."[fn 424] The plaintiff renewed its motion to join its subsidiary as a co-plaintiff. The court found that the subsidiary did not have standing to sue for infringement of the patent-at-issue.

The district court found that "the written agreement between [plaintiff] and [the subsidiary] expressly grant[s] a 'non-exclusive' license of [plaintiff's] patents," including the patent-at-issue, to the subsidiary. "Novozymes must take the burdens of that structure along

---

[fn 417] *Id.* (citing 2006 U.S. Dist. LEXIS 77521).

[fn 418] *Crown Die & Tool Co. v. Nye Tool & Mach. Works*, 261 U.S. 24 (1923).

[fn 419] *Mars*, 527 F.3d at 1359.

[fn 420] *Sicom Sys., Ltd. v. Agilent Techs., Inc.*, 427 F.3d 971, 976 (Fed. Cir. 2005).

[fn 421] *Mars*, 527 F.3d at 1359.

[fn 422] *Id.* (citing *Morrow v. Microsoft Corp.*, 499 F.3d 1332, 1341 (Fed. Cir. 2007)).

[fn 423] *Mars*, 527 F.3d at 1359 (citing *Rite-Hite*, 56 F.3d at 1551).

[fn 424] *Novozymes A/S v. Genencor Int'l, Inc.*, 474 F. Supp. 2d 592 (D. Del. 2007).

with the benefits. Novozymes may not blur the legal distinction between itself and NZNA to recover damages that Novozymes has not directly suffered." [fn 425]

*Aero Products* presented "the question of whether Aero's recovery of both patent and trademark infringement damages represents an impermissible double recovery." [fn 426] The jury had awarded Aero $2.95 million for patent infringement damages and $1 million as disgorgement of Intex's and Quality Trading's profits for trademark infringement damages. "The district court agreed with Aero, concluding that a 'patentee is entitled to recover the loss it suffered without regard to whether the infringer profited,' whereas 'trademark infringement damages are premised on unjust enrichment and compensation theories.'" [fn 427] The Federal Circuit disagreed and held "that the district court abused its discretion by allowing to stand the jury's award to Aero of $1 million in trademark damages." [fn 428]

The principal basis for the Federal Circuit's opinion was that both trademark and patent claims were tied to the same sale. "As just seen, the record demonstrates that Aero based both its patent and trademark damages solely on sales of the accused Intex mattresses. Aero did not rely on any other evidence in support of its trademark damages." Accordingly, the Federal Circuit determined that "Aero was fully compensated for defendants' patent infringement when it was awarded a reasonable royalty for patent infringement based on sales of the infringing Intex mattresses. It could not also be awarded defendants' profits for trademark infringement based on the same sales of the same accused devices." [fn 429] Therefore, the Federal Circuit concluded the district court erred in allowing the jury's award of $1 million in trademark infringement damages and vacated the award.

In *MedImmune, Inc. v. Genentech, Inc.*, the Supreme Court held "that petitioner was not required, insofar as Article III [of the U.S. Constitution] is concerned, to break or terminate its 1997 license agreement before seeking a declaratory judgment in federal court that the underlying patent is invalid, unenforceable, or not infringed." "The licensee argued that it paid the royalties under protest to avoid the serious potential consequences of the licensors' threatened infringement action, and that the licensee was not required to actually suffer those consequences as a precursor to seeking judicial relief." The Supreme Court agreed that "[t]he licensee's promise, in the licensing agreement, to pay royalties on patents that had not been held invalid did not amount to a promise not to seek a holding of their invalidity." "The licensee's self-avoidance of imminent injury by paying the royalties was coerced by the threatened enforcement action of the licensors, and the coer-

---

[fn 425] *Id.*

[fn 426] *Aero Prods. Int'l, Inc. v. Intex Rec. Corp.*, 466 F.3d 1000 (Fed. Cir. 2006).

[fn 427] *Id.* (citing *Order Denying New Damages Trial*, 2004 U.S. Dist. LEXIS 25941.).

[fn 428] *Id.*

[fn 429] *Id.*

cive nature of the exaction of royalties preserved the licensee's right to recover the royalties paid or to challenge the legality of the licensors' demand for royalties." Consequently, it ruled that the Court of Appeals "erred in affirming the dismissal of this action for lack of subject-matter jurisdiction."[fn 430]

In *On-Line Technologies, Inc. v. Perkin-Elmer Corp.*,[fn 431] United States District Court for the District of Connecticut considered a motion to preclude the plaintiff's new theory of damages, that is, lost profits due to the defendants' conceded infringement of the patent-at-issue.

## Patent Exhaustion

As noted subsequently, the issue of patent exhaustion is a legal question. However, this legal issue may affect the damages period or the assumption regarding which of the defendant's products infringe. Therefore, this section provides certain information regarding recent case decisions to assist the forensic accountant in understanding this issue.

The doctrine of patent exhaustion limits the patent rights that survive the initial authorized sale of a patented item. In other words, once a licensee is licensed to sell a product, subsequent purchasers of the licensee's product are covered by the original license and cannot be subject to claims of infringement or damages. Exhaustion is triggered only by a sale authorized by the patent owner.

In *Quanta*,[fn 432] LG Electronics (LGE) licensed the patents to Intel that authorized Intel to manufacture and sell microprocessors and chipsets using the LGE patents. A separate agreement required Intel to notice its customers in writing that the LGE license does not extend to a product made by combining an Intel product with a non-Intel product. Quanta purchased microprocessors and chipsets from Intel and then manufactured computers using Intel parts in combination with non-Intel parts but did not modify any of the Intel components. The Federal Circuit found that the doctrine of patent exhaustion does not apply to method patent claims, which describe operations to make or use a product, and "concluded that exhaustion did not apply [in the instant case] because LGE did not license Intel to sell the Intel Products to Quanta for use in combination with non-Intel products."[fn 433] The Supreme Court, however, in reversing the lower court's decision found that the doctrine of patent exhaustion does apply to method patents, and because LGE's license with Intel authorized the sale of components with the patents-at-issue,

---

[fn 430] *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007).

[fn 431] *On-Line Techs., Inc. v. Perkin-Elmer Corp.*, 2006 U.S. Dist. LEXIS 12809 (D. Conn. 2006).

[fn 432] *Quanta Computer, Inc. v. LG Elecs., Inc.*, 553 U.S. 617 (2008). The patents-at-issue relate to computer memory technology, some of which are utility patents and one of which was a method patent.

[fn 433] *Id.* (discussing the Federal Circuit court decision in 453 F.3d 1364).

LGE could not assert its patent rights on products that embody the licensed patents. In Justice Thomas's opinion, he remarked, "[n]othing in this Court's approach to patent exhaustion supports LGE's argument that method patents cannot be exhausted." The Supreme Court determined that a "patented method may not be sold in the same way as an article or device, but methods nonetheless may be 'embodied' in a product, the authorized sale of which exhausts patent rights." [fn 434]

In *Fujifilm*, [fn 435] the Federal Circuit found that a patent owner's foreign sales do not exhaust its U.S. patent rights. This case clarified precedent from *Quanta*, by citing that it "did not involve foreign sales." Jack C. Benun and Jazz bought the used Fujifilm LFFPs, as previously discussed; refurbished them in China; and sold them new. The Federal Circuit asserted that "a practicing use may be 'outside the country,' while an infringing use must occur in the country where the patent is enforceable." Further addressing the "territoriality requirement for patent exhaustion," the court cited the Supreme Court decision in *Quanta* for the proposition that "exhaustion occurs when the only reasonable and intended use of the products sold is to complete the patented combination." [fn 436]

## Willfulness or Inducement

Damages in infringement matters may be adjusted based upon a finding of willfulness. A finding of willfulness is a decision for the court, but the court may obtain guidance from the jury. The issue of willfulness may arise during an infringement trial, and, therefore, this section provides certain information regarding recent case decisions to assist the forensic accountant in understanding the issue and the cases that may be cited by counsel or the court.

In *Underwater Devices, Inc. v. Morrison-Knudsen Co., Inc.*, [fn 437] the Federal Circuit had held that a defendant has an affirmative duty of due care (such as obtaining legal advice from counsel) to determine whether its actions infringe. In 2007, the Federal Circuit reversed this standard in *In re Seagate Technology, LLC.*

The Federal Circuit affirmed the position that an award of enhanced damages requires a showing of willful infringement, although a finding of willfulness does not require an award of enhanced damages; it merely permits it. [fn 438] However, the court concluded that

---

[fn 434] *Id.*

[fn 435] *Fujifilm Corp. v. Benun*, 605 F.3d 1366 (Fed. Cir. 2010). The patents-at-issue relate to single-use cameras or LFFPs.

[fn 436] *Id.*

[fn 437] *Underwater Devices, Inc. v. Morrison-Knudsen Co. Inc.*, 717 F.2d 1380 (Fed. Cir. 1983).

[fn 438] *In re Seagate Tech., LLC*, 497 F.3d 1360 (Fed. Cir. 2007) (citing *Beatrice Foods Co. v. New England Printing & Lithographing Co.*, 923 F.2d 1576, 1578 (Fed. Cir. 1991); *Jurgens v. CBK, Ltd.*, 80 F.3d 1566, 1570 (Fed. Cir. 1996); *Odetics, Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1274 (Fed. Cir. 1999); and 35 USC 284.)

"the duty of care announced in *Underwater Devices* sets a lower threshold for willful infringement that is more akin to negligence," as opposed to "a showing of objective recklessness." [fn 439]  Accordingly, the court established the following revised framework for demonstrating willful infringement based on the Supreme Court's interpretation of "the meaning of willfulness as a statutory condition of civil liability for punitive damages": [fn 440]

> ...to establish willful infringement, a patentee must show by clear and convincing evidence that the infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent. The state of mind of the accused infringer is not relevant to this objective inquiry. If this threshold objective standard is satisfied, the patentee must also demonstrate that this objectively-defined risk (determined by the record developed in the infringement proceeding) was either known or so obvious that it should have been known to the accused infringer. [fn 441]

The court stated that it would leave further elaboration to future cases.

In 2008, the Court of Appeals for the Federal Circuit affirmed its position in *Finisar Corp. v. DirecTV Group, Inc.*, citing *In re Seagate* for the proposition that "'[p]roof of willful infringement permitting enhanced damages requires at least a showing of objective recklessness.'" [fn 442]  The court also affirmed its ruling in *In re Seagate* , stating that "this court imposes 'no affirmative obligation to obtain opinion of counsel'" and that such an opinion, if sought, need not address validity. [fn 443]

---

[fn 439] *In re Seagate*, 497 F.3d at 1360.

[fn 440] *Id.* (citing *Safeco Ins. Co. of Am. v. Burr*, 127 S. Ct. 2201 (June 4, 2007)).

[fn 441] *Id.*

[fn 442] *Finisar Corp. v. DirecTV Group, Inc.*, 523 F.3d 1323, 1339 (Fed. Cir. 2008) (citing *In re Seagate*, 497 F.3d at 1360).

[fn 443] *Id.*

# Chapter 3

## *Conclusion*

This practice aid provides the practitioner with a discussion of the theoretical, legal, economic, and accounting foundations of intellectual property and the methodologies commonly employed in the calculation of infringement damages. Notably, the United States courts continue to award damages in intellectual property cases under a variety of theories and analyses, giving the damages expert freedom to explore the economic consequences of the infringing activity. As in calculating damages under any civil cause of action, the expert should carefully consider the facts and circumstances of the dispute at hand.

# Appendix A

## *Intellectual Property Print and Electronic Resources*

### Periodicals and Publications

Many periodicals and publications either discuss the valuation of intellectual property assets or contain market information regarding the sale, transfer, or exchange of intellectual property. Although it is not within the scope of this practice aid to identify all of the potential sources for this kind of information, some recommended sources include the following:

- *Intellectual Property Law: Damages and Remedies.* Terrence P. Ross (2004), Law Journal Press, 105 Madison Avenue, New York, NY, 10016, www.lawcatalog.com.

- *Licensing Economics Review*, 155 Gaither Drive, P.O. Box 1050, Moorestown, NJ, 08057.

- *Les Nouvelles* (a Journal of the Licensing Executives Society). Alexandria, VA. Licensing Executives Society (U.S.A. and Canada), Inc., 1997.

- *Intellectual Property Strategist*. Leadership Publications, New York.

- *Licensing of Intellectual Property*. Jay Dratler, Jr. New York: Law Journal Seminars-Press, 1994.

- *Licensing a Strategy for Profits*. Edward P. White. U.S.A.: Licensing Executives Society (U.S.A. and Canada), Inc., 1997.

- *Technology Licensing: Corporate Strategies for Maximizing Value*. Russell L. Parr and Patrick H. Sullivan. New York: John Wiley & Sons, Inc., 1996.

- *Intellectual Property Infringement Damages: A Litigation Support Handbook*. Russell L. Parr. New York: John Wiley & Sons, Inc., 1993.

- *Valuation of Intellectual Property and Intangible Assets*. 2nd Edition. Gordon Smith and Russell Parr. New York: John Wiley & Sons, Inc., 1994.

- *Valuation of Intellectual Property* (videocourse). Joseph A. Agiato and Russell L. Parr. New York: The American Institute of Certified Public Accountants, Inc., 1996.

- *Valuation of Intellectual Property Course Handbook*. Joseph A. Agiato and Russell Parr. New York: AICPA Publication, 1996.

- *Investing in Intangible Assets: Finding and Profiting From Hidden Corporate Value*. Russell L. Parr. New York: John Wiley & Sons, Inc., 1991.

- *How to License Technology*. Robert C. Megantz. New York: John Wiley & Sons, Inc., 1996.

- *Licensing Intellectual Property: Legal, Business and Market Dynamics*. John W. Schlicher. New York: John Wiley & Sons, Inc., 1996.

## Professional Organizations

See appendix B, "Intellectual Property Professional Associations," of this practice aid for a list of contact information for specific professional organizations.

## Internet Sites

A number of Internet resources are available to the expert to access market information relating to businesses and intellectual property matters. Although it is not possible to list all potential sources of information, the following table provides a sampling of Internet sites that may prove useful.

| Source Name | Website |
|---|---|
| United States Census Bureau | www.census.gov |
| United States Copyright Office) | www.copyright.gov |
| The Financial Valuation Group | www.fvgi.com |
| Company financial data | www.hoovers.com |
| International Trademark Association | www.inta.org |
| Licensing Executives Society International | www.lesi.org |
| Royalty Source | www.royaltysource.com |
| Licensing Executives Society—USA, Canada | www.lesusacanada.org/ |
| U.S. Securities and Exchange Commission's searchable database of filings | www.sec.gov/edgar.shtml |
| U.S. Patent and Trademark Office's searchable database of patents and trademarks | www.uspto.gov |
| U.S. State Trademark Laws and Databases | www.ggmark.com/#State_Trademark_Law |

# Appendix B

## *Intellectual Property Professional Associations*

A number of national and local professional organizations provide information on intel-
lectual property matters. The contact information provided in this appendix comes from
the publication *National Trade and Professional Associations of the United States*, issued
by Columbia Books, Inc. It is updated annually to incorporate any changes to existing
listings or the addition of new organizations.

American Intellectual Property Law Association
2001 Jefferson Davis Highway, Suite 203
Arlington, VA 22202
703.415.0780, Fax 703.415.0786

American Society of Composers, Authors and Publishers
1 Lincoln Plaza
New York, NY 10023
212.621.6000, Fax 212.724.9064

Association of University Technology Managers
60 Revere Dr., Suite 500
Northbrook, IL 60062
847.559.0846, Fax 847.480.9282

Business Software Alliance (USA)
1150 18th St. NW, Suite 700
Washington, D.C. 20036
202.872.5500, Fax 202.872.5501

Copyright Society of the USA
352 Seventh Ave., Suite 739
New York, NY 10001
212.354.6401, Fax 212.354.2847

Intellectual Property Owners Association
1255 23rd Street NW, Suite 200
Washington, DC 20037
202.466.2396, Fax 202.466.2893

International Trademark Association
655 Third Avenue, 10th Floor
New York, NY 10017
212.768.9887, Fax 212.768.7796

Inventors Workshop International Education Foundation
1029 Castillo Street
Santa Barbara, CA 93101
805.962.5722, Fax 805.899.4927

Licensing Executives Society (USA & Canada)
1800 Diagonal Rd., Suite 280
Alexandria, VA 22314
703.836.3106, Fax 703.836.3107

Los Angeles Copyright Society
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067

National Association of Patent Practitioners
4680-18-i Monticello Ave., PMB 101
Williamsburg, VA 23188
800.216.9588, Fax 757.220.3928

National Association of Plant Patent Owners
1000 Vermont Avenue, Suite 300
Washington, DC 20005
202.789.2900, Fax 202.789.1893

International Collegiate Licensing Association
http://nacda.collegesports.com/nacda/nacda-contact.html

International Intellectual Property Alliance
1747 Pennsylvania Avenue NW, Suite 825
Washington, DC 20006
202.833.4198, Fax 202.872.0546

International Licensing Industry Merchandisers' Association
350 5th Avenue, Suite 1408
New York, NY 10118
212.244.1944, Fax 212.563.6552

National Council of Intellectual Property Law Associations
c/o Procter and Gamble
11520 Reed Hariman Hwy.
Cincinnati, OH 45241
513.634.4782

Patent and Trademark Office Society
P.O. Box 2089
Arlington, VA 22202

Patent Office Professional Association
742 S. 26th St.
Arlington, VA 22202
703.305.3000, Fax 703.308.0818

# Appendix C

## *Summary of Cited Intellectual Property Cases (Through January 4, 2011)*

| Case Name | Subject |
|---|---|
| A&L Technology v. Resound Corp., 1995 WL 415146 (N.D. Calif. 1995) | Patent |
| Aero Products International, Inc. v. Intex Recreation Corp., 466 F.3d 1000 (Fed. Cir. 2006) | Patent/Trademark |
| Allen Archery, Inc. v. Browning Manufacturing Co., 898 F.2d 787 (Fed. Cir. 1990) | Patent |
| Allen-Myland v. International Business Machines Corp., 770 F. Supp. 1014 (3d Cir. 1991) | Copyright |
| Alpo PetFoods, Inc. v. Ralston Purina Co., 997 F.2d 949 (D.C. Cir. 1993) | Trademark |
| American Seating Co. v. USSC Group, Inc., 514 F.3d 1262 (Fed. Cir. 2008) | Patent |
| Amado v. Microsoft Corp., 2007 U.S. Dist. LEXIS 96487, 39 (C.D. Cal. 2007) | Patent |
| American Hoist & Derrick Co. v. Sowa & Sons, 725 F.2d 1350 (Fed. Cir. 1984), *cert. denied*, 469 U.S. 821 (1984) | Patent |
| American Medical Systems, Inc. v. Medical Engineering Corp., 794 F. Supp. 1370 (E.D. Wis. 1992) | Patent |
| American Original Corp. v. Jenkins Food Corp., 774 F.2d 459 (Fed. Cir. 1985) | Patent |
| American Sales Corp. v. Adventure Travel, Inc., 862 F. Supp. 1476 (E.D. Va. 1994) | Trade Secrets |
| Amstar Corp. v. Envirotech Corp., 823 F.2d 1538 (Fed. Cir. 1987) | Patent |
| Andrew Corp. v. Gabriel Electronics, Inc., 785 F. Supp. 1041 (N.D. Me. 1992) | Patent |
| Applied Medical Resources Corp. v. United States Surgical Corp., 435 F.3d 1356 (Fed. Cir. 2006) | Patent |
| Apple Computer, Inc. v. Franklin Computer Corp., 714 F.2d 1240 (3d Cir. 1983), *cert. denied*, 464 U.S. 1033 (1984) | Copyright |
| Aro Manufacturing Co. v. Convertible Replacement Top Co., 377 U.S. 476 (1964) | Patent |
| Ariba v. Emptoris, 567 F. Supp. 2d 914 (E.D. Tex. 2008) | Patent |
| Arriflex Corp. v. Aaton Cameras, Inc., 220 U.S.P.Q. 424 (S.D.N.Y. 1983) | Patent |
| Atlantic Thermoplastics Co., Inc. v. Faytex Corp., 970 F.2d 834 (Fed. Cir. 1992) | Patent |
| Austin-Western Road Machinery Co. v. Disc Grader & Plow Co., 291 F. 301 (8th Cir. 1923), *cert. denied*, 263 U.S. 717 (1924) | Patent |
| Bandag, Inc. v. Gerrard Tire Co., Inc., 704 F.2d 1578 (Fed. Cir. 1983) | Patent |
| BASF Corp. v. Old World Trading Co., Inc., 41 F.3d 1081 (7th Cir. 1994) | Patent |
| Baumstimler v. Rankin, 677 F.2d 1061 (5th Cir. 1982) | Patent |
| Beatrice Foods Co. v. New England Printing & Lithographing Co., 899 F.2d 1171 (Fed. Cir. 1990), and 923 F.2d 1576 (Fed. Cir. 1991) | Patent |
| Best Cellars, Inc. v. Wine Made Simple, Inc., LJG Wines, Inc., 320 F. Supp. 2d 60 (S.D.N.Y. 2003) | Trademark |

| *Case Name* | *Subject* |
|---|---|
| BIC Leisure Products, Inc. v. Windsurfing International, Inc., 850 F. Supp. 224 (S.D.N.Y. 1994) | Patent |
| Bio-Rad Laboratories Inc. v. Nicolet Instrument Corp., 739 F.2d 604 (Fed. Cir. 1984), *cert. denied*, 469 U.S. 1038 (1984), and 807 F.2d 964 (Fed. Cir. 1986), *cert. denied*, 482 U.S. 915 (1987) | Patent |
| Big O Tire Dealers, Inc. v. The Goodyear Tire & Rubber Co., 561 F.2d 1365(10th Cir. 1977) | Trademark |
| Bose Corp. v. JBL, Inc., 112 F. Supp. 2d 138 (N.D. Mass. 2000) | Patent |
| Bose Corp. v. JBL, Inc., 274 F.3d 1354 (Fed. Cir. 2001) | Patent |
| Boston Scientific v. Johnson & Johnson, 2009 WL 975424 (N.D. Cal.) | Patent |
| Bott v. Four Star Corp., 807 F.2d 1567 (Fed. Cir. 1986) | Patent |
| Broderbund Software, Inc. v. Unison World, Inc., 648 F. Supp. 1127 (N.D. Cal. 1986) | Copyright |
| Brooktree Corp. v. Advanced Micro Devices, Inc., 977 F.2d 1555 (Fed. Cir. 1992) | Patent |
| Brunswick v. United States, 36 Fed. Cl. 204 (Fed. Cir. 1996) | Patent |
| Bryant v. Media Right Productions, Inc., 603 F.3d 135 (2nd Cir. 2010) | Copyright |
| Business Trends Analysts, Inc. v. Freedonia Group, Inc., 887 F.2d 399 (2d Cir. 1989) | Copyright |
| Callaway Golf Co. v. Dunlop Slazenger, 384 F. Supp. 2d 735 (D. Del. 2005) | Trademark |
| Carella v. Starlight Archery & Pro Line Co., 804 F.2d 135 (Fed. Cir. 1986) | Patent |
| Central Soya Co., Inc. v. Geo. A. Hormel & Co., 723 F.2d 1573 (Fed. Cir. 1983) | Patent |
| Century Wrecker Corp. v. E.R. Buske Manufacturing Co., Inc., 898 F. Supp. 1334 (N.D. Iowa 1995) | Patent |
| Chevron Chemical Co. v. Voluntary Purchasing Groups, Inc., 659 F.2d 695 (5th Cir. 1981), *cert. denied*, 457 U.S. 1126 (1982) | Trade Dress |
| Columbia Machine & Stopper Corp. v. Adriance Machine Works, 79 F.2d 16(2d Cir. 1935) | Patent |
| Comair Rotron, Inc. v. Nippon Densan Corp., 49 F.3d 1535 (Fed. Cir. 1995) | Patent |
| Cornell University v. Hewlett-Packard Co., 609 F. Supp. 2d 279 (N.D.N.Y. 2009) | Patent |
| Corning Glass Works v. Sumitomo Electric USA, Inc., 868 F.2d 1251 (Fed Cir. 1989) | Patent |
| Creative Internet Advertising Corp. v. Yahoo! Inc., 674 F. Supp. 2d 847 (E.D. Tex. 2009) | Patent |
| Crown Die & Tool Co. v. Nye Tool & Machine Works, 261 U.S. 24 (1923) | Patent |
| Cryovac, Inc. v. Pechiney Plastic Packaging, Inc., 430 F. Supp. 2d 346 (D. Del. 2006) | Patent |
| Crystal Semiconductor Corp. v. TriTech Microelectronics International, Inc., 246 F.3d 1336 (Fed. Cir. 2001) | Patent |
| Cummins-Allison Corp. v. SBM Co., 584 F. Supp. 2d 916 (E.D. Tex. 2008) | Patent |
| CVI/Beta Ventures, Inc. v. Tura LP, 905 F. Supp. 1171 (E.D.N.Y. 1995) | Patent |
| Datascope Corp. v. SMEC, Inc., 879 F.2d 820 (Fed. Cir. 1989), *cert. denied*, 493 U.S. 1024 (1990) | Patent |
| DataTreasury Corp. v. Wells Fargo & Co., 2010 U.S. Dist. LEXIS 25291 (E.D. | Patent |

| Case Name | Subject |
|---|---|
| Tex.) | |
| Deepsouth Packing Co., Inc. v. Laitram Corp., 406 U.S. 518 (1972) | Patent |
| Deere & Co. v. International Harvester Co., 710 F.2d 1551 (Fed. Cir. 1983) | Patent |
| Del Mar Avionics, Inc. v. Quinton Instrument Co., 836 F.2d 1320 (Fed. Cir. 1987) | Patent |
| DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc., 567 F.3d 1314 (Fed. Cir. 2009) | Patent |
| Devex Corp. v. General Motors Corp., 494 F. Supp. 1369 (D. Del. 1980), *aff'd*, 667 F.2d 347 (3d Cir. 1981), *cert. denied*, 461 U.S. 648 (1983) | Patent |
| Digital Communications Associates, Inc. v. Softklone Distributing Corp., 659 F. Supp. 449 (N.D. Ga.1987) | Copyright |
| DSU Medical Corp. v. JMS Co., Ltd., 471 F.3d 1293 (Fed. Cir. 2006) | Patent |
| Duraco Products, Inc. v. Joy Plastic Enterprise, Ltd., 40 F.3d 1431 (3d Cir. 1994) | Trade Dress |
| Ebay, Inc. v. MercExchange, LLC, 547 U.S. 388 (2006) | Patent |
| Egry Register Co. v. Standard Register Co., 23 F.2d 438 (6th Cir. 1928) | Patent |
| Eolas Technologies, Inc. v. Microsoft Corp., 399 F.3d 1325 (Fed. Cir. 2005) | Patent |
| Feist Publications, Inc. v. Rural Telephone Service Co., Inc., 499 U.S. 340 (1991) | Copyright |
| Fenner Investments, Ltd. v. Hewlett-Packard Co., 2010 U.S. Dist. LEXIS 41514 (E.D. Tex.) | Patent |
| Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd., 72 F.3d 857 (Fed. Cir. 1995) | Patent |
| Finisar Corp. v. DirecTV Group, Inc., 523 F.3d 1323, 1339 (Fed. Cir. 2008) (*citingIn re* Seagate Technology, LLC, 497 F.3d 1360 (Fed. Cir. 2007)) | Patent |
| Fonar Corp. v. General Electric Co., 107 F.3d 1543 (Fed. Cir. 1997) | Patent |
| Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc., 772 F.2d 505 (9th Cir. 1985) | Copyright |
| Fromson v. Western Litho. Plate and Supply Co., 853 F.2d 1568 (Fed. Cir. 1988) | Patent |
| Fujifilm Corp. v. Benun, 605 F.3d 1366 (Fed. Cir. 2010) | Patent |
| Gargoyles, Inc. v. U.S., 37 Fed. Cl. 95 (Fed. Cir. 1997) | Patent |
| General Motors Corp. v. Devex Corp., 461 U.S. 648 (1983) | Patent |
| Georgia-Pacific Corp. v. U.S. Plywood Corp., 318 F. Supp. 1116 (S.D.N.Y. 1970), *modified*, 446 F.2d 295 (2d Cir. 1971), *cert. denied*, 404 U.S. 870 (1971) | Patent |
| GNB Battery Technologies, Inc. v. Exide Corp., 886 F. Supp. 420 (D. Del. 1995) | Patent |
| Golden Blount, Inc. v. Robert H. Peterson Co., 438 F.3d 1354 (Fed. Cir. 2006) | Patent |
| Golight, Inc. v. Wal-Mart Stores, Inc., 355 F.3d 1327 (Fed. Cir. 2004) | Patent |
| Goodyear Tire & Rubber Co. v. Overman Cushion Tire Co., 95 F.2d 978 (6th Cir. 1937), *cert. denied*, 306 U.S. 665 (1939) | Patent |
| Graham v. John Deere Co. of Kansas City, 383 U.S. 1 (1966) | Patent |
| Grain Processing Corp. v. American Maize-Products Co., 185 F.3d 1341(Fed. Cir. 1999) | Patent |
| Gustafson, Inc. v. Intersystems Industrial Products, Inc., 897 F.2d 508 (5th Cir. 1990) | Patent |

| *Case Name* | *Subject* |
|---|---|
| Gyromat Corp. v. Champion Spark Plug Co., 735 F.2d 549 (Fed. Cir. 1984) | Patent |
| Hanson v. Alpine Valley Ski Area, Inc., 718 F.2d 1075 (Fed. Cir. 1983) | Patent |
| Harris Corp. v. Ericsson, Inc., 417 F.3d 1241 (Fed. Cir. 2005) | Patent |
| Hartness International, Inc. v. Simplimatic Engineering Co., 819 F.2d 1100 (Fed. Cir. 1987) | Patent |
| Holiday Inns, Inc. v. Airport Holiday Corp., 683 F.2d 931 (5th Cir. 1982) | Trademark |
| Hooker Chemicals & Plastics Corp. v. U.S., 591 F.2d 652 (Ct. Cl. 1979) | Patent |
| Horvath v. McCord Radiator & Manufacturing Co., 100 F.2d 326, 335 (6th Cir. 1938) | Patent |
| Hughes Tool Co. v. Dresser Industries, Inc., 816 F.2d 1549 (Fed. Cir. 1987), *cert. denied*, 484 U.S. 914 (1987) | Patent |
| Hyatt Roller Bearing Co. v. U.S., 43 F.2d 1008 (Ct. Cl. 1930) | Patent |
| i4i Limited Partnership. v. Microsoft Corp., 598 F.3d 831 (Fed. Cir. 2010) | Patent |
| i4i Limited Partnership v. Microsoft Corp., 670 F. Supp. 2d 568 (E.D. Tex. 2009) | Patent |
| Imonex Services v. W.H. Munzprufer Dietmar Trenner Gmbh, 408 F.3d 1374 (Fed. Cir. 2005) | Patent |
| *In re* Dahlgren International, Inc., 811 F. Supp. 1180 (N.D. Texas 1992) | Patent |
| *In re* Mahurkar, 831 F. Supp. 1354 (N.D. Ill. 1993), *aff'd*, 71 F.3d 1573(Fed. Cir. 1995) | Patent |
| *In re* Seagate Technology, LLC, 497 F.3d 1360 (Fed. Cir. 2007) | Patent |
| Integra Lifesciences v. Merck KGaA, 331 F.3d 860 (Fed. Cir. 2003) | Patent |
| Intergraph Corp. v. Intel Corp., 253 F.3d 695 (11th Cir. 2001) | Patent |
| International Industries, Inc. v. Warren Petroleum Corp., 248 F.2d 696 (3d Cir. 1957) | Trade Secrets |
| IP Innovation LLC v. Red Hat, Inc., 2010 U.S. Dist. LEXIS 32528 (E.D. Tex.) | Patent |
| IP Innovation, LLC v. Red Hat, Inc., 705 F. Supp. 2d 687 (E.D. Tex. 2009) | Patent |
| Jenn-Air Corp. v. Penn Ventilation Co., Inc., 394 F. Supp. 665 (E.D. Pa. 1975) | Patent |
| Johnson v. Jones, 149 F.3d 494 (6th Cir. 1998) | Copyright |
| Joyal Products, Inc. v. Johnson Electric North America, Inc., 2009 WL 512156 (D. N.J.) | Patent |
| Juicy Couture, Inc. v. L'Oreal USA, Inc., 2006 U.S. Dist. LEXIS 30219 (S.D.N.Y.) | Trademark |
| Juicy Couture, Inc. v. L'Oreal USA, Inc., No. 4 CIV 7203 (DLC), 2006 WL 1359955 (S.D.N.Y. May 18, 2006) | Trademark |
| Juicy Whip, Inc. v. Orange Bang, Inc., 382 F.3d 1367 (Fed. Cir. 2004) | Patent |
| Kalman v. Berlyn Corp., 914 F.2d 1473 (Fed. Cir. 1990) | Patent |
| Kaufman Co. v. Lantech, Inc., 926 F.2d 1136 (Fed. Cir. 1991) | Patent |
| Kearns v. Chrysler Corp., 32 F.3d 1541 (Fed. Cir. 1994), *cert. denied*, 115 S. Ct. 1392 (1995) | Patent |
| King Instrument Corp. v. Otari Corp., 767 F.2d 853 (Fed. Cir. 1985), *cert. denied*, 475 U.S. 1016 (1986) | Patent |

| Case Name | Subject |
|---|---|
| King Instruments Corp. v. Perego, 65 F.3d 941 (Fed. Cir. 1995) | Patent |
| Kori Corp. v. Wilco Marsh Buggies & Draglines, Inc., 761 F.2d 649 (Fed. Cir. 1985), *cert. denied*, 474 U.S. 902 (1985) | Patent |
| Laitram Corp. v. Cambridge Wire Cloth Co., 785 F.2d 292 (4th Cir. 1986), *cert. denied*, 479 U.S. 820 (1986) | Patent |
| Lam, Inc. v. Johns-Manville Corp., 718 F.2d 1056 (Fed. Cir. 1983) | Patent |
| LaserDynamics, Inc. v. Quanta Storage America, Inc., 2:06-cv-00348 (E.D. Tex 2010) | Patent |
| Leinoff v. Louis Milona & Sons, Inc., 726 F.2d 734 (Fed. Cir. 1985) | Patent |
| Leesona Corp. v. U.S., 599 F.2d 958 (Ct. Cl. 1981) | Patent |
| Lindemann Maschinenfabrik GmbH v. American Hoist & Derrick Co., 895 F.2d 1403 (Fed. Cir. 1990) | Patent |
| Livesay Window Co. v. Livesay Industries, Inc., 251 F.2d 469 (5th Cir. 1958) | Patent |
| Lottie Joplin Thomas Trust v. Crown Publishers, 456 F. Supp. 531 (S.D.N.Y. 1977), *aff'd*, 592 F.2d 651 (2d Cir. 1978) | Copyright |
| Lucent Technologies, Inc. v. Gateway Inc., 2007 U.S. Dist. LEXIS 57135 (S.D. Cal.) | Patent |
| Lucent Technologies, Inc. v. Gateway Inc., 580 F.3d 1301 (Fed. Cir. 2009) | Patent |
| Lummus Industries, Inc. v. DM&E Corp., 862 F.2d 267 (Fed. Cir. 1988) | Patent |
| Marine Polymer Technologies, Inc. v. HemCon, Inc., 1:06-cv-00100 ( D. NH, 2010) | Patent |
| Mars, Inc. v. Coin Acceptors, Inc., 527 F.3d 1359 (Fed. Cir. 2008) | Patent |
| McRoberts Software, Inc. v. Media 100, Inc., 329 F.3d 557 (7th Cir. 2003) | Copyright |
| Mackie v. Rieser, 296 F.3d 909 (9th Cir. 2002) | Copyright |
| Manville Sales Corp. v. Paramount Systems, Inc., 917 F.2d 544 (Fed. Cir. 1990) | Patent |
| Markman v. Westview Instruments, Inc., 517 U.S. 370 (1996) | Patent |
| Marsh-McBirney, Inc. v. Montedoro-Whitney Corp., 882 F.2d 498 (Fed. Cir. 1989) | Patent |
| Mathis v. Spears, 857 F.2d 749 (Fed. Cir. 1988) | Patent |
| MedImmune, Inc. v. Genentech, Inc., 2007 LEXIS 1003 | Patent |
| MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118 (2007) | Patent |
| MercExchange, LLC v. eBay, Inc., 401 F.3d 1323 (Fed. Cir. 2005) | Patent |
| Micro Chemical, Inc. v. Lextron, Inc., 318 F.3d 1119 (Fed. Cir. 2003) | Patent |
| Micro Motion, Inc. v. Exac Corp., 761 F. Supp. 1420 (N.D. Cal. 1991) | Patent |
| Microsoft Corp. v. AT&T Corp., 127 S. Ct. 1746 (2007) | Patent |
| *In re* Midgard Corp., 107 F.3d 880 (10th Cir. 1997) (unpublished opinion) | Trade Secrets |
| Milgo Electronics Corp. v. United Business Communications, Inc., 623 F.2d 645 (10th Cir. 1980), *cert. denied*, 449 U.S. 1066 (1980) | Patent |
| Minco, Inc. v. Combustion Engineering, Inc., 903 F. Supp. 1204 (E.D. Tenn. 1995), *aff'd*, 95 F.3d 1109 (Fed. Cir. 1996) | Patent |

| Case Name | Subject |
|---|---|
| Minnesota Mining & Manufacturing Co. v. Johnson & Johnson Orthopaedics, Inc., 976 F.2d 1559 (Fed. Cir. 1992) | Patent |
| Mitutoyo Corp. v. Central Purchasing, LLC, 499 F.3d 1284 (Fed. Cir. 2007) | Patent |
| Mobil Oil Corp. v. Amoco Chemicals Corp., 915 F. Supp. 1333 (D. Del. 1995) | Patent |
| Monsanto Co. v. McFarling, 488 F.3d 973 (Fed. Cir. 2007) | Patent |
| Monsanto Co. v. Ralph, 382 F.3d 1374 (Fed. Cir. 2004) | Patent |
| Montgomery v. Noga, 168 F.3d 1282 (11th Cir. 1999) | Copyright |
| Nichia Corp. v. Seoul Semiconductor Co., 2008 U.S. Dist. LEXIS 12183 (N.D. Cal.) | Patent |
| Nickson Industries, Inc. v. Rol Manufacturing Co., Ltd., 847 F.2d 795 (Fed. Cir. 1988) | Patent |
| Nintendo of America, Inc. v. Dragon Pacific International, 40 F.3d 1007 (9th Cir. 1994), *cert. denied*, 515 U.S. 1107 (1995) | Trademark |
| Northlake Marketing & Supply, Inc. v. Glaverbel, 72 F. Supp. 2d 893 (N.D. Ill. 1999) | Patent |
| Novozymes A/S v. Genencor International, Inc., 474 F. Supp. 2d 592 (D. Del. 2007) | Patent |
| On Davis v. The Gap, Inc., 246 F.3d 152 (2d Cir. 2001) | Copyright |
| On-Line Technologies, Inc. v. Perkin-Elmer Corp., 2006 U.S. Dist. LEXIS 12809 (D. Conn. 2006) | Patent |
| Orthman Manufacturing, Inc. v. Chromalloy American Corp., 512 F. Supp. 1284 (C.D. Ill. 1981) | Patent |
| Paice LLC v. Toyota Motor Corp., 504 F.3d 1293 (Fed. Cir. 2007) | Patent |
| Paice LLC v. Toyota Motor Corp., 609 F. Supp. 2d 620 (E.D. Texas 2009) | Patent |
| Paine, Webber, Jackson & Curtis, Inc. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 564 F. Supp. 1358 (D. Del. 1983) | Patent |
| Pall Corp. v. Micron Separations, Inc., 66 F.3d 1211 (Fed. Cir. 1995) | Patent |
| Panduit Corp. v. Stahlin Bros. Fibre Works, Inc., 575 F.2d 1152 (6th Cir. 1978) | Patent |
| Paper Converting Machinery Co. v. Magna-Graphics Corp., 745 F.2d 11 (Fed. Cir. 1984) | Patent |
| Paymaster Technologies, Inc. v. United States, 180 Fed. Appx. 942 (Fed. Cir. 2006) | Patent |
| PepsiCo, Inc. v. Redmond, 1996 WL 3965 (N.D. Ill. 1996) | Trade Secrets |
| Pfizer, Inc. v. International Rectifier Corp., 218 U.S.P.Q. 586 (C.D. Cal. 1983) | Patent |
| Pioneer Corp. v. Samsung SDI Co., 2008 U.S. Dist. LEXIS 107079 (E.D. Tex.) | Patent |
| Pitcairn v. United States, 547 F.2d 1106 (Ct. Cl. 1976) | Patent |
| Playboy Enterprises, Inc. v. P.K. Sorren Export Co., 546 F. Supp. 987 (D.C. Fla. 1982) | Trademark |
| Polaroid Corp. v. Eastman Kodak Co., 16 U.S.P.Q.2d 1481 (N.D. Mass. 1990), *aff'd*, 17 U.S.P.Q.2d 1711 (D. Mass. 1991) | Patent |
| Polaroid Corp. v. Polarad Electronics Corp., 287 F.2d 492 (2d Cir. 1961) | Trademark |
| Poly-America, L.P. v. GSE Lining Technology, Inc., 383 F.3d 1303 (Fed. Cir. 2004) | Patent |

| Case Name | Subject |
|---|---|
| Presidio Components, Inc. v. American Technical Ceramics Corp., 2010 WL 3070370 (S.D. Cal.) | Patent |
| Qualitex Co., v. Jacobson Products Co., Inc., 514 U.S. 159 (1995) | Trademark |
| Quanta Computer, Inc. v. LG Electronics, Inc., 553 U.S. 617 (2008) | Patent |
| Radio Steel & Manufacturing Co. v. MTD Products, Inc., 788 F.2d 1554 (Fed. Cir. 1986) | Patent |
| Railroad Dynamics, Inc. v. A. Stucki Co., 727 F.2d 1506 (Fed. Cir. 1984), *cert. denied*, 469 U.S. 871 (1984) | Patent |
| ReedHycalog UK, Ltd. v. Diamond Innovations Inc., 6:08-cv-00325 (E.D. Tex., 2010) | Patent |
| ResQNet.com, Inc. v. Lansa, Inc., 594 F.3d 860, 870 (Fed. Cir. 2010) | Patent |
| Richardson v. Suzuki Motor Co., Ltd., 868 F.2d 1226 (Fed. Cir. 1989), *cert. denied*, 493 U.S. 853 (1989) | Patent |
| Ristvedt-Johnson, Inc. v. Brandt, Inc., 805 F. Supp. 557 (N.D. Ill. 1992) | Patent |
| Rite-Hite Corp. v. Kelley Co., Inc., 56 F.3d 1538 (Fed. Cir. 1995), *cert. denied*, 516 U.S. 867 (1995) | Patent |
| Rockwood v. General Fire Extinguisher Co., 37 F. 2d 62 (2d Cir. 1930) | Patent |
| Rogers v. Koons, 960 F.2d 301 (2d Cir. 1992) | Copyright |
| Rude v. Westcott, 130 U.S. 152 (1889) | Patent |
| Ryco, Inc. v. Ag-Bag Corp., 857 F.2d 1418 (Fed. Cir. 1988) | Patent |
| Schneider (Europe) AG v SciMed Life Systems, Inc., 852 F. Supp. 813 (D. Minn. 1994), *aff'd*, 60 F.2d 839 (Fed. Cir. 1995) | Patent |
| Scott Paper Co. v. Moore Business Forms, Inc., 594 F. Supp. 1051 (D. Del. 1984) | Patent |
| Scripto-Tokai Corp. v. Gillette Co., 788 F. Supp. 439 (C.D. Cal. 1992) | Patent |
| Service Recorder Co. v. Routzahn, 24 F.2d 875 (N.D. Ohio 1927) | Patent |
| Shamrock Technologies, Inc. v. Medical Sterilization, Inc., 808 F. Supp. 932 (E.D.N.Y. 1992) | Patent |
| Shiley, Inc. v. Bentley Laboratories, Inc., 225 U.S.P.Q. 1013 (C.D. Cal. 1985), *aff'd*, 794 F.2d1561 (Fed. Cir. 1986) | Patent |
| Shockley v. Arcan, Inc., 248 F.3d 1349 (Fed. Cir. 2001) | Patent |
| Shurgard Storage Centers, Inc. v. Safeguard Self Storage, Inc., 119 F. Supp. 2d 1121 (W.D. Wash. 2000) | Trade Secrets |
| Sicom Systems, Ltd. v. Agilent Technologies, Inc., 427 F.3d 971, 976 (Fed. Cir. 2005) | Patent |
| Slimfold Manufacturing Co. v. Kinkead Industries Inc., 932 F.2d 1453 (Fed. Cir. 1991) | Patent |
| SmithKline Diagnostics, Inc. v. Helena Laboratories Corp., 926 F.2d 1161 (Fed. Cir. 1991) | Patent |
| Snellman v. Ricoh Co., Ltd., 862 F.2d 283 (Fed. Cir. 1988), *cert. denied*, 491 U.S. 910 (1989) | Patent |
| Software Tree, LLC v. Red Hat, Inc., 2010 U.S. Dist. LEXIS 70542 (E.D. Tex.) | Patent |
| Sony BMG Music Entertainment v. Tenenbaum, 2010 U.S. Dist. LEXIS 68642 (D. Mass.) | Copyright |
| Standard Havens Products, Inc. v. Genco Industries, Inc., 953 F.2d 1360 (Fed. Cir. 1991) | Patent |

| Case Name | Subject |
|---|---|
| Standard Manufacturing Co., Inc. & DBP, Ltd. v. United States, 42 Fed. Cl. 748 | Patent |
| Stanfield v. Osborne Industries, Inc., 52 F.3d 867 (10th Cir. 1995) | Patent |
| State Industries, Inc. v. Mor-Flo Industries, Inc., 883 F.2d 1573 (Fed. Cir. 1989), *cert. denied*, 493 U.S. 1022 (1990) | Patent |
| Steiner Corp. v. Benninghoff, 5 F. Supp. 2d 1117 (D. Nev. 1998) | Valuation |
| Stickle v. Heublein, Inc., 716 F.2d 1550 (Fed. Cir. 1983) | Patent |
| Stryker Corp. v. Intermedics Orthopedics, Inc., 891 F. Supp. 751 (E.D.N.Y. 1995) | Patent |
| Stuart Hall Co. v. Ampad Corp., 51 F.3d 780 (8th Cir. 1995) | Trade Dress |
| Studiengesellschaft Kohle, m.b.h. v. Dart Industries, Inc., 862 F.2d 1564 (Fed. Cir. 1988) | Patent |
| Sun Studios, Inc. v. ATA Equipment Leasing, Inc., 872 F.2d 978 (Fed. Cir. 1989) | Patent |
| Taylor v. Meirick, 712 F.2d 1112 (7th Cir. 1983) | Copyright |
| Tektronix, Inc. v. U.S., 552 F.2d 343 (Ct. Cl. 1977) | Patent |
| Tights, Inc. v. Kayser-Roth Corp., 442 F. Supp. 159 (M.D.N.C. 1977) | Patent |
| Total Containment, Inc. v. Environ Products, Inc., 921 F. Supp. 1355 (E.D. Pa. 1995), *aff'd*, 106 F.3d 427 (Fed. Cir. 1997) | Patent |
| Trans-World Manufacturing Corp. v. Al Nyman & Sons, Inc., 750 F.2d 1552 (Fed. Cir. 1984) | Patent |
| Trell v. Marlee Electronics Corp., 912 F.2d 1443 (Fed. Cir. 1990) | Patent |
| Trio Process Corp. v. L. Goldstein's Sons, Inc., 533 F.2d 126 (3d Cir. 1976) | Patent |
| TWM Manufacturing Co., Inc. v. Dura Corp., 789 F.2d 895 (Fed. Cir. 1986), *cert. denied*, 479 U.S. 852 (1986) | Patent |
| Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763 (1992) | Trade Dress |
| Tyco Healthcare Group LP v. E-Z-EM, Inc., 2010 U.S. Dist. LEXIS 18253 (E.D. Tex.) | Patent |
| U-Haul International, Inc. v. Jartran, Inc., 793 F.2d 1034 (9th Cir. 1986) | Trademark |
| Underwater Devices, Inc. v. Morrison-Knudsen Co., 717 F.2d 1380 (Fed. Cir. 1983) | Patent |
| Uniloc USA, Inc. v. Microsoft Corp., 10-1035, U.S. Court of Appeals for the Federal Circuit (Washington) | Patent |
| Uniroyal, Inc. v. Rudkin-Wiley Corp., 939 F.2d 1540 (Fed. Cir. 1991) | Patent |
| Unisplay S.A. v. American Electronic Sign Co., 69 F.3d 512 (Fed. Cir. 1995) | Patent |
| Utah Medical Products v. Graphic Controls Corp., 350 F.3d 1376 (Fed. Cir. 2003) | Patent |
| Voda v. Cordis Corp., 476 F.3d 887 (Fed. Cir. 2007) | Patent |
| Wang Laboratories Inc. v. Mitsubishi Electronics America, Inc., 860 F. Supp. 1448(C.D. Cal. 1993) | Patent |
| Water Technologies Corp. v. Calco, Ltd., 850 F.2d 660 (Fed. Cir. 1988), *cert. denied*, 488 U.S. 968 (1988) | Patent |
| Weiner v. Rollform, Inc., 744 F.2d 797 (Fed. Cir. 1984), *cert. denied*, 470 U.S. 1084 (1985) | Patent |

| *Case Name* | *Subject* |
|---|---|
| Whelan Associates, Inc. v. Jaslow Dental Laboratory, Inc., 797 F.2d 1222 (3d Cir. 1986) | Copyright |
| William A. Graham Co. v. Haughey, 94 U.S.P.Q.2d 1147 (E.D. Pa. 2010) | Copyright |
| Wordtech Systems v. Integrated Network Solutions, Inc., 609 F.3d 1308 (Fed. Cir. 2010) | Patent |
| Yale Lock Manufacturing Co. v. Sargent, 117 U.S. 536 (1886) | Patent |
| Yarway Corp. v. Eur-Control USA, Inc., 775 F.2d 268 (Fed. Cir. 1985) | Patent |
| z4 Technologies, Inc. v. Microsoft Corp., 434 F. Supp. 2d 437 (E.D. Texas 2006) | Patent |
| Ziggity Systems, Inc. v. Val Watering Systems, 769 F. Supp. 752 (E.D. Pa. 1990) | Patent |
| Zygo Corp. v. Wyko Corp., 79 F.3d 1563 (Fed. Cir. 1996) | Patent |