# EXHIBIT B

# LITIGATION SERVICES HANDBOOK

## Sixth Edition

The Role of the Financial Expert

Roman L. Weil

Daniel G. Lentz

Elizabeth A. Evans

Cover design: Wiley

Copyright © 2017 by John Wiley & Sons, Inc. All rights reserved.

Published by John Wiley & Sons, Inc., Hoboken, New Jersey.
Published simultaneously in Canada.

No part of this publication may be reproduced, stored in a retrieval system, or transmitted in any form or by any means, electronic, mechanical, photocopying, recording, scanning, or otherwise, except as permitted under Section 107 or 108 of the 1976 United States Copyright Act, without either the prior written permission of the Publisher, or authorization through payment of the appropriate per-copy fee to the Copyright Clearance Center, Inc., 222 Rosewood Drive, Danvers, MA 01923, (978) 750-8400, fax (978) 646-8600, or on the Web at www.copyright.com. Requests to the Publisher for permission should be addressed to the Permissions Department, John Wiley & Sons, Inc., 111 River Street, Hoboken, NJ 07030, (201) 748-6011, fax (201) 748-6008, or online at www.wiley.com/go/permissions.

Limit of Liability/Disclaimer of Warranty: While the publisher and author have used their best efforts in preparing this book, they make no representations or warranties with respect to the accuracy or completeness of the contents of this book and specifically disclaim any implied warranties of merchantability or fitness for a particular purpose. No warranty may be created or extended by sales representatives or written sales materials. The advice and strategies contained herein may not be suitable for your situation. You should consult with a professional where appropriate. Neither the publisher nor author shall be liable for any loss of profit or any other commercial damages, including but not limited to special, incidental, consequential, or other damages.

For general information on our other products and services or for technical support, please contact our Customer Care Department within the United States at (800) 762-2974, outside the United States at (317) 572-3993 or fax (317) 572-4002.

Wiley publishes in a variety of print and electronic formats and by print-on-demand. Some material included with standard print versions of this book may not be included in e-books or in print-on-demand. If this book refers to media such as a CD or DVD that is not included in the version you purchased, you may download this material at http://booksupport.wiley.com. For more information about Wiley products, visit www.wiley.com.

*Library of Congress Cataloging-in-Publication Data:*

ISBN 978-1-119-16632-0 (Hardcover)
ISBN 978-1-119-36316-3 (ePDF)
ISBN 978-1-119-36318-7 (ePub)

Printed in the United States of America

10 9 8 7 6 5 4 3 2 1

# C

**Preface   xi**

**PART I: TH**

**1. A Disput**
Eliz
Dan
Rom

**2. Serving a**
Eliza
Rom

**3. Testimon**
**Part A:** *Da*
Dou
Salce
**Part B: Th**
Dani

**PART II: DE**

**4. Damages**
Eliza
Phil J
Dani

**5.** *Ex Ante ve*
Eliza
Roma

**6. Use of Stat**
Mark
Peter

**7. Survey Res**
Paul J
Jeffer

**8. Statistical B**
M. La
Willia
Roma

CHAPTER **19**

# ECONOMIC ANALYSIS OF NONPATENT INTELLECTUAL PROPERTY RIGHTS AND DAMAGES MEASURES

**Elizabeth A. Evans**
**Peter P. Simon**

## CONTENTS

19.1  Introduction  19.2
19.2  Main Forms of Nonpatent Intellectual Property Rights  19.2
    (a)  Copyrights  19.2
    (b)  Trademarks  19.5
    (c)  Trade Secrets  19.8
19.3  General Damages Measurement Issues in Nonpatent Intellectual Property Cases  19.10
    (a)  Injuries to Owners of Intellectual Property  19.10
    (b)  Running Royalty versus Lump-Sum Royalty  19.12
    (c)  Reasonable Royalty versus Lost Profits  19.13
    (d)  Calculating Sales in the But-For World  19.14
    (e)  Unjust Enrichment  19.14
    (f)  Monopoly, Oligopoly, and Game Theory  19.15
19.4  How Nonpatent Intellectual Property Damages Differ from Patent Damages  19.16
    (a)  Claiming the Infringer's Profits  19.16
    (b)  Owner's Burden of Proof  19.17
    (c)  Apportionment of Infringer's Profits  19.17
    (d)  Lack of Damages Floor  19.18
    (e)  Use of Nonmonetary Remedies  19.18
    (f)  The Absence of Paradigm Decisions  19.19
19.5  Damages Issues Specific to Copyright Infringement  19.19
    (a)  Damages to the Copyright Owner  19.20
    (b)  Infringer's Profits (or Unjust Enrichment)  19.21
    (c)  Statutory Damages  19.25
    (d)  Other Remedies  19.26
19.6  Damages Issues Specific to Trademark Infringement and False Advertising  19.26
    (a)  Standards for Injunctive Relief and Monetary Recovery  19.27
    (b)  Calculating Damages (Owner's Lost Profits)  19.27
    (c)  Calculating the Infringer's Profits  19.30
    (d)  Statutory Damages and Other Remedies  19.33
19.7  Damages Issues Specific to Trade Secrets  19.34
    (a)  Standards for Injunctive Relief and Monetary Recovery  19.34
    (b)  Calculating the Owner's Damages  19.35
    (c)  Calculating the Infringer's Profits  19.35
    (d)  Reasonable Royalty and Punitive Damages  19.35
19.8  Conclusion  19.36

APPENDIX: COMPARISON OF INTELLECTUAL PROPERTY REMEDIES  19.37

NOTES  19.44

LIST OF CASES  19.53

REFERENCES  19.56

## 19.1  INTRODUCTION

Property means a tangible or intangible resource to which an owner has legal title.[1] *Property rights* refer to the capacity of people or firms to own, buy, sell, and use property in a market economy.[2] Readers familiar with these terms in the context of physical property or financial capital often do not understand the rights of authors or inventors, how the law protects these rights, and the proper compensation if an abuser infringes these rights. Chapter 20 discusses these issues for patents; this chapter focuses on these issues and other considerations as they relate to nonpatent intellectual property.[3]

Section 19.2 introduces the three forms of nonpatent intellectual property rights (copyrights, trademarks with associated protection against false advertising, and trade secrets) and discusses each form's economic characteristics. Section 19.3 analyzes damages measurement issues unique to intellectual property. Section 19.4 explains how nonpatent intellectual property differs from patent intellectual property. Sections 19.5, 19.6, and 19.7 discuss various issues specific to copyrights, trademarks and false advertising, and trade secrets, respectively.

## 19.2  MAIN FORMS OF NONPATENT INTELLECTUAL PROPERTY RIGHTS

The three main types of nonpatent intellectual property rights are copyrights, trademarks, and trade secrets. This section discusses the protections the law provides, what an owner must do to obtain protection, and the economic implications for each type. Why examine the economic implications for each type of intellectual property? Economics is "the study of how societies use scarce resources to produce valuable commodities and distribute them among different people."[4] Regarding intellectual property as a scarce resource, economists have studied how the law rewards its creation, the cost to society of this reward system, and whether the system's benefits exceed its costs. Hence, this section will also focus on how the law can structure intellectual property rights so that the creator of intellectual property will receive an appropriate return at a minimal cost to society. This chapter's appendix compares different types of intellectual property.

### (a) Copyrights

Copyrights protect "original works of authorship fixed in any tangible medium of expression."[5] Section 102 of the Copyright Act lists eight protected categories: literary works; musical works (including any accompanying words); dramatic works (including any accompanying music); pantomimes and choreographic works; pictorial, graphic, and sculptural works; motion pictures and other audiovisual works; sound recordings; and architectural works.[6] Congress intended these categories to be illustrative, not exhaustive.[7] The particular medium containing the work does not affect its right to copyright protection: "A novel is still a novel and protected by copyright whether it is recorded in the form of a manuscript, typescript, computer diskette, printed plates, laser disks, or bubble memory."[8]

Copyright protection never covers the expressed idea, only the expression of that idea. Section 102 of the Copyright Act states, "In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system,

method of operation, cor
which it is described, expl
copyright protection requ
*and Juliet* theme will not
fact, two people separatel
copyright and each author
tion against any use, even
dently. In contrast, an ind

Despite the perception
give their works away co
protection against infring
software—made publicly
Open-source authors ofte
copyrighted material. If u
for infringement and rela

As in the case of paten
works created after Decer
the death of the work's
pseudonymous works, or
the work's first publicat
comes first. When a cop
tected property freely.

Congress has imposed
to accommodate socially
fair to the copyright ow
criticism, comment, new
within the fair use except

- The purpose and na
  the materials for pu
- The nature of the co
- The percentage of th
  as a whole; and
- The effect of the use
  value.[14]

Courts must tailor fa
*Harper & Row v. Nation E*
300 to 400 words of copy
violated the fair use doc
an insubstantial portion
words chosen played a k
under which the infring
of portions of a copyrigl
author by establishing h

In 1998, Congress pas
The Digital Millenniun E
tion, or use of technologi

. PROPERTY

h an owner has legal title.
to own, buy, sell, and use
ese terms in the context of
stand the rights of authors
e proper compensation if
ese issues for patents; this
ons as they relate to non-

intellectual property rights
inst false advertising, and
acteristics. Section 19.3 ana-
tual property. Section 19.4
patent intellectual property.
ic to copyrights, trademarks

 PROPERTY RIGHTS

erty rights are copyrights,
the protections the law pro-
d the economic implications
s for each type of intellectual
scarce resources to produce
ifferent people."[4] Regarding
s have studied how the law
rd system, and whether the
ion will also focus on how
 that the creator of intellec-
minimal cost to society. This
ectual property.

ed in any tangible medium of
ght protected categories: liter-
ying words); dramatic works
s and choreographic works;
ctures and other audiovisual
Congress intended these cat-
cular medium containing the
n: "A novel is still a novel and
 form of a manuscript, type-
, or bubble memory."[8]
dea, only the expression of that
case does copyright protection
a, procedure, process, system,

method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work."[9] Nor does copyright protection require novelty of the work: that a play reworks the *Romeo and Juliet* theme will not keep an author from receiving copyright protection. In fact, two people separately can create similar works; yet, each of them can receive a copyright and each author can have copyright protection. A patent provides protection against any use, even if the second inventor developed the same idea independently. In contrast, an independently created copy does not infringe a copyright.

Despite the perception that the authors who use open-source arrangements give their works away condition-free, these authored works often have copyright protection against infringement. *Open source* refers to original material—commonly software—made publicly available for use by others under certain conditions.[10] Open-source authors often copyright and require conditions on the use of that copyrighted material. If users do not meet those conditions, authors can often sue for infringement and related damages.[11]

As in the case of patents, rights under copyright endure for a limited time. For works created after December 31, 1977, a copyright will continue for 70 years after the death of the work's only or last surviving author.[12] For anonymous works, pseudonymous works, or works made for hire, a copyright lasts for 95 years after the work's first publication or 120 years from its original[13] creation, whichever comes first. When a copyright expires, the public can exploit the formerly protected property freely.

Congress has imposed fair use limitations on the rights of the copyright owner to accommodate socially desirable copying (in certain circumstances) that remains fair to the copyright owner. "Fair use" includes copying for purposes such as criticism, comment, news reporting, teaching, and research. To decide what falls within the fair use exception, the courts look to the following:

- The purpose and nature of the use (courts treat more leniently groups using the materials for purposes other than economic gain);
- The nature of the copyrighted work;
- The percentage of the copyrighted work used and its importance to the work as a whole; and
- The effect of the use on the potential market for the copyrighted work or its value.[14]

Courts must tailor fair use analysis to the individual case. For example, in *Harper & Row v. Nation Enterprises*, the Supreme Court held that the publication of 300 to 400 words of copyrighted material from memoirs of former President Ford violated the fair use doctrine.[15] Even though the amount of words quoted were an insubstantial portion of the total transcript, the Supreme Court found that the words chosen played a key role in the infringing article and that the circumstances under which the infringer published them affected the right of first publication, an important marketable subsidiary right. On the other hand, courts allow use of portions of a copyrighted work in a book review because this can benefit the author by establishing his work in a new market.[16]

In 1998, Congress passed legislation that eliminated some fair use limitations. The Digital Millennium Copyright Act (DMCA) forbids the creation, distribution, or use of technologies that make circumvention of digital rights management

**19 • 4    ECONOMIC ANALYSIS OF NONPATENT INTELLECTUAL PROPERTY**

(DRM) systems possible.[17] DRM technology systems allow copyright holders to protect and control access to their copyrighted works. Put simply, DMCA limits the copying of digital material. Prior case decisions defined fair use to include, for example, videotaping of television programs for later viewing.[18] Some observers propose that this law's protection of digital works eliminates the possibility of any fair use of these works.[19] The DMCA also provides an alternative route to injunction by allowing a copyright holder to request that an Internet service provider remove infringing material from a website, with the provider facing the possibility of litigation if it refuses the request.[20]

In *American Broadcasting Cos. v. Aereo, Inc.* (*Aereo*), the Supreme Court addressed whether a television program streaming service provider violated copyright laws.[21] Aereo provided a service to viewers in which, upon request from a customer, one of thousands of individual television signal antennas was dedicated for use by the customer for the duration of a broadcast, and the signal was transmitted via the Internet (and was saved in a customer-dedicated file for future viewing).[22] Copyright law gives a copyright owner the exclusive right to perform a copyrighted work publicly, and that right includes the right to transmit a performance publicly. The court viewed Aereo's service as substantially similar to that provided by a cable television company. Because of the 1976 amendments to the Copyright Act, the Court explained, Congress made clear that "an entity that acts like a [cable] system itself performs, even when it simply enhances viewers' ability to receive broadcast television signals."[23] Furthermore, since a cable system performs publicly, so did Aereo. The court held that Aereo did violate copyright law; Aereo subsequently entered bankruptcy.[24]

The issuance of copyrights involves competing social benefits and costs. If a publisher appropriates an author's novel (or other copyrightable work) without compensation, the author will not have received an appropriate return for his or her investment in creativity.[25] However, if the publisher pays the author compensation, such as a royalty, the publisher then will pass on to the public the compensation it pays an author in the form of a higher book price. In other words, one must consider whether the benefits of copyright (the creator has an incentive to create the work) exceed the costs (one must pay to duplicate the work). Litigation related to file sharing forces the courts to balance these interests. For example, in *MGM v. Grokster*, the Supreme Court ruled that duplicating technology that enabled and encouraged infringement itself infringed a copyright.[26] These considerations parallel those involved in the economic analysis of patent rights.

Economic analysis of copyrights involves at least four considerations:

1. Copyrights protect the expression of the idea and not the idea itself.
2. Copyright holders receive control over derivative works.
3. Copyrights do not protect holders from independent duplication.
4. The ease of private copying leads to varying effects of replication on producer and consumer welfare.

*(i) Expression of an Idea*   Courts and authorities have suggested at least two justifications for protecting the *expression* of an idea, rather than the idea itself: (1) the cost of expressing the idea exceeds the cost of creating the idea, and (2) the public benefits by a larger number of competing works.[27] If one could copyright ideas, the public would have fewer works from which to choose, the work being the expression of the idea.

**19.2   MAIN FOR[...]**

*(ii) Derivative Works*   Copyr[...] ents because the author o[...] work, such as translation[...] or in calendars. Suppose [...] elements to create a new o[...] this new chemical in a cer[...] tor will have to pay a ro[...] works provides the maxi[...] early release of a work: i[...] publication to prepare r[...] This rewards the author [...] as soon as possible, from [...] suggests that giving auth[...] age the efficient use of th[...] ing several translations i[...] some argue that royalty p[...] hard- and softcover editi[...]

*(iii) Independent Duplication* [...] protection than do copyrig[...] the author of a copyrighte[...] of the author's work. This [...] ing for duplicates in the co[...]

*(iv) Ease of Copying*   One c[...] Some justify the doctrine[...] consent to the use of a p[...] pay, high negotiation co[...] provides a benefit to the [...]

**(b) Trademarks**

A trademark is any word[...] business uses to distingu[...] identify products so that [...] facturers can then benefit[...]

Trademark law protec[...] or smells,"[38] as well as n[...] even protect symbols, sl[...] with the Microsoft Wind[...] Donald Trump, and the s[...]

Trademark protectio[...] company cannot register[...] to a trademark owned by[...] distinctive or famous trac[...] name if it can show that [...] ruled that, because no e[...] Quest Publishing, did no[...]

Whereas patent and c[...] law aims to avoid decep[...]

allow copyright holders to
Put simply, DMCA limits
ined fair use to include, for
viewing.[18] Some observers
inates the possibility of any
alternative route to injunc-
n Internet service provider
provider facing the possibil-

e Supreme Court addressed
er violated copyright laws.[21]
uest from a customer, one o
dedicated for use by the cus-
s transmitted via the Internet
e viewing).[22] Copyright law
a copyrighted work publicly,
ce publicly. The court viewed
d by a cable television com-
ght Act, the Court explained,
able] system itself performs,
eive broadcast television sig-
blicly, so did Aereo. The court
quently entered bankruptcy.[24]
ocial benefits and costs. If a
opyrightable work) without
appropriate return for his or
her pays the author compen-
on to the public the compen-
ok price. In other words, one
e creator has an incentive to
uplicate the work). Litigation
these interests. For example,
t duplicating technology that
d a copyright.[26] These consid-
lysis of patent rights.
: four considerations:

and not the idea itself.

tive works.

endent duplication.

; effects of replication on pro-

e suggested at least two justifi-
her than the idea itself: (1) the
ing the idea, and (2) the public
[7] If one could copyright ideas,
to choose, the work being the

*(ii) Derivative Works*   Copyrights provide a stronger form of protection than do pat-
ents because the author of a copyrighted novel controls all derivative uses of the
work, such as translation into another language or quotes appearing on T-shirts
or in calendars. Suppose an inventor receives a patent for a method of combining
elements to create a new chemical and another inventor receives a patent for using
this new chemical in a certain way to create a new product. The chemical's inven-
tor will have to pay a royalty to use the new process.[28] Control over derivative
works provides the maximum incentive to produce.[29] Such control encourages the
early release of a work: in the absence of this protection, the author would delay
publication to prepare related translations and other commercial derivatives.[30]
This rewards the author while giving the public as many works as possible, and
as soon as possible, from which to choose. The prospect theory[31] of Edmund Kitch
suggests that giving authors control over derivative works allows them to man-
age the efficient use of their ideas and to avoid duplicative efforts, such as mak-
ing several translations instead of using a single foreign language.[32] For example,
some argue that royalty payments enable an author to maximize the joint value of
hard- and softcover editions of the author's work.[33]

*(iii) Independent Duplication*   Regarding independent duplication, patents provide more
protection than do copyrights. Under the patent system, the winner takes all, whereas
the author of a copyrighted work has no protection from an independent recreation
of the author's work. This inconsistency has an economic rationale: the cost of check-
ing for duplicates in the copyright system exceeds that for the patent system.[34]

*(iv) Ease of Copying*   One cannot easily assess social gains and losses from copying.
Some justify the doctrine of fair use by noting that, although most authors will
consent to the use of a portion of their work for a slight fee and most users will
pay, high negotiation costs preclude such exchanges. Thus, the fair use doctrine
provides a benefit to the user and causes little harm to the author.[35]

**(b) Trademarks**

A trademark is any word, name, symbol, device, or any combination thereof that a
business uses to distinguish its goods or services from those of others.[36] Trademarks
identify products so that consumers can choose those they know and like; manu-
facturers can then benefit from building up a strong base of consumer support.[37]
    Trademark law protects any "words, designs, shapes, numbers, slogans, sounds,
or smells,"[38] as well as names like *McDonald's*, *Xerox*, and *Coca-Cola*. Trademarks
even protect symbols, slogans, and phrases such as the flying window associated
with the Microsoft Windows programs, the phrase "You're Fired" registered to
Donald Trump, and the shape of the old Coca-Cola bottle.[39]
    Trademark protection extends to Internet domain names. An individual or
company cannot register or use a domain name identical to or confusingly similar
to a trademark owned by another entity. An entity that registers another entity's
distinctive or famous trademark as a domain name, however, can keep the domain
name if it can show that it did not do so in bad faith.[40] For example, an arbitrator
ruled that, because no evidence of bad faith existed, qwestcorp.com, owned by
Quest Publishing, did not infringe Qwest, Inc.'s trademark.[41]
    Whereas patent and copyright law aims to encourage innovation, trademark
law aims to avoid deception and confusion of customers and to protect a firm's

investment in reputation and goodwill. As a result, one cannot trademark a product feature determined by the product's purpose. For example, the manufacturer cannot trademark the circular shape of a car's tire because its form follows from its rolling function.[42]

Trademarks must have distinctive characteristics. The more distinctive the word, the more likely the trademark protection. To decide which marks, symbols, and names qualify for protection, the law uses a distinctiveness scale with four categories (listed here in ascending order of distinctiveness):[43]

1. *Generic* encompasses many commonly used words and phrases, as well as formerly distinctive words. For example, although once a protected trademark, the word *aspirin* no longer belongs to any one firm, having become common.

2. *Descriptive* contains names that usually describe the product being represented. The trademark law does not give trademark protection to descriptive names unless the manufacturer can prove a secondary meaning that consumers have come to associate the name with a single source (*Honey-Baked*, for example).[44]

3. *Suggestive* includes names or symbols loosely associated with a product. For example, *Microsoft* suggests products pertaining to computers and software. Trademark law does, however, extend protection to suggestive trademarks without proof of secondary meaning.

4. *Arbitrary* or *fanciful* names bear no obvious relation to the product they represent. *Apple Computer* is arbitrary as apples do not, by themselves, suggest computers; *Kodak* is an example of a fanciful mark. Trademark law generally protects such names.[45]

Unlike that of patents and copyrights, ownership of trademarks depends primarily on use. The trademark will last as long as the company holding the mark continues to use it. Should the trademark owner cease using the trademark, it will lapse.[46] The licensee must renew a registered trademark every 10 years, with no limit on the number of renewals.[47] Although one can register a mark with the U.S. Patent and Trademark Office and with other state regulatory bodies, one need not do so except to receive the advantage of "a nationwide right of priority, even in areas where the work has not been used."[48] If an owner registers a trademark and an infringer violates those rights, the owner can recover damages through the Trademark Act. An owner who has not registered the mark can recover damages under state common law.

In trademark infringement cases, courts examine the similarity of marks, the similarity of products or services, the geographic area involved, the manner of concurrent use, the strength of the plaintiff's allegedly infringed mark, the degree of care taken by purchasers in their purchase decisions, evidence of confusion in the marketplace, and the defendant's intention.[49] Although the owner of a trademark need not prove confusion—only the likelihood of confusion—the owner will find it easier to prevail in a lawsuit if the owner establishes confusion.[50]

Trademarks provide rules of orderly marketing. Trademark protection benefits society by reducing consumer search costs and encouraging firms to invest in quality.[51] For efficient trademark protection, the consumer must find it cheaper to search for the trademarked good than for the desired attributes of a product, and the consumer

must find past experience
to achieve their purpose,
reflects the implicit thinki
advertising the trademark
petition if a firm advertise
good exceeds the quality c

Trademarks have lega
ents or copyrights becaus
way manufactured produ
rent-seeking issues. Man
products that infringe pa
trademarks apply to phy

Although various con
marks, the Lanham Act
infringement. Section 43(
infringement represents

*(i) False Advertising*  Anoth
false advertising. False a
a competitor (the plainti
defendant). It includes f
fashion that tends to dec
tion. Courts have found
advertising claims. False
print, or online) advertis
general sales pitches or b
public relations materials

False advertising clair
with federal regulations
*derful v. Coca-Cola*[56] addr
asserted that compliance
would disallow a challen
a suit against Coca-Cola
products misled consum
berry juice in the produ
laws to complement one
est, may bring Lanham
labels that are regulated
out a natural consequenc
lation (following from th
labeling claims under the

False advertising case
damages, as other Lanha
trademark and false adv
of specific damages app
from trademark infringe
vice versa. Therefore, eve
property issue, this chap
under the Lanham Act.

t, one cannot trademark a
. For example, the manufac-
ire because its form follows

s. The more distinctive the
ecide which marks, symbols,
stinctiveness scale with four
eness):[43]

ords and phrases, as well as
ugh once a protected trade-
ny one firm, having become

ibe the product being repre-
ark protection to descriptive
econdary meaning that con-
a single source (*Honey-Baked*,

ssociated with a product. For
g to computers and software.
ion to suggestive trademarks

ation to the product they rep-
o not, by themselves, suggest
ark. Trademark law generally

o of trademarks depends pri-
e company holding the mark
se using the trademark, it will
mark every 10 years, with no
register a mark with the U.S.
regulatory bodies, one need
onwide right of priority, even
owner registers a trademark
recover damages through the
he mark can recover damages

e the similarity of marks, the
area involved, the manner of
lly infringed mark, the degree
ions, evidence of confusion in
lthough the owner of a trade-
l of confusion—the owner will
ablishes confusion.[50]

Trademark protection benefits
uraging firms to invest in qual-
must find it cheaper to search for
of a product, and the consumer

must find past experience a good predictor of the future. For a firm's trademarks to achieve their purpose, the firm must have products of a consistent quality.[52] This reflects the implicit thinking that guides trademark law. However, some argue that advertising the trademarked good can result in monopolistic rents or wasteful competition if a firm advertises to convince the public without base that the trademarked good exceeds the quality of the same, different, generic good.[53]

Trademarks have legal protection for a different period of time than either patents or copyrights because trademark names do not consume scarce resources the way manufactured products do. In other words, trademark names do not involve rent-seeking issues. Many of the problems associated with tracing or identifying products that infringe patents, moreover, do not exist with trademarks because trademarks apply to physical, easily identified goods.[54]

Although various common law provisions and state statutes address trademarks, the Lanham Act has become the primary source of law for trademark infringement. Section 43(a) of the act prohibits unfair competition and trademark infringement represents a type of unfair competition.[55]

*(i) False Advertising*   Another type of unfair competition under the Lanham Act is false advertising. False advertising encompasses false or misleading claims about a competitor (the plaintiff or a third party) or about the originating entity (the defendant). It includes false statements, literally true statements presented in a fashion that tends to deceive or mislead, and failure to disclose material information. Courts have found that obvious hyperbole does not provide a basis for false advertising claims. False advertising laws apply not only to media (broadcast, print, or online) advertising, but also acts or materials such as project labeling, general sales pitches or badmouthing, letters, or oral representations to clients and public relations materials.

False advertising claims can even apply when the defendants have complied with federal regulations related to labeling. The Supreme Court in *POM Wonderful v. Coca-Cola*[56] addressed challenges to labeling claims where the defendant asserted that compliance with the Federal Food, Drug, and Cosmetic Act (FDCA) would disallow a challenge using the Lanham Act. POM Wonderful had brought a suit against Coca-Cola under the Lanham Act, alleging that one of Coca-Cola's products misled consumers regarding the proportion of pomegranate and blueberry juice in the product. The Court found that Congress intended for the two laws to complement one another and ruled that "[c]ompetitors, in their own interest, may bring Lanham Act claims like POM's that challenge food and beverage labels that are regulated by the FDCA."[57] As a result, some observers have pointed out a natural consequence of this ruling: compliance with FDA food product regulation (following from the FDCA) does not preclude competitors' challenges to labeling claims under the Lanham Act.[58]

False advertising cases allow the same forms of remedy, including monetary damages, as other Lanham Act claims. In practice, of course, the fact patterns for trademark and false advertising cases can differ in ways that affect the relevance of specific damages approaches. Nevertheless, courts often cite case law arising from trademark infringement matters as precedent in false advertising cases and vice versa. Therefore, even though false advertising does not imply an intellectual property issue, this chapter includes it in discussions of damages for trademarks under the Lanham Act.

*(ii) Case Law*   Further, a 2014 Supreme Court case (*Lexmark v. Static Control*)[59] has changed the rules related to the ability to bring a trademark or false advertising claim under the Lanham Act and has done so in a way that will affect the types of damages claimed. The Lanham Act states that a claim may be brought "by any person who believes that he or she is likely to be damaged."[60] Although these words apply to both trademark and false advertising cases, federal courts had interpreted them differently for the two types of cases. They allowed non-competitors to bring trademark infringement cases but required direct competition or competitive injury for false advertising claims.[61] In *Lexmark*, the federal district court had dismissed the plaintiff's false advertising claim because Lexmark and Static were not direct competitors; the Sixth Circuit reversed, finding that Static had standing to sue because a reasonable commercial interest was at stake. Instead of adopting one of these two approaches, the Supreme Court rejected both and adopted a new two-part standing test, the first part being a "zone-of-interests test" and the second a "proximate [i.e., primary] cause" requirement. The zone-of-interests test requires that courts find that a claimant "falls within the class of plaintiffs whom Congress has authorized to sue."[62]

Granted that this ruling will make bringing false advertising cases easier, how does this affect the damages under the two types of action? The effect comes from applying "proximate cause" as the second requirement of having standing to bring the suit.[63] The Supreme Court in *Lexmark* did not limit its ruling to false advertising claims and specifically referenced only the Lanham Act. This suggests that the two standing tests for false advertising also apply to trademark infringement claims.[64] As a result, trademark infringement claimants will need to show that (a) they fall within the class of plaintiffs that Congress intended to sue and (b) proximate cause exists between the harmful acts and the damages that ensued.

In the past, courts have found trademark infringement exists where consumer confusion occurs before the point of sale ("initial interest confusion"), when "the consumer is momentarily confused but has a corrected understanding before making his or her purchase." Claimants have used the concept of initial interest confusion, for example, in bringing trademark infringement claims over keyword advertising in search engines.[65] Yet the Supreme Court in its zone-of-interest test stated that injuries are proximately caused only when the causal chain between the violation and the harm is direct and unbroken. Using this reasoning, trademark infringement matters where a break exists between the initial confusion and the point of sale (for example, where the consumer obtains a corrected understanding before making the purchase) may result in a finding that the claimant has not satisfied the second requirement of the standing to sue test. Hence, the courts might dismiss future initial interest confusion claims in trademark infringement matters.

**(c) Trade Secrets**

Whereas statutes established patents, copyrights, and trademarks to protect people who have put their works before the public, the intellectual property rights for trade secrets function to keep knowledge hidden from others. Each state sets its own trade secret laws, although all generally agree as to what constitutes a trade secret. According to the Uniform Trade Secrets Act, trade secrets encompass

information, including
technique, or process th
tial, from not being ge
proper means by, other
or use, and (2) is the sub
maintain its secrecy.[69]

Hence, to receive pro
have some economic val
and protect it from any
price and cost data, pro
programs, computer pro
books of formulas know
advantage (similar to a f

If one acquires a trade
breach of confidence, br
one must compensate th
an indefinite time. The S
protection for a secret d
Courts recognize revers
for example.[70]

In some ways, the law
to owners of patents. Ha
Chicken, after 20 years a
trade secret, the colonel
the public indefinitely. H
replicating a secret recip
unlike a patent owner, v

The intellectual prop
the others analyzed thu
disclosure—as with pa
tion grants the creator
secret. Also, unlike patc
intellectual property ri
courts base remedies fc

Landes and Posner a
tion offered by patents a
owner of the trade secre
penalizes industrial esp
neering will frequently
improvements.[72]

Trade secret law deri
less, some federal laws
Act[73] and the Federal Tr
by federal employees wh
ees. Further, the Freedo
of documents containin
government does not n
doing so would cause s

AL PROPERTY

...mark v. Static Control)[59] has
demark or false advertising
ay that will affect the types
claim may be brought "by
damaged."[60] Although these
ases, federal courts had inter-
ey allowed non-competitors
rect competition or competi-
he federal district court had
use Lexmark and Static were
ding that Static had standing
at stake. Instead of adopting
cted both and adopted a new
interests test" and the second
zone-of-interests test requires
of plaintiffs whom Congress

advertising cases easier, how
action? The effect comes from
ment of having standing to
d not limit its ruling to false
ne Lanham Act. This suggests
apply to trademark infringe-
claimants will need to show
Congress intended to sue and
and the damages that ensued.
ement exists where consumer
terest confusion"), when "the
rected understanding before
d the concept of initial inter-
rk infringement claims over
Supreme Court in its zone-
caused only when the causal
and unbroken. Using this rea-
break exists between the initial
re the consumer obtains a cor-
) may result in a finding that
ent of the standing to sue test.
rest confusion claims in trade-

and trademarks to protect peo-
intellectual property rights for
from others. Each state sets its
e as to what constitutes a trade
t, trade secrets encompass

information, including a formula, pattern, compilation, program, device, method, technique, or process that: (1) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.[66]

Hence, to receive protection, the knowledge must be secret, the secret must have some economic value, and the owner must make some effort to keep it secret and protect it from any unauthorized use.[67] Courts have found trade secrets in price and cost data, production processes, customer lists, databases, computer programs, computer program algorithms, secret formulas, marketing plans, and books of formulas known in the trade but combined in a way to provide a unique advantage (similar to a football playbook).[68]

If one acquires a trade secret by improper means—such as industrial espionage, breach of confidence, bribery, subversion of employees, or breach of contract—one must compensate the owner of the trade secret. This protection endures for an indefinite time. The Supreme Court has ruled, however, that an owner has no protection for a secret discovered by another who used fair and honest means.[69] Courts recognize reverse engineering from a publicly available source as proper, for example.[70]

In some ways, the law extends more protection to owners of trade secrets than to owners of patents. Had Colonel Sanders patented the recipe for Kentucky Fried Chicken, after 20 years anyone could have used it. By maintaining the recipe as a trade secret, the colonel and his successors in interest have hidden the recipe from the public indefinitely. However, if someone independently develops a method of replicating a secret recipe or other sensitive information, the original secret holder, unlike a patent owner, will receive no compensation.

The intellectual property protection extended to trade secrets differs from the others analyzed thus far. First, instead of granting its creator rights for its disclosure—as with patents, copyrights, and trademarks—trade secret protection grants the creator rights only as long as the intellectual property remains secret. Also, unlike patents or copyrights, the damages award for violating this intellectual property right has nothing to do with rewarding creativity. The courts base remedies for its violation solely on its commercial value.

Landes and Posner argue that trade secret protection supplements the protection offered by patents and tends to keep the benefits of innovation accruing to the owner of the trade secret.[71] They also note, however, that the law of trade secrets penalizes industrial espionage, but not reverse engineering, because reverse engineering will frequently generate knowledge about the product that will allow improvements.[72]

Trade secret law derives not from federal but rather from state law. Nevertheless, some federal laws relate to theft of trade secrets. The Federal Trade Secret Act[73] and the Federal Trade Commission Act[74] prohibit disclosure of trade secrets by federal employees who receive such information in their role as federal employees. Further, the Freedom of Information Act[75] does not require public disclosure of documents containing trade secrets if the authorized official believes that the government does not normally release such information to the public and that doing so would cause significant competitive harm to the trade secret's owner.[76]

19 • 10    ECONOMIC ANALYSIS OF NONPATENT INTELLECTUAL PROPERTY

Because the Racketeer Influenced and Corrupt Organizations Act (RICO)[77] allows recovery to anyone injured by interstate theft, an owner might use a RICO action to recover damages for trade secrets that a perpetrator steals and takes across state lines. The U.S. government can use the Economic Espionage Act of 1996 (EEA) to prosecute theft of trade secrets, with penalties increased if the theft benefits a foreign government, instrumentality, or agent. In *United States v. Dongfan Chung*, the government used provisions in the EEA to criminally prosecute a Boeing employee who stole information from Boeing and provided it to the Chinese government. The court sentenced the defendant to nearly 16 years in prison.[78]

The Computer Fraud and Abuse Act (1984) encompasses a wide range of misdeeds, including illegal use of government computers and use of computers for extortion, but the relevant provisions pertain to theft of company data by former employees. The act allows lawsuits against former employees for transferring information stored electronically to a new employer. A plaintiff can pursue compensation for damages or losses. Damages are "any impairment to the integrity or availability of data, a system or information," and losses are "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system or information to its condition prior to the offense, and any revenue lost, cost incurred or other consequential damages incurred because of an interruption of service."[79]

## 19.3 GENERAL DAMAGES MEASUREMENT ISSUES IN NONPATENT INTELLECTUAL PROPERTY CASES

In almost all commercial cases, damages equal the difference between the profits the property owner would have received but for the defendant's actions and the profits (or losses) the owner received. Given the property rights discussed in previous sections of this chapter, however, the owner of intellectual property can suffer in ways not found in most commercial cases. For example, because a copyright grants its owner a monopoly on the copyrighted work and because the behaviors of prices and costs of a monopoly differ from those in a competitive market, the measurement of damages to a copyright holder (whether measured as lost profits, royalties, or unjust enrichment) will differ from measurement of damages in other commercial cases. This section discusses some of the damages measurement issues involved in making whole the owner of intellectual property.

### (a) Injuries to Owners of Intellectual Property

Assume that someone has infringed the rights of an intellectual property owner by illegally using the intellectual property. How has that person harmed the owner? If the owner would have produced the product exclusively, the owner suffers reduced sales and thus lost profits on the infringing sales.[80] The owner may have also lost sales on noninfringed goods as a result of infringement. Profits on these, too, are recoverable. In addition to the lost profits on sales, the infringement further reduced the owner's profits through less obvious effects on the owner's cost structure. For instance, the reduced sales could have resulted in reduced economies of scale, or the unwarranted competition could have caused an increase in costs, such as advertising aimed at maintaining sales. Moreover, price erosion

caused by competition fr[...]
the owner's sales. In the [...]
monopoly (to a greater o[...]
have charged monopoly [...]
from the infringer. Such c[...]

If the owner would hav[...]
others (i.e., a licensor/cor[...]
damages:

- To the extent that a [...]
  owner would have [...]
  losses because the r[...]
  These lower costs, in[...]
  the number of sales o[...]
  had the infringer pai[...]
- The added competiti[...]
  the lowered prices in[...]
  the owner retained.
- The infringer depriv[...]
- To the extent that th[...]
  ees, those licensees i[...]
  royalty payments to [...]

Would-be licensor/con[...]
reasonable royalties or lo[...]
lost profit damages. Why [...]
that in the but-for world [...]
to the intellectual propert[...]
petitor situation, one assu[...]
licensed the property. Th[...]
total quantity would be as[...]
of damages that looks lik[...]
lower prices) results from[...]
reasonable royalty calcul[...]

In addition to lost profi[...]
in some cases can also clai[...]
by which the infringer h[...]
Section 19.3(e) of this cha[...]
measure that exceeds a lo[...]
lectual property in questi[...]
could manufacture a pro[...]
than the owner could; as [...]
exceed an award based on[...]
infringer's profits creates[...]
the owner can, in princip[...]
a first approximation of [...]
If the court required the i[...]
profits as a royalty, the inf[...]
invalidate the assumption[...]

zations Act (RICO)[77] allows
er might use a RICO action
steals and takes across state
pionage Act of 1996 (EEA)
reased if the theft benefits a
ited States v. Dongfan Chung,
minally prosecute a Boeing
ovided it to the Chinese gov-
16 years in prison.[78]
npasses a wide range of mis-
rs and use of computers for
of company data by former
employees for transferring
. A plaintiff can pursue com-
impairment to the integrity
d losses are "any reasonable
; to an offense, conducting a
n, system or information to its
cost incurred or other conse-
on of service."[79]

## ES IN NONPATENT

difference between the profits
he defendant's actions and the
operty rights discussed in pre-
of intellectual property can suf-
example, because a copyright
ork and because the behaviors
e in a competitive market, the
whether measured as lost prof-
n measurement of damages in
e of the damages measurement
llectual property.

n intellectual property owner by
that person harmed the owner?
exclusively, the owner suffers
ng sales.[80] The owner may have
f infringement. Profits on these,
s on sales, the infringement fur-
rious effects on the owner's cost
have resulted in reduced econo-
ould have caused an increase in
; sales. Moreover, price erosion

caused by competition from the infringer could have reduced profitability on the owner's sales. In the absence of infringement, the owner would have had a monopoly (to a greater or lesser extent) on the intellectual property and could have charged monopoly prices. With infringement, the owner faced competition from the infringer. Such competition leads to lower prices.

If the owner would have both used the intellectual property and licensed it to others (i.e., a licensor/competitor owner), the court can consider several types of damages:

- To the extent that a competitor infringed, the owner lost sales. Even if the owner would have otherwise licensed to the infringer, the owner suffers losses because the royalty-free infringement reduced the infringer's costs. These lower costs, in turn, afforded the infringer lower prices and increased the number of sales over the sales level that the infringer would have achieved had the infringer paid for the use of the intellectual property.
- The added competition created price pressures on the owner that, because of the lowered prices in the market, lowered the owner's profits on the sales that the owner retained.
- The infringer deprived the owner of royalty payments.
- To the extent that the infringer competed with legitimate third-party licens-ees, those licensees in turn may have sold less and, as a result, made lower royalty payments to the owner than otherwise.

Would-be licensor/competitor owners will find irrelevant whether they receive reasonable royalties or lost profits because the reasonable royalty model includes lost profit damages. Why is this so? When calculating damages, one often assumes that in the but-for world the infringer would have used the next best alternative to the intellectual property, not the property itself. However, in the licensor/com-petitor situation, one assumes that in the but-for world the infringer would have licensed the property. The owner would structure the license so that price and total quantity would be as in the situation with no infringement. Thus, the portion of damages that looks like lost profits (part of the lower sales the owner made at lower prices) results from the infringer's not having paid a running royalty and a reasonable royalty calculation should include that portion.[81]

In addition to lost profits and reasonable royalty damages measures, the owner in some cases can also claim damages based on unjust enrichment (i.e., the amount by which the infringer has profited by the infringement). This remedy, which Section 19.3(e) of this chapter discusses in more detail, can result in a damages measure that exceeds a lost profits calculation when the infringer can use the intel-lectual property in question more effectively. For example, suppose an infringer could manufacture a product with lower costs using the intellectual property than the owner could; as a result, an award based on the infringer's profits might exceed an award based on the owner's lost profits. Moreover, the amount of the infringer's profits creates an upper limit on the amount of reasonable royalty that the owner can, in principle, recover. The amount of unjust enrichment represents a first approximation of the maximum amount available for a royalty payment. If the court required the infringer to pay more than the amount of the infringer's profits as a royalty, the infringer would have negative income and the court would invalidate the assumption underlying the reasonable royalty calculation.

**19 • 12   ECONOMIC ANALYSIS OF NONPATENT INTELLECTUAL PROPERTY**

### (b) Running Royalty versus Lump-Sum Royalty

When examining but-for royalty income, the expert must often decide what form the arrangement would have taken had one existed. Would the royalty have been a running royalty (e.g., a certain percentage of revenues or a per-unit charge) or a paid-up (lump-sum) license fee?

An expert should not arbitrarily choose between a running royalty and a lump-sum license fee. Instead, a variety of factors will favor one over the other. One factor considers the relative importance of the intellectual property. For example, if the expert finds that a relatively small (e.g., 0.1 percent of sales) running royalty would properly compensate the owner, the parties will more likely choose a lump-sum fee because of the relatively low value of the license and the relatively high cost of monitoring sales.

The expert must also decide whether the infringer/licensee would have had an exclusive license. If so, the owner/licensor and licensee would have more likely negotiated a lump-sum royalty because of a phenomenon known as *double marginalization*.[82] In essence, if the intellectual property has significant value, an exclusive licensee will have a measure of monopoly power. When paying a running royalty, the licensee will take the cost of the running royalty into account in deciding on pricing and production levels, resulting in the licensee producing too few items, at too high a price, to maximize the joint profits of the licensor and the licensee. A lump-sum royalty solves this problem and increases the profits split between owner/licensor and infringer/licensee.

A corollary situation exists in which the infringer/licensee will compete with the owner or with other licensees who pay running royalties. In a competitive situation, the owner maximizes profits attributable to the intellectual property by setting a running royalty at a level that raises total marginal cost (including the royalty) to the monopoly price. If all competitors paid a lump-sum royalty, they would ignore the sunk cost of their licenses and compete the price toward marginal cost. In such cases, the licensees might not recover their sunk costs, thus reducing the incentives to pay a lump sum. Hence, one might expect to see clauses in such licenses that would assure the licensee that the license terms will always equal, at a maximum, the most favorable license the owner grants.

One reason that the owner of significant intellectual property does not often license it to competitors relates to the following argument. For the owner to avoid putting the licensee at a competitive disadvantage, the owner would have to charge itself the same license royalty rate. An economically sophisticated owner would understand that this charge was a real opportunity cost in making a sale, because the owner takes such a sale from one of its licensees who would otherwise have paid the owner a running royalty. A would-be licensee, however, may wonder whether a sale-maximizing owner would ignore such opportunity costs in day-to-day competition. If so, the result could be a price war that would squeeze or eliminate the owner's profits. Nevertheless, in computing a reasonable royalty, one must assume that in the but-for world some solution to this problem exists and that the owner could convince the infringer (assumed to be a licensee in the but-for world) that the owner would take this opportunity cost into account in competing.

Experts also consider t[...]
and lump-sum royalties. [...]
alty shifts risks from the [...]
attributes, the expert mig[...]
thus informing the choice[...]

Existing licenses can a[...]
a lump-sum royalty. One [...]
ongoing widespread infr[...]
adjustment to remove the[...]
payment for a paid-up lic[...]
he or she has provided p[...]
sum royalty in a world w[...]

### (c) Reasonable Royalty ver[...]

Nonpatent intellectual pr[...]
royalty or lost profits. Ne[...]
expert should note that a [...]
ondary but foreseeable da[...]
and prices for the owner [...]
exceeds the result from a l[...]
competitive industries wit[...]
two measures, when appr[...]
conditions, an owner will [...]
regardless of whether the [...]

To illustrate, assume th[...]
shape superior for catchi[...]
The manufacturer uses th[...]
that it uses for other lure[...]
normal price of $5. In su[...]
charge a royalty of $5 pe[...]
will receive the same pro[...]

Slight variations to thi[...]
profits or a reasonable roy[...]
pose that the manufactur[...]
that a single firm can adv[...]
of costs for many such fir[...]
duce the lure and damage[...]
able royalty because a po[...]
of manufacture, distributi[...]

In another scenario, a[...]
ous channels. In this cas[...]
manufacturers to cover a[...]
licensing would then e[...]
would lose no (or fewer) [...]
infringer sold through ch[...]
ing licensees), a reasonal[...]
based on lost profits.

ust often decide what form
'ould the royalty have been
es or a per-unit charge) or a

unning royalty and a lump-
or one over the other. One
tual property. For example,
rcent of sales) running roy-
es will more likely choose a
he license and the relatively

licensee would have had an
see would have more likely
non known as *double margin-
gnificant value, an exclusive
en paying a running royalty,
into account in deciding on
ee producing too few items,
he licensor and the licensee.
ses the profits split between

iger/licensee will compete
unning royalties. In a com-
ributable to the intellectual
at raises total marginal cost
ll competitors paid a lump-
eir licenses and compete the
sees might not recover their
ump sum. Hence, one might
assure the licensee that the
ie most favorable license the

tual property does not often
iment. For the owner to avoid
e, the owner would have to
omically sophisticated owner
irtunity cost in making a sale,
its licensees who would oth-
would-be licensee, however,
ould ignore such opportunity
uld be a price war that would
ess, in computing a reasonable
some solution to this problem
iger (assumed to be a licensee
; opportunity cost into account

Experts also consider the effects of risk aversion in deciding between running and lump-sum royalties. Relative to a running royalty situation, a lump-sum royalty shifts risks from the licensor to the licensee. Perhaps because of size or other attributes, the expert might find that one party is more risk-averse than the other, thus informing the choice between running royalty and lump-sum royalty.

Existing licenses can also influence the choice between a running royalty and a lump-sum royalty. One must not, however, use licenses granted in the face of ongoing widespread infringement as evidence without making an appropriate adjustment to remove the effects of infringement. An infringer who makes a small payment for a paid-up license to a third-party competitor must not conclude that he or she has provided persuasive evidence that the court should award a lump-sum royalty in a world without infringement to the owner.

#### (c) Reasonable Royalty versus Lost Profits

Nonpatent intellectual property owners can estimate damages based on a reasonable royalty or lost profits. Neither measure serves as a floor on damages. However, an expert should note that a reasonable royalty calculation that includes the other secondary but foreseeable damages from failure to pay the royalty (e.g., reduced sales and prices for the owner or the other licensees) often will result in an amount that exceeds the result from a lost profits calculation. Moreover, for products produced in competitive industries with constant returns to scale and no significant sunk costs, the two measures, when appropriately calculated, should yield the same results. In such conditions, an owner will realize the full incremental benefit of intellectual property regardless of whether the owner produces the product, or others do and pay royalties.

To illustrate, assume that a manufacturer of fish lures discovers a lure color and shape superior for catching striped bass and holds this property as a trade secret. The manufacturer uses the same manufacturing process for the new superior lure that it uses for other lures. Assume that striped bass fishermen will pay twice the normal price of $5. In such a case, the owner can produce all the special lures or charge a royalty of $5 per lure or some combination of the two. The manufacturer will receive the same profits in any event.

Slight variations to this basic example show how damages based on either lost profits or a reasonable royalty can yield different calculated damages amounts. Suppose that the manufacturer must advertise the lure to educate buyers. Further assume that a single firm can advertise a specialty product for smaller total cost than the sum of costs for many such firms. In such a case, the owner will probably choose to produce the lure and damages based on lost profits will exceed those based on a reasonable royalty because a potential licensee would need to make enough over the cost of manufacture, distribution, royalty payments, and the cost of its own advertising.

In another scenario, assume that lure manufacturers distribute through various channels. In this case, the owner can maximize profits by licensing enough manufacturers to cover all the major distribution channels. The total profits from licensing would then exceed those from self-manufacture because the owner would lose no (or fewer) sales as a result of unserved distribution channels. If the infringer sold through channels different from those of the owner (and other existing licensees), a reasonable royalty damages award would likely exceed damages based on lost profits.

**19 • 14    ECONOMIC ANALYSIS OF NONPATENT INTELLECTUAL PROPERTY**

What about the case in which the owner has demonstrated that the owner would under no circumstances, short of legal compulsion, sell a license to the infringer? Should the court pretend such a license exists and then award reasonable royalty damages when, in fact, reasonable royalty damages exceed the owner's lost profits? To do so would make the owner better off than the owner would have been if infringement had not occurred. Hence, courts often compromise when reasonable royalty damages exceed lost profits and when the evidence shows that the owner would not have licensed to the infringer. In such cases, the courts should award an amount equal to lost profits (even if the amount is less than reasonable royalty damages) but no less than what a reasonable royalty payment from the infringer alone would have been (i.e., reasonable royalty damages excluding the effects on the owner's own sales and on its other licensees' sales). This exception prevents the infringer from profiting from infringement.

**(d) Calculating Sales in the But-For World**

In both lost profits and reasonable royalty damages calculations, the prices charged in the but-for world usually exceed the actual prices. In damages based on lost profits, the unlawful competition from the infringer will have expanded output and lowered the actual price below the but-for price. Similarly, in the case of damages based on a reasonable royalty, the infringer will have likely passed on to customers some or all of the cost savings the infringer enjoyed as a result of infringement. Thus, an expert must decide what prices and sales would have been in the absence of infringement, keeping in mind that higher prices mean lower sales quantities.

In certain situations, however, lower costs due to infringement do not significantly expand output and decrease price. Assume that environmentally contaminated underground tanks cost $10,000 to remove safely using an older technology. Then a firm invents and treats as a trade secret a process that costs $9,000. As long as the owner and the infringer (the trade secret thief) did not come to dominate the market (i.e., some competitors continued to use the old technology and retained their market share), then the prices would still be set under the influence of the cost of the old technology. In this type of case, infringement (theft of the trade secret) will not have resulted in a significantly lower price.

In any event, an expert should not make the unrealistic assumption in a lost profits case that the owner would have made all of its sales and all of the infringer's sales and made all of these sales at higher prices. Instead, higher prices should mean a lower combined number of units sold.

**(e) Unjust Enrichment**

This discussion has focused on making the property owner whole through payment of damages caused by the infringer. An infringed owner can also claim the infringer's profits (only to the extent such an amount does not duplicate other damages). Including the infringer's profit in the damages calculation will ensure that infringement does not enrich the infringer.[83] The law for each type of nonpatent intellectual property permits recovery of unjust enrichment (either as an explicit award labeled "unjust enrichment," or through allowing recovery of the

infringer's profits). We d
marks, and trade secrets i

**(f) Monopoly, Oligopoly, a**

Infringement usually char
and quantities made ava
enjoyed a monopoly-like
company, the infringer. In
competitive duopoly (i.e.,
polies can reach the comp
in between, the expert can
fall. If a period of no infr
relations and estimate the

Experts often estimate
after time periods—by us
how competitors interact
game theory allows the ex
or the likely choices of th
range from fully competi
likely prices and quantiti

Game theory models g
can show the power of t
secret that lowers the cos
steals and begins using th
percent of the market (as
units each; and they sell t
can derive models that a
charge if it alone had the t
price, and (3) the damage

For example, one gam
each competitor in a du
residual demand curve.[8
industry demand curve l
elasticity (i.e., sensitivity
elasticity divided by the
index, one assumes that
a markup over cost equa
one.[86] Thus, by using the
an expert can estimate th
lose 5 percent of sales (th

Next the expert can us
petitor's share of the ma
The residual demand ela
market demand elasticity
optimal monopoly price
competition. The inverse
cent [= $1/(2.5 - 1)$] mark

UAL PROPERTY

19.3   DAMAGES IN NONPATENT IP CASES   **19 • 15**

...trated that the owner would
...ll a license to the infringer?
...n award reasonable royalty
...xceed the owner's lost prof-
...e owner would have been if
...ompromise when reasonable
...idence shows that the owner
...es, the courts should award
...s less than reasonable royalty
... payment from the infringer
...ages excluding the effects on
...les). This exception prevents

...alculations, the prices charged
...es. In damages based on lost
...r will have expanded output
...rice. Similarly, in the case of
...r will have likely passed on to
...ringer enjoyed as a result of
...ces and sales would have been
...hat higher prices mean lower

...to infringement do not signifi-
...that environmentally contami-
...fely using an older technology.
...ocess that costs $9,000. As long
...f) did not come to dominate the
...e old technology and retained
... set under the influence of the
...nfringement (theft of the trade
...er price.

...nrealistic assumption in a lost
...its sales and all of the infringer's
...s. Instead, higher prices should

...erty owner whole through pay-
...ringed owner can also claim the
...mount does not duplicate other
...damages calculation will ensure
...[83] The law for each type of non-
... unjust enrichment (either as an
...hrough allowing recovery of the

infringer's profits). We discuss unjust enrichment related to copyrights, trademarks, and trade secrets in Sections 19.5(b), 19.6(c), and 19.7(c), respectively.

### (f) Monopoly, Oligopoly, and Game Theory

Infringement usually changes the nature of competition and, as a result, the prices and quantities made available in the marketplace. Where owners would have enjoyed a monopoly-like position, they find themselves competing with one other company, the infringer. Instead of a legal monopoly, the owner now faces a more competitive duopoly (i.e., a market with two competitors). Although in theory duopolies can reach the competitive price level, the monopoly price level, or anywhere in between, the expert can often show how much the competition caused prices to fall. If a period of no infringement occurs, the expert can calculate price and cost relations and estimate the but-for prices (adjusted for changes in cost and demand).

Experts often estimate the price effect—even if they lack precise before-and-after time periods—by using game theory. Economists use game theory to model how competitors interact and to estimate equilibrium prices and quantities. Using game theory allows the expert to map out factors such as each competitor's choices or the likely choices of the other competitor(s). Although prices in duopoly can range from fully competitive to monopolistic, game theory helps us find the most likely prices and quantities that would have existed in the but-for world.

Game theory models go beyond the scope of this chapter, although an example can show the power of this approach. Assume that someone discovers a trade secret that lowers the cost of producing an item from $170 to $100; the defendant steals and begins using the trade secret; the defendant and plaintiff each have 50 percent of the market (as a result of their lower costs) with sales of one million units each; and they sell the product for $125. Using these limited data, an expert can derive models that answer such questions as (1) the price the plaintiff would charge if it alone had the trade secret, (2) the volume the plaintiff would sell at that price, and (3) the damages the plaintiff would suffer from theft.

For example, one game theory model of competitor interaction concludes that each competitor in a duopoly (i.e., a two-supplier market) prices according to its residual demand curve.[84] In turn, each firm's residual demand curve equals the industry demand curve less the current production of its competitor. The demand elasticity (i.e., sensitivity to price) for each competitor equals the industry demand elasticity divided by the competitor's market share.[85] Further, using the Lerner index, one assumes that each competitor maximizes its profits at a price that is a markup over cost equal to the inverse of (the quantity of) that elasticity minus one.[86] Thus, by using the data in the previous example and this game theory model, an expert can estimate that for each 1 percent increase in price, the competitor will lose 5 percent of sales (the residual demand elasticity).[87]

Next the expert can use this residual demand elasticity, coupled with the competitor's share of the market, to estimate the entire market's demand elasticity.[88] The residual demand elasticity (5) times the market share (50 percent) results in market demand elasticity of 2.5. With this information, an expert can estimate the optimal monopoly price that the plaintiff would have enjoyed without the illegal competition. The inverse of (the quantity of) this elasticity minus one is a 66.7 percent [≈ 1/(2.5 − 1)] markup over cost, or a but-for price of $166.67. The elasticity

**19 • 16    ECONOMIC ANALYSIS OF NONPATENT INTELLECTUAL PROPERTY**

also suggests that at this price the plaintiff would have sold 974,000 units.[89] This analysis estimates lost profits at about $40 million, the difference between estimated profits of $65 million and the actual profits of $25 million.

An expert can modify this model to reflect different costs between the litigants, different economies of scale (or lack thereof), and the existence of constraining alternative technologies. For instance, assume that the old way of making the product costs $140 instead of $170. In that case, the owner of the trade secret would set a price just equal to (or slightly less than) $140 to prevent competition from the older technology. At that price, the owner of the trade secret would sell about 1.5 million units, for a total profit of $60 million.[90] Compared with actual profits of $25 million, the lost profit damages in this scenario would equal $35 million. Of course, if the owner of the trade secret would have made capital expenditures to increase capacity for this additional production, then these saved capital costs offset damages.

## 19.4    HOW NONPATENT INTELLECTUAL PROPERTY DAMAGES DIFFER FROM PATENT DAMAGES

Differences exist in the fundamental purpose of laws governing the various forms of intellectual property. Patent and copyright laws aim first to protect the inventor or author, to the eventual benefit of the public. However, patent law protects the inventor from all unauthorized uses, whereas copyrights protect authors only from copying and unjustified use. Trademark and trade secret laws focus not on protecting the inventor, but rather on the immediate protection of the public and on maintenance of business ethics, respectively. These differences in fundamental purposes drive differences in damages measurement for patent and nonpatent intellectual property cases. Factors occurring only in nonpatent intellectual property cases comprise the following:

- An ability to claim a damages award based on both the owner's losses and the infringer's gains;
- The owner's burden of proving only revenues in a claim for the infringer's profits;
- The infringer's burden to prove that the court should attribute only a portion of the infringer's profits to the infringer's wrongful act;
- The lack of a floor in damages calculations;
- The greater use of nonmonetary remedies; and
- The lack of a paradigm decision in the courts that addresses the damages calculation method.

This section discusses each of these factors. See the appendix for a comparison of the different types of intellectual property.

### (a) Claiming the Infringer's Profits

The intellectual property owner's ability to claim an award based on the infringer's gains or profits represents the most significant difference between patent and nonpatent intellectual property damages calculations. Although legislation in 1946

(35 U.S.C. § 289) removed damages in patent cases (e... related to any of the nonpat... on either the owner's own ... that double recovery does ... a damages measure means ... the owner has suffered eco... scienter (willfulness or bad ... ery of the infringer's profi... courts have awarded an in... ful or in bad faith. Howeve... necessary for an award of p... used as an estimate of the ... Calculating Infringer's Pro...

### (b) Owner's Burden of Proo...

In calculating a claim for ... lectual property cases gen... the discovery process or f... den of proving the specifi... the infringer's profits shif... many cases. Even with di... tage in ascertaining the in... intellectual property cases ... revenues (e.g., the printin... fact that no consensus am... nonpatent intellectual pro... prove incremental costs b... the appropriate measure ... cases, the infringer often ... success of this method wh... not increase incrementall... contributed to the realiza...

### (c) Apportionment of Infri...

The owner's recovery of ... cases should not exceed t... wrongful act. As a resul... presence and influence o... apportion its computed ... trademark case the infrin... and aesthetic qualities of ... addition to or instead of ... ers often argue for appo... a book with other work... subroutine of a comput...

UAL PROPERTY

ve sold 974,000 units.⁸⁹ This
he difference between esti-
$25 million.

r costs between the litigants,
ne existence of constraining
the old way of making the
ner of the trade secret would
revent competition from the
ade secret would sell about
ompared with actual profits
io would equal $35 million.
e made capital expenditures
nen these saved capital costs

Y DAMAGES DIFFER

governing the various forms
iim first to protect the inven-
However, patent law protects
pyrights protect authors only
trade secret laws focus not
diate protection of the public
. These differences in funda-
surement for patent and non-
only in nonpatent intellectual

n both the owner's losses and

in a claim for the infringer's

hould attribute only a portion
igful act;

s that addresses the damages

he appendix for a comparison

n award based on the infring-
difference between patent and
ns. Although legislation in 1946

(35 U.S.C. § 289) removed the availability of an infringer's profits as a measure of damages in patent cases (except for design patents), an owner bringing an action related to any of the nonpatent intellectual property rights can claim damages based on either the owner's own lost profits, the infringer's profits, or both (to the extent that double recovery does not result).⁹¹ The availability of an infringer's profits as a damages measure means that an owner might recover damages without proving the owner has suffered economic harm. As a result, certain courts require proof of scienter (willfulness or bad faith) on the infringer's part as a prerequisite to recovery of the infringer's profits. For example, in the case of trademark infringement, courts have awarded an infringer's profits only when the infringement was willful or in bad faith. However, the Ninth Circuit has held willful infringement to be necessary for an award of profits under an unjust enrichment theory, but not when used as an estimate of the plaintiff's damages.⁹² For more detail, see Chapter 22, Calculating Infringer's Profits in Trademark, Copyright, and Design Patent Cases.

### (b) Owner's Burden of Proof

In calculating a claim for the infringer's profits, laws governing nonpatent intellectual property cases generally provide that the owner bears the burden, through the discovery process or from public sources, of proving only revenues. The burden of proving the specific costs one should deduct from revenues to calculate the infringer's profits shifts to the infringer. This shift in burden is reasonable, in many cases. Even with discovery procedures, the owner remains at a disadvantage in ascertaining the infringer's cost structure, and in many types of nonpatent intellectual property cases, the infringer's costs are minimal as a percentage of its revenues (e.g., the printing costs of books). Complicating matters, however, is the fact that no consensus among courts exists as to which costs one should deduct in nonpatent intellectual property cases, unlike patent cases in which parties seek to prove incremental costs because courts generally agree on incremental profits as the appropriate measure of damages. Hence, in nonpatent intellectual property cases, the infringer often tries to deduct as many costs as possible.⁹³ One sees the success of this method when courts have endorsed the deduction of costs that did not increase incrementally with the level of infringing sales but that nonetheless contributed to the realization of those sales.

### (c) Apportionment of Infringer's Profits

The owner's recovery of the infringer's profits in nonpatent intellectual property cases should not exceed the portion of profits attributable to the infringer's alleged wrongful act. As a result, an infringer can argue that its profits result from the presence and influence of factors other than the alleged wrongful act and seek to apportion its computed profit amount based on those factors. For example, in a trademark case the infringer might argue that profits resulted from the functional and aesthetic qualities of its product, the quality of the sales force, and pricing, in addition to or instead of the alleged infringing mark. In a copyright case, infringers often argue for apportionment when the infringed work is, for example, in a book with other works, is part of an otherwise original musical play, or is a subroutine of a computer program. As with the cost calculation, the burden of

19 • 18    ECONOMIC ANALYSIS OF NONPATENT INTELLECTUAL PROPERTY

proving a reasonable approach to apportionment rests with the infringer. The copyright law requires that the infringer prove "the element of profit attributable to factors other than the copyrighted work."[94] Apportionment methods can and often do split profits even when the alleged infringing activity forms an integral part of an economic whole. This feature of nonpatent actions differs from the entire-market-value rule in patent cases in which the entire profit of a product containing an infringing element becomes a proper basis for recovery despite the contribution of noninfringing elements, provided the patentee shows that the patented characteristic represents a material reason for the sale of the product.[95]

### (d) Lack of Damages Floor

Damages based on a royalty applies to all types of intellectual property cases, including both patent and nonpatent actions. The patent statute, however, provides that damages in a patent case must equal or exceed a reasonable royalty. Assuming that the damages calculation for patent violation based on lost profits exceeds a calculation based on royalty, the royalty-based calculation sets an explicit floor for damages.[96] In contrast, whereas all nonpatent intellectual property actions permit royalty-based awards, the laws governing such actions do not provide for a royalty floor for damages. Furthermore—unlike patent cases—in trade secrets and most trademark cases, the court can find liability but no damages when the owner cannot establish that the owner lost profits and can neither (1) establish that the infringer realized profits because of its wrongful acts nor (2) prove willfulness by the infringer in jurisdictions that require this as a prerequisite to recovery of the infringer's profits.

### (e) Use of Nonmonetary Remedies

Several types of nonmonetary sanctions exist for actions involving intellectual property rights. These include temporary or permanent injunction (an enforceable order to stop producing and selling the item), seizing, impounding (the physical taking of the item) and destroying offending goods, excluding importation, and criminal penalties. In applying these sanctions, courts attempt to maintain a balance between free and unfettered commercial competition and protection of the property owner's rights. The courts use these nonmonetary sanctions more often in nonpatent cases.

For example, in the midst of the Beanie Babies craze, Goffa International began producing a line of Bean Bag Friends strikingly similar to the Friendly Pebble Pets made by Imperial Toy Corp. (Neither Imperial nor Goffa sold Beanie Babies. We mention Beanie Babies only for context.) Imperial showed that Goffa had copied its work with "substantially similar" elements. The court granted Imperial's motion for a preliminary injunction, enjoining Goffa from "importing, manufacturing, distributing, advertising or selling" nine of the ten toys in its catalog.[97]

Some would say that this decision reflects a historical preference on the part of the courts for injunction as a resolution to Lanham Act matters. Some attribute this preference to the difficulty in isolating the owner's harm or the infringer's gain caused solely by the wrongful act when a complex array of factors contribute to a product's success in the marketplace and the perception that proving monetary damages requires "something more."[98]

In copyright cases, wh [...] *prima facie* case for infring [...] continues, the court can i [...] impounding of infringing [...] court can impose a perma [...] goods. The court can als [...] terms, in cases of willful [...] cial advantage."[99]

If the court finds the i [...] order impounding and [...] under RICO laws.[100] In [...] offending advertising ma [...] secrets in some cases prov [...]

The Supreme Court ru [...] will not always follow a f [...] cases also are not automa [...] have not decided whethe [...] agree about the effects of [...] texts. Some authors belie [...] subject to the same revie [...] ment.[103] Others disagree b [...] exclusive jurisdiction of t [...] law.[104] Another commen [...] trade secrets cases will li [...] ents, courts will rarely de [...] defined trademarks and [...] (for the purpose of remov [...]

### (f) The Absence of Paradig

Compared with patent [...] erty cases have attempt [...] approaches to damages. [...] lent to the widely cited [...] which the court presente [...] alty for a patent. (Chapte [...] paradigm cases allows fo [...] damages in nonpatent ca [...] approaches. Thus, partie [...] in the particular venue w [...]

### 19.5   DAMAGES ISSUE

The owner of an infringe [...] ing the following:

1. Actual damages to [...]
2. The infringer's pro [...]

sts with the infringer. The
ement of profit attributable

ofits even when the alleged
omic whole. This feature of
lue rule in patent cases in
nfringing element becomes
of noninfringing elements,
eristic represents a material

intellectual property cases,
t statute, however, provides
reasonable royalty. Assum-
ased on lost profits exceeds a
tion sets an explicit floor for
tual property actions permit
s do not provide for a royalty
;—in trade secrets and most
ages when the owner cannot
1) establish that the infringer
ve willfulness by the infringer
overy of the infringer's profits.

ctions involving intellectual
ent injunction (an enforceable
g, impounding (the physical
, excluding importation, and
ts attempt to maintain a bal-
petition and protection of the
onetary sanctions more often

ze, Goffa International began
lar to the Friendly Pebble Pets
Goffa sold Beanie Babies. We
showed that Goffa had cop-
The court granted Imperial's
a from "importing, manufac-
he ten toys in its catalog.[97]
torical preference on the part
m Act matters. Some attribute
ner's harm or the infringer's
lex array of factors contribute
perception that proving mon-

In copyright cases, when the court believes that the copyright owner has a *prima facie* case for infringement and will suffer irreparable harm if infringement continues, the court can issue a preliminary injunction or order the seizing and impounding of infringing goods before a trial. If the owner prevails at trial, the court can impose a permanent injunction and order the destruction of impounded goods. The court can also levy criminal sanctions, including fines and prison terms, in cases of willful copyright infringement for "personal profit or commercial advantage."[99]

If the court finds the infringement to constitute counterfeiting, the court can order impounding and destruction of offending goods and criminal sanction under RICO laws.[100] In false advertising cases, courts have ordered recalls of offending advertising material.[101] Finally, the state laws governing theft of trade secrets in some cases provide for criminal penalties.

The Supreme Court ruling in *eBay v. MercExchange* instructs that an injunction will not always follow a finding of patent infringement.[102] Injunctions in copyright cases also are not automatic. In trademark and trade secret cases, however, courts have not decided whether injunctions should be automatic. Commentators disagree about the effects of *eBay v. MercExchange* on trademark and trade secret contexts. Some authors believe that similarities make injunctions in trademark cases subject to the same review as required for cases of patent or copyright infringement.[103] Others disagree because copyright and trademark cases are not within the exclusive jurisdiction of the federal circuit and may be subject to particular state law.[104] Another commentator predicts that, while injunctions in trademark and trade secrets cases will likely undergo the same review as that required for patents, courts will rarely deny them because of the public interest in having clearly defined trademarks and the short-term nature of injunctions in trade secret cases (for the purpose of removing any head start advantage).[105]

### (f) The Absence of Paradigm Decisions

Compared with patent law, few decisions in other types of intellectual property cases have attempted to establish frameworks or paradigms for general approaches to damages. The nonpatent intellectual property law has no equivalent to the widely cited *Georgia-Pacific Corp. v. United States Plywood Corp.*,[106] in which the court presented 15 factors to consider in calculating a reasonable royalty for a patent. (Chapter 20 discusses these factors.) The relative absence of such paradigm cases allows for more creative approaches in calculating and rebutting damages in nonpatent cases but also introduces uncertainty regarding acceptable approaches. Thus, parties involved in these suits should search for any precedents in the particular venue where a court will decide the current case.

## 19.5  DAMAGES ISSUES SPECIFIC TO COPYRIGHT INFRINGEMENT

The owner of an infringed work has several damages remedies available, including the following:

1. Actual damages to the copyright owner;
2. The infringer's profits or unjust enrichment;

3. Both (1) and (2) to the extent that double counting does not occur;
4. Statutory damages;
5. Other remedies such as costs, attorney's' fees, prejudgment interest, and punitive damages; and
6. Impoundment and injunction, which the courts often employ when the owner has not suffered monetary damages and the infringer has not realized monetary gains.

This section examines each of these remedies, with the exception of impoundment and injunction, which we discussed in Section 19.4(e). See the appendix for a comparison of various aspects of copyrights with those of other types of intellectual property.

### (a) Damages to the Copyright Owner

The owner of an infringed copyrighted work "is entitled to recover the actual damages suffered by him or her as a result of the infringement" (17 U.S.C. § 504(b)).[107] Actual damages awarded under the Copyright Act of 1976 should compensate the copyright owner for the fair value of the infringed work. Courts follow two approaches, depending on whether the owner and infringer sell their relevant products in the same market: if they do, then one looks to the owner's sales lost to the infringer; if not, one assesses the market value of the property or a reasonable royalty.[108] One commentator summarized the approach to actual damages by noting that "conceptually, all measures of copyright damages are measures of market value. The willing buyer-willing seller measure, the reasonable royalty measure and, indeed, the lost sales measure simply represent different routes to computing market value."[109] Owners use the following five elements to calculate this loss of market value.

*(i) License or Usage Rate Established by Earlier Authorized Use or Unfulfilled Contracts*    Owners can establish their damages by using the actual royalty rate or other license rate that the owner established prior to the infringement. Royalty rates apply to creative works (e.g., a song), and technical works (e.g., encryption software) and to works that have both technical and creative elements (e.g., architectural plans).[110] For example, in software cases, the owner could have suffered lost profits or damages that experts can calculate as the established license rate multiplied by the number of central processing units (or other license units) on which the infringer has used the work.[111]

*(ii) Appropriate Trade Customs or Standard Industry Practices*    Parties use industry experts who have negotiated licenses or royalties for comparable works in the past to establish the royalty rate or license fee that the owner should have received. This approach often offers the best method when the copyright holder has not issued licenses to any party.

However, when the owner has not agreed to licensing in the past, an expert can consider the industry standard as the minimum amount for damages measurement. Some artists oppose licensing or commercial use of their work to an extent that industry standards or averages might understate the amount it would have required to induce them to license. For example, in *Cary Grant v. Esquire, Inc.*,[112] the

---

court found that a higher t[...]
Cary Grant had not previo[...]
though Cary Grant brough[...]
importance of looking to th[...]
could consider damages.

*(iii) Lost Profits of the Copyri[...]*
and the infringer compete[...]
the factors that an expert[...]
world. After experts mak[...]
tal costs associated with th[...]
have achieved and for whi[...]
words, from the lost sales [...]
that change as sales vary [...]
that the longer the period[...]
variable costs: in the long[...]

*(iv) Market Value and Reasonal[...]*
approaches when the own[...]
market value method, th[...]
rate—no more than what [...]
the infringer would have [...]
have agreed to through b[...]
context when establishing[...]
term, reasonable royalty, i[...]
often uses "reasonable ro[...]
previous license, employe[...]
These methods seek to esti[...]
have agreed to through ba[...]
prior licenses to inform th[...]
to prior licenses, and, if n[...]
market value method.[116]

*(v) Cost to Create or Duplicat[...]*
duplicated work has no [...]
infringing material such [...]
the infringer's cost saving[...]
to develop or create the [...]
lysts often factor these co[...]
approach violates the fu[...]
that the value of the wor[...]
fails to consider any time[...]
ket earlier than it would [...]
uct. Experts should consi[...]

### (b) Infringer's Profits (or U[...]

The Copyright Act of 19[...]
are attributable to the in[...]
actual damages" (17 U.S[...]

AL PROPERTY

ɡ does not occur;

prejudgment interest, and

ts often employ when the
the infringer has not real-

the exception of impound-
9.4(e). See the appendix for
hose of other types of intel-

ed to recover the actual dam-
ment" (17 U.S.C. § 504(b)).[107]
of 1976 should compensate
ed work. Courts follow two
infringer sell their relevant
ks to the owner's sales lost to
the property or a reasonable
ch to actual damages by not-
nages are measures of market
reasonable royalty measure
different routes to computing
nents to calculate this loss of

e or Unfulfilled Contracts   Own-
l royalty rate or other license
ɡement. Royalty rates apply
ks (e.g., encryption software)
e elements (e.g., architectural
could have suffered lost prof-
blished license rate multiplied
er license units) on which the

s   Parties use industry experts
nparable works in the past to
her should have received. This
opyright holder has not issued

nsing in the past, an expert can
amount for damages measure-
l use of their work to an extent
tate the amount it would have
*Cary Grant v. Esquire, Inc.,*[112] the

court found that a higher than average license rate was appropriate because actor Cary Grant had not previously allowed commercial licensing of his identity. Even though Cary Grant brought this case as a right of publicity issue, it illustrates the importance of looking to the value in the specific situation and how the trier of fact could consider damages.

*(iii) Lost Profits of the Copyright Holder*   Experts use this method when the owner and the infringer compete in the same market. Sections 19.3(a) and (d) discussed the factors that an expert should consider in estimating lost sales in the but-for world. After experts make such an estimate, they must subtract the incremental costs associated with those lost sales to measure the profits the owner would have achieved and for which the infringer should compensate the owner. In other words, from the lost sales revenue, the expert subtracts variable costs—those costs that change as sales vary between the actual level and the but-for level.[113] Note that the longer the period of infringement, the greater the number and level of variable costs: in the long run, all or most costs vary with output.

*(iv) Market Value and Reasonable Royalty to the Copyright Holder*   Experts use these related approaches when the owner and infringer operate in different markets. With the market value method, the expert seeks to approximate an appropriate royalty rate—no more than what the owner would have accepted and no less than what the infringer would have paid—by establishing the license fee the parties would have agreed to through bargaining.[114] Experts employ this concept in the patent context when establishing a *reasonable royalty*. One might think to use the same term, reasonable royalty, in the copyright context. The copyright context, however, often uses "reasonable royalty" to refer to an established royalty, earned from a previous license, employed to estimate what the defendant should have paid.[115] These methods seek to estimate what compensation the owner and infringer would have agreed to through bargaining with the reasonable royalty method looking to prior licenses to inform the outcome of that bargaining. In practice, one can look to prior licenses, and, if none exists (but even when one or more do), turn to the market value method.[116]

*(v) Cost to Create or Duplicate*   Experts will find this approach useful only when the duplicated work has no resale value of its own and is mixed in with other, noninfringing material such as software used in operations. This method focuses on the infringer's cost savings, that is, the cost the infringer would have had to pay to develop or create the work independently (e.g., in-house programmers). Analysts often factor these cost savings into an assessment of market value. The cost approach violates the fundamental axiom that "cost does not equal value" and that the value of the work provides the appropriate measure. This approach also fails to consider any time savings that the infringer achieved by entering the market earlier than it would have had it developed rather than duplicated the product. Experts should consider this a fallback approach.

**(b) Infringer's Profits (or Unjust Enrichment)**

The Copyright Act of 1976 permits recovery of "any profits of the infringer that are attributable to the infringement and are not taken into account in computing actual damages" (17 U.S.C. § 504 (b)). Hence, one can measure damages as the

seller's (i.e., infringer's) revenues less the costs it incurred to realize those sales, as Section 19.4(a) discusses. For example, one can measure the infringer's profit by its incremental gross margin, although—as noted in Section 19.4(b)—no consensus exists regarding the nature of costs subtracted to calculate the infringer's profits. In calculating this incremental gross margin, the expert should consider the following elements.

*(i) Burden of Proof for Revenues*    The burden of proof for an infringer's revenues falls on the copyright owner (17 U.S.C. § 504(b)).

*(ii) Burden of Proof for Costs*    Once the owner establishes the infringer's gross revenue, the burden shifts to the infringer "to prove his deductible expenses and the elements of profit attributable to factors other than the copyrighted work."[117] If the infringer fails to prove deductible expenses, the owner can recover gross revenues as profits.[118]

The expert can use two approaches when deciding which costs to deduct. The first approach deducts a portion of all common costs shared by an infringing work and other works of the infringer, reasoning that the infringing work is only one of many items that the infringer produces and should carry its share of all the costs. The owner prefers the second, opposing approach that the computation should deduct only incremental costs of producing the infringing work, since eliminating portions of overhead costs unrelated to the infringing work from consideration increases the profit of the infringing work. Advocates of this view argue that the infringing work adds incrementally to the infringer's profits so one should evaluate costs in like fashion when evaluating the infringer's profits.

For example, assume that a particular common cost does not appear to have increased with the additional production related to an infringing work. The first approach would result in the deduction of a share of that cost (perhaps based on a percentage of revenues) in ascertaining the profitability of the infringing product. The second approach would subtract the cost only if it appeared incremental to the production of the infringing work. That is, the infringer's expert would lower the profits of the infringing work to account for the cost only if he or she could show that production of the infringing work caused this cost to be higher and then only by the increase in cost that the production caused.

*(iii) Costs Deductible in Calculating the Infringer's Profits*    Case law indicates that the damages calculation should include only costs that would have been saved but for the production or sale of the infringing product, but it is "an inherent part of the defendant's burden to produce adequate and acceptable evidence to its costs."[119] These represent the variable costs of producing or using the infringing work, such as the license fee that the infringer would have had to pay the copyright owner,[120] the duplication costs,[121] and contractors hired for producing the work.[122]

The decision in *Jarvis v. A&M*[123] included an extensive list of deductible and nondeductible items. The court allowed deductions for sales discounts, distribution fees, manufacturing, packaging, artwork, recording costs, and promotion and marketing of the infringing work. The court did not allow deductions for items sold and returned, artist and mechanical royalties, a parent company service charge unrelated to the infringing work, and other overhead.

*(iv) Possible Deductibility of* activities other than the righted works, it must travel were incurred be "that would be incurred they cannot be avoided cating overhead expense cannot be done with pr ably acceptable formula barred willful (or know Chapter 22 also discusse

*(v) Apportionment (Alloca* the 1940 case *Sheldon v* affirmed a lower court's work) and award to the larger work that include award based on "only t of the copyrighted mate supplied."[131] The Copyr to apportion some of th *other than* the copyrighte ing those other factors. defendant's profits resu different factors, it will

In "doubtful cases, co cuit stated that the "burd of elements other than t of such a calculation doe it did not require mathe In *Wesley Walker v. Forb* arise in the calculations

When estimating da the infringing work's qu overall work. One cour ing power of the [defer 1991 case, singer Gilbe for sampling (i.e., inclu "Alone Again (Natural sampled only three wo hit, but the court conclu again, naturally," was a

Courts have found a on expert testimony. E regression helpful, part infringing element und

When the courts can tributed to the infringe the profits from the infr

incurred to realize those sales,
measure the infringer's profit
...ted in Section 19.4(b)—no con-
...cted to calculate the infringer's
...gin, the expert should consider

for an infringer's revenues falls

...lishes the infringer's gross rev-
...his deductible expenses and the
...the copyrighted work."[117] If the
...wner can recover gross revenues,

...ding which costs to deduct. The
...sts shared by an infringing work
...e infringing work is only one of
...ld carry its share of all the costs,
...ch that the computation should
...fringing work, since eliminating
...nging work from consideration
...cates of this view argue that the
...er's profits so one should evalu-
...nger's profits.

...n cost does not appear to have
... to an infringer. The first
... of that cost (perhaps based on a
...ability of the infringing product,
...only if it appeared incremental
...is, the infringer's expert would
...unt for the cost only if he or she
...ork caused this cost to be higher
...duction caused.

...fits   Case law indicates that the
...that would have been saved but
...oduct, but it is "an inherent part
...e and acceptable evidence to its
...producing or using the infring-
...nger would have had to pay the
...contractors hired for producing

...extensive list of deductible and
...ions for sales discounts, distribu-
...recording costs, and promotion
...art did not allow deductions for
...oyalties, a parent company service
...er overhead.

*(iv) Possible Deductibility of Overhead Costs*   "If the infringer is engaged in business activities other than the production, distribution, performance or display of copyrighted works, it must prove that expenses such as rent, salaries, telephone and travel were incurred because of the infringement."[124] One court noted that costs "that would be incurred anyway should not be subtracted, because by definition they cannot be avoided by curtailing the profit-making activity."[125] Because "allocating overhead expenses between infringing and noninfringing activities usually cannot be done with precision,"[126] the courts have required only that a "reasonably acceptable formula be established."[127] On the other hand, some courts have barred willful (or knowing)[128] infringers from deducting any overhead costs.[129] Chapter 22 also discusses the calculation of infringer's costs.

*(v) Apportionment (Allocation) of Overall Profitability to the Infringing Component*   In the 1940 case *Sheldon v. Metro-Goldwyn Pictures Corp.*, the U.S. Supreme Court affirmed a lower court's decision to apportion (allocate a value to the infringed work) and award to the copyright owner a part of the total profits earned by a larger work that included the infringing element within it.[130] The Court upheld the award based on "only that part of the profits found to be attributable to the use of the copyrighted material as distinguished from what the infringer himself has supplied."[131] The Copyright Act of 1976 follows *Sheldon* by allowing the infringer to apportion some of the revenues to "the element of profit attributable to factors *other than* the copyrighted work"[132] but places on the infringer the burden of proving those other factors. The House report notes, however, that "where some of the defendant's profits result from the infringement and other profits are caused by different factors, it will be necessary for the court to make an apportionment."[133]

In "doubtful cases, courts should err on the side of generosity."[134] The Ninth Circuit stated that the "burden of proving apportionment (i.e., the contribution to profits of elements other than the infringed property), is the defendant's."[135] The precision of such a calculation does not limit its feasibility. The court in *Sheldon* confirmed that it did not require mathematical exactness but only a "reasonable approximation."[136] In *Wesley Walker v. Forbes*, the Fourth Circuit notes that "fiendish difficulties" can arise in the calculations and that the courts cannot apply "hard and fast rules."[137]

When estimating damages by apportionment, the expert should not consider the infringing work's quantitative share of the total but rather its *relative value* to the overall work. One court stated that it must "consider the relative quality or drawing power of the [defendant's] show's various components."[138] For example, in a 1991 case, singer Gilbert O'Sullivan sued performer Biz Markie and eight others for sampling (i.e., including without permission) a small portion of O'Sullivan's "Alone Again (Naturally)" in Markie's song "Alone Again." The infringing work sampled only three words and eight bars of the music from O'Sullivan's earlier hit, but the court concluded that what it borrowed, particularly the words "Alone again, naturally," was an important part of the work.[139]

Courts have found apportioning sales value a subjective exercise, usually based on expert testimony. Experts find mathematical estimating techniques such as regression helpful, particularly if the infringer sold the work with and without the infringing element under similar conditions.

When the courts cannot calculate a fair apportionment and many elements contributed to the infringer's profits, the Copyright Act of 1976 gives the owner all the profits from the infringing sale. The act does not, however, address the proper

**19 • 24    ECONOMIC ANALYSIS OF NONPATENT INTELLECTUAL PROPERTY**

approach when the infringer does not sell the work directly but uses it as part of an advertisement or the operations of the company, such as proprietary software. Some case law has addressed this question. In *Estate of Vane v. The Fair, Inc.*, the court recognized that the use of copyrighted photographs in a television commercial for a retail store was not the only source of profits to the store after the commercial ran.[140]

*(vi) Indirect Profits*   Damages can include the profits earned by an infringer from any of its operations that the infringement enhanced and the enhancement may be indirect. For example, in *Frank Music v. MGM*, the court awarded damages in part on the infringer's increased hotel and gaming operations that resulted from including a copyrighted song in one of its stage performances.[141] The increased revenues related to the stage performance would involve direct profits, the increased revenue from additional guests drawn to the hotel because of the stage performance and gambling during their stays would involve indirect profits. This theory also applies to cases in which the infringer has used a copyrighted work in an advertisement because even though the infringer does not sell advertisements (typically considered an expense), the infringement contributes to the infringer's overall profitability.[142]

A theory adapted from patent practice provides another method for estimating the value of an infringed work when the infringer does not sell the item itself but uses it in business operations.[143] Under this method, the property's overall value equals some multiple of the appropriate royalty rate. Substantial industry experience exists regarding the relation between royalties paid to a patent holder and the profitability of the intellectual property to the licensor.[144] The literature suggests that, on average, the licensed property receives between 25 and 33 percent of the licensor's expected overall profitability from the activity or work incorporating the licensed property. In other words, a work's expected profitability equals three to four times the amount paid to the owner of the contributing intellectual property.[145] The literature itself presents these rates as approximations, and specific individual results based on all the factors affecting a royalty negotiation will be higher or lower. This approach, however, can provide a useful starting point in the calculation process. Practitioners, however, should note that the Federal Circuit rejected the use of the 25 percent rule in *Uniloc USA, Inc., v. Microsoft,* 632 F.3d 1292 (Fed. Cir. 2011). Finally, a copyright owner can recover the value of receiving credit as the author and any related loss of goodwill.

*(vii) Value in Use*   To estimate the infringer's profitability, courts also consider value in use—the value from the infringer's internal perspective. One case characterized the funds not spent on licensing as available to expand the business and generate additional profits to the infringer.[146] This approach resembles damages suffered when the infringer uses the product in advertising because the infringer does not directly resell the product, but the infringed work contributes to the infringer's overall profitability. The expert can approximate the value in use by examining the following:

- The infringer's other contracts in force or in negotiation for an equivalent product;
- Appropriate trade or customs in the industry; and
- A reasonable royalty or license fee found in the industry.

**19.5   DAMA**

This theory also resem ized through lower opera to a creative work. Cour infringed software but us saved through reduced c ment, to expand the busi has not incurred royalty not-for-profit entities bec infringed work.

**(c) Statutory Damages**

Unlike patent cases, 17 U. right infringement. Hence based damages and cann receive an award. The am ranges from $750 to $30,0 owners elect to have statu owner must have register publication, however, to r does not register an unpu

If the owner proves to a maximum of $150,0 infringement and had n can decrease the award damages when infringer copyrighted work in the institution or public bro

For an example of st *Productions, Inc., v. McD* ascertain which sales had had not. Without knowi not measure the infringe on the following:

- The number of cop
- The number of infr
- Whether the plainti
- The amount that sh ment.

Hence, the plaintiff commercials times $6,00 items times $5,000 per i infringement. The court 114 commercials and ea separate infringements. or promotional item wa of how many times the

lirectly but uses it as part of
uch as proprietary software.
*of Vane v. The Fair, Inc.,* the
graphs in a television com-
profits to the store after the

ned by an infringer from any
he enhancement may be indi-
awarded damages in part on
that resulted from including a
he increased revenues related
s, the increased revenue from
ge performance and gambling
theory also applies to cases in
n advertisement because even
ically considered an expense),
l profitability.[142]

nother method for estimating
oes not sell the item itself but
. the property's overall value
e. Substantial industry experi-
s paid to a patent holder and
licensor.[144] The literature sug-
between 25 and 33 percent of
e activity or work incorporat-
s expected profitability equals
of the contributing intellectual
s as approximations, and spe-
ting a royalty negotiation to
ovide a useful starting point in
ould note that the Federal Cir-
USA, Inc., v. Microsoft, 632 F.3d
a recover the value of receiving
ll.

ility, courts also consider value
pective. One case characterized
pand the business and generate
h resembles damages suffered
; because the infringer does not
k contributes to the infringer's
the value in use by examining

n negotiation for an equivalent

; and
he industry.

This theory also resembles a patent infringement claim because savings real-
ized through lower operating costs can result from an infringed device as opposed
to a creative work. Courts apply this approach when the infringer does not sell
infringed software but uses it in its operations. Under this approach, any money
saved through reduced expenses becomes available, as a result of the infringe-
ment, to expand the business and generate additional profits because the infringer
has not incurred royalty costs. Courts also apply this approach in cases involving
not-for-profit entities because they usually generate little or no revenue from an
infringed work.

### (c) Statutory Damages

Unlike patent cases, 17 U.S.C. § 504(c) makes statutory remedies available for copy-
right infringement. Hence, even when the owner fails to prove lost profits or royalty-
based damages and cannot prove enrichment to the infringer, the owner can still
receive an award. The amount the owner can elect to receive as statutory damages
ranges from $750 to $30,000 per infringement. At any time prior to final judgment,
owners elect to have statutory damages awarded either by judges or by a jury.[147] The
owner must have registered for a copyright at most three months after the work's first
publication, however, to receive statutory damages for a published work. If the owner
does not register an unpublished work, the owner cannot seek statutory damages.[148]

If the owner proves willful infringement, the court can increase an award
to a maximum of $150,000. If infringers establish that they did not know of the
infringement and had no reason to believe that they were infringing, the court
can decrease the award to a minimum of $200. Courts can award zero statutory
damages when infringers reasonably believe that they acted within fair use of the
copyrighted work in the course of their employment by a nonprofit educational
institution or public broadcasting entity, library, or archive.[149]

For an example of statutory damages, consider *Sid & Marty Krofft Television
Productions, Inc., v. McDonald's Corporation, et al.,* wherein the trial court could not
ascertain which sales had resulted from the infringing advertising and which sales
had not. Without knowing the infringing sales, the trial court decided that it could
not measure the infringer's profits and instead awarded statutory damages based
on the following:

* The number of copyrights involved;
* The number of infringements;
* Whether the plaintiff notified the defendants of the infringement; and
* The amount that should be awarded for each of the various types of infringe-
ment.

Hence, the plaintiff received $1,044,000 based on (1) 114 different infringing
commercials times $6,000 per infringement, (2) 66 different infringing promotional
items times $5,000 per infringement, and (3) 60 other infringing acts times $500 per
infringement. The court rejected the owner's claim that each airing of each of the
114 commercials and each sale of the 66 infringing promotional items represented
separate infringements. Instead, the court held that a single infringing commercial
or promotional item was one part of a single continuous infringement regardless
of how many times the defendant aired or sold it.[150]

In another example (*Maverick Recording Company, et al. v. Whitney Harper*),[151] the court imposed a statutory damages remedy and rejected the defendant's innocent infringer defense. The case involved music downloading where the infringer claimed naiveté regarding copyright protection. Innocence is typically not a defense in such situations,[152] and the court did not find exception in this case, explaining that the defendant "contended only that she was too young and naïve to understand that the copyrights on published music applied to downloaded music," and ruled that "the plain language of the statute shows that the infringer's knowledge or intent does not affect its application" and so a lack of legal sophistication does not make one an innocent infringer.[153] The court awarded the plaintiff $750 damages per infringed work.[154]

### (d) Other Remedies

The Copyright Act of 1976 states, "In any civil action under this title, the court in its discretion may allow the recovery of full costs by or against any party other than the United States or an officer thereof. Except as otherwise provided by this title, the court may also award a reasonable attorney's fee to the prevailing party as part of the costs." As with statutory damages, these become recoverable only if a party infringes after the copyright owner has registered the work with the U.S. Copyright Office or, if a party infringes before registration, the copyright owner registers within three months of publication. Courts do not agree on whether to award prejudgment interest in copyright matters but the trend is toward awarding prejudgment interest.[155]

"Although courts have not categorically excluded the possibility of punitive damage awards in copyright cases, they award them only rarely."[156] Practitioners suggest that the rate or level of compensatory damages often reflects the trier of fact's outrage at the infringer's willfulness. For example, in *Waits v. Frito-Lay, Inc.*, singer-songwriter Tom Waits received compensatory and punitive damages.[157] He refused to do commercials or allow his music to be used in them. The court estimated the unauthorized use would reduce his fee by $75,000 should he ever change his mind, yet awarded punitive damages totaling $2 million.

## 19.6    DAMAGES ISSUES SPECIFIC TO TRADEMARK INFRINGEMENT AND FALSE ADVERTISING

As Section 19.2 discusses, the Lanham Act is the primary source of law for trademarks and false advertising and combines the common law remedy of an owner's damages with the equitable remedy of an infringer's profits. Hence, the court can award the owner both its damages and the infringer's profits, as shown in *Veryfine Products, Inc., v. Colon Brothers, Inc.*[158] An owner, however, generally will not receive compensation for both damages and the infringer's profits for the same sale.[159] The courts intend that awards, whether of damages or profits, compensate for the infringement, although some also regard as acceptable the award of profits as a means of deterring future infringement.[160] The appendix of this chapter compares various aspects of trademarks with those of other types of intellectual property.

**IAL PROPERTY**

*al. v. Whitney Harper*),[151] the
·cted the defendant's inno-
loading where the infringer
nocence is typically not a
find exception in this case,
ne was too young and naïve
sic applied to downloaded
te shows that the infringer's
nd so a lack of legal sophisti-
e court awarded the plaintiff

1 under this title, the court in
y or against any party other
is otherwise provided by this
y's fee to the prevailing party
se become recoverable only if
stered the work with the U.S.
stration, the copyright owner
s do not agree on whether to
ut the trend is toward award-

led the possibility of punitive
m only rarely."[156] Practitioners
nages often reflects the trier of
mple, in *Waits v. Frito-Lay, Inc.*,
tory and punitive damages.[157]
to be used in them. The court
fee by $75,000 should he ever
otaling $2 million.

**·RK INFRINGEMENT**

rimary source of law for trade-
·mon law remedy of an owner's
·er's profits, as shown in *Very-*
·her, however, generally will not
· infringer's profits for the same
· damages or profits, compensate
· as acceptable the award of prof-
[160] The appendix of this chapter
ose of other types of intellectual

## (a) Standards for Injunctive Relief and Monetary Recovery

A finding of trademark infringement will not necessarily result in a monetary award. Courts tend to distinguish between the standard of proof required to establish a right to injunctive relief and that required to establish a right to damages, as seen in *Camel Hair and Cashmere Institute of America v. Associated Dry Goods Corp.*[161] Establishing a likelihood of confusion between trademarks will generally support an injunction to prevent continued infringement.[162] However, courts appear to require a standard of proof for monetary recovery that exceeds the rigor of the likelihood-of-confusion standard required for an injunction. In other words, the owner seeking damages must establish actual harm or, at a minimum, confusion resulting from the infringement for an award of damages. The testimony of confused customers found in survey evidence offers one possible proof of confusion[163] although in at least one case, the court found a simple assessment of the nature of the products and the markets in which they were sold sufficient to establish confusion.[164]

Moreover, some venues require a showing of bad faith for an award of damages or profits. Courts have defined bad faith to include the following:

- Fraud or palming off of one's goods as those of another;
- Deliberate intent to cause confusion, mistake, or deception among purchasers;
- Wanton and intentionally fraudulent action; and
- Any infringement done knowingly and with callous disregard of the mark holder's or competitor's rights.[165]

Even though the federal circuit courts lack consensus on how much confusion, bad faith, or both, an owner must show to obtain an infringer's profits, the following framework, approved by the First Circuit and observed in *Aktiebolaget Electrolux v. Armatron*,[166] encompasses many of the criteria applied by different circuits:

1. An owner seeking damages must prove actual harm caused by the infringement, such as lost sales. In demonstrating harm, the owner can establish an adequate basis by showing that confusion existed.
2. An award of the infringer's profits requires that the products compete directly, such that the infringer's profits would have gone to the owner but for the infringement.
3. Guideline (2) becomes less restrictive if bad faith exists, such that a court may presume actual harm.
4. Where the establishment of bad faith bypasses the usual rule of actual harm, courts base recovery on an unjust enrichment or deterrence theory.

In the final analysis, the court's equitable discretion will determine the right to any monetary recovery.[167]

## (b) Calculating Damages (Owner's Lost Profits)

Owners have advanced several types of claims under the Lanham Act. In economic terms, most represent some type of lost profits, including profits on projected future lost sales, price erosion, and actual and projected remedial costs (for example, corrective advertising). Owners can claim damages by measuring

**19 • 28    ECONOMIC ANALYSIS OF NONPATENT INTELLECTUAL PROPERTY**

the diminution or dilution in the value of the mark.[168] Although statutes do not provide for the use of a royalty as a measure of an owner's damages, a number of Lanham Act cases have used it. This section discusses each of these damages methods.

*(i) Calculating Lost Sales*   An owner claiming profits on lost sales must demonstrate that the infringer's wrongful acts caused the loss. Methods used by owners' experts include the examination of three factors:

1. **Sales trends.** Experts often analyze sales trends in periods before and after the commencement of the wrongful acts. In *U-Haul v. Jartran* (a false advertising case),[169] the owner and infringer were the only two significant competitors in the market and the infringer's advertising directly targeted the owner. Trend analysis showed a noticeable change in the owner's sales trends and a commensurate increase in the infringer's sales following the wrongful acts. Conversely, in *Otis Clapp & Sons v. Filmore Vitamin*,[170] the court found that the owner's sales grew during the infringement period and declined after the infringement stopped, leading the court to conclude that the owner lost no sales.

2. **Projections.** The expert can compare the owner's actual sales following the infringer's wrongful acts with projections prepared in the normal course of business. In *Merriam-Webster v. Random House*, courts attributed the difference between projected and actual sales to the infringer's acts.[171]

3. **Market share.** Experts can also use market share approaches similar to those of some patent cases to estimate the additional sales that the owner would have made but for the infringer's wrongful acts. In *BASF Corp. v. Old World Trading Co., Inc.*,[172] the owner calculated its but-for market share of the infringer's sales as the owner's actual market share divided by the market share of all relevant competitors except the infringer.

Courts do not limit lost profits claims to the loss of past sales. In *Taco Cabana v. Two Pesos*,[173] a case involving trade dress infringement, the infringer entered a market in which the owner did not do business. The infringer's market entry, however, preempted the owner's entry into the same market, causing the owner to lose anticipated future profits.

In the much-litigated *Alpo Petfoods, Inc., v. Ralston-Purina Co.*,[174] the owner received the present value of future profits lost because the infringer's false advertising claim delayed a new product rollout. In this case, the court based the award on the owner's calculation of profits from projections for the new product rollout that the owner had prepared in the ordinary course of business.

The calculation of profits on lost sales deducts the incremental costs that the owner would have incurred to produce and sell the lost units. Although one can find occasional exceptions, all types of intellectual property cases, including Lanham Act cases, recognize this standard.

*(ii) Eroded Prices*   Owners in Lanham Act cases can claim price erosion if they can establish that they could have charged higher prices but for the infringer's wrongful acts. Proving such a premise often becomes difficult in trademark or false advertising cases, however, because many factors influence prices. If the infringer can

---

**19.6   DAMAGES**

demonstrate that the other c
owner's pricing policies, or t
infringer on price with or wit
sion will fail. For example, in
owner's price erosion claim b
petitors and pricing had histo

*(iii) Profits Lost Because of Ac
ing)*   Another type of lost pro
jected future cost to restore th
created by false advertising.
the owner's actual costs, as s
(2) the projected future costs
*Adry-Mart*.[178] The second loo
a measure of the harm to th
tures needed to correct the h

Several courts have critic
damages award, however. I
that the statute does not spe
of damages and stated:

> It is a surrogate for plaintiff'
> a defendant spends x amoun
> likely to lose x amount as a
> reasonable to suppose that
> ing campaign, it will enjoy
> Court has no basis for conc
> that either supposition fits
> basis for equating cost of a
> profit, we believe that there

The future incidence of
facts of the particular case a

*(iv) Damage to Goodwill*   Clai
dom appear in Lanham Act
part that not only infringes
aging advertising or marke

Such claims seek a type
forward claims for future l
to goodwill too speculative
*Cabana v. Two Pesos*,[181] the
award, even when awardin
fying such damages with p
to double (*Pioneer Leimel F
mark-Chicago v. E. Mishan*)
separate amount for dama

*(v) Reasonable Royalty*   Altho
a measure of an owner's lo
The nature of the property

...[168] Although statutes do not
... owner's damages, a number
...usses each of these damages

...n lost sales must demonstrate
... Methods used by owners'

...ds in periods before and after
...-Haul v. Jartran (a false adver-
... only two significant competi-
...g directly targeted the owner.
... the owner's sales trends and a
... following the wrongful acts.
...itamin,[170] the court found that
...ent period and declined after
...o conclude that the owner lost

...er's actual sales following the
...pared in the normal course of
...e, courts attributed the differ-
...infringer's acts.[171]

...share approaches similar to
...dditional sales that the owner
...ngful acts. In BASF Corp. v. Old
...l its but-for market share of the
...t share divided by the market
...fringer.

... of past sales. In Taco Cabana v.
...ent, the infringer entered a mar-
...ringer's market entry, however,
...causing the owner to lose antici-

...alston-Purina Co.,[174] the owner
...ause the infringer's false adver-
...case, the court based the award
...ons for the new product rollout
...se of business.

...s the incremental costs that the
...he lost units. Although one can
... property cases, including Lan-

...n claim price erosion if they can
...es but for the infringer's wrong-
...icult in trademark or false adver-
...ence prices. If the infringer can

demonstrate that the other competitors or market forces, or both, influenced the owner's pricing policies, or that the owner would have had to compete with the infringer on price with or without the alleged wrongful acts, a claim for price erosion will fail. For example, in *BASF v. Old World Trading Co.*,[175] the court denied the owner's price erosion claim because the relevant market encompassed several competitors and pricing had historically represented an important competitive tool.

*(iii) Profits Lost Because of Actual or Anticipated Additional Costs (Corrective Advertising)*   Another type of lost profits recovery has involved the owner's actual or projected future cost to restore the value of its trademark or correct the misimpression created by false advertising. Courts have awarded two types of such damages: (1) the owner's actual costs, as seen in *Cuisinarts, Inc., v. Robot-Coupe Int'l Corp.*,[176] and (2) the projected future costs, as observed in *Big O Tire v. Goodyear*[177] and *Adray v. Adry-Mart.*[178] The second looks to advertising expense incurred by the infringer as a measure of the harm to the owner's goodwill or the probable level of expenditures needed to correct the harm in the marketplace.

Several courts have criticized the use of corrective advertising as a basis for a damages award, however. In *The Gillette Co. v. Wilkinson Sword*, the court noted that the statute does not specifically provide for cost of advertising as a measure of damages and stated:

> It is a surrogate for plaintiff's profit only if it is reasonable to suppose that every time a defendant spends x amount on an advertising campaign, a competitor (plaintiff) is likely to lose x amount as a result. It is a surrogate for defendant's profit only if it is reasonable to suppose that every time a defendant spends x amount on an advertising campaign, it will enjoy profits of at least x amount on the resulting sales. The Court has no basis for concluding that either of these suppositions is reasonable, or that either supposition fits the facts of this case. In light of the absence of a factual basis for equating cost of advertising with either plaintiff's damages or defendant's profit, we believe that there is no statutory basis for a cost-of-advertising measure.[179]

The future incidence of awards for corrective advertising will depend on the facts of the particular case and the court's disposition.

*(iv) Damage to Goodwill*   Claims for damages resulting from harm to goodwill seldom appear in Lanham Act cases. Such cases involve some action on the infringer's part that not only infringes but also tarnishes the owner's business, such as disparaging advertising or marketing an inferior product under an infringing mark.

Such claims seek a type of present value of future lost profits. As with straightforward claims for future lost profits, courts sometimes find claims for damage to goodwill too speculative. In *DC Comics, Inc., v. Filmation Associates*[180] and *Taco Cabana v. Two Pesos*,[181] the court rejected such claims or affirmed a jury's lack of award, even when awarding other damages. Recognizing the difficulty of quantifying such damages with precision, courts have on occasion used their discretion to double (*Pioneer Leimel Fabrics, Inc., v. Paul Rothman Ind., Ltd.*)[182] or triple (*Artmark-Chicago v. E. Mishan*)[183] other compensatory awards rather than awarding a separate amount for damage to goodwill.

*(v) Reasonable Royalty*   Although statutes do not provide for the use of a royalty as a measure of an owner's lost profits, a number of Lanham Act cases have used it. The nature of the property and the facts of the case, however, must support the use

of a royalty award. For example, in *Gillette v. Wilkinson Sword*, the court found a royalty inappropriate because the wrongful act comprised an advertising campaign that emphasized differences between the parties' products. Courts have awarded royalties in cases in which the owner and infringer did not compete directly but the infringement created a false impression of association with the owner, such as in *Taco Cabana v. Two Pesos*. Further, in *Babbitt Electronic, Inc., v. Dynascan Corp.,*[184] the court awarded both an accounting of the infringer's profits (calculated as gross margin) and the owner's damages in the form of a reasonable royalty on infringing sales.

Lanham Act case law has no equivalent to the *Georgia-Pacific* case, in which the court identified 15 factors for evaluating a reasonable royalty in a patent case (see Chapter 20). Nothing prevents an expert on Lanham Act damages from borrowing concepts from *Georgia-Pacific* or other intellectual property cases as a framework for analysis, in spite of a lack of legal precedent for doing so. The expert should consider, however, the possibility of the opposing side raising a *Daubert* challenge if he or she does so.

Lanham Act case law suggests that one can base a royalty on established royalty, the going rate in the market, a license agreement, an infringer's offer to license, or other acceptable methods. No one method takes precedence. For example, the court in *Holiday Inns, Inc., v. Airport Holiday Corp.*[185] granted the owner a royalty for the infringer's unauthorized use of the Holiday Inn name at the "going rate in the marketplace" instead of the rate in effect during the license agreement prior to the agreement's termination.

Although this section has discussed the use of royalty as a measure of the owner's lost profits, a royalty can also measure the infringer's unjust enrichment as an avoided cost related to the infringed property. Indeed, a royalty's ability to represent both or either measure of damages appears to provide its appeal to some courts. In *Sands, Taylor & Wood v. Quaker Oats*, the Seventh Circuit reversed the award of profits and remanded, suggesting that a royalty would "more accurately reflect the extent of Quaker's unjust enrichment *and* the interest of (the plaintiff) that has been infringed" (emphasis added).[186]

### (c) Calculating the Infringer's Profits

In trademark infringement and false advertising cases, the court can award the infringer's profits under three distinguishable theories.

1. **Unjust enrichment.** Most cases award the infringer's profits to make the infringer forgo profit it would not have earned but for its wrongful acts and to restore those profits to the owner. Courts refer to such awards as *unjust enrichment*.

2. **Deterrence.** In some cases, the court awards the infringer's profits to deter future infringement, even when the court found the infringer to have acted in good faith. As demonstrated in *Playboy Enterprises, Inc., v. Baccarat Clothing Co., Inc.*, and *Otis Clapp & Son v. Filmore Vitamin Company*, courts sometimes view a recovery's primary purpose under the Lanham Act as making infringement an unprofitable activity.[187]

3. **Proxy for owner's damages.** The courts can award an infringer's profits as a proxy for the owner's damages because the infringer's wrongful act

prevented the owne[...]
calculation. Althou[...]
approximate dama[...]
would have made e[...]

The following section[...]
infringer's profits in Lan[...]

*(i) Burden of Proof in Estab[...]* and quantifying the infr[...] ever, an expert for an inf[...] tion or review the owner[...] data adequate to calcula[...] rely on a wide variety of[...]

*(ii) Apportioning Sales and[...]* sumers' choices of the co[...] tising and the brand ide[...] pricing, quality of the sa[...] and convenience. These [...] lectual property case, to[...] possibility of apportioni[...] indicates a significant di[...] the owner's damages an[...]

When quantifying sa[...] its, experts must ask wh[...] infringer's wrongful act[...] mark or false advertisin[...] the infringer. The owne[...] infringer's sales but for [...] the profits on the entire[...] factors contributed to th[...]

In contrast, an infring[...] the court should apport[...] other factors on the con[...] infringer can present a r[...] factors other than the all[...] based on the infringer's [...]

The burden for provi[...] with the infringer;[191] how[...] Courts have on occasion[...] testimony of fact witnes[...] infringer produced testi[...] came from customers sp[...] the infringer's profits reli[...] cent of the infringer's pr[...]

In practice, experts ca[...] ment. The simplest meth[...] offending content. For e[...]

_on Sword_, the court found a
sed an advertising campaign
ducts. Courts have awarded
not compete directly but the
n with the owner, such as in
_Inc., v. Dynascan Corp.,_[184] the
ofits (calculated as gross mar-
le royalty on infringing sales.
Georgia-Pacific case, in which
asonable royalty in a patent
Lanham Act damages from
ellectual property cases as a
precedent for doing so. The
the opposing side raising a

oyalty on established royalty,
n infringer's offer to license,
precedence. For example, the
granted the owner a royalty
nn name at the "going rate in
he license agreement prior to

alty as a measure of the own-
ger's unjust enrichment as an
eed, a royalty's ability to rep-
to provide its appeal to some
Seventh Circuit reversed the
yalty would "more accurately
d the interest of (the plaintiff)

ases, the court can award the
ies.

nfringer's profits to make the
d but for its wrongful acts and
refer to such awards as _unjust_

the infringer's profits to deter
nd the infringer to have acted
terprises, Inc., v. Baccarat Cloth-
Vitamin Company, courts some-
ler the Lanham Act as making

n award an infringer's profits
e the infringer's wrongful act

prevented the owner from establishing sufficient sales to provide a basis for calculation. Although based on the infringer's profits, awards of this type approximate damages in competitive relations, assuming that the plaintiff would have made each of the infringer's sales.[188]

The following sections discuss issues that experts encounter in calculating an infringer's profits in Lanham Act cases.

_(i) Burden of Proof in Establishing Sales_  The owner bears the burden of establishing and quantifying the infringer's sales of the infringing product. In practice, however, an expert for an infringer will almost always make an independent calculation or review the owner's calculation. If the infringer fails to maintain or produce data adequate to calculate sales with precision, courts have permitted owners to rely on a wide variety of estimation methods.[189]

_(ii) Apportioning Sales and Profits_  In the marketplace, many factors influence consumers' choices of the companies that they do business with. In addition to advertising and the brand identity associated with a trademark, these factors include pricing, quality of the sales force, functional and aesthetic features of the product, and convenience. These factors affect both the owner and the infringer in an intellectual property case, to the extent that they compete in the same market. The possibility of apportioning the infringer's profits in a Lanham Act case, however, indicates a significant difference in the conceptual approaches to awards based on the owner's damages and those based on the infringer's profits.

When quantifying sales to include in a calculation of the owner's lost profits, experts must ask whether the owner would have made the sale but for the infringer's wrongful acts. The owner need not demonstrate that the infringed mark or false advertising offered the sole reason consumers did business with the infringer. The owner must show only that the owner would have made the infringer's sales but for the wrongful act. The owner's lost profits will then equal the profits on the entire sale that the owner would have captured, even if other factors contributed to that sale.

In contrast, an infringer facing claims for the infringer's profits can argue that the court should apportion those profits to reflect the presence and influence of other factors on the consumers' decision to do business with the infringer. If the infringer can present a rational and reasonable means of calculating the effect of factors other than the alleged wrongful acts, the infringer can argue that an award based on the infringer's profits should represent something less than the whole.[190]

The burden for proving the reasonableness of any apportionment method rests with the infringer;[191] however, case law provides little guidance on apportionment. Courts have on occasion accepted theories based on little more than the subjective testimony of fact witnesses. For example, in _Holiday Inns v. Airport Holiday_,[192] the infringer produced testimony by an employee that only 30 percent of its business came from customers specifically seeking a Holiday Inn. The trial court's award of the infringer's profits relied on this testimony when the court ruled that only 30 percent of the infringer's profits related to the unauthorized use of its infringing signs.

In practice, experts can use several analytical techniques to establish apportionment. The simplest method quantifies the proportion of offending content to non-offending content. For example, the expert can calculate the proportion of square

inches of print or seconds of broadcast time devoted to the portion deemed false or misleading in an infringer's total advertising campaign. In other cases under the Lanham Act, as in copyright cases, the court has rejected this approach when the owner could demonstrate that the value of the wrongful message or misappropriated mark was disproportionate to its temporal and physical representation.

Experts can also use various types of surveys to quantify an apportionment of sales. In addition, when the facts of the case and available data permit, time series analyses of the infringer's sales and profits before and after the alleged wrongful act can help. Finally, experts can compare sales and profits for the alleged infringing product with noninfringing but otherwise comparable products sold by the infringer. This approach resembles the analytical method used in patent cases.

*(iii) Deduction of Costs*    As with apportionment of sales, the infringer bears the burden of proving expenses to deduct. When calculating damages based on the owner's lost sales, one should use incremental profits. The law lacks this clarity with respect to calculating the infringer's profits. At least two general approaches—incremental and percentage (i.e., fully allocated)—appear acceptable in certain situations, as well as a number of hybrids.

The infringer subject to an incremental cost approach can deduct only those expenses that vary with the production and sale of the infringing products at the level of production relevant to the case. The infringer using a percentage-basis (also known as *fully allocated* or *full absorption*) approach can deduct most or all of its costs of doing business to calculate the percentage basis, whether such costs increase incrementally at the relevant level of sales. Experts often allocate expenses between alleged infringing and noninfringing sales, when necessary, by applying a common expense percentage. They can base such percentages on the ratio of total expense to total sales but can also use ratios of units produced or percent of labor hours. The percentage-basis approach to cost deduction will result in a lower calculation of profits than a strictly incremental approach.

For example, assume that total expenses are $25 and that total revenues are $100 for infringing and noninfringing sales. Also assume that expenses increasing with production of the infringing product are only $5 and that the revenues for the infringing product are $50. The percentage-basis approach results in a $37.50, or 75 percent, profit for infringing sales. However, the incremental approach results in a $45, or 90 percent, profit for infringing sales.

Certain types of costs appear to receive unique treatment in Lanham Act cases without regard to the overall approach taken to cost deductions. Courts allow (*Carter Products, Inc., v. Colgate-Palmolive Co.*)[193] or deny (*S.C. Johnson & Son, Inc., v. Drop Dead Co.*)[194] deductions for advertising expenses when the content of such advertising forms the basis for the action. In at least one case, specifically *W.E. Bassett Co. v. Revlon, Inc.*,[195] the court denied deduction for the infringer's efforts at remediation (in this case, to relabel infringing goods).

Outside the context of litigation, experts will find that any of these methods provides an appropriate approach to calculating profits for various business purposes, and yet none of the methods follows generally accepted accounting principles, which govern the presentation of corporate financial information. We also advise experts to consider both the facts of the case and any known prejudices of the relevant circuit court in formulating opinions on the deduction of costs. To sum up, the authors note that beyond this point, here are dragons. Fly them at your own risk.

*(iv) Offset of Loss against Profit* periods or individual produ allow the owner to include claim. For example, in *Wol* infringer's attempt to offse with losses from other yea *King Corp. v. Mason*,[197] whi locations, the Eleventh Ci with loss years when a sing losses at one restaurant loc though the same infringer

*(v) Use of a Reasonable Roya* royalty offers an allowable er's profits, just as it pose Courts find royalty (or fra demonstrated by the follow

* A fraction of revenue from its wrongful acts
* Royalty awarded as a infringer's total profit

**(d) Statutory Damages and**

Owners can claim statuto feiting even without proc damages instead of actual ment. Statutory damages f per type of product, or u damages awarded depen lectual Property and Com as the Anticybersquatting statutory damages of not name in lieu of actual dam of the Lanham Act to pro Internet domain names th "distinctive," or "famous"

Prejudgment interest in use of funds wrongfully requires award of prejud profits. The economic bas when the court awards th did not compete (see Cha

Courts do not, howev under the Lanham Act so economic relevance for th awarding prejudgment i interest when it consider

to the portion deemed false
paign. In other cases under
rejected this approach when
wrongful message or misap-
l and physical representation
quantify an apportionment of
lable data permit, time series
nd after the alleged wrongful
profits for the alleged infring-
parable products sold by the
ethod used in patent cases.

. the infringer bears the burden
amages based on the owner's
v lacks this clarity with respect
neral approaches—incremental
otable in certain situations, as

proach can deduct only those
the infringing products at the
nger using a percentage-basis
proach can deduct most or all
ercentage basis, whether such
of sales. Experts often allocate
nging sales, when necessary, by
n base such percentages on the
ratios of units produced or per-
n to cost deduction will result in
nental approach.
$25 and that total revenues are
assume that expenses increasing
$5 and that the revenues for the
approach results in a $37.50, or
he incremental approach results

e treatment in Lanham Act cases
o cost deductions. Courts allow
or deny (*S.C. Johnson & Son, Inc.*,
penses when the content of such
least one case, specifically *W.E.*
ction for the infringer's efforts at
ods).
nd that any of these methods pro-
fits for various business purposes,
y accepted accounting principles,
ncial information. We also advise
d any known prejudices of the rel-
he deduction of costs. To sum up,
lragons. Fly them at your own risk.

*(iv) Offset of Loss against Profit—Products and Periods*  When an infringer has some time periods or individual products with profits and others with losses, most courts will allow the owner to include only profitable periods or products in its total damages claim. For example, in *Wolfe v. National Lead Co.*,[196] the Ninth Circuit rejected the infringer's attempt to offset profits made from infringement during certain years with losses from other years. Most courts have followed this approach. In *Burger King Corp. v. Mason*,[197] which involved an infringer's profits on multiple restaurant locations, the Eleventh Circuit permitted an infringer to offset profitable years with loss years when a single restaurant experienced both. The court did not allow losses at one restaurant location to offset profits incurred at another location, even though the same infringer owned and operated all locations.

*(v) Use of a Reasonable Royalty*  Although not provided for by statute, reasonable royalty offers an allowable alternative to other methods of computing an infringer's profits, just as it poses an alternative to computing an owner's lost profits. Courts find royalty (or fractions of revenues) useful in certain circumstances, as demonstrated by the following examples:

- A fraction of revenue used as a measure of an infringer's economic benefit from its wrongful acts when the infringer did not generate profits;[198] and
- Royalty awarded as an alternative when the court found disgorgement of the infringer's total profits a windfall to the owner.[199]

### (d) Statutory Damages and Other Remedies

Owners can claim statutory damages for trademark infringement by counterfeiting even without proof of monetary harm. The owner can choose statutory damages instead of actual damages at any time before the court renders final judgment. Statutory damages for counterfeiting range from $500 to $100,000 per mark per type of product, or up to $1 million for willful infringement. The statutory damages awarded depend on the opinion of the court only.[200] Finally, the Intellectual Property and Communications Omnibus Reform Act of 1999 (also known as the Anticybersquatting Consumer Protection Act) permits an owner to elect statutory damages of not less than $1,000 nor more than $100,000 per domain name in lieu of actual damages and profits. The act specifically amends Section 43 of the Lanham Act to prohibit the registration and bad faith intent to profit from Internet domain names that the court deems "confusingly similar" to registered, "distinctive," or "famous" marks.

Prejudgment interest in Lanham Act cases compensates the owner for the lost use of funds wrongfully diverted to or realized by the infringer. Economic logic requires award of prejudgment interest when the court awards the owner's lost profits. The economic basis for awarding prejudgment interest lacks such clarity when the court awards the infringer's profits or when the plaintiff and defendant did not compete (see Chapter 16).

Courts do not, however, consistently base awards of prejudgment interest under the Lanham Act solely on economic principles. Findings of bad faith lack economic relevance for this issue and the law does not require such findings for awarding prejudgment interest; however, courts appear more likely to award interest when it considers the violation "intentional" and "outrageous."[201] The

Second Circuit found that, even though the Lanham Act does not recognize prejudgment interest, the court can use its discretion regarding prejudgment interest, which nevertheless "is normally reserved for 'exceptional' cases."[202]

No single approach to calculating prejudgment interest has universal acceptance. Calculations at either the prime rate or the owner's borrowing rate have occurred, pursuant to the court's discretion. District courts have upheld compounding, but courts can deny compounding as they see fit.[203] Courts can also look to state statutory interest rates, particularly when the defendant violates state law in addition to actions under the Lanham Act.

Finally, Section 35 of the Lanham Act provides for awards of attorneys' fees in exceptional cases and such an award becomes automatic in cases of counterfeiting. The court can award other costs related to the action, including experts' fees and other items.[204]

The Lanham Act allows courts wide latitude to adjust an award of damages, either upward (up to a trebling) or downward, as warranted by the circumstances of the case. Such augmentation of damages under federal law must, however, "constitute compensation and not a penalty."[205] Conversely, courts can reduce the award on the grounds that some uncertainty in the lost profits calculation could result in an undue windfall to the owner.

Owners can seek punitive damages in Lanham Act cases under accompanying state unfair competition claims. Federal intellectual property laws do not otherwise provide for punitive damages.

## 19.7    DAMAGES ISSUES SPECIFIC TO TRADE SECRETS

Trade secret law derives not from federal statute but from common law, state regulations, and case law. A state-by-state discussion goes beyond the scope of this chapter; rather, we discuss the general themes of damages under trade secret law. For a discussion of the laws for a particular state, we recommend an *American Law Reports* annotation on trade secret damages.[206] See the appendix of this chapter for a comparison of various aspects of trade secrets with those of other types of intellectual property.

### (a) Standards for Injunctive Relief and Monetary Recovery

To establish liability, the owner must prove the following:

- The existence of a legally protectable trade secret;
- The infringer had a confidential relation with the secret's owner or improperly discovered the trade secret (such relation can exist by virtue of employment as between a company and its employees or by contract); and
- Use of the trade secret.[207]

Remedies available to the owner in a trade secrets case resemble those available in other nonpatent intellectual property actions and include injunction, recovery of damages, and disgorgement of the infringer's gains. Unlike copyright and Lanham Act cases, however, trade secret cases rarely result in perpetual injunction

because many courts pres[...] develop the secret informati[...] protecting the rights of the [...] for the length of time the us[...] using available information [...]

### (b) Calculating the Owner's D[...]

The standards for assessing [...] resemble those applicable to t[...] both the fact of damages and [...] the owner's loss.[209] The types [...] claim relief include profits o[...] lost profits, developmental c[...]

### (c) Calculating the Infringer's [...]

In most respects, issues in c[...] ham Act cases. The owner [...] to the extent that this doe[...] ries the burden of proving [...] resulted from factors other [...] do not offset gains from an [...] can yield damages where [...] owner's lost profits can inc[...] through increased costs, a[...] represents gain to the infri[...]

### (d) Reasonable Royalty and [...]

The courts have awarded [...] for the same reasons that o[...] form Trade Secrets Act rec[...] ate measure in certain case[...] other methods, the damag[...] imposition of liability for re[...] disclosure or use of a trade [...] *Corp. v. Engineering Researc[...]* royalty of 15 percent. The [...] profit apportionment becau[...] with the plaintiff's secret in[...]

No paradigm cases guid[...] calculating a royalty in a [...] *Georgia-Pacific* useful if th[...] resembles subject matter si[...]

State laws allow puniti[...] guidelines and standards a[...]

JAL PROPERTY

Act does not recognize pre-
rding prejudgment interest,
onal' cases."[202]

nterest has universal accep-
wner's borrowing rate have
t courts have upheld com-
ey see fit.[203] Courts can also
n the defendant violates state

awards of attorneys' fees in
matic in cases of counterfeit-
ction, including experts' fees

adjust an award of damages,
rranted by the circumstances
federal law must, however,
versely, courts can reduce the
lost profits calculation could

ct cases under accompanying
l property laws do not other-

### RETS

but from common law, state
ion goes beyond the scope of
of damages under trade secret
te, we recommend an *American*
See the appendix of this chap-
crets with those of other types

overy

llowing:

cret;

n the secret's owner or improp-
n can exist by virtue of employ-
es or by contract); and

ets case resemble those available
nd include injunction, recovery
ains. Unlike copyright and Lan-
ly result in perpetual injunction

---

because many courts presume that others could and would independently develop the secret information. Courts can accommodate this presumption while protecting the rights of the secret's owner by preventing use of the information for the length of time the usurpers would have needed to develop the information using available information and art.[208]

### (b) Calculating the Owner's Damages

The standards for assessing and calculating monetary damages for trade secrets resemble those applicable to trademark and copyright actions. The owner must prove both the fact of damages and a causal connection between the infringer's actions and the owner's loss.[209] The types of items for which an owner in a trade secrets case may claim relief include profits on diverted sales, eroded prices, remedial costs, future lost profits, developmental costs, harm to reputation, and royalties.[210]

### (c) Calculating the Infringer's Profits

In most respects, issues in calculating the infringer's profits mirror those in Lanham Act cases. The owner can claim both lost profits and the infringer's gains, to the extent that this does not result in double recovery. The infringer carries the burden of proving the extent to which a portion of the infringer's sales resulted from factors other than the theft.[211] Losses from one accounting period do not offset gains from another.[212] Analysis of damages by year and by product can yield damages where none would emerge at an aggregate level. Just as an owner's lost profits can include not only profits on lost sales but also profits lost through increased costs, any costs saved by the trade secret's unauthorized use represents gain to the infringer, and the courts can disgorge these amounts.[213]

### (d) Reasonable Royalty and Punitive Damages

The courts have awarded a reasonable royalty to the owner as damages, often for the same reasons that one finds such awards in Lanham Act cases.[214] The Uniform Trade Secrets Act recognizes the reasonable royalty remedy as an appropriate measure in certain cases by stating that "in lieu of damages measured by any other methods, the damages caused by misappropriation may be measured by imposition of liability for reasonable royalty for a misappropriator's unauthorized disclosure or use of a trade secret."[215] For example, in *Structural Dynamics Research Corp. v. Engineering Research Corp.*,[216] the court awarded the plaintiff a reasonable royalty of 15 percent. The court intended for the award to address the issue of profit apportionment because the defendants commingled use of their own skills with the plaintiff's secret information.

No paradigm cases guide royalty calculations for trade secrets cases. An expert calculating a royalty in a trade secrets case will, however, find guidance from *Georgia-Pacific* useful if the case involves a technical trade secret or otherwise resembles subject matter similar to that found in patents.

State laws allow punitive damages[217] but subject such awards to the same guidelines and standards as in other tort actions.

## 19.8  CONCLUSION

Copyrights, trademarks, and trade secrets call for similar approaches to calculating and thinking about damages from their infringement. However, differences in their economic characteristics lead to different approaches to damages in some instances. This chapter does not intend to endorse or criticize the views presented by various courts as related to trademark, trade secret, false advertising, and copyright cases but, rather, focuses on identifying standards and trends. The authors do not recommend any specific method of calculating damages without first considering the facts of a particular case.

*Appendix: Comparison of Intellectual Property Remedies*

| | Type of Intellectual Property | | | |
| --- | --- | --- | --- | --- |
| | Patent | Copyright | Trademark | Trade Secret |
| Protected Elements | The subject matter of a patent must be novel, not obvious, useful, and not a mere idea | "Original works of authorship fixed in any tangible medium of expression" | Any word, name, symbol, device, or combination thereof that a business uses to | "[I]nformation . . . that (1) derives independent economic value from not being known to . . . other |